IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN NURSES ASSOCIATION, <u>et al.</u>, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civ. Action No. 1:06cv1087 (HHK) |
| ) | |
| MICHAEL O. LEAVITT, <u>et al.</u>, ) | |
| ) | |
| Defendants. ) | |
| _____) | |

## <u>DEFENDANTS' MOTION TO DISMISS</u>

Pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6), defendants in the above-captioned action

respectfully move this Court for an order dismissing plaintiffs' complaint on the grounds that it is

not within the Court's subject-matter jurisdiction and that it fails to state a claim.  For the reasons in

support of these motions, defendants respectfully refer the Court to the attached memorandum of

points and authorities.   A proposed order is also attached.

<table>
<tr><td></td><td>Respectfully submitted,</td></tr>
<tr><td>OF COUNSEL:<br>DANIEL MERON<br>General Counsel</td><td>PETER D. KEISLER<br>Assistant Attorney General</td></tr>
<tr><td>KATHLEEN H. MCGUAN<br>Associate General Counsel</td><td>KENNETH L. WAINSTEIN<br>United States Attorney</td></tr>
<tr><td>MARK D. POLSTON<br>Deputy Associate General<br>Counsel</td><td><u>/s/ Peter Robbins</u><br>SHEILA M. LIEBER<br>PETER ROBBINS<br>Department of Justice</td></tr>
<tr><td>TRACEY GLOVER<br>Attorney<br>Department of Health<br>and Human Services</td><td>20 Massachusetts Avenue, N.W., Room 7142<br>Washington, D.C.  20530<br>Tel: (202) 514-3953<br>Attorneys for Defendants</td></tr>
</table>

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| AMERICAN NURSES ASSOCIATION, <u>et al.</u>, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civ. Action No. 1:06cv1087 (HHK) |
| | ) | |
| MICHAEL O. LEAVITT, <u>et al.</u>, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANTS' MEMORANDUM IN
SUPPORT OF THEIR MOTION TO DISMISS**

OF COUNSEL:

DANIEL MERON
General Counsel

KATHLEEN H. MCGUAN
Associate General Counsel

MARK D. POLSTON
Deputy Associate General
Counsel

TRACEY GLOVER
Attorney
Department of Health
and Human Services

PETER D. KEISLER
Assistant Attorney General

KENNETH L. WAINSTEIN
United States Attorney

SHEILA M. LIEBER
PETER ROBBINS
Department of Justice
20 Massachusetts Avenue, N.W., Room 7142
Washington, D.C.  20530
Tel: (202) 514-3953

Attorneys for Defendants

# **TABLE OF CONTENTS**

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

GENERAL BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.  Conditions of Participation and Nurse-Staffing Requirements. . . . . . . . . . . . . . . . . . . . 2

    B.  The State Survey. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    C.  The Accreditation Survey. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

STATUTORY BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    I.  PLAINTIFF NURSE ASSOCIATIONS LACK STANDING IN THEIR OWN
        RIGHT TO CHALLENGE COMPLIANCE POLICIES AT ACCREDITED
        HOSPITALS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

        A.  The Plaintiff Associations Cannot Borrow Harms Allegedly Suffered
            by Medicare Beneficiaries to Establish an Injury to Themselves. . . . . . . . . . . . . 20

        B.  Plaintiffs' Social Concern for the Welfare of Medicare Beneficiaries
            Does Not Establish an Injury to Themselves. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

        C.  The Organizational Interests of Nurse Associations Are Not Within
            the Zone of Interests of the Medicare Conditions of Participation. . . . . . . . . . . . 23

        D.  Plaintiffs Have Not Shown Any Causal Connection Between the
            Alleged Understaffing of Nurses and the Secretary's Choice of Survey Tracks. . . 24

   II.  PLAINTIFFS LACK ASSOCIATIONAL STANDING TO ASSERT THE
       PUTATIVE RIGHTS OF THEIR MEMBER NURSES. . . . . . . . . . . . . . . . . . . . . . . . . 28

        A.  Plaintiffs' Members Lack Injuries that are Traceable and Redressable
            for the Same Reasons as the Associations Themselves. . . . . . . . . . . . . . . . . . . . . 28

        B.  Plaintiffs' Members in Psychiatric Units Lack a Fairly Traceable Injury
            Because Nurse-Staffing Requirements at Psychiatric Hospitals Fall
            Outside the Deeming Statute. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

C.  The Desire of Plaintiffs' Members to Maintain High Standards of the Nursing Profession Does Not Establish a Legally Cognizable Injury. . . . . . . . . . . . . . . . . .  30

D.  Plaintiffs' Fear that Their Members May Be Harmed in the Future as Hospital Patients Is Too Speculative to Establish Standing. . . . . . . . . . . . . .  31

III.  REVIEW OF PLAINTIFFS' CLAIMS IS NOT AVAILABLE UNDER THE ADMINISTRATIVE PROCEDURE ACT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  31

A.  The Aggressiveness With Which the Secretary Enforces Nurse-Staffing Requirements is Committed to Agency Discretion by Law . . . . . . . . . . . . . . . . .  32

B.  The Comprehensive Enforcement Scheme Precludes a Private Cause of Action under the Administrative Procedure Act. . . . . . . . . . . . . . . . . . . . . . . .  33

IV.  PLAINTIFFS' CHALLENGES TO THE SECRETARY'S USE OF ACCREDITED STATUS TO SELECT SURVEY TRACKS FOR HOSPITALS ARE WITHOUT MERIT.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  36

A.  Because the Bedside-Immediacy Regulation Was Promulgated Under 42 U.S.C. § 1395x(e)(5), It Does Not Matter Whether Accreditation Standards Are Equivalent. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  36

B.  The Accreditation Standards of the Joint Commission Are Not Facially Incompatible with the Regulations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  40

C.  The Secretary Has Not Unlawfully Delegated His Enforcement Authority to the Joint Commission. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  41

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  45

## INTRODUCTION

This action attempts to challenge an enforcement scheme that has been successfully used by the Secretary of Health and Human Services for more than fifty years to make sure that hospitals meet basic requirements of the Medicare program.  To qualify for Medicare payment, health-care providers must satisfy certain "conditions of participation."  These requirements are enforced through surveys conducted by state agencies on behalf of the Secretary.  Hospitals that have been accredited by a recognized national authority are initially deemed to satisfy most of the conditions of participation, 42 U.S.C. § 1395bb(a)(1), but their compliance is subject to being verified by the Secretary by means of surveys conducted on the basis of representative samples and in response to substantial allegations of deficiencies at specific hospitals.  42 U.S.C. §§ 1395aa(c), 1395bb(d); 42 C.F.R. §§ 488.7, 488.10(c).  Unaccredited hospitals are surveyed on a periodic basis.  42 U.S.C. § 1395aa(a); 42 C.F.R. § 488.20.  Plaintiffs in this case essentially ask this Court to force the Secretary to survey all hospitals on the periodic basis, at least with respect to one particular condition of participation related to the staffing of registered nurses.  The complaint, which rests on a simple misreading of the statutory and regulatory scheme, should be dismissed for lack of subject-matter jurisdiction and failure to state a claim.

## GENERAL BACKGROUND

Title XVIII of the Social Security Act, commonly known as the Medicare Act, 42 U.S.C. §§ 1395, et seq., establishes a federal health insurance program for the elderly and disabled.  A health-care provider that wishes to participate in Medicare must enter into an agreement with the Secretary, 42 U.S.C. § 1395cc, in which it promises to comply with all applicable conditions of participation.  42 U.S.C. § 1395cc(b)(2)(B).  A provider found to be out of compliance with any conditions of participation is entitled to judicial review in district court, 42 U.S.C. § 1395cc(h)(1), but only after exhaustion of a detailed administrative hearing process.  See 42 C.F.R. §§ 498.1-

498.103.  Since the beginning of the Medicare program, Congress has "intended that the remedies

provided by" this review procedure "shall be exclusive."  S. Rep. No. 89-404 at 55 (1965),

reprinted in 1965 U.S.C.C.A.N. 1943, 1995.

**A.  Conditions of Participation and Nurse-Staffing Requirements**

The conditions of participation for hospitals are forth in 42 U.S.C. § 1395x(e).  For

purposes of this case, the statute can be divided into two parts.  The first eight paragraphs describe

specific characteristics that a hospital must have to participate in Medicare.  42 U.S.C.

§§ 1395x(e)(1)-(8).  The ninth paragraph is a catch-all provision that mandates compliance with

"such other requirements as the Secretary finds necessary in the interest of the health and safety of

individuals who are furnished services in the institution."  42 U.S.C. § 1395x(e)(9).

The portion of the statute relevant to this case is paragraph (5), which requires the hospital

to provide "24-hour nursing service rendered or supervised by a registered professional nurse" and

to have "a licensed practical nurse or registered professional nurse on duty at all times."  42 U.S.C.

§ 1395x(e)(5).  Regulations interpreting paragraph (5) are set forth at 42 C.F.R. § 482.23.  To meet

the requirements of paragraph (5), the hospital "must have an organized nursing service that

provides 24-hour nursing services" and those "nursing services must be furnished or supervised by

a registered nurse."  42 C.F.R. § 482.23.[1]  For a hospital to meet this test, four features are

necessary.  First, the nursing service must be "well-organized" and governed by "a plan of

administrative authority and delineation of responsibilities for patient care."  42 C.F.R. § 482.23(a).

Second, the nursing service must be run by a "director" who is "a licensed registered nurse" and

---

[1] See also 42 C.F.R. § 482.23(b)(1) (hospital "must provide 24-hour nursing services
furnished or supervised by a registered nurse, and have a licensed practical nurse or registered
nurse on duty at all times," except where a waiver has been granted under 42 C.F.R.
§ 405.1910(c)).

who is "responsible for the operation of the service, including determining the types and numbers of nursing personnel and staff necessary to provide nursing care for all areas of the hospital." Id. Third, nurses must administer drugs and biologicals in accordance with federal and state laws and "accepted standards of practice." 42 C.F.R. § 482.23(c). Finally, the hospital must "have adequate numbers of licensed registered nurses, licensed practical (vocational) nurses, and other personnel to provide nursing care to all patients as needed," and "[t]here must be supervisory and staff personnel for each department or nursing unit to ensure, when needed, the immediate availability of a registered nurse for bedside care of any patient." 42 C.F.R. § 482.23(b).

 Plaintiffs in this action challenge whether the Secretary is conducting compliance surveys often enough to properly enforce this last standard at nationally accredited hospitals. The gravamen of their complaint is that the regulations that govern the frequency of the surveys place unlawful emphasis on whether a hospital has earned accreditation from a nationally recognized authority. Before the substance of this argument is addressed, it is useful to begin by examining the nature of the state survey process and comparing it to the survey methodology used by the relevant private authority for purposes of hospital accreditation.

### B.  The State Survey

 To determine a hospital's compliance with the conditions of participation, state surveyors are instructed to conduct a "patient-focused" survey, State Operations Manual, App. A, Survey Protocol, Regulations and Interpretative Guidelines for Hospitals, Introduction at 12 (HHS Rev. 1, September 21, 2004) ("State Operations Manual") (Def. Ex. A), that employs a combination of "observations, interviews, and document/record reviews." Id. at 4. The survey is designed to "focus attention on actual and potential patient outcomes," rather than merely verifying that a hospital formally possesses institutional structures that correspond to the "required processes" set

forth in the relevant statutes and regulations.  Id. at 13.  The centerpiece of the survey is to select a

sample of patients whose care is "reflective of the scope of services provided by the hospital," id. at

12, and to then undertake a "comprehensive review of care and services received by each patient in

the sample."  Id. at 15.  During the course of this sample review, there are numerous ways in which

deficiencies in nurse staffing could come to light.

      One part of the process requires the surveyors to physically "[v]isit patient care settings"

and "[o]bserve the actual provision of care and services to patients and the effects of that care," id.

at 13, "by stationing themselves as physically close to patient care as possible."  Id. at 15.  With

patient permission, the surveyors are instructed to "observe the care provided in a variety of

treatment settings," including "intravenous therapy, tube feedings, [and] wound dressing changes."

Id.  This "[o]bservation of the care environment provides valuable information about how the care

delivery system works and how hospital departments work together to provide care," id., including

"staff interactions with patients, safety hazards, and infection control practices."  Id. at 15-16.

While conducting these observations, the surveyors also are instructed to "[m]aintain open and

ongoing dialogue with the facility staff," id. at 15, and "afford[] facility staff the opportunity to

present additional information or to offer explanations concerning identified issues."  Id.  Thus, if

surveyors observed slowness in response to the needs of patients for immediate bedside care, they

could investigate further to determine whether understaffing was a problem and could compare the

answers given to that question by the registered nurse in charge, the other nurses on the floor, the

hospital administration, and the patients themselves.

      A second part of the process is to conduct interviews with patients and hospital staff, both

"to collect information" in the first instance and "to verify and validate information obtained

through observations."  Id. at 16.  The manual instructs that "[p]atient interviews should include

questions specific to the patient's condition, reason for hospital admission, quality of care received, and the patients['] knowledge of their plan of care." Id. at 17.  "Staff interviews should gather information about the staff's knowledge of the patient's needs, plan of care, and progress toward goals." Id.  Surveyors are instructed to ask "open-ended questions" to patients about "the quality of the services received," id., and "to validate the patient's perception" against the perceptions of the staff.  Id.  The interview process is intended to be a flexible one that is used "throughout the duration of the survey" as the need for discussion arises.  Id. at 16.  Thus, a nurse-staffing deficiency missed through physical observations of the care received by the patient sample might be identified separately through these interviews.

The third part of the survey process is document review.  At this stage, "[p]atient's clinical records" are reviewed to "validate information gained during the interviews" and to "provide a broad picture of the patient's care." Id. at 18.  Medical records may be used to "determine past practice," to evaluate "the scope or frequency of a deficient practice," and to "provide information about services that are not being provided." Id.  The document review also includes "[s]taffing documents to determine if adequate numbers of staff are provided according to the number and acuity of patients," and "[p]ersonnel files to determine if staff members have the appropriate educational requirements, have had the necessary training required, and are licensed, if it is required." Id.  Once the "document review is completed," the surveyors are to "integrate the data obtained with data gathered through observations and interviews to decide if the hospital is in compliance." Id.  During the review of medical, staffing and personnel records, deficiencies in nurse-staffing might also come to light.

In evaluating the hospital for compliance with nurse-staffing requirements specifically, surveyors are instructed to pay particular attention to two kinds of documents.  The first is the

formal "nurse staffing schedule" used by the hospital.  State Operations Manual, Regulations and Interpretive Guidelines for § 482.23(b) at A-0202.  The surveyor is instructed to examine this schedule "for a one-week period," to verify that "there is at least one [registered nurse] for each unit on each tour of duty, 7 days a week, 24 hours a day," id. at A–0202, and to determine that the written staffing schedules demonstrate that "there is supervision of personnel performance and nursing care for each department or nursing unit."  Id. at A-0201.  A licensed practical nurse can be assigned to provide services to patients, so long as a registered professional nurse, "who is immediately available for bedside care of those patients, supervises that care."  Id. at A-0202.  A registered nurse is not considered to be "immediately available" if he or she is "working on more than one unit, building, [or] floor in a building" or is assigned to more than one health-care provider or more than one "distinct part" (such as a psychiatric unit or skilled nursing facility) within the hospital.  Id. at A-0201.  Aside from that formal requirement, the adequacy of the staffing schedule is otherwise evaluated in a flexible manner that takes into consideration the "[p]hysical layout and size of the hospital," the "[n]umber of patients," the "[i]ntensity of illness and nursing needs," the "[t]raining and experience of personnel," and the "[a]vailablity of nurses' aides and orderlies and other resources for nurses."  Id.

        The examination of the nurse-staffing schedule is only the beginning of the document inquiry, however.  The second – and arguably more important – aspect of the process requires the surveyors to "[r]eview medical records to determine if patient care that is to be provided by nurses is being provided as ordered."  Id.  In this regard, the surveyor does not rely on any particular ratio of registered nurses to patients to determine whether appropriate care is being provided.  Rather, the survey focuses on "actual and potential patient outcomes," State Operations Manual, Introduction at 13, as indicators of whether the hospital is sufficiently staffed.  If the medical

records indicate that patient outcomes which one would expect to be good if a hospital had adequate staffing of nurses are, in fact, not good, this circumstance is taken as a strong indication that nursing may be understaffed.  The mere fact that the formal staff schedule appears to have a full complement of appropriately credentialed nurses is not, standing alone, taken to be conclusive evidence of compliance with the nurse-staffing regulations.

### C.  The Accreditation Survey

The Joint Commission on Accreditation of Healthcare Organizations ("Joint Commission" or "JCAHO") is a non-profit corporation that sets "state-of-the-art standards" for the health-care industry, JCAHO Facts at 1,[2] and conducts "accreditation programs in conjunction with those standards."  Wilk v. AMA, 895 F.2d 352, 372 (7th Cir. 1990).  Since its founding in 1951 as the Joint Commission on Accreditation of Hospitals ("JCAH"), JCAHO has been engaged in a continuous process of developing and refining its accrediting practices "in consultation with health care experts, providers, measurement experts, purchasers and consumers." JCAHO Facts at 1.  Accreditation by the Joint Commission is regarded as "a nationwide seal of approval that indicates a hospital meets high performance standards."  JCAHO Fast Track at 1.[3]

Hospital accreditation is reviewed approximately every three years using a survey methodology that combines observation, interviews, review of staffing plans, and analysis of patient outcomes in a manner not dissimilar from the state surveys used by the Secretary to enforce Medicare conditions of participation.  A central feature of the accreditation survey is an on-site visit that employs an approach, known as the "tracer methodology," where surveyors follow "the course

---

[2] Facts about the Joint Commission on Accreditation of Health Care Organizations, available online at http://www.jointcommission.org/AboutUs/joint_commission_facts.

[3] Accreditation Programs – Hospitals – Fast Track (JCAHO 2006), available at http://www.jointcommission.org/AccreditationPrograms/Hospitals.

of a type of care, treatment, and service provided to the patient by the hospital." Comprehensive

Accreditation Manual for Hospitals: The Official Handbook at ACC-12 ((JCAHO 2006) ("Joint

Commission Manual") (Def. Ex. B). The tracer process includes "interactive sessions with the

surveyor(s) and organization staff that explore the performance of important patient-related

functions that cross the organization." Id. at ACC-13. These aspects of the accreditation survey

bear obvious similarities to the observational and interview phases of the state surveys.

The accreditation survey also relies on the review of staffing plans and patient outcomes in

a manner similar to the state surveys. To receive accreditation, a hospital must "provide the right

number of competent staff to meet patients' needs," and it must have "the appropriate level of

staffing to fulfill its mission and meet the needs of the population(s) served." Id. at HR-1. The

level of nurse staffing is an area of special concern. To meet accreditation standards, the hospital

must have a nurse executive who "participates with hospital leaders in defining nursing care needs

of the patient population" and "in providing for a sufficient number of appropriately qualified

nursing staff members to assess each patient's nursing care needs." Id. at NR-1. Among other

things, the nurse executive is responsible for developing a "nurse staffing" plan, id. at NR-8, that

provides for the availability of a "qualified staff" to provide "patient care and services on a

continuous basis, 24 hours a day, 7 days a week." Id. at NR-1. To be properly qualified, the

nursing staff "must include Registered Nurses (RNs)" and "may include others," including

"Licensed Practical or Vocational Nurses." Id. at GL-14.

Once it is determined that a hospital has, on paper, a nurse-staffing plan that provides for

24-hour nursing service, the next step is to determine whether the hospital has "an adequate number

and mix of staff" that is both "consistent with the hospital's staffing plan" and adequate "to meet the

care, treatment, and service needs of the patients." Id. at HR-7. This inquiry involves more than

"just 'numbers.'" Id. at HR-8b. It focuses on the "effectiveness" of staffing "in relation to" the "provision of needed care, treatment, and services." Id. at HR-8a.

The analysis begins with the proposition that "[e]ffective staffing" is "linked to positive patient outcomes and improved quality and safety of care," id. at HR-8a, a conclusion that has been repeatedly confirmed by scientific studies,[4] and is endorsed by plaintiffs themselves.[5] To determine whether patient outcomes consistent with effective nurse staffing exist, the hospital is required to identify certain indicators that, based on "[k]nowledge about staffing issues likely to impact patient safety or quality of care," id. at HR-8b, are considered to be both "nursing-sensitive" and "staffing-related," id. at HR-8a, in that one would expect to find good results where hospitals were properly staffed and poor results where the hospital did not have enough nurses available. The hospital then must develop, through empirical analysis, baseline levels of "desired performance" for each indicator. Id. at HR-8c. Where ongoing analysis reveals that nursing-sensitive outcomes "do not meet performance expectations," the "underlying causes" for the disparity are then investigated "to screen for possible nurse staffing issues," id. at HR-8a, and the hospital is required to take "appropriate action in response." Id. at HR-8c.

---

[4] A recent Harvard University study commissioned by the Secretary concluded that certain clinical outcomes have a strong correlation to levels of nurse-staffing. Jack Needleman & Peter Buerhaus, et al., Nurse Staffing and Patient Outcomes in Hospitals (Feb. 28, 2001 Final Report, Contract No. 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), available at http://bhpr.hrsa.gov/nursing/staffstudy.htm. Academic researchers have drawn the same conclusion. See, e.g., Lucian L. Leape, et al., Systems Analysis of Adverse Drug Events, 274 JAMA 35, 39 (July 5, 1995) (medication errors correlate with nurse-staffing problems).

[5] See. e.g., ANA study: More nurses, better patient outcomes, American Nurse 2 (May/June 2000) (American Nurses Association finds nurse-staffing levels correlate with positive outcomes).

Four indicators are used to measure the adequacy of nurse staffing. Two of these measures must be "clinical/service indicators," id., at HR-8b, that focus on patient outcomes.[6] The other two must be "human resource indicators," id., that focus on the attitudes and job performance of the nurses themselves.[7] By this means, the accreditation process is designed to "assess and continuously improve staffing effectiveness," id. at HR-2, through an "objective, evidence-based approach." Id. at HR-8a.

## STATUTORY BACKGROUND

The legal question that plaintiffs are attempting to raise in this action concerns the frequency with which the Secretary must conduct surveys for compliance with the "bedside immediacy" standard in 42 C.F.R. § 482.23(b) at hospitals that have received accreditation from the Joint Commission. The Secretary surveys accredited hospitals on a representative sample basis and in response to substantial allegations of deficiencies at specific hospitals. 42 C.F.R. § 488.7.

---

[6] Clinical/service indicator subjects include areas such as complaints by patients and their family members, adverse drug events, injuries to patients, skin breakdown, pneumonia, post-operative infections, urinary tract infections, upper gastrointestinal bleeding, shock/cardiac arrest, length of stay, death among surgical inpatients with treatable serious complications (failure to rescue), pressure ulcer prevalence, falls prevalence, falls with injury, restraint prevalence, catheter-associated urinary-tract infection in intensive-care unit patients, central line catheter-associated blood stream infection rate for intensive-care unit and high-risk nursery patients, ventilator-associated pneumonia for intensive-care unit and high-risk nursery patients, and smoking cessation counseling for acute myocardial infarction, heart failure and pneumonia patients. Id. at HR-8c-8d.

[7] These include personnel matters, such as overtime, staff vacancy rate, staff satisfaction, staff turnover rate, staff injuries on the job, on-call or per diem use, sick time, and use of nurses from outside agencies. Id. at HR-8d. The idea here is that deficiencies in nurse-staffing are likely to show up in job dissatisfaction and performance problems. The Joint Commission's survey handbook requires that "[a]ll nursing staff (including registered nurses, licensed practical nurses, and nursing assistants or aides)" must be "included in the human resource indicators," although "[d]ecisions regarding stratification of data by discipline are left to the hospital." Id. at H-8c (emphasis omitted). In other words, so long as registered nurses are among the nursing employees included in the human resource indicator, it is not necessary to create a separate indicator solely to address their overtime, vacancy rates, staff satisfaction, etc.

Plaintiffs apparently think that the bedside-immediacy standard should be separately enforced on the basis of periodic surveys in the same way that all nurse-staffing standards are surveyed at unaccredited hospitals. 42 C.F.R. § 488.20. To evaluate this contention, it is necessary to briefly review the historical development of the relevant statutory scheme.

Medicare was originally conceived of as an "insurance program," 42 U.S.C. § 1395c, that would pay benefits to the elderly and disabled in essentially the same manner as a private insurer. See 42 U.S.C. §§ 1395h, 1395u (employing insurance companies to process claims as "intermediaries" and "carriers"). Congress did not intend to create a regulatory program that would police the medical professions or superintend the administration of hospitals. To emphasize this point, the very first section of the Medicare Act states as follows:

> Nothing in this subchapter shall be construed to authorize any Federal officer or employee to exercise any supervision or control over the practice of medicine or the manner in which medical services are provided, or over the selection, tenure, or compensation of any officer or employee of any institution, agency, or person providing health care services; or to exercise any supervision or control over the administration or operation of any such institution, agency, or person.

42 U.S.C. § 1395. Rather, the guiding philosophy of the Medicare program was "to support the efforts of the various professional accrediting organizations sponsored by the medical and hospital associations, health insurance plans, and other interested parties to improve the quality of care in hospitals." S. Rep. No. 89-404 at 29 (1965), reprinted in 1965 U.S.C.C.A.N. at 1969.

As originally enacted in 1965, the provision at 42 U.S.C. § 1395x(e) defined the term "hospital" according to eight standards. The requirement for 24-hour nursing service and supervision by a registered nurse was set forth in paragraph (5), using the same language that exists today. 42 U.S.C. § 1395x(e)(5) (Supp. IV 1965-69). The catch-all provision for "such other requirements as the Secretary finds necessary in the interest of the health and safety of individuals"

was originally in paragraph (8).  42 U.S.C. § 1395x(e)(8) (Supp. IV 1965-69).  Any requirement

imposed under the catch-all provision, however, could "not be higher than the comparable

requirements prescribed for the accreditation of hospitals by the Joint Commission on

Accreditation of Hospitals."  Id.  In addition, Congress mandated that "an institution shall be

deemed to meet the requirements" under paragraph (5) and all but one other subsection of

§ 1395x(e), "if such institution is accredited as a hospital by the Joint Commission on Accreditation

of Hospitals."  42 U.S.C. § 1395bb (Supp. IV 1965-69).[8]  The confluence of these two provisions

produced the result that accredited hospitals were "conclusively presumed" to meet nurse-staffing

(and almost all other) conditions of participation without any compliance inspection whatsoever by

any government official.  S. Rep. No. 89-404 at 29, reprinted in 1965 U.S.C.C.A.N. at 1970.  The

Secretary's enforcement powers were limited to inspections of unaccredited hospitals by means of

surveys performed by state agencies under contract with the Secretary.  42 U.S.C. § 1395aa(a)

(Supp. IV 1965-69).

   This state of affairs swiftly ran into criticism.  In 1967, the Health Insurance Benefits

Advisory Council ("HIBAC")[9] argued that it was "inappropriate to continue statutory delegation to

a private agency of all the Government's authority to safeguard quality of care paid for by a

government program" and urged that the ultimate "authority to establish policy on minimum quality

should be retained by the Government."  HIBAC Annual Report on Medicare 9 (1966-67).  The

_____

   [8] The one hospital standard that was not automatically deemed to be satisfied by JCAH
accreditation was the requirement for a utilization-review plan in subsection (e)(6), which could
be deemed to be satisfied "[i]f such Commission, as a condition of accreditation of a hospital,
requires a utilization review plan or imposes another requirement which serves substantially the
same purpose."  42 U.S.C. § 1395bb(a) (Supp. IV 1965-69).

   [9] HIBAC was established in 1965 to monitor the Medicare program and make
recommendations for changes in annual reports to Congress.  42 U.S.C. § 1395dd (1965).  Its
function is now performed by the Medicare Payment Advisory Council.  42 U.S.C. § 1395b-6.

Council urged Congress to "remove the present limitations on the Secretary's authority to establish health and safety standards for hospitals." Id. at 10.  Academic commentators also urged Congress to undertake a related reform that would demote accreditation from being a conclusive indicator to being merely "prima facie evidence of compliance" that would be subject to verification through subsequent "certification inspection" in some manner by the state agencies that surveyed unaccredited hospitals.  William Worthington & Laurens H. Silver, Regulation of Quality of Care in Hospitals:  The Need for Change, 35 Law & Contemp. Probs. 305, 324 (1970).  The 1965 statute, the reformers complained, gave "quasi-public status" to a "totally private body unaccountable to the public or to the government." Id. at 325.

Congress responded to these criticisms in § 244 of the Social Security Act Amendments of 1972, Pub. L. No. 92-603, 86 Stat. 1329, 1422-23 (1972).  The drafters agreed that "[s]everal problems have arisen with respect to the JCAH role in the medicare certification process."  S. Rep. No. 92-1230 at 61 (1972).  One problem was that "the Federal agencies responsible to the Congress for the administration of medicare" were "not in a position to audit the validity of the overall JCAH survey process and thus are unable to determine the extent to which specific deficiencies may exist in the vast majority of participating hospitals." Id.  A second problem was that the Medicare statute, as it then existed, "serves as an almost total and blanket delegation of authority over hospital standards to a private agency," id. at 62, because "medicare is barred from setting any standards which are higher than comparable JCAH requirements" and "[t]his has been interpreted" by the Secretary "to also bar establishment of any standards in an area where JCAH has remained silent." Id. at 61-62.

To remedy these perceived problems, Congress made three changes in the statutory scheme. First, it added a new subsection (c) to 42 U.S.C. § 1395aa, which authorized the Secretary to enter

into agreements with state agencies to survey JCAH-accredited hospitals. These surveys of accredited hospitals were to be conducted "on a selective sample basis" and "where the Secretary finds that a survey is appropriate because of substantial allegations of the existence of a significant deficiency or deficiencies which would, if found to be present, adversely affect health and safety of patients." 42 U.S.C. § 1395aa(c); see also S. Rep. No. 92-1230 at 62. Second, Congress added a new subsection (b) to 42 U.S.C. § 1395bb which provided that an accredited hospital found (through a sample-based or allegation-driven survey) to have "significant deficiencies" shall "be not deemed to meet the requirements" of 42 U.S.C. § 1395x(e), "[n]otwithstanding any other provision of this title." 42 U.S.C. § 1395bb(b) (1976). Finally, Congress amended 42 U.S.C. § 1395aa so as to not only remove the prohibition against "catch-all" health and safety requirements more stringent than accreditation standards, but to actually forbid the Secretary from granting "deemed" status with respect to JCAH standards less stringent than the Secretary's requirements, unless the Secretary made a finding that the JCAH standards were substantially equivalent. The effect of these changes was to restrict the statutory and regulatory requirements for which accreditation conferred "deemed" status and to limit the effect of "deemed" status from conclusive evidence of compliance to a provisional assumption of compliance subject to validation through sample-based and allegation-driven state surveys.

Since 1972, the statutory scheme has undergone several amendments (not relevant here) that have broadened the range of accrediting authorities that are qualified to confer temporary "deemed" status, broadened the range of health-care entities subject to being granted "deemed" status, and made other changes. The statutory language currently in effect provides that, if "an institution is accredited as a hospital by the Joint Commission on Accreditation of Hospitals," 42 U.S.C. § 1395bb(a)(1), "then, such institution shall be deemed to meet the requirements," 42

U.S.C. § 1395bb(a), of, among other things, the "24-hour nursing service" provision in 42 U.S.C.

§ 1395x(e)(5).[10]  However, this "deemed status" is provisional only, and it may subsequently be

revoked if "the Secretary finds that a provider entity has significant deficiencies," 42 U.S.C.

§ 1395bb(d), after a sample-based or allegation-driven validation survey is conducted pursuant to

42 U.S.C. § 1395aa(c).  Therefore, all hospitals, whether accredited or not, are required at all times

to meet the nurse-staffing standards set forth in 42 U.S.C. § 1395x(e) and regulations promulgated

thereunder, and no hospital can rest easy that substandard practices will go undetected by a

government survey.

Although "deemed status" for JCAHO-accredited hospitals is automatic for the nurse-

staffing requirements in 42 U.S.C. § 1395x(e)(5), the same is not true with respect to "such other

requirements as the Secretary finds necessary in the interest of the health and safety of individuals

who are furnished services in the institution."  42 U.S.C. § 1395x(e)(9).  For such standards, an

accredited hospital "shall be deemed to meet the requirements," 42 U.S.C. § 1395bb(a)(1), except

for "any standard, promulgated by the Secretary" that "is higher than the requirements prescribed

for accreditation" by the Joint Commission.  42 U.S.C. § 1395bb(a)(4).  With respect to such higher

paragraph (9) standards, accreditation is deemed to meet the regulatory requirements only if the

Commission "imposes a standard which the Secretary determines is at least equivalent to the

standard promulgated by the Secretary."  42 U.S.C. § 1395bb(a).  As in the case of nurse-staffing

requirements, a hospital deemed to meet paragraph (9) requirements by virtue of JCAHO

accreditation is still subject to having its compliance verified through sample-based and allegation-

---

[10] To achieve preliminary "deemed" status, the hospital must authorize the release of the
most current accreditation survey and any related information that the Secretary may require
(including corrective action plans), 42 U.S.C. § 1395bb(a)(2)(A), and the Commission must
actually release the survey.  42 U.S.C. § 1395bb(a)(2)(B).

driven validation surveys, 42 U.S.C. § 1395aa(c), and to having its deemed status revoked if significant deficiencies are found.  42 U.S.C. § 1395bb(d).

## STATEMENT OF THE CASE

Plaintiffs in this action are three professional associations that advocate the interests of member nurses.  Compl. at ¶¶ 9-11.  The gravamen of their complaint is that the Secretary erred when he concluded that the "bedside immediacy" requirement in 42 C.F.R. § 482.23(b) was promulgated under his authority to implement the nurse-staffing provision in 42 U.S.C. § 1395x(e)(5), rather than under his catch-all authority to establish "other" standards for health and safety under 42 U.S.C. § 1395x(e)(9).  See Compl. at ¶ 28.[11]  On the basis of this erroneous proposition, plaintiffs contend that it is unlawful for the Secretary to deem hospitals accredited by the Joint Commission to be in provisional compliance with the bedside-immediacy portion of the nurse-staffing regulation, pursuant to 42 U.S.C. §§ 1395bb(a)(1)-(2), and, in turn, that it is unlawful for him to rely on the sample-based and allegation-driven survey track in 42 U.S.C. § 1395aa(c) and 42 C.F.R. § 488.7 to enforce compliance with that particular provision, unless he first makes a finding that the accreditation standards are "at least equivalent" to the provision.  42 U.S.C. § 1395bb(a).  Although the complaint does not say so in so many words, plaintiffs apparently believe that enforcement of the "bedside immediacy" regulation – but no other nurse-staffing standard – belongs on the periodic survey track described in 42 U.S.C. § 1395aa(a) and 42 C.F.R. § 488.20, see Compl. at ¶¶ 39-40, and, for that reason, the Secretary has "failed to establish a system to ensure adequate registered nurse staffing in violation of 42 C.F.R. [§] 482.23."  Compl. at ¶ 1.  In

---

[11] The preamble to the regulations states that all nurse-staffing requirements were promulgated under "Section 1861(e)(5) of the Social Security Act."  51 Fed. Reg. 22,010, 22,018 (June 17, 1986).  The statute codified at 42 U.S.C. § 1395x(e)(5) is § 1861(e)(5) of the Social Security Act.

addition, plaintiffs accuse the Secretary of "unlawfully delegating to a private party" – the Joint

Commission – "the authority to determine the sufficiency of its standards when measured against

the . . . conditions of participation." Id. at ¶ 2.

By way of injury, plaintiffs allege that unidentified hospitals at which their members might

work "have consistently failed to provide sufficient registered nurse staffing to make a registered

nurse immediately available when needed," id. at ¶ 41, and this is causing their nurse-members and

Medicare beneficiaries to suffer various harms. Id. at ¶¶ 42-46. These averments are most

noteworthy, however, for what they do not allege. The complaint does not say whether the

hospitals that plaintiffs believe are understaffed are accredited or unaccredited. Nor does it allege

that registered nurses are more plentiful at unaccredited hospitals (subject to periodic surveys) than

at accredited ones (subject to sample-based and allegation-driven surveys). Nor does it aver that

plaintiffs or their members have attempted to bring any hospital-specific complaints of nurse-

staffing deficiencies to the attention of the Secretary, so that he might institute an allegation-driven

survey of the offending institutions, pursuant to 42 U.S.C. § 1395aa(c) and 42 C.F.R. § 488.7. The

complaint draws no direct connection, therefore, between the complained-of government action –

the placement of "bedside immediacy" enforcement on the sample-based/allegation-driven survey

track rather than on the periodic track – and any injuries that plaintiffs allege they are suffering

from the alleged understaffing of registered nurses.

The relief requested by plaintiffs is equally curious. If the problem alleged in the complaint

is that (a) the Secretary has incorrectly characterized the bedside-immediacy regulation as having

been promulgated under the aegis of paragraph (5), rather than paragraph (9), of 42 U.S.C.

§ 1395x(e), and (b) he has therefore wrongfully deemed accredited hospitals to be in provisional

compliance with the bedside-immediacy requirement under 42 U.S.C. § 1395bb, and (c) he has

consequently placed accredited hospitals on the wrong survey track for purposes of enforcing the bedside-immediacy regulation under 42 U.S.C. § 1395aa, then the logical remedy would be to (a) remand the case to the Secretary to make a determination, pursuant to 42 U.S.C. § 1395bb(a), as to whether the Joint Commission's standards are "at least equivalent" to the bedside-immediacy requirement and (b) enjoin the Secretary, in the meantime, from enforcing the requirement through means other than periodic surveys until such a finding of equivalence is made. Plaintiffs' complaint asks for neither remedy, however.

Instead, plaintiffs ask this Court to make up two entirely new systems of enforcement. First, plaintiffs ask the Court to order the Secretary to "establish a system to ensure that JCAHO standards are at least equivalent to those established by the Secretary," Compl. at ¶ 53, although they do not identify any source of law that authorizes the Secretary to tell the Joint Commission how to conduct its private business. Second, they ask the Court to order the Secretary to "set aside" the deemed status of accredited hospitals (at least with respect to the bedside-immediacy requirement); to grant hospitals "provisional approval" to continue to receive Medicare payments; and to "ensure that hospitals" – by which plaintiffs apparently mean accredited hospitals – "comply with the registered nurse staffing regulation." Compl. at ¶ 52. In seeking this second remedy, plaintiffs do not appear to understand that, at least since 1972, "deemed" status has never accorded accredited hospitals anything more than "provisional" approval to receive Medicare payments to begin with. Nor do they appear to understand that the Secretary already has a "system" – the sample-based and allegation-driven surveys authorized by 42 U.S.C. § 1395aa(c) – for enforcing compliance at accredited hospitals and that he has the power under 42 U.S.C. § 1395bb(d) to find hospitals to be out of compliance notwithstanding their accredited status. Unless plaintiffs are attempting to argue, at a much higher level of generality, that the Secretary is merely not doing a

-18-

sufficiently aggressive job of enforcing compliance no matter which survey track he uses, it is not clear that the second form of relief sought by plaintiffs is even different from the status quo about which they purport to complain.

## ARGUMENT

Plaintiffs' claim is patently baseless on the merits. No serious argument can be made that the bedside-immediacy standard nestled in the middle of the nurse-staffing regulation at 42 C.F.R. § 482.23 implements anything other than the statutory requirements in 42 U.S.C. § 1395x(e)(5), as the preamble to the regulation plainly states. 51 Fed. Reg. at 22,018. The doubts that plaintiffs attempt to raise about whether the Joint Commission's nurse-staffing standards are equivalent to the regulation are legally irrelevant, since such equivalency could only matter here if the regulation were promulgated under 42 U.S.C. § 1395x(e)(9). At the threshold, however, plaintiffs' complaint suffers from numerous jurisdictional defects that make it unnecessary to reach the merits.

## I. PLAINTIFF NURSE ASSOCIATIONS LACK STANDING IN THEIR OWN RIGHT TO CHALLENGE COMPLIANCE POLICIES AT ACCREDITED HOSPITALS.

At the outset, plaintiffs do not meet the requirements necessary to have standing to bring the suit at all. It is well settled that "an asserted right to have the Government act in accordance with law is insufficient, standing alone, to confer jurisdiction on a federal court." Allen v. Wright, 468 U.S. 737, 754 (1984); see also Arizonans for Official English v. Arizona, 520 U.S. 43, 64 (1997) ("An interest shared generally with the public at large in the proper application of the Constitution and laws will not do."). Rather, a plaintiff objecting to a government policy must allege four things. First, he must show that he himself has suffered "personal injury." Raines v. Byrd, 521 U.S. 811, 818 (1997) (quoting Allen, 468 U.S. at 751) (emphasis added in Raines). Second, he must demonstrate that the injury is "fairly traceable to the defendant's allegedly unlawful conduct,"

Daimler/Chrysler Corp. v. Cuno, 126 S. Ct. 1854, 1861 (2006) (quoting Allen, 468 U.S. at 751),

and not to "the independent action of some third party not before the Court." Lujan v. Defenders of

Wildlife, 504 U.S. 555, 560 (1992) (quoting Simon v. E. Kentucky Welfare Rights Org., 426 U.S.

26, 41-42 (1976)).  Third, "it must be 'likely,' as opposed to merely 'speculative,' that the injury will

be redressed by a favorable decision." Id. at 561 (quoting Simon, 426 U.S. at 38, 43).  Finally, the

alleged injury must represent the "invasion of a legally protected interest," id. at 560, that "arguably

[falls] within the zone of interests to be protected or regulated," FEC v. Akins, 524 U.S. 11, 20

(1998), by the specific source of law "whose violation forms the legal basis for his complaint."

Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 883 (1990).  In this case, the only injury to their own

interests that is alleged by the plaintiff nurse associations is articulated in their complaint as

follows:  the Secretary's enforcement of the bedside immediacy regulation at accredited hospitals

by means of sample-based and allegation-driven surveys, rather than periodic surveys, encourages

hospitals to allow putative deficiencies in "registered nurse staffing" to go "unchecked," Compl. at

¶ 42, and plaintiffs, in turn, are "concerned" that resulting nurse-to-patient ratios might "seriously

endanger the health and well-being of the patients who seek Medicare-reimbursed health care

services" at the allegedly understaffed hospitals.  Id. at ¶ 43.  However well-intentioned, concern

for such an attenuated threat to the well-being of strangers is insufficient to establish standing.

> **A.  The Plaintiff Associations Cannot Borrow Harms Allegedly Suffered by Medicare Beneficiaries to Establish an Injury to Themselves.**

First, plaintiffs cannot simply borrow an injury allegedly faced by Medicare beneficiaries to

support their own standing to sue in federal court.  The "Art. III judicial power exists only to

redress or otherwise protect against injury 'to the complaining party.'" Vermont Agency of Natural

Res. v. United States ex rel. Stevens, 529 U.S. 765, 771 (2000) (quoting Warth v. Seldin, 422 U.S.

490, 499 (1975) (emphasis added in <u>Vermont Agency</u>).  To have the personal injury necessary for

standing, a plaintiff must therefore allege that he has suffered "a distinct and palpable injury to

<u>himself</u>," <u>Gladstone Realtors v. Village of Bellwood</u>, 441 U.S. 91, 100 (1979) (emphasis added),

and not merely "that injury has been suffered by <u>other[s]</u>," <u>Warth</u> , 422 U.S. at 502 ((emphasis

added), even where the injury is alleged to be "shared by a large class of other possible litigants."

<u>Id</u>. at 501.  In the absence of a "next friend" or similar legal relationship that places the plaintiff

directly in the shoes of the allegedly injured person, the Supreme Court has repeatedly held that a

plaintiff cannot base his standing on injuries alleged to have been suffered by someone else, <u>Elk</u>

<u>Grove Unified Sch. Dist. v. Newdow</u>, 542 U.S. 1, 17 (2004) (non-custodial parent cannot complain

of injuries to daughter over objection of custodial parent); <u>Whitmore Arkansas</u>, 495 U.S. 149, 154-

66 (1990) (one prison inmate cannot complain of injuries allegedly suffered by another inmate

during court proceedings); <u>Conn v. Gabbert</u>, 526 U.S. 286, 292-93 (1999) (lawyer cannot complain

about injury to his client), and it has instructed that this limitation should be enforced with

particular care where the success of the plaintiff's case "may have an adverse effect on the person

who is the source of the plaintiff's claimed standing."  <u>Elk Grove</u>, 542 U.S. at 17.

   In this case, the plaintiff nurse associations claim no "next friend" or other legal relationship

with Medicare beneficiaries, and the interests they seek to vindicate are potentially antagonistic to

those of beneficiaries.  As their complaint makes clear, plaintiffs' ultimate objective in the case is to

produce a lower ratio of registered nurses to patients at hospitals that participate in Medicare.

Compl. at ¶ 44.  But a lower ratio of nurses to patients could be achieved in two ways.  One way

would be for the hospitals to hire more nurses, but a second way would be to reduce admissions.

The latter expedient might serve the interests of registered nurses in having their workloads reduced

to what they consider to be more manageable levels, but it might impair the ability of Medicare

beneficiaries to obtain hospital care at all. Plaintiff nurse associations therefore would be a particularly poor champion for the interests of beneficiaries, even if they otherwise had standing to complain of alleged injuries to patients.[12]

### B. Plaintiffs' Social Concern for the Welfare of Medicare Beneficiaries Does Not Establish an Injury to Themselves.

It would do no good, of course, for plaintiffs to attempt to couch an injury to themselves as an organization in terms of an interference with their desire to "actively promote[]" what they conceive to be "patient safety" or "appropriate staffing" in hospitals. Compl. at ¶ 9. It is well-settled that the federal courts are not a soapbox for "organizations or individuals who seek to do no more than vindicate their own value preferences," Sierra Club v. Morton, 405 U.S. 727, 740 (1972), or assert "generalized grievances more appropriately addressed in the representative branches." Elk Grove, 542 U.S. at 12 (citation omitted); see also Arizonans, 520 U.S. at 64-65 (quoting Diamond v. Charles, 476 U.S. 54, 62 (1986) ("The decision to seek review 'is not to be placed in the hands of 'concerned bystanders'" or "persons who would seize it 'as a vehicle for the vindication of value interests'"). Thus, a mere policy "'interest in a problem,' no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem" is insufficient to create standing. Sierra Club, 405 U.S. at 739.

---

[12] To the extent that plaintiffs seek to assert the putative rights of Medicare beneficiaries (as opposed to merely borrowing their alleged injuries), the complaint should also be dismissed because they have not shown a separate injury to themselves, they do not have any contractual or other legally-relevant relationship with beneficiaries, and they have not alleged that beneficiaries suffer from an impairment that hinders them from defending their own putative rights. Plaintiffs therefore also fail the prudential test for third-party standing. See Powers v. Ohio, 499 U.S. 400, 411 (1991); see also Charles Alan Wright, Arthur R. Miller, Edward H. Cooper & Richard D. Freer, 13 Federal Practice and Procedure § 3531.4 at 945 (Supp. 2006) ("the rules that limit standing to assert the rights of others begin from the premise that a person who is not injured cannot rely on another's injury").

> [I]f a 'special interest' in [a] subject were enough to entitle [one organization] to commence this litigation, there would appear to be no objective basis upon which to disallow a suit by any other bona fide 'special interest' organization however small or short-lived.  And if any group with a bona fide special interest could initiate such litigation, it is difficult to perceive why any individual citizen with the same bona fide special interest would not also be entitled to do so.

Id. at 739-40.  Because plaintiffs' "[f]rustration" with the Secretary's Medicare enforcement policies is merely a policy-oriented "[c]onflict between a defendant's conduct and an organization's mission," it is precisely "the type of abstract concern that does not impart standing."  Ctr. for Law & Educ. v. Dep't of Educ., 396 F.3d 1152, 1161-62 (D.C. Cir. 2005) (quoting NTEU v. United States, 101 F.3d 1423, 1429 (D.C. Cir. 1996)).

## C.  The Organizational Interests of Nurse Associations Are Not Within the Zone of Interests of the Medicare Conditions of Participation.

Even if plaintiffs could show some injury to their ability to function as advocacy organizations, however, standing would still be lacking because their ability to function as advocacy organizations is not within the "zone of interests protected by the law invoked."  Elk Grove, 542 U.S. at 12 (quoting Allen, 468 U.S. at 751).  A plaintiff cannot meet the zone-of-interests test merely by alleging that a regulatory scheme protects or regulates someone else's interests in a way that might indirectly affect his own.  See Air Courier Conference v. Am. Postal Workers Union, 498 U.S. 517, 522-31 (1991); Lujan v. Nat'l Wildlife Fed'n, 497 U.S. at 883.  He must show that "the procedures in question are designed to protect [or regulate] some concrete interest of his that is the ultimate basis of his standing. "  Ctr. for Law, 396 F.3d at 1157 (quoting Defenders of Wildlife, 504 U.S. at 573 n.8) (emphasis in Ctr. for Law).  Plaintiffs do not meet that test here.

The Medicare Act generally establishes a medical insurance program for "individuals who are age 65 and over and are eligible for retirement benefits," as well as certain disabled persons and

persons suffering from end-stage renal disease.  42 U.S.C. § 1395c (emphasis added).  It is for the

protection of those individuals that the conditions of participation exist.  The parties regulated by

the conditions of participation are hospitals.  These sources of law simply make no "mention of

advocacy organizations' interests."  Ctr. for Law, 396 F.3d at 1157.  Nor do they regulate the

conduct of advocacy groups.  Any effect on nurses is incidental.  See Air Courier Conference, 498

U.S. at 522-31 (work-related interests of postal employees found to be outside zone of interests of

statute regulating international mail); Nat'l Wildlife Fed'n, 497 U.S. at 883 (hypothetical interests of

court reporters in gainful employment would be outside zone of interests of statute mandating on-

the-record hearings).  An association representing the interests of nurses would therefore fall

outside the zone of interests of the Medicare conditions of participation.

> **D.  Plaintiffs Have Not Shown Any Causal Connection Between the Alleged Understaffing of Nurses and the Secretary's Choice of Survey Tracks.**

Even if plaintiffs' claim to personal injury could survive to this point, however, the

complaint does not establish that their alleged injuries are fairly traceable to the complained-of

governmental conduct or likely to be redressed by a favorable decision.  To establish traceability,

plaintiffs must show, in some "concretely demonstrable way," Warth, 422 U.S. at 504, that there is

"a connection between the alleged injury in fact and the alleged conduct of the defendant," Vermont

Agency, 529 U.S. at 1861 (citing Simon, 426 U.S. at 41), that is not "too attenuated," Allen, 468

U.S. at 752, to establish causation and redressability.  As the Supreme Court has explained, where

"the plaintiff himself is an object of the action (or foregone action) at issue," there is "ordinarily

little question that the action or inaction has caused him injury, and that a judgment preventing or

requiring the action will redress" it.  Defenders of Wildlife, 504 U.S. at 561-62.  Where, however,

"a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of

regulation) of <u>someone else</u>, much more is needed," because "it becomes the burden of the plaintiff

to adduce facts" showing that the injury-inducing "choices" made by "the regulated (or regulable)

third party" are fairly traceable to a particular "government action or inaction" to which the plaintiff

objects. <u>Id</u>. at 562 (emphasis in original). "Thus, when the plaintiff is not himself the object of the

government action or inaction he challenges, standing is not precluded, but it is ordinarily

'substantially more difficult' to establish." <u>Id</u>. at 562 (quoting <u>Allen</u>, 468 U.S. at 758, and citing

<u>Simon</u>, 426 U.S. at 44-45, and <u>Warth</u>, 422 U.S. at 505).

     In this case, all of the injuries alleged in plaintiffs' complaint, Compl. at ¶¶ 42-46, stem

from the single alleged condition that "there are hospitals" in the United States that "have

consistently failed to provide sufficient registered nurse staffing to make a registered nurse

immediately available, when needed," by patients. <u>Id</u>. at ¶ 41. However, the connection between

the injury-inducing staffing practices (on the part of third-party hospitals) and the complained-of

enforcement policy (on the part of the Secretary) is "only speculative," <u>Linda R.S. v. Richard D.</u>,

410 U.S. 614, 618 (1973), and therefore fails to establish causation and redressability.

     The complaint does not allege, for instance, that unaccredited hospitals (which are subject

to periodic surveys) are staffed more completely than accredited hospitals, so that it might be

possible to lay the discrepancy at the doorstep of the different survey tracks. Nor is there any

logical reason to suppose that accredited hospitals subject to sample-based and allegation-driven

surveys might be more likely to risk non-compliance with nurse-staffing regulations than

unaccredited hospitals subject to periodic surveys. Even if the hospital administrators were to

calculate that the odds of getting caught are less when sample-based, rather than periodic, surveys

are used, the specter of an allegation-driven survey surely would give them pause. Inasmuch as

hospitals compete with each other based in large part on their reputations, it is not unreasonable to

think that the allegation-driven survey (whether prompted by complaints from patients, watchdog groups, or the institution's own nurses) would have the greatest in terrorem effect of all. The prospect of losing accreditation might be held in similar regard. There is no reason to think that compliance behavior on the part of hospitals is necessarily influenced in a more positive direction by periodic surveys than by recurring accreditation surveys by the Joint Commission, followed up by sample-based and allegation-driven surveys by state authorities.

In addition, plaintiffs' complaint proffers no coherent reason why periodic surveys conducted by state agencies should necessarily be presumed to catch nurse-staffing deficiencies that accreditation surveys overlook. As was discussed above, there are significant similarities between the state surveys conducted on behalf of the Secretary, for purposes of enforcing the hospital conditions of participation, and the surveys conducted by the Joint Commission, for purposes of accreditation. Both surveys require the hospital to show that it has a 24-hour nursing service that meets the needs of patients. Both require the presence of a supervising registered nurse. To enforce these standards, both methodologies employ what can be termed a "gauntlet-style" approach that assumes that deficiencies in nurse staffing will not escape notice when the hospital's operations are examined from various different angles. Both rely on direct observation of patient care. Both rely on interviews with patients and staff. Both examine nurse-staffing plans. Both examine medical records to determine if patient outcomes are consistent with a well-staffed nursing service. The accreditation survey goes one step further by also examining whether human resource indicators are consistent with proper staffing.[13]

---

[13] Plaintiffs' contention that an additional measure used exclusively by the Joint Commission – the human resources indicators – do not survey registered nurses separately from other nurses, Compl. at ¶ 36, overlooks the fact that the state surveys do not use a human resources indicator at all. Thus, whatever deficiencies in registered nurses plaintiffs believe

The only real difference between the two survey methods is one of wording.  The

Secretary's manual states that a licensed practical nurse can provide care to patients, so long as a

supervising registered nurse is "immediately available for the bedside care of those patients," State

Operations Manual, Regulations and Interpretive Guidelines for § 482.23(b) at A-0202, and it adds

that a registered nurse would not be considered to be "immediately available" if he or she were

assigned to two floors or units at the same time.  Id. at A-0201.  The Joint Commission's manual

does not address "bedside immediacy" as a separate standard in so many words, but it is difficult to

imagine that a hospital understaffed in this manner would be considered appropriately staffed or

that this defect would escape notice during the combination of direct patient observations, staff and

patient interviews, examination of staffing plans, and evaluation of outcome-based indicators

described above.[14]  In light of the multi-dimensional methodology and outcome-oriented focus of

the accreditation inquiry, there is little reason to think that the absence of certain "magic words" in

its survey manual is seriously likely to result in significant differences in accreditation and state

survey results.  Plaintiffs have therefore failed to establish that the injury-causing understaffing of

registered nurses, if it exists, is fairly traceable to the provisional "deemed" status of accredited

---

"may go undetected" in the human-resources inquiry in the accreditation process, id. (emphasis
added), are no more likely to be detected in the periodic state survey.

[14] Plaintiffs' contention that the Joint Commission's nurse-staffing standards are "totally
devoid of standards and requirements concerning the immediate availability of a registered nurse
to render bedside care to" patients, Compl. at ¶ 33 – is merely a cleverly worded half-truth.
Although it is true, as was discussed above, that the accreditation survey manual does not
mention bedside immediacy in so many words or instruct surveyors to make sure that the same
registered nurse is not assigned to more than one floor or unit at the same time, it does (a) require
the hospital to have a "nurse staffing" plan, Joint Commission Manual at NR-8, that provides for
the availability of a "qualified staff" to provide "patient care and services on a continuous basis,
24 hours a day, 7 days a week," id. at NR-1; (b) demand that the hospital provide "a sufficient
number of appropriately qualified nursing staff members to assess each patient's nursing care
needs," id.; and (c) stipulate that a properly qualified nursing staff "must include Registered
Nurses (RNs)."  Id. at GL-14.

hospitals or the Secretary's use of sample-based and allegation-driven surveys to enforce compliance with the "bedside immediacy" regulation.

## II.  PLAINTIFFS LACK ASSOCIATIONAL STANDING TO ASSERT THE PUTATIVE RIGHTS OF THEIR MEMBER NURSES.

Plaintiffs fare no better to the extent that they seek to bring suit on behalf of their member nurses.  To have standing to represent their members, plaintiffs must first establish that the "members would have standing in their own right," Arizonans, 520 U.S. at 66, and that the members' claims are otherwise within the court's subject-matter jurisdiction.  Shalala v. Illinois Council on Long Term Care, Inc., 529 U.S. 1, 24 (2000).  They must also show that "the interests at stake are germane to the organization's purpose" and that "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 181 (2000).  All the claims plaintiffs seek to bring here on behalf of their members fail the first test, and some fail the second, as well.

### A.  Plaintiffs' Members Lack Injuries that are Traceable and Redressable for the Same Reasons as the Associations Themselves.

Like the injuries asserted by plaintiffs as organizations, each of the harms that plaintiffs allege their members may suffer, Compl. at ¶¶ 43-46, stems from the underlying assertion that hospitals "have consistently failed to provide sufficient registered nurse staffing to make a registered nurse immediately available when needed." Id. at ¶ 41.  For the same reasons as their parent associations, plaintiffs' individual members therefore fail the tests of traceability and redressability.  The analysis of associational standing can end here.  The assertion of associational standing, however, is deficient for other reasons, as well.

**B.    Plaintiffs' Members in Psychiatric Units Lack a Fairly Traceable Injury Because Nurse-Staffing Requirements at Psychiatric Hospitals Fall Outside the Deeming Statute.**

Plaintiffs' contention that nurses "who work in psychiatric units are at greater risk [of] suffering violent incidents when there are inadequate numbers of registered nurse staffing," Compl. at ¶ 45, also fails the tests of traceability and redressability for another reason.  The conditions of participation that psychiatric hospitals (and separate psychiatric units within hospitals) must meet are set forth separately in 42 U.S.C. § 1395x(f).  Under 42 U.S.C. § 1395x(f)(2), psychiatric hospitals must satisfy the conditions of participation for hospitals set forth at 42 U.S.C. §§ 1395x(e)(3)-(9), but they also must meet "such staffing requirements as the Secretary finds necessary for the institution to carry out an active program of treatment for individuals who are furnished services in the institution."  42 U.S.C. § 1395x(f)(4).  Comprehensive nurse-staffing requirements for psychiatric hospitals are set forth at 42 C.F.R. § 482.62(d), and they include psychiatric-specific mandates that "[t]he staffing pattern must insure the availability of a registered professional nurse 24 hours each day," 42 C.F.R. § 482.62(d)(1), and "[t]here must be adequate numbers of registered nurses, licensed practical nurses, and mental health workers to provide the nursing care necessary under each patient's active treatment program."  42 C.F.R. § 482.62(d)(2).  Although JCAHO accreditation was once deemed to satisfy these staffing requirements, 42 U.S.C. § 1395x(f)(5) (1984), the statutory section that so provided was repealed by § 2340(a) of the Deficit Reduction Act of 1984, Pub. L. No. 98-369, 98 Stat. 494, 1093 (1984).  The regulations therefore provide that the "additional special staffing . . . requirements that are considered necessary for the provision of active treatment in psychiatric hospitals" are excluded from the list of conditions of participation that can be deemed to be satisfied – even provisionally – by accredited status.  42 C.F.R. § 488.5(a)(2).  These requirements are enforced by means of periodic surveys already.  Any

lack of registered nurses on psychiatric units therefore is not traceable to reliance on accredited status and would not be redressed by an order requiring the Secretary to enforce nurse-staffing requirements by means of periodic surveys.

###    C.    The Desire of Plaintiffs' Members to Maintain High Standards of the Nursing Profession Does Not Establish a Legally Cognizable Injury.

Plaintiffs' next contention – that the use of sample-based and allegation-driven surveys to enforce the bedside-immediacy standard causes understaffing that, in turn, places "registered nurses in the untenable position of providing health care services in a manner that does not comport with the high professional standards of the nurses who work for affected hospitals," Compl. at ¶ 43 – merits little discussion.  Assuming arguendo, that "decreased job satisfaction" can theoretically qualify as a "noneconomic injury" sufficient to support standing in some circumstances, the plaintiff must, at a minimum, allege "a direct and specific injury to such interests." Minnesota Fed'n of Teachers v. Randall, 891 F.2d 1354, 1358 n.6 (8th Cir. 1989).  In the absence of a particularized averment that a particular nurse is suffering a particular impairment of a particular professional standard, the allegations in plaintiffs' complaint are merely examples of the generalized "vocational nexus" and "professional interest" theories found by the Supreme Court in Lujan to be too nebulous to sustain standing.  504 U.S. at 565 (wildlife groups lack standing based on allegation that government policies may reduce worldwide populations of species that naturalists study).

In any event, the professional satisfaction of plaintiffs' members is not within the zone of interests regulated or protected by the relevant Medicare statutes.  The conditions of participation regulate hospitals for the benefit of patients.  Any effect on the professional satisfaction of nurses who work at regulated hospitals is purely incidental.  Air Courier Conference, 498 U.S. at 522-31; Nat'l Wildlife Fed'n, 497 U.S. at 883.

-30-

### D.  Plaintiffs' Fear that Their Members May Be Harmed in the Future as Hospital Patients Is Too Speculative to Establish Standing.

Plaintiffs' final standing contention – that their members may someday be "consumers" of hospital care as Medicare patients themselves and may experience harm to their health care because of nurse understaffing caused by the use of sample-based and allegation-driven surveys, Compl. at ¶ 46 – is creative, but unavailing.  Once again, in the absence of a <u>particularized</u> allegation that a <u>particular</u> nurse-member is currently a Medicare patient in actual or imminent danger of suffering a <u>particularized</u> diminution in the quality of medical service, the allegation is merely an example of the kind of "some day" worries that are too nebulous to sustain standing.  <u>Defenders of Wildlife</u>, 504 U.S. at 564.  In addition, the purpose of the plaintiff associations is to assert the professional interests of their members, not to provide their members with nursing care.  The alleged injury to plaintiffs' members <u>qua</u> patients is therefore not germane to the mission of the plaintiff associations <u>qua</u> associations.

## III.  REVIEW OF PLAINTIFFS' CLAIMS IS NOT AVAILABLE UNDER THE ADMINISTRATIVE PROCEDURE ACT.

Even if plaintiffs' complaint could survive its standing defects, their claims cannot be maintained under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.  Although the APA generally grants a right of judicial review to parties aggrieved by final agency action, 5 U.S.C. § 702, so long as there is no other remedy available in court, 5 U.S.C. § 704, it contains two important exceptions.  One precludes judicial review where "agency action is committed to agency discretion by law."  5 U.S.C. § 701(a)(2).  The other precludes review where "statutes preclude judicial review."  5 U.S.C. § 701(a)(1).  Both exceptions are relevant here.

### A. The Aggressiveness With Which the Secretary Enforces Nurse-Staffing Requirements is Committed to Agency Discretion by Law.

To the extent that plaintiffs are merely attempting to allege, in a generalized sense, that the Secretary is not using enough vigor to enforce compliance with conditions of participation related to hospital staffing of registered nurses, the complaint clearly should be dismissed because the manner in which the Secretary chooses to commit his "finite compliance resources" to enforce regulations, Bowen v. Am. Hosp. Ass'n, 476 U.S. 610, 647 (1986), is "committed to agency discretion by law," 5 U.S.C. § 701(a)(2), because there is "no law to apply." S. Rep. No. 79-752 at 26 (1945). The analysis begins and ends with the leading case, Heckler v. Chaney, 470 U.S. 821 (1985), in which the Supreme Court held that the Secretary's "refusal to take requested enforcement action" with respect to a particular statutory scheme committed to his administration must be presumed to be "committed to an agency's absolute discretion," id. at 831, unless "the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers." Id. at 833. This principle applies with full force to the Secretary's decisions "whether to undertake enforcement actions" to enforce Medicare conditions of participation. Beverly Health & Rehab. Servs., Inc. v. Thompson, 223 F. Supp. 2d 73, 89 (D.D.C. 2002); see also id. at 92 & n.18; cf. Arent v. Shalala, 70 F.3d 610, 614 (D.C. Cir. 1995) (Secretary's refusals to take "enforcement action" entitled to presumption of unreviewability).

In this case, the only guideline that Congress has provided to the Secretary for enforcement of hospital conditions of participation in general is that he must make an agreement with any state willing and able to do so that the state will survey hospitals for compliance with conditions of participation, 42 U.S.C. § 1395aa(a), and plaintiffs do not allege that the Secretary has failed to do so here. The only other relevant mandate is that the Secretary may not deem a hospital accredited

by the Joint Commission to be in provisional compliance, 42 U.S.C. § 1395bb(a), and therefore subject to the sample-based and allegation-driven survey track, 42 U.S.C. §§ 1395aa(c), 1395bb(d), with respect to a "catch-all" regulation promulgated under 42 U.S.C. § 1395x(e)(9), where (a) the paragraph (9) standard "is higher than the standards prescribed for accreditation" by the Joint Commission, 42 U.S.C. § 1395bb(a)(4), and (b) the Secretary has not determined that the Joint Commission standard is "at least equivalent" to the standard promulgated by the Secretary. 42 U.S.C. § 1395bb(a). Thus, plaintiffs' claims survive scrutiny under 5 U.S.C. § 701(a)(2) only to the extent that plaintiffs allege that the Secretary erred in construing the bedside-immediacy regulation at 42 C.F.R. § 482.23(b) to have been promulgated under 42 U.S.C. § 1395x(e)(5), and not § 1395x(e)(9). To the extent, that the complaint alleges a "failure to act" to "ensure adequate nurse staffing," Compl. at ¶¶ 1, 5, at any higher level of generality, the complaint should be dismissed.

## B. The Comprehensive Enforcement Scheme Precludes a Private Cause of Action under the Administrative Procedure Act.

Anything that might remain of the complaint should also be dismissed, however, on the ground that "statutes preclude judicial review" within the meaning of 5 U.S.C. § 701(a)(2). In Block v. Community Nutrition Institute, 467 U.S. 340 (1984), the Supreme Court found review to be precluded in a case similar to this one where a statutory scheme gave administrative and judicial remedies to certain regulated entities (milk processors known as "handlers"), but not to the public or other interested parties. Noting that "[w]hether and to what extent a particular statute precludes judicial review is determined not only from its express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved," id. at 345, the Court held that Congress intended for APA review to be limited to the claims of those regulated entities.

> The regulation of agricultural products is a complex, technical undertaking. Congress channeled disputes concerning marketing orders to the Secretary in the first instance because it believed that only he has the expertise necessary to illuminate and resolve questions about them. Had Congress intended to allow consumers to attack provisions of marketing orders, it surely would have required them to pursue the administrative remedies [available to regulated parties] as well. The restriction of the administrative remedy to handlers strongly suggests that Congress intended a similar restriction on judicial review of market orders.

Id. at 347. Because the statutory scheme gave the Secretary the responsibility for protecting the interests of the public, the Court concluded, "[a]llowing consumers to sue the Secretary would severely disrupt this complex and delicate administrative scheme." Id. at 348. The Court therefore held that the absence of "an express provision for participation by consumers" in "a complex scheme of this type" is "sufficient reason," standing alone, to conclude "that Congress intended only producers and handlers, and not consumers, to ensure that the statutory objectives would be realized" and that "Congress intended to foreclose consumer participation in the regulatory process" and to foreclose an action by consumers under the APA. Id. at 347.

The circumstances here similarly support a conclusion that a claim by nursing associations or other public interest groups to enforce hospital conditions of participation is foreclosed by the comprehensive remedial scheme established by Congress for hospitals. As was discussed above, the Medicare statutes conceive of compliance with conditions of participation as part of an agreement between the Secretary and hospitals, 42 U.S.C. § 1395cc(b)(2), which the Secretary is able to enforce through a comprehensive administrative review process, 42 C.F.R. §§ 498.1-498.103, at the end of which hospitals can seek judicial review of the Secretary's enforcement action in federal court. 42 U.S.C. § 1395cc(h)(1). The legislative history of the Medicare Act expressly states that Congress intended for "the remedies provided by this review procedure" to be "exclusive," S. Rep. No. 89-404 at 55, reprinted in 1965 U.S.C.C.A.N. at 1995; and, in Shalala v.

Illinois Council, the Supreme Court held that this statutory scheme "demands the 'channeling' of virtually all legal attacks" involving conditions of participation through this administrative process, 529 U.S. at 13, and only after an issue has been "so channeled" may it be heard in district court. Id. at 23. Judicial review is therefore limited to claims brought by hospitals for the same reasons that it was limited to claims brought by milk handlers in Community Nutrition.[15]

In Community Nutrition, the Supreme Court also emphasized that allowing members of the public to sue under the APA to challenge market orders "would provide handlers with a convenient device for evading the statutory requirement that they first exhaust their administrative remedies" because a "handler may also be a consumer" and, in any event, would only need to find a consumer who is willing to join in or initiate an action in district court. 467 U.S. at 348. The same concern is present here. If a lawsuit alleging too-lenient enforcement of conditions of participation can be brought today by associations friendly to professional registered nurses, a suit alleging too-strict enforcement could presumably be brought tomorrow by friends of hospitals or licensed practical nurses. Congress vested responsibility for protecting the interests plaintiffs seek to vindicate here in the Secretary. If plaintiffs think that a right of action should also be given to public interest groups, their remedy is political, not judicial.

---

[15] See also United States v. Fausto, 484 U.S. 439, 448 (1988) ("comprehensive statutory scheme that gives "administrative and judicial review" only to certain employees is "manifestation of a considered congressional judgment" that other employees should not have claim to raise same issues); Morris v. Gressette, 432 U.S. 491, 500-07 (1977) (private action to challenge Attorney General's failure to make objection to reapportionment plan precluded by statutory scheme of Voting Rights Act).

**IV.  PLAINTIFFS' CHALLENGES TO THE SECRETARY'S USE OF ACCREDITED STATUS TO SELECT SURVEY TRACKS FOR HOSPITALS ARE WITHOUT MERIT.**

For the reasons stated above, plaintiffs' complaint should be dismissed for lack of subject-matter jurisdiction.  The reasons why the complaint should be dismissed on the merits require considerably less discussion.  Plaintiffs' reading of the relevant statute and regulation is clearly erroneous, and whatever theory they are attempting to advance under the "non-delegation doctrine" makes no sense.

**A.  Because the Bedside-Immediacy Regulation Was Promulgated Under 42 U.S.C. § 1395x(e)(5), It Does Not Matter Whether Accreditation Standards Are Equivalent.**

In pertinent part, the statute on which plaintiffs rely provides that, with certain exceptions, "an institution" which "is accredited as a hospital" by the Joint Commission, 42 U.S.C. § 1395bb(a)(1), "shall be deemed to meet the requirements of the numbered paragraphs" in 42 U.S.C. § 1395x(e), including the 24-hour nursing requirement in paragraph (5).  42 U.S.C. § 1395bb(a) (emphasis added).  A hospital deemed to meet these requirements by receiving JCAHO accreditation can be placed only on the sample-based and allegation-driven survey track, 42 U.S.C. § 1395aa(c), and its ability to participate in Medicare can be terminated only if that enforcement mechanism reveals "significant deficiencies." 42 U.S.C. § 1395bb(d).  The Secretary is not authorized to use periodic surveys under 42 U.S.C. § 1395aa(a) to enforce paragraph (5) nursing requirements at accredited hospitals.  He has no discretion in this regard.  The "deemed" status of accredited hospitals and the corresponding limitations on survey options are both mandatory.

The exception on which plaintiffs attempt to rely forbids the Secretary from granting deemed status to accredited hospitals with respect to "any standard, promulgated by the Secretary

pursuant to paragraph (9) thereof, which is higher than the requirements prescribed for accreditation" by the Joint Commission, 42 U.S.C. § 1395bb(a)(4), unless JCAHO "imposes a standard which the Secretary determines is at least equivalent to the standard promulgated by the Secretary." 42 U.S.C. § 1395bb(a). Thus, the need to evaluate equivalency arises only with respect to the additional paragraph (9) requirements that "the Secretary finds necessary in the interest of the health and safety of individuals who are furnished services in the institution," 42 U.S.C. § 1395x(e)(9), and only when the Secretary "identifies" the requirements "as being higher or more precise than the requirements of accreditation," "after consulting with" accrediting authorities. 42 C.F.R. § 488.5(a)(3). The regulation that plaintiffs claim is not being properly enforced – 42 C.F.R. § 482.23(b) – simply does not meet these tests.

The analysis begins with the proposition that the Secretary's "construction of [his] own regulations is entitled to substantial deference," Shalala v. Guernsey Mem'l Hosp., 514 U.S. 87, 95 (1995) (quoting Lyng v. Payne, 476 U.S. 926, 939 (1986)), and "must be given 'controlling weight unless it is plainly erroneous or inconsistent with the regulation.'" Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994) (quoting Udall v. Tallman, 380 U.S. 1, 16 (1965), and Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 414 (1945)). In this case, the Secretary's interpretation of his own regulations could not be clearer. The preamble plainly states that the nursing standards in 42 C.F.R. § 482.23 were promulgated exclusively under "Section 1861(e)(5) of the Social Security Act" (which is codified at 42 U.S.C. § 1395x(e)(5)), and not under section (e) (9). 51 Fed. Reg. at 22,018. To confirm the point, the Secretary has never made a finding under 42 C.F.R. § 488.5(a) with respect to whether the Joint Commission's accreditation standards for nursing are higher or more precise than the regulations. Clearly, he intended for enforcement of the nursing

regulations at accredited hospitals to be subject to deeming and placed on the appropriate survey track.

An examination of the text of the regulation only confirms the point.  As was discussed earlier, 42 U.S.C. § 1395x(e)(5) states, in pertinent part, that a hospital must provide "24-hour nursing service rendered or supervised by a registered professional nurse" and have "a licensed practical nurse or registered professional nurse on duty at all times."  The regulation promulgated at 42 C.F.R. §482.23 merely elaborates on the features a hospital must possess to meet these requirements.

Tracking the language of the statute, the regulation generally provides that the hospital "must have an organized nursing service that provides 24-hour nursing services" and the "nursing services must be furnished or supervised by a registered nurse."  42 C.F.R. § 482.23.  Subsection (a) goes on to define what circumstances must exist for the nursing service to be considered "well-organized."  42 C.F.R. § 482.23(a).  Subsections (b) and (b)(1) define what circumstances must exist for there to be a bona fide 24-hour service rendered or supervised by a registered nurse.  To meet this test:

- "The nursing service must have adequate numbers of licensed registered nurses" and other personnel "to provide nursing care to all patients as needed."  42 C.F.R. § 482.23(b).

- "There must be supervisory and staff personnel for each department or nursing unit to ensure, when needed, the immediate availability of a registered nurse for bedside care of any patient."  Id.

- The nursing services must actually be provided on a "24-hour" basis.  42 C.F.R. § 482.23(b)(1).

- The services "must be furnished or supervised by a registered nurse."  Id.; and

- With exceptions not relevant here, the hospital must "have a licensed practical nurse or registered professional nurse on duty at all times." Id.

The regulation then goes on to mandate that the nursing service "must have a procedure to ensure that hospital nursing personnel for whom licensure is required have valid and current licensure," 42 C.F.R. § 482.23(b)(2); "the nursing care of each patient" must be supervised and evaluated by a "registered nurse," 42 C.F.R. § 482.23(b)(3); the hospital must develop and keep current a nursing care plan for each patient, 42 C.F.R. § 482.23(b)(4); nursing care must be assigned "in accordance with the patient's needs," 42 C.F.R. § 482.23(b)(5); and, where a hospital employs an outside nursing service, nurses employed by the service must meet the same standards as employee-nurses. 42 C.F.R. § 482.23(b)(6). The last subsection of the regulation deals with how nurses should prepare and administer drugs and injections. 42 C.F.R. § 482.23(c).

The bedside-immediacy test in 42 C.F.R. § 482.23(b) can reasonably be construed as part of the integrated whole of the regulation at 42 C.F.R. § 482.23, which defines what it means to have a "24-hour nursing service rendered or supervised by a professional registered nurse" and what it means to have "a registered practical nurse or a registered professional nurse on duty at all times." 42 U.S.C. § 1395x(e)(5). It cannot plausibly be read as an oasis in which the Secretary, sub silentio, placed a totally separate, paragraph (9), requirement "in the interest of the health and safety" of patients. 42 U.S.C. § 1395x(e)(9). The Secretary is therefore expressly required to deem hospitals accredited by the Joint Commission as meeting the bedside-immediacy regulation, 42 U.S.C. § 1395bb(a)(1), and required to place accredited hospitals on the sample-based and allegation-driven survey track for enforcement of the requirement, 42 U.S.C. §§ 1395aa(c), 1395bb(d), regardless of whether the accreditation standards are equivalent to the bedside-immediacy regulation or, for that matter, whether the Joint Commission has any nursing-related

standards at all.  If plaintiffs believe that the accreditation standards are objectively "lower" than the regulatory standards with respect to nurse-staffing, Compl. at ¶ 37, their remedy is to ask the Joint Commission to raise its standards.  Their argument has no relevance to whether the Secretary has properly placed accredited hospitals on the right survey track for purposes of enforcement.

### B.   The Accreditation Standards of the Joint Commission Are Not Facially Incompatible with the Regulations.

For the reason stated above, plaintiffs have not established that the bedside-immediacy regulation at 42 C.F.R. § 482.23(b) was promulgated under 42 U.S.C. § 1395x(e)(9), and therefore it is not necessary to consider whether the regulation is "higher than the requirements prescribed for accreditation" by the Joint Commission, 42 U.S.C. § 1395bb(a)(4), or whether the accreditation standards are "at least equivalent" to the regulation.  42 U.S.C. § 1395bb(a).[16]  Even when plaintiffs' claim is taken on its own terms, however, it is far from clear that a regulation which mandates the "immediate availability" of registered nurses at the bedside "when needed," 42 C.F.R. § 482.23(b), is necessarily "higher than," 42 U.S.C. § 1395bb(a)(4), the Joint Commission's results-oriented evaluation of nurse staffing on the basis of direct observation, patient and staff interviews, and analysis of patient-outcome and human-resources indicators.  It is even less clear that the JCAHO standards are not "at least equivalent," 42 U.S.C. § 1395bb(a), to the regulation.

The word "'[e]quivalent'," is "a term capable of broad interpretation," <u>Cospito v. Heckler</u>, 742 F.2d 72, 88 (3d Cir. 1984), and it connotes approximate similarity, not exact sameness.[17]  As

---

[16] Furthermore, as was discussed above, even if plaintiffs could make a case on the merits, the only relief for which they should be asking is a remand to the Secretary to make an equivalency determination and to place accredited hospitals on the periodic survey track in the meantime.

[17] <u>See</u> <u>Black's Law Dictionary</u> 581 (8th ed. 2004) ("[e]qual in value, force, amount, effect, or significance;" "[c]orresponding in effect or function;" "nearly equal;" "virtually identical"); <u>Random House-Webster's Unabridged Dictionary</u> 657 (2d ed. 2001) ("equal in value, measure,

was discussed earlier, although the Joint Commission's standards may not use the magic words that

a registered nurse must be "immediately available" for "the bedside care of any patient," <u>State</u>

<u>Operations Manual</u>, Regulations and Interpretive Guidelines for § 482.23(b) at A-0201, or

expressly instruct surveyors to make sure that the same supervising registered nurse is not assigned

to more than one floor or unit, <u>id</u>., those standards do require accredited hospitals (a) to have a

"qualified staff," <u>Joint Commission Manual</u> at NR-1, that includes "[r]egistered [n]urses," <u>id</u>. at

GL-14; (b) to ensure that nursing services are provided "on a continuous basis 24 hours a day, 7

days a week," <u>id</u>. at NR-1; (c) to provide "the right number of competent staff to meet patients'

needs," <u>id</u>. at HR-1, including the "the optimal number of competent personnel with the appropriate

skill mix, <u>id</u>. at ACC-11; and JCAHO further makes sure these standards are met by means of a

comprehensive combination of direct observation, patient and staff interviews, review of nurse

staffing plans, and evaluation of nurse-sensitive patient outcomes reflected in patient medical

records.  <u>Id</u>. at ACC-1-15; HR-7-8d; NR-7-8.  It would not be unreasonable for the Secretary to

conclude that these standards – and the gauntlet of tests used to determine whether they are met –

are equivalent to the nurse-staffing standards in 42 C.F.R. § 482.23 and the survey methodology

used by state agencies on behalf of the Secretary.

> **C.    The Secretary Has Not Unlawfully Delegated His Enforcement Authority to the
> Joint Commission.**

Plaintiffs' only other argument on the merits –  that the Secretary is "unlawfully delegating

to a private party" the "authority to determine the sufficiency of its standards when measured

against the . . . conditions of participation," Compl. at ¶ 2 – makes little sense.  Although a

"legislature cannot delegate its power to make a law," it "can make a law to delegate a power to

---

force, effect, significance, etc.;" "corresponding in position, function").

determine some fact or state of things upon which the law makes or intends to make its own action depend." United States v. Grimaud, 220 U.S. 506, 520 (1911) (quoting Marshall Field & Co. v. Clark, 143 U.S. 649, 694 (1892)).  Making government action contingent on a circumstance that comes into being through the actions of a private party does not delegate any governmental authority to the private party.  See Perot v. FEC, 97 F.3d 553, 559-60 (D.C. Cir. 1996) (finding no delegation of authority where regulations permit non-profit organizations to stage candidate debates, so long as they have their own "objective criteria" for deciding which candidates may participate).  In this case, the Secretary does not delegate any authority of any kind to the Joint Commission when he determines whether to enforce nurse-staffing requirements by means of periodic surveys, 42 U.S.C. § 1395aa(a); 42 C.F.R. § 488.20, or sample-based and allegation-driven surveys.  42 U.S.C. § 1395aa(c); 42 C.F.R. § 488.7.  He merely takes notice (as the statutory scheme instructs him to do) of a fact (whether or not a hospital is accredited by the JCAHO) when he determines which of the two survey tracks applies to the enforcement of nurse-staffing requirements at a particular hospital.  42 U.S.C. § 1395bb(a).  The mere fact that a government regulator attaches significance to whether or not a hospital is accredited when it enforces regulatory standards does not "imbue" the accrediting body "with the authority of the state" nor "shift responsibility" for regulation to the accrediting body.  McKeesport Hosp. v. Accreditation Council for Graduate Med. Educ., 24 F.3d 519, 524 (3d Cir. 1994).[18]

---

[18] Accord Shoemaker v. Accreditation Council for Graduate Med. Educ., 1996 WL 341935 at *1 (9th Cir. June 19, 1996) (same); see also Hickey v. Dist. of Columbia Ct. App., 457 F. Supp. 584, 587 n.2 (D.D.C. 1978) (conditioning admission to state bar on graduation from accredited law school generally not held to delegate governmental authority to law schools or accrediting bodies) (citing Potter v. New Jersey Sup. Ct., 403 F. Supp. 1036, 1040 (D.N.J. 1975), aff'd mem., 546 F.2d 418 (3d Cir. 1976)).

To the extent that plaintiffs are attempting to argue that the <u>statutory scheme</u> itself is unconstitutional because <u>Congress</u> has unlawfully delegated lawmaking authority to the Joint Commission, the claim has equally little merit.  Although in <u>Carter v. Carter Coal Co.</u>, 298 U.S. 238 (1936), the Supreme Court expressed doubt about whether it was permissible for Congress to give private-industry representatives the unfettered ability to set prices, <u>id</u>. at 311, the Court subsequently upheld an amended version of the statute that used private-industry standards "as an aid" to price-setting, subject to the "surveillance and authority" of a federal commission.  <u>Sunshine Anthracite Coal. Co. v. Adkins</u>, 310 U.S. 381, 388 (1940).  In fact, the Supreme Court has twice held that the non-delegation doctrine does not forbid statutory price-control schemes where private producers enjoyed the collective power to veto government marketing orders by majority vote. <u>United States v. Rock Royal Co-Op, Inc.</u>, 307 U.S. 533, 577-78 (1939); <u>Currin v. Wallace</u>, 306 U.S. 1, 15-16 (1939).[19]  Taken together, these decisions stand for the proposition that federal regulatory schemes may permissibly rely heavily on the industry standards of "non-governmental expert organizations with specific expertise," at least so long as federal authorities "maintain responsibility for the final conclusion" of the regulatory process in some manner.  <u>EMR Network v. FCC</u>, 391 F.3d 269, 273 (D.C. Cir. 2004); <u>see also</u> <u>Nat'l Ass'n of Regulatory Utility Comm'rs v. FCC</u>, 737 F.2d 1095, 1144 (D.C. Cir. 1984) (reliance on private-industry standards permissible where federal agency retains "final authority").

---

[19] <u>See also</u> <u>St. Louis, Iron Mountain. & S. Ry. v. Taylor</u>, 210 U.S. 281, 287 (1908) (upholding regulation of railroads based on industry standards); <u>Buttfield v. Stranahan</u>, 192 U.S. 470, 492-97 (1904) (upholding regulation of trade based on industry standards); <u>Butte City Water Co. v. Baker</u>, 196 U.S. 119, 126-27 (1905) (recognizing validity of statute that gave legal effect to rules developed by miners).

In Cospito v. Heckler, the Court of Appeals for the Third Circuit applied this principle to a (now repealed) statutory scheme once used to enforce the conditions of participation at psychiatric hospitals accredited by the Joint Commission.  Although the scheme compelled the Secretary to give "special attention" to the accredited status of the hospital, the Court held that it did not offend the non-delegation doctrine because the Secretary retained the power to "independently determine whether a particular institution was qualified for participation" by means of his own "de novo evaluation" of "the adequacy of a hospital's facilities," and he retained the power to "decertify the institution" if he found that it had "serious deficiencies."  742 F.2d at 88.  "Since, in effect, all actions of the JCAH are subject to full review by a public official who is responsible and responsive to the political process," the Court held that "there has been no real delegation of authority to JCAH" because the statutory scheme did not "tether[] the Secretary to the JCAH's leash, such that JCAH's promulgated standards must automatically be adopted as the Secretary's standards."  Id. at 89.  The dissenting judge agreed that if the statutory scheme had allowed the Secretary to "correct adjudicatory errors in the JCAH's application of its own regulations," and to "also correct problems with the JCAH's rules themselves," then it would not run afoul of the non-delegation doctrine, id. at 90 (Becker, J., dissenting), although he questioned whether the statute actually retained as much ultimate authority in the Secretary as the majority thought.

In the regulatory scheme at issue in this case, the Secretary retains ultimate authority to determine whether accredited hospitals meet the nurse-staffing requirements of the conditions of participation.  As discussed earlier, it is true that accreditation by the Joint Commission was accorded conclusive weight in the original Medicare Act, but the 1972 amendments changed all that, giving the Secretary the power to conduct his own surveys on a sample-based and allegation-driven basis, 42 U.S.C. § 1395aa(c), and to take corrective action against any accredited hospital

-44-

that does not meet the standards.  42 U.S.C. § 1395bb(d).  There is no question that the Secretary

can conduct his own validation survey "to determine whether the accredited hospital does, in fact,

meet Medicare/Medicaid participation standards," Evelyn V. v. Kings County Hosp. Ctr., 956 F.

Supp. 288, 291 (E.D.N.Y. 1997), and can terminate participation "if his own survey indicates

'significant deficiencies.'"  Woe by Woe v. Cuomo, 729 F.2d 96, 107 n.11 (2d Cir. 1984).  The

mere fact that the statutory scheme takes indirect advantage of the Joint Commission's expertise

when it establishes survey priorities does not offend the non-delegation doctrine.[20]

## CONCLUSION

For the reasons stated, defendants' motion to dismiss should be granted.

|  | Respectfully submitted, |
|---|---|
| OF COUNSEL: | |
| DANIEL MERON | PETER D. KEISLER |
| General Counsel | Assistant Attorney General |
| | |
| KATHLEEN H. MCGUAN | KENNETH L. WAINSTEIN |
| Associate General Counsel | United States Attorney |
| | |
| MARK D. POLSTON | /s/ Peter Robbins |
| Deputy Associate General | SHEILA M. LIEBER |
| Counsel | PETER ROBBINS |
| | Department of Justice |
| TRACEY GLOVER | 20 Massachusetts Avenue, N.W., Room 7142 |
| Attorney | Washington, D.C.  20530 |
| Department of Health | Tel: (202) 514-3953 |
| and Human Services | Attorneys for Defendants |

---

[20] See also Hays v. Hoffman, 325 F.3d 982, 988 (8th Cir. 2003) (Medicare permissibly delegates authority to private contractors); Ass'n of Am. Physicians & Surgeons v. Weinberger, 395 F. Supp. 125, 139-40 (N.D. Ill. 1975), aff'd, 423 U.S. 975 (1975) (upholding authority of Secretary to delegate authority to private organizations to make Medicare decisions, so long as administrative appeal is available); Simon v. Cameron, 337 F. Supp. 1380, 1383 (C.D. Cal. 1970) (upholding state statute that "entrust[s] a private body with law making functions in order to take advantage of [its] expertise and experience in a particular area requiring the exercise of professional judgment and specialized skills").