# HCPro's
# The CMS-JCAHO Crosswalk, 2006 Edition

Welcome to **The CMS-JCAHO Crosswalk, 2006 Edition** Interactive CD-ROM.

An index file is provided on the CD to make navigating this material as easy as possible. Simply **click here to open the index file,** and use your mouse to click on the form you want to view. You will automatically be brought to that document. Click on the **"Next page"** button to go to the next page in the form. When done, simply click the **"Back to Contents"** button and you'll return to the index.





HCPro, Inc.
200 Hoods Lane
Marblehead, MA 01945 USA
Phone: 877/727-1728
Fax: 800/639-8511
webmaster@hcmarketplace.com
http://www.hcpro.com

# CONTENTS

**About the author**

**Introduction**

**Crosswalk**

CoP 482.11: Compliance with Federal, State, and Local Laws

CoP 482.12: Governing Body

CoP 482.13: Patients' Rights

CoP 482.21: Quality Assessment and Performance Improvement

CoP 482.22: Medical Staff

CoP 482.23: Nursing Services

CoP 482.24: Medical Record Services

CoP 482.25: Pharmaceutical Services

CoP 482.26: Radiological Services

CoP 482.27: Laboratory Services

CoP 482.28: Food and Dietetic Services

CoP 482.30: Utilization Review

CoP 482.41: Physical Environment

CoP 482.42: Infection Control

CoP 482.43: Discharge Planning

CoP 482.45: Organ, Tissue, and Eye Procurement

CoP 482.51: Surgical Services

CoP 482.52: Anesthesia Services

CoP 482.53: Nuclear Medicine Services

CoP 482.54: Outpatient Services

CoP 482.55: Emergency Services

CoP 482.56: Rehabilitation Services

CoP 482.57: Respiratory Services

## Appendix

Hospital policy on patient rights and responsibilities

Hospital policy about patient advocates/representatives

Hospital policy on advance directives

Hospital policies on restraint/immobilization

Policy on sentinel events

Medical staff bylaws/policies and procedures

Incident report summary regarding medication errors or adverse drug effects

Set policy to verify vendor's information

EC plans/procedures for medical equipment

Sample nutritional assessment form

Sample emergency management program

Sample fire drills policy

Sample infectious diseases influx policy

Sample standard precautions policy and procedure

Sample patient discharge instructions policy

Sample organ and tissue donation policy

# ABOUT THE AUTHOR

## Cheryl A. Niespodziani, MBA

**Cheryl A. Niespodziani, MBA,** has worked in healthcare for more than 20 years. She is currently the administrative manager in the emergency department at The Children's Hospital in Denver. She has held administrative positions in both patient care and operational departments, was a member of the hospital's senior management team, and was the quality performance director and corporate compliance officer. She led the facility through several successful JCAHO surveys and was the hospital's lead person for validation and unannounced survey visits. She received both her Bachelor of Arts and Masters of Business Administration degrees from the University of Colorado at Denver.

# INTRODUCTION

Anyone involved in healthcare, from chief executive officers to front-line staff, dreads hearing, "We're here to do an unannounced site visit of your facility." On any day of the week, unexpected surveyors who say these words can cause anxiety, stress, and anguish in even the best-run organizations. Starting in 2006, unannounced visits will be the norm for hospitals.

Such surveys will determine whether your healthcare facility meets regulatory requirements, of which there are several sets. These sets have evolved over the past 10 years, as organizations in healthcare and other industries have established corporate compliance programs to help monitor, identify, and improve or remedy compliance issues.

When healthcare professionals talk about these regulatory agencies, they usually speak in acronyms or simply use an alphabet soup that most of their colleagues understand: OSHA (Occupational Safety and Health Administration), EPA (Environmental Protection Agency), FDA (Food and Drug Administration), OIG (Office of Inspector General), and CDC (Centers for Disease Control and Prevention). They also talk about the Centers for Medicare & Medicaid Services (CMS) and the Joint Commission on Accreditation of Healthcare Organizations (JCAHO).

Unlike the others, the last two agencies regulate the administration of care—that is, they both regulate the same aspect of healthcare. And most facilities do both: They must meet federal requirements outlined by CMS called Conditions of Participation (CoP) if they want to receive Medicare or Medicaid reimbursement for services and most also participate in a voluntary survey process through the JCAHO.

Because the two overlap in some areas of the country, the state's department of health surveys hospitals for CoP compliance at the same time that the JCAHO conducts its accreditation survey. In other areas, JCAHO completes its accreditation process and CMS then authorizes the state's department of health to conduct a validation survey, usually within 60 days of the JCAHO survey. In addition, JCAHO and CMS can survey "for cause" based on a complaint, or they can randomly select organizations for unannounced surveys. These site visits can occur at any time during an organization's accreditation cycle.

During such surveys, both the hospital and the regulatory/accrediting agency surveying the hospital want to demonstrate that the organization meets the necessary requirements for compliance. They do so primarily through document review, interviews with leaders and staff, observations, and the tracer methodology.

In the past, many organizations prepared for survey (or crammed for the exam) six to 12 months before the anticipated visit. With new survey processes—along with the move to completely unannounced surveys and the new requirement to update and submit the organization's Periodic Performance Review (PPR) annually—this preparation method is no longer viable or successful. The way to prepare now is to maintain a constant state of readiness and ongoing compliance. Doing so can seem overwhelming when you have two different surveys for which to be ready, but healthcare facilities do not necessarily need to prepare different documents or different processes to meet CMS' and JCAHO's standards.

To help healthcare organizations maintain preparations for both surveys, this book outlines, or crosswalks, the CMS CoPs and the JCAHO standards and elements of performance (EP). Its goal is to provide a tool to help organizations understand the requirements, see the similarities and differences between the requirements, and identify the documents or processes that are already in place so that you can prepare for one or both surveys without duplicating efforts.

The crosswalk is arranged in a tabular format. The first column outlines the CMS requirements, which were taken from the *State Operations Manual, Appendix A—Survey Protocol, Regulations, and Interpretative Guidelines for Hospitals* (Rev. 1, 05-21-04), as well as an update to the interpretative guidelines that was issued on August 18, 2005. The second column details the corresponding 2006 version of the JCAHO hospital standards and EPs.

The CMS made the following minor changes in four of the CoPs based on August 2005 revisions:
• Governing Body (§482.12)—Clarifies which patients admitted by nurse midwives require supervision by a physician
• Patients' Rights (§482.13)—Clarifies the patient grievance process, updates definitions, and outlines requirements for written responses
• Laboratory Services (§482.27)—Clarifies availability of emergency laboratory services

• Food and Dietetic Services (§482.28)—Clarifies that the provider(s) taking care of the patient must order therapeutic diets

Although the JCAHO added only three new standards, most of the chapters were adjusted—from minor rewording of standards to renumbering of EPs due to additions/deletions to new EPs added for 2006. The majority of changes were seen in the Medication Management (MM), Management of Information (IM), and Provision of Care (PC) chapters. All changes are highlighted throughout this crosswalk for easy reference. Even with the revisions made for 2006, more than 75% of the JCAHO hospital standards/EPs tie to one or more of the CoPs.

The third section provides a brief summary or analysis of the similarities and differences between CMS and JCAHO requirements. This section also includes other tips or helpful documents to have available where applicable.

An added feature to the 2006 crosswalk is a CD with a searchable PDF of this book that users can install on their desktops and access electronically.

All healthcare organizations will undergo surveys of some kind at some point in time. By understanding the similarities between them, hopefully ongoing survey preparation can be efficient and can help you achieve excellent results. After all, the goal of all participants—the hospital, the regulatory agency, and the patient—is quality care and service that meets and exceeds standards and expectations.

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| **§ 482.11  CoP: Compliance with Federal, State, and Local Laws** | **Leadership (LD), Management of Human Resources (HR), Medical Staff (MS)** |

| | |
|---|---|
| a.  The hospital must be in compliance with applicable federal laws related to the health and safety of patients. (A-0003)<br><br>b.  The hospital must be (1) Licensed; or (2) Approved as meeting standards for licensing established by the agency of the state or locality responsible for licensing hospitals. (A-0004)<br><br>c.  The hospital must ensure that personnel are licensed or meet other applicable standards that are required by state or local laws. (A-0005) | **LD.1.30, EP1:** Compliance with applicable laws/regulations is required.<br><br>**LD.1.30, EP3:** Organization must have license, certification or permit.<br><br>**LD.3.70, EP1-4:** Organization provides qualified staff (whether employees, non-employee individuals, or LIPs) and ensures appropriate privileging and credentialing of that staff.<br>• *Changes to LD.3.70—The rationale section has been expanded and new EP3 and 4 have been added.*<br><br>HR.1.20, EP3-7, 18, 46: Verification of licensure/certification/registration, credentials, education, criminal background check, and health screen is done. If there is no licensure/certification for patient care providers, accreditation decision will be impacted.<br><br>• *Changes to HR.1.20—EP 1 and EP 2 remain unchanged. EP3 and 5 are reworded and renumbered. EP4 has three additional notes regarding primary source verification and credentials verification organizations (CVO). The 2005 EP18 and EP19 were eliminated and new EP18 and EP46 were added.*<br><br>**HR.3.10, EP1-10:** Competencies are assessed and demonstrated for all staff.<br><br>**MS.4.10, EP1-4:** A credentialing process exists for the medical staff and is outlined in the bylaws.  Documentation of licensure, training/experience, and competence is verified by primary or secondary source verification or an equivalent source.<br><br>• *No changes to standard or EP; added sources for verification.* |

**NEW for 2006** (alongside LD.3.70 section)

**NEW for 2006** (alongside MS.4.10 section)

*See next page for analysis/guidelines on §482.11  >*

## Analysis/Guidelines

CMS and JCAHO requirements are similar when it comes to compliance with federal, state, and local laws. Both want to see that the hospital has a current license and meets the licensure standards for the state in which the hospital resides. Both want to see that hospital personnel required to be licensed have a current license to practice; these licensure laws vary state to state. Positions needing a license could include MDs, DOs, RNs, PAs, PTs, OTs, and RTs. Verification of qualifications, training/education, and permits should be checked. JCAHO standards covering these areas are found in both the Leadership and Management of Human Resources chapters.

Survey Tips:

- Post the hospital license in a central place within the organization
- Have managers keep updated records of current licensure and training/education for staff (including employees, non-employee individuals, and LIPs)
- Review personnel files to verify that credentials information is current

Suggested Documents:

- Hospital license
- Personnel files/credentials information
- Selected policies associated with corporate compliance program, such as the following:
  - Code of Business Conduct
  - Policy on zero tolerance
  - Policy on problem reporting and non-retaliation

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| **§482.12  CoP:  Governing Body** | **Leadership (LD),**<br>**Medical Staff (MS)** |

| | |
|---|---|
| The hospital must have an effective governing body legally responsible for the conduct of the hospital as an institution. If a hospital does not have an organized governing body, the persons legally responsible for the conduct of the hospital must carry out the functions specified in this part that pertain to the governing body (A-0006). | **LD.1.10, EP4-6:** Medical staff is permitted to be represented at governing body meetings and participate in the organization's governance. |
| (a)  Standard: Medical staff | **MS.1.10, EP1-6:** A single medical staff, with accountability to the governing body, is organized to oversee the quality of patient care and services provided by those medical staff with appropriate credentials and privileges. |
| The governing body must (A-0007): | **MS.1.20, EP1-19:** The medical staff has bylaws and rules/regulations that outline the medical staff's rights and responsibilities. Areas include roles and responsibilities, qualifications, medical staff executive committee, correction actions, fair hearing process, credentialing/privileging/appointments, and related medical staff governance documentation. |
| (1)  Determine, in accordance with state law, which categories of practitioners are eligible candidates for appointment to the medical staff (A-0008) | |
| (2)  Appoint members of the medical staff after considering the recommendations of the existing members of the medical staff (A-0009) | • *Changes to MS.1.20—Most of the EPs have been slightly reworded and renumbered. A few have been consolidated (e.g., the revised EP12 is a combination of the previous EP12 and EP13; the revised EP13 is a combination of the previous EP 14 and 15. EP19 is new regarding medical staff governing documentation, but it does not go into effect until January 1, 2007.* |
| (3)  Ensure that the medical staff has bylaws (A-0010) | |
| (4)  Approve medical staff bylaws and other medical staff rules and regulations (A-0011) | **MS.1.30, EP1:** Both the medical staff and governing body must approve changes to the medical staff bylaws and rules/regulations. |
| (5)  Ensure that the medical staff is accountable to the governing body for the quality of care provided to patients (A-0012) | **MS.1.40, EP1-12:** A medical staff executive committee exists within the hospital to carry out the responsibilities of the medical staff. |
| (6)  Ensure the criteria for selection are individual character, competence, training, experience, and judgment (A-0013) | **MS.4.10, EP1-4:** A credentialing process exists for the medical staff and is outlined in the bylaws. Documentation of licensure, training/experience, and competence is verified by primary or secondary source verification or an equivalent source. |
| (7)  Ensure that under no circumstances is the accordance of staff membership or professional privileges in the hospital dependent solely upon certification, fellowship, or membership in a specialty body or society (A-0014) | • *No changes to standard or EP; added sources for verification.* |
| | **MS.4.20, EP1-15:** A clinical privileging process exists for the medical staff. The governing body approves clinical privileges. |

*NEW for 2006*

*NEW for 2006*

***See next page for analysis/guidelines on §482.12   >***

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| | **MS.4.30, EP1-7:** A process to expedite appointments and privileges to the medical staff exists using agreed-upon criteria outlined in the bylaws.<br><br>**MS.4.40, EP1-5:** A process for reappointment to the medical staff is outlined in the bylaws. |

## §482.12 Analysis/Guidelines

Both CMS and JCAHO emphasize the interrelationship between a hospital's governing board and its medical staff. The governing body has overall responsibility for the conduct and care provided by the organization. The medical staff has responsibility for its members and provides recommendations on quality of care and services, credentials and clinical privileges, and medical staff bylaws/policies and procedures to the governing body. One group cannot work without the other to establish consistent policies, processes, and care guidelines for the institution. CMS and JCAHO require the medical staff to have bylaws, policies, procedures, credentialing and clinical privileging processes, and quality of care oversight, with accountability to the governing board of the hospital.

Survey Tips:

- Review medical staff bylaws/policies/procedures and have changes or revisions approved by the governing body
- Review credentials files to verify information is up to date and complete
- Review governing body meeting minutes for documentation on approval/denial of medical staff recommendations and actions

Suggested Documents:

- Hospital bylaws
- Medical staff bylaws/policies/procedures
- Credentials files
- Governing body meeting minutes

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| §482.12  CoP: Governing Body | Leadership (LD),<br>Medical Staff (MS) |
| (b)  Standard: Chief executive officer<br>   The governing body must appoint a chief executive officer (CEO) who is responsible for managing the hospital (A-0015). | **LD.1.20, EP5:** The governing body appoints people responsible for hospital operations.<br><br>**LD.2.10, EP1 and 2:** The governing body gives authority for hospital operations to designated people. This includes absences of these people from the hospital. |

**NEW for 2006**

## Analysis/Guidelines

The governing body must have a formal process for appointing a CEO for the hospital who is responsible for managing the entire organization. CMS and JCAHO verify that the documented process is followed and the CEO has ultimate responsibility.

Survey Tips:

- Review hospital bylaws outlining process for CEO appointment
- Have updated CEO job description
- Review chain of command structure if CEO is absent

Suggested Documents:

- Hospital bylaws
- Job description for CEO

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| **§482.12  CoP: Governing Body** | **Leadership (LD), Medical Staff (MS)** |
| (c)  Standard: Care of patients<br>In accordance with hospital policy, the governing body must ensure that the following requirements are met (A-0016):<br><br>(1)  Every Medicare patient is under the care of<br><br>(i)  A doctor of medicine or osteopathy;<br><br>(ii)  A doctor of dental surgery or dental medicine who is legally authorized to practice dentistry by the state and who is acting within the scope of his or her license;<br><br>(iii)  A doctor of podiatric medicine, but only with respect to functions which he or she is legally authorized by the state to perform;<br><br>(iv)  A doctor of optometry who is legally authorized to practice optometry by the state in which he or she practices;<br><br>(v)  A chiropractor who is licensed by the state or legally authorized to perform the services of a chiropractor, but only with respect to treatment by means of manual manipulation of the spine to correct a subluxation demonstrated by x-ray to exist; or<br><br>(vi)  A clinical psychologist as defined in §410.71 of this chapter, but only with respect to clinical psychologist services as defined in §410.71 of this chapter and only to the extent permitted by state law (A-0017).<br><br>(2)  Patients are admitted to the hospital only on the recommendation of a licensed practitioner permitted by the state to admit patients to a hospital (A-0018). If a Medicare patient is admitted by a practitioner not specified in paragraph (c)(1) of this section, that patient is under the care of a doctor of medicine or osteopathy (A-0019).<br><br>(3)  A doctor of medicine or osteopathy is on duty or on call at all times (A-0020). | **MS.2.10, EP1-11:** The medical staff provides leadership for patient care functions, including patient safety, patient satisfaction, and medical history & physical (H&P) exams.<br><br>**MS.2.20, EP1-4:** Physicians who have appropriate credentials and privileges coordinate and manage the patient's medical care.<br><br>**MS.4.20, EP1-15:** A clinical privileging process exists for the medical staff. The governing body approves clinical privileges. |

NEW for 2006

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| §482.12  CoP: Governing Body | Leadership (LD),<br>Medical Staff (MS) |
| (4)  A doctor of medicine or osteopathy is responsible for the care of each Medicare patient with respect to any medical or psychiatric problem that:<br><br>(i)  Is present on admission or develops during hospitalization; and is not specifically within the scope of practice of a doctor of dental surgery, dental medicine, podiatric medicine or optometry; a chiropractor; or clinical psychologist, as that scope is (a) defined by the medical staff; (b) permitted by state law; and (c) limited, under paragraph (c)(1)(v) of this section, with respect to chiropractors (A-0021). | |

## §482.12(c) Analysis/Guidelines

CMS is more specific in its requirements than JCAHO and focuses primarily on Medicare and Medicaid patients. CMS hospital regulations permit licensed practitioners (e.g., doctors of dental surgery, podiatric medicine, optometry, chiropractors, nurse practitioners, midwives, etc.) to admit patients to the hospital (if allowed by the state), and CMS does not require these practitioners to be employed by an MD/DO. CMS regulations do require that Medicare and Medicaid patients admitted by these practitioners are under the care of an MD/DO, and that you document this in the patient's record. CMS also requires an MD/DO to be on 24-hour call; JCAHO has no corresponding standard for this.

Note: In the past, CMS included organ and tissue procurement and donation requirements in this section; however, these requirements are now listed separately under §482.45 CoP: Organ, Tissue, and Eye Procurement.

Survey Tips:

- Review credentials files to verify information is up to date and complete
- Verify that patients are admitted to the hospital only by licensed practitioners (physicians, nurse practitioners, PAs, midwives, etc.) who have admitting privileges as approved by the governing board
- Review which categories of practitioners have admitting privileges (as allowed by bylaws and state law)
- Audit medical records to verify each patient is under the care of an MD/DO
- Interview nursing staff about how they identify the on-call physician and whether an MD/DO is available at all times

Suggested Documents:

- On-call schedules
- Credentials files
- Medical staff bylaws

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| **§482.12  CoP: Governing Body** | **Leadership (LD),** <br> **Medical Staff (MS)** |

| | |
|---|---|
| (d) Standard: Institutional plan and budget <br><br> The institution must have an overall institutional plan that meets the following conditions: <br><br> (1) The plan must include an annual operating budget that is prepared according to generally accepted accounting principles. <br><br> (2) The budget must include all anticipated income and expenses. This provision does not require that the budget identify item by item the components of each anticipated income or expense. <br><br> (3) The plan must provide for capital expenditures for at least a three-year period, including the year in which the operating budget specified in paragraph (d)(2) of this section is applicable. <br><br> (4) The plan must include and identify in detail the objective of, and the anticipated sources of financing for, each anticipated capital expenditure in excess of $600,000 (or a lesser amount that is established, in accordance with section 1122(g)(1) of the Social Security Act (SSA), by the state in which the hospital is located) that relates to any of the following: <br><br>     (i)   Acquisition of land <br>     (ii)  Improvement of land, buildings, and equipment <br>     (iii) The replacement, modernization, and expansion of building and equipment (A-0022) <br><br> (5) The plan must be submitted for review to the planning agency designated in accordance with section 1122(b) of the Act, or if an agency is not designated, to the appropriate health planning agency in the state (A-0023). A capital expenditure is not subject to section 1122 review if 75% of the healthcare facility's patients who are expected to use the service for which the capital expenditure is made are individuals enrolled in an HMO or competitive medical plan (CMP) that meets the requirements of section 1876(b) of the SSA, and if the department determines that the capital expenditure is for services and facilities that are needed by the HMO or CMP in order to operate efficiently and economically | **LD.1.20, EP6:** The governing body and hospital leaders provide the resources necessary to carry out hospital operations. <br><br> **LD.2.50, EP1-5, 7:** Hospital leaders coordinate, implement, and monitor operating and capital expenditure budgets that are audited annually and approved by the governing body. <br><br> • *Changes to LD.2.50—EP7 regarding monitoring of long-term capital plans has been added.* |

**NEW for 2006**

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| **§482.12  CoP: Governing Body** | **Leadership (LD), Medical Staff (MS)** |

| | |
|---|---|
| and that are not otherwise readily accessible to the HMO or CMP because: | |
| (i)   The facilities do not provide common services at the same site; | |
| (ii)  The facilities are not available under a contract of reasonable duration; | |
| (iii) Full and equal medical staff privileges in the facilities are not available; | |
| (iv) Arrangements with these facilities are not administratively feasible; or | |
| (v)  The purchase of these services is more costly than if the HMO or CMP provided the services directly (A-0024). | |
| (6)  The plan must be reviewed and updated annually (A-0025). | |
| (7) The plan must be prepared: | |
| (i)   Under the direction of the governing body; and by a committee consisting of representatives of the governing body, the administrative staff, and the medical staff of the institution (A-0026). | |

## Analysis/Guidelines

While CMS outlines seven requirements compared with JCAHO's two standards, both accreditors require the organization to have an operating and capital budget plan that is reviewed, updated, and approved by the governing board on an annual basis. Both require staff input in the budget process. JCAHO identifies (in LD.2.50, EP5) the requirement of an annual financial audit; CMS does not specify this in the CoP. CMS outlines the requirement for the capital expenditures plan to be submitted to the planning agency designated to review capital expenditures. In some cases, facilities used by HMO or competitive medical plan (CMP) patients are exempt from this review.

Survey Tips:
• Review budget process to include governing body, administrative staff, and medical staff participation

Suggested Documents:
• Hospital's annual financial plan
• Hospital's annual operating and capital budgets
• Governing body meeting minutes
• Financial audit report

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| **§482.12  CoP: Governing Body** | **Leadership (LD),<br>Medical Staff (MS)** |
| (e)  Standard: Contracted services<br>    The governing body must be responsible for services fur-<br>    nished in the hospital whether or not they are furnished under<br>    contracts. The governing body must ensure that a contractor<br>    of services (including one for shared services and joint ven-<br>    tures) furnishes services that permit the hospital to comply<br>    with all applicable conditions of participation and standards<br>    for the contracted services (A-0027).<br><br>    (1)  The governing body must ensure that the services per-<br>        formed under a contract are provided in a safe and<br>        effective manner (A-0028).<br><br>    (2)  The hospital must maintain a list of all contracted<br>        services, including the scope and nature of the servic-<br>        es provided (A-0029). | **LD.3.140, EP1 & 2:** For organizations that do not provide psychi-<br>atric or substance abuse services, provide documentation about<br>how to care for patients referred to the organization needing<br>these services.<br><br>**LD.3.50, EP1-8:** Any services provided under a contract, consul-<br>tation, or other service agreement are defined in writing and<br>approved by hospital leadership. (See note in<br>Analysis/Guidelines section)<br><br>**LD.4.50, EP 2:** Processes that could be high-volume, high-risk, or<br>problem-prone must be monitored by the organization for safety<br>and efficiency issues. |

## Analysis/Guidelines

The governing body is responsible for the services provided at the hospital, whether those services are provided directly by hospital staff or indirectly through a contractual arrangement (e.g., formal contract, joint venture, informal agreements, shared services, or lease arrangements). Both CMS and JCAHO require processes to ensure that contracted services are provided in a safe and effective manner. These services should be monitored and evaluated to the same hospitalwide quality and performance improvement expecta-tions as other services provided directly by the organization.

**NEW for 2006**

NOTE: At press time, LD.3.50 was in field review by the JCAHO. Proposed revisions of this standard and related EPs will be forthcom-ing. The JCAHO is also proposing the addition of a new standard (LD.3.55) regarding the safety and quality of contracted services.

Survey Tips:

- Review contracting process and update policy as needed
- Verify that contractor services provided in the organization are in compliance with CoPs
- Review quality plan to ensure contracted services are evaluated

Suggested Documents:

- Hospital bylaws
- Hospital policy regarding contract process, review, and approval
- List of contracted services provided to the hospital including scope and nature of services

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| §482.12  CoP: Governing Body | Leadership (LD), Medical Staff (MS) |
| (f)  Standard: Emergency services<br><br>   (1)  If emergency services are provided at the hospital, the hospital must comply with the requirements of §482.55 (A-0031).<br><br>   (2)  If emergency services are not provided at the hospital, the governing body must ensure that the medical staff has written policies and procedures for appraisal of emergencies, initial treatment, and referral when appropriate (A-0032).<br><br>   (3)  If emergency services are provided at the hospital but are not provided at one or more off-campus departments of the hospital, the governing body of the hospital must assure that the medical staff has written policies and procedures in effect with respect to the off-campus department(s) for appraisal of emergencies and referral when appropriate (A-0033). | If emergency services are not provided at your organization, see the standards outlined above in this section.<br><br>If your organization provides emergency services, see §482.55 CoP: Emergency Services. |

## Analysis/Guidelines

This is a new CMS standard in this section and applies to off-campus, non-emergency departments/locations of hospitals that provide emergency services. For hospitals that provide emergency services, see §482.55 CoP: Emergency Services.

Survey Tips:

- Verify the medical staff has written policies/procedures for managing medical or psychiatric emergencies
- Review emergency care policies/procedures (for on-campus and off-campus locations)
- Talk with hospital staff at various locations to see if they know what to do if someone seeks emergency care at their site

Suggested Documents:

- Medical staff policies/procedures

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| §482.13 COP: Patients' Rights | Ethics, Rights & Responsibilities (RI), Provision of Care (PC), Management of Information (IM), Leadership (LD) |

**NEW for 2006**

A hospital must protect and promote each patient's rights (A-0038).

(a) Standard: Notice of rights

  (1)  A hospital must inform each patient or, when appropriate, the patient's representative (as allowed under state law), of the patient's rights, in advance of furnishing or discontinuing patient care whenever possible (A-0040).

  (2)  The hospital must establish a process for prompt resolution of patient grievances and must inform each patient whom to contact to file a grievance (A-0041). The hospital's governing body must approve and be responsible for effective operation of the grievance process, and must review and resolve grievances, unless it delegates the responsibility in writing to grievance committee (A-0042). The grievance process must include a mechanism for timely referral of patient concerns regarding quality of care or premature discharge to the appropriate Utilization or Quality Control, Quality Improvement Organization. At a minimum (A-0043):

    i. The hospital must establish a clearly explained procedure for the submission of a patient's written or verbal grievance to the hospital (A-0044).

    ii. The grievance process must specify time frames for review of the grievance and the provision of a response (A-0045).

    iii. In its resolution of the grievance, the hospital must provide the patient with written notice of its decision that contains the name of the hospital contact person, the steps taken on behalf of the patient to investigate the grievance, the results of the grievance process, and the date of completion (A-0046).

**RI.2.10, EP1-4:** The organization supports and respects patient rights. Rights include care/treatment, cultural, spiritual, psychosocial, and personal dignity.

**RI.2.20, EP1, 5, 6:** Patient right information is given to patients. Information on advance directives is provided upon admission.

**RI.2.120, EP1-5:** A patient grievance resolution process exists and complaints are addressed.

**RI.2.140, EP1-3:** Patient has the right to personal space and preservation of personal dignity.

**RI.3.10, EP1-4:** Patient responsibility information is given to patients.

**LD.1.20, EP6 & 7:** The governing body defines the organization's leaders' roles in establishing policies and evaluates the organization's performance annually.

*See next page for analysis/guidelines on §482.13 (a)  >*

## §482.13(a) Analysis/Guidelines

Both CMS and JCAHO require that inpatients and outpatients are informed about their rights. JCAHO standards are more specific about rights around care/treatment, cultural, spiritual, psychosocial, and personal dignity. JCAHO also addresses patient responsibility information whereas CMS does not. Hospitals are required to have a formal patient grievance process and mechanism that has been approved by the organization's governing board. The CMS interpretative guidelines define a patient grievance as "a written or verbal complaint by a patient, or the patient's representative, regarding the patient's care, abuse or neglect, issues related to the hospital's compliance with CMS Hospital CoPs, or a Medicare beneficiary billing complaint related to rights and limitations." Billing issues are not considered grievances unless the complaint also contains issues about patient service or care. The hospital must inform the patient of the grievance process and provide a written response to each patient's grievance. If the grievance will not be resolved, or if the investigation is not or will not be completed within seven days, the hospital should inform the patient or his or her representative that the hospital is stilling working to resolve the grievance and will follow up with a written response within a stated number of days based on the hospital's grievance policy. The hospital must attempt to resolve all grievances in a timely manner.

Survey Tips:

- Review hospital policies on patient rights and patient grievance processes
- Review how the hospital meets needs of diverse patients (e.g., those with language or communication barriers, those needing assistive devices, etc.)
- Review grievance documentation to see if process is followed and how long it takes to respond to patient grievances
- Interview patients or patient's representative to see whether they know how to submit a grievance

Suggested Documents:

- Patient rights/responsibilities handout/document
- Hospital policy on patient rights/responsibilities
- Hospital policies about patient advocates/representatives
- Hospital policy on patient grievance process

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| **§482.13 CoP: Patients' Rights** | **Ethics, Rights & Responsibilities (RI), Provision of Care (PC), Management of Information (IM), Leadership (LD)** |

| | |
|---|---|
| (b) Standard: Exercise of rights<br>   (1) The patient has the right to participate in development and implementation of his or her plan of care (A-0048).<br><br>   (2) The patient or his or her representative (as allowed under state law) has the right to make informed decisions regarding his or her care (A-0049). The patient's rights include being informed of his or her health status (A-0050), being involved in care planning and treatment (A-0051), and being able to request or refuse treatment. This right must not be construed as a mechanism to demand the provision of treatment or services deemed medically unnecessary or inappropriate (A-0052).<br><br>   (3) The patient has the right to formulate advance directives and to have hospital staff and practitioners who provide care in the hospital comply with these directives, in accordance with §489.100, §489.102, and §489.104 (A-0053).<br><br>   (4) The patient has the right to have a family member or representative of his or her choice and his or her own physician notified promptly of the patient's admission to hospital (A-0054). | **RI.2.30, EP1-5:** The organization involves the patient/family in care decisions or dilemmas.<br><br>**RI.2.40, EP1-3:** A process to obtain informed consent from the patient/family exists.<br><br>**RI.2.50, EP1-7:** Consent from the patient/family is obtained before filming or recording the patient occurs.<br><br>**RI.2.60, EP1-2:** The patient/family is informed about their care provider(s).<br><br>**RI.2.70, EP1-2:** The patient/family can refuse care/treatment.<br><br>**RI.2.80, EP1-8, 10-12, 21:** The organization involves the patient/family in life-sustaining/resuscitative efforts and decisions at the end of life.<br><br>**RI.2.90, EP1-3:** The organization informs the patient/family about care outcomes, both anticipated and unanticipated, or as associated with a sentinel event.<br><br>   • *Changes to RI.2.90—EP3 has been revised to include outcomes associated with sentinel events.*<br><br>**RI.2.100, EP1-3:** The organization provides verbal and written communication to the patient/family so that information is understood.<br><br>**RI.2.160, EP1:** Management of pain is a patient's right.<br><br>**PC.8.70, EP1-2:** Dying patients receive comfort and dignity. |
| | ***See next page for analysis/guidelines on §482.13  >*** |

NEW for 2006

## Analysis/Guidelines

CMS and JCAHO are consistent in requiring patients' involvement with their care plans, care decisions, and decisions at end of life. JCAHO includes a standard (RI.2.100) emphasizing the need for verbal and written communication so that information is understood by the patient or patient's representative. CMS includes a component about notifying a family member or the patient's physician at the time of hospital admission.

Survey Tips:

- Review current informed consent and advance directive policies and processes
- Audit a sample of medical records for presence of care plans and documentation of patient's involvement, informed consent, and advance directive
- Verify that patient/patient's representative has been notified of his or her rights to be involved with care decisions
- Assess staff's understanding of informed consent and advance directive processes

Suggested Documents:

- Policy on informed consent and associated form(s)
- Policy on advance directives and associated form(s)
- Policy on do not resuscitate (DNR) guidelines and associated form(s)
- Policy/guidelines for foregoing life-sustaining treatment

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| **§482.13 CoP: Patients' Rights** | **Ethics, Rights & Responsibilities (RI), Provision of Care (PC), Management of Information (IM), Leadership (LD)** |
| (c) Standard: Privacy and safety<br><br>   (1)  The patient has the right to personal privacy (A-0056).<br><br>   (2)  The patient has the right to receive care in safe setting (A-0057).<br><br>   (3)  The patient has the right to be free from all forms of abuse or harassment (A-0058). | **RI.2.130, EP2-4:** The patient has the right to privacy, confidentiality, safety, and security.<br><br>**RI.2.150, EP1-2:** The patient cannot be exposed to any forms of abuse or harassment.<br>  • *Changes to RI.2.150, EP2 has been revised. Instead of the hospital investigating potential abuse cases, this EP states that cases should be referred to the "proper authority" for further investigation.*<br><br>**RI.2.170, EP1-4:** A patient may access protective services as requested.<br><br>**PC.3.10, EP1-7:** The organization identifies patients who may be victims of abuse or harassment. |

**NEW for 2006**

---

## Analysis/Guidelines

The main emphasis of these standards is to protect a patient's basic rights to privacy, safety, dignity, and security while in the hospital. These rights apply to activities (e.g., bathing, dressing, exams) as well as verbal or written patient information (e.g., release of personal patient information without prior consent, discussions about diagnoses, care plan/treatment). The hospital must ensure that abuse, neglect, or harassment of patients does not occur, whether from hospital staff, other patients, or visitors.

Survey Tips:

- Observe the environment where patient care is provided to see if safety and privacy are protected
- Observe where patient rights information is posted to ensure that it is in public view
- Review hospital policies about processes for investigating allegations of abuse, neglect, or harassment

Suggested Documents:

- Patient rights/responsibilities handout/document
- Hospital policies on domestic, spousal, or child abuse and neglect
- Hospital policies on HIPAA
- Hospital security policies/procedures

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| §482.13 CoP: Patients' Rights | Ethics, Rights & Responsibilities (RI), Provision of Care (PC), Management of Information (IM), Leadership (LD) |
| (d) Standard: Confidentiality of patient records<br>(1) The patient has the right to the confidentiality of his or her clinical records (A-0060).<br><br>(2) The patient has the right to access information contained in his or her clinical records within a reasonable time frame. The hospital must not frustrate the legitimate efforts of individuals to gain access to their own medical records and must actively seek to meet these requests as quickly as its recordkeeping system permits (A-0061). | **RI.2.130, EP1:** Patient information is kept confidential.<br><br>**IM.2.10, EP1-8:** A patient's medical record is confidential and private.<br>• *Changes to IM.2.10—EP3, which states that the hospital's privacy/confidentiality/HIPAA policies are implemented, has been added. EP4 through EP9 have been renumbered due to this addition and have been slightly reworded.*<br><br>**IM.2.20, EP1-8:** The organization provides safeguards to information and the integrity of that information.<br>• *Changes to IM.2.20, EP3, which states that the hospital's data security and integrity policies are implemented, has been added. EP4 through EP8 have been renumbered due to this addition and have been slightly reworded.*<br><br>**IM.6.10, EP1-9, 17, 18:** Every patient has an accurate record of the care/ treatment they received.<br>• *Changes to IM.6.10, EP4 is expanded to include authentication of medical records. EP9 expands the requirement of the time to complete a record following discharge (<30 days).*<br><br>**IM.6.60, EP1-2:** Patient information must be accessible when needed for patient care/treatment. |

**NEW for 2006**

## Analysis/Guidelines

CMS and JCAHO have had confidentiality standards for many years. Although neither specifically mentions the Health Insurance Portability and Accountability Act of 1996 (HIPAA), these regulations are a key piece in today's patient record/management programs. As more hospitals move toward electronic medical records, the challenge is to manage information in all media (e.g., paper documentation, videos, audiotapes, and information stored on computer). CMS and JCAHO agree that confidentiality applies to all forms of clinical records, both in the hospital and at off-campus locations. Patients also have a right to access their own medical records. Organizations must provide this information in a timely manner. JCAHO specifies (in IM.6.10) that every patient must have a medical record.

Survey Tips:

• Conduct walk-throughs of patient care areas and observe if patient information can be viewed by visitors or is posted in public view
• Review medical record policies on how to release information contained in a patient's record

Suggested Documents:

• Hospital HIPAA policies and associated forms
• Policy on confidentiality
• Medical record policies/procedures (e.g., release of information, medical record retention)

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| §482.13 CoP: Patients' Rights | Ethics, Rights & Responsibilities (RI), Provision of Care (PC), Management of Information (IM), Leadership (LD) |

| | |
|---|---|
| (e) Standard: Restraint for acute medical and surgical care<br><br>(1)  The patient has the right to be free from restraints of any form that are not medically necessary or are used as a means of coercion, discipline, convenience, or retaliation by staff. The term "restraint" includes either a physical restraint or a drug that is being used as a restraint (A-0063).<br><br>(2)  A restraint can only be used if needed to improve the patient's well being and less restrictive interventions have been determined to be ineffective (A-0064).<br><br>(3)  The use of a restraint must be:<br><br>(i)  selected only when other less restrictive measures do not protect the patient or others from harm (A-0065).<br><br>(ii)  in accordance with the order of a physician or other LIP permitted by the state and hospital to order a restraint. This order must (A-0066)<br><br>(a)  never be written as a standing order or on an as-needed basis (A-0067); and<br><br>(b)  be followed by consultation with the patient's treating physician, as soon as possible, if the restraint is not ordered by patient's treating physician (A-0068).<br><br>(iii)  in accordance with a written modification to the patient's plan of care (A-0069).<br><br>(iv)  implemented in the least restrictive manner possible (A-0070).<br><br>(v)  in accordance with safe and appropriate restraining technique (A-0071).<br><br>(vi)  ended at the earliest possible time (A-0072). | **LD.3.90, EP1-2:** Policies/procedures exist regarding how care and services are provided.<br><br>**PC.11.10, EP1-3:** Criteria are outlined by the organization's leaders for use of restraints in acute medical and surgical settings.<br><br>**PC.11.20, EP1:** Restraint alternatives and system improvements are identified for use of restraints in acute medical and surgical settings.<br><br>**PC.11.30, EP1-2:** The organization has policies/procedures for use of restraints in acute medical and surgical settings.<br><br>**PC.11.40, EP1-7:** The use of restraints in acute medical and surgical settings must have a written order/reorder by an LIP.<br><br>**PC.11.50, EP1-2:** Orders for use of restraints in acute medical and surgical settings must meet the organization's policies/procedures and the patient's needs.<br><br>**PC.11.60, EP1-4:** Criteria for use of restraints in acute medical and surgical settings outlined in protocols must be clinically relevant.<br><br>**PC.11.70, EP1-3:** Restraint use in acute medical and surgical settings is monitored.<br><br>**PC.11.100, EP1-3:** All restraint use in acute medical and surgical settings is documented according to the organization's policies/procedures.<br><br><br>*continued on next page >* |

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| (4) The condition of the restrained patient must be continually assessed, monitored, and reevaluated (A-0073).<br><br>(5) All staff that have direct patient contact must have ongoing education and training in the proper and safe use of restraints (A-0074). | |

## Analysis/Guidelines

Similarities between CMS and JCAHO standards regarding restraints include the following:

- Patients have the right to be free from restraint that is not medically necessary
- Less restrictive alternatives should be identified
- Restraints must be ordered by a physician or licensed independent practitioner (LIP)
- Restrained patients must be assessed and monitored.
- Medically necessary or voluntary positioning used to temporarily immobilize patients during procedures is not a restraint
- Protective safety interventions (e.g., raised crib rails, crib covers) for pediatric patients is not a restraint

Differences include:

- JCAHO provides time frames for when orders must be entered in the patient's record (i.e., within 24 hours of the restraint being put on)
- JCAHO notes (in PC.11.100) the requirement of documenting restraint use
- CMS requires that direct patient care staff must have ongoing education/training around restraint use; however, JCAHO includes this requirement under the behavioral management section for restraint/seclusion

Survey Tips:

- Audit a sample of patient medical records who are/were in restraints during hospital admission to see if orders are written, restraint was appropriate, and restraint episode was documented
- Collect data to determine whether there is a pattern between increased restraint use and staffing

Suggested Documents:

- Hospital policies on restraint/immobilization

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| §482.13 CoP: Patients' Rights | Ethics, Rights & Responsibilities (RI), Provision of Care (PC), Management of Information (IM), Leadership (LD) |

| | |
|---|---|
| (f) Standard: Seclusion and restraint for behavior management<br><br>  (1) The patient has the right to be free from seclusion and restraints, of any form, imposed as a means of coercion, discipline, convenience, or retaliation by staff. The term "restraint" includes either a physical restraint or a drug that is being used as a restraint. Seclusion is the involuntary confinement of a person in a room or an area where the person is physically prevented from leaving (A-0076).<br><br>  (2) Seclusion or restraint can only be used in emergency situations if needed to ensure that the patient's safety and less restrictive interventions have been determined to be ineffective (A-0077).<br><br>  (3) The use of a restraint or seclusion must be:<br><br>    (i) selected only when less restrictive measures have been found to be ineffective to protect the patient or others from harm (A-0078).<br><br>    (ii) in accordance with the order of a physician or other LIP permitted by the state and hospital to order seclusion or restraint. The following requirements will be superseded by existing state laws that are more restrictive (A-0079):<br><br>      A. Orders for use of seclusion or a restraint must never be written as a standing order or on an as-needed basis (A-0080).<br><br>      B. The treating physician must be consulted as soon as possible if the restraint or seclusion is not ordered by patient's treating physician (A-0081).<br><br>      C. A physician or other LIP must see and evaluate the need for restraint or seclusion within one hour after the initiation of intervention (A-0082).<br><br>      D. Each written order for a physical restraint or seclusion is limited to four hours for adults; two hours for children and adolescents ages 9–17; or one hour for patients under 9 (A-0083). The original order may only be renewed in | **LD.3.90, EP1-2:** Policies/procedures exist regarding how care and services are provided.<br><br>**PC.12.10, EP1-2:** The organization relays its policies/procedures for restraint/seclusion use in behavioral healthcare settings to its staff.<br><br>**PC.12.20, EP1-6:** Consider several factors (e.g., diagnoses, staff qualifications, patient acuity, patient age, etc.) when making staffing assignments for restraint/seclusion in behavioral healthcare settings.<br><br>**PC.12.30, EP1-12:** Staff involved with restraint/seclusion use in behavioral healthcare settings must be trained and show competency in its use.<br><br>**PC.12.40, EP1, 4-10:** Assess patients in behavioral healthcare settings for their risk of needing restraint/seclusion.<br><br>**PC.12.50, EP1:** Alternative approaches to physical restraint techniques are preferred.<br><br>**PC.12.60, EP1-4:** Restraint/seclusion in behavioral healthcare settings is used in emergency situations or when the patient is a threat to himself or herself or others.<br><br>**PC.12.70, EP1-3:** Use of restraint/seclusion in behavioral healthcare settings must be ordered by an LIP.<br><br>**PC.12.80, EP1:** The organization communicates with the family in a timely manner about the need for restraint/seclusion in behavioral healthcare settings.<br><br>**PC.12.90, EP1-4:** The care provider must see and evaluate the patient in a behavioral healthcare setting before restraint/seclusion can be ordered.<br><br>**PC.12.100, EP1-3:** Time limits for use of restraint/seclusion in a behavioral healthcare setting must be included in orders (four hours for patients 18 or older, two hours for patients 9–17 years, and one hour for patients <9 years).<br><br>*continued on next page >* |

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| accordance with these limits up to a total of 24 hours (A-0084). After the original order expires, a physician or LIP (if allowed under state law) must see and assess the patient before issuing a new order (A-0085).<br><br>(iii) in accordance with a written modification to the patient's plan of care (A-0086).<br><br>(iv) implemented in the least restrictive manner possible (A-0087).<br><br>(v) in accordance with safe appropriate restraining techniques (A-0088).<br><br>(vi) ended at the earliest possible time (A-0089).<br><br>(4) A restraint/seclusion may not be used simultaneously unless the patient is<br><br>(i) Continually monitored face-to-face by an assigned staff member (A-0090).<br><br>(ii) Continually monitored by staff using both video and audio equipment. This monitoring must be in close proximity to the patient (A-0091).<br><br>(5) The condition of the patient who is in restraint or in seclusion must be continually assessed, monitored, and reevaluated (A-0092).<br><br>(6) All staff who have direct patient contact must have ongoing education and training in the proper and safe use of seclusion and restraint application and techniques (A-0093) and alternative methods for handling behavior, symptoms and situations that traditionally have been treated through the use of restraints or seclusion (A-0094).<br><br>(7) The hospital must report to CMS any death that occurs while a patient is restrained or in seclusion, or where it is reasonable to assume that a patient's death is a result of restraint or seclusion (A-0095). | **PC.2.110, EP1-6:** Use of restraint/seclusion in behavioral healthcare settings must be reevaluated by an LIP using same time limits as noted in PC.12.100.<br><br>**PC.12.120, EP1-2:** If a patient has multiple restraint/seclusion incidents, the care provider is notified.<br><br>**PC.12.130, EP1-3:** Patient assessment must be done for patients needing restraint/seclusion in behavioral healthcare settings. This includes when the restraint/seclusion can be stopped.<br><br>**PC.12.140, EP1-3:** Patient monitoring must be done continuously for patients in restraints/seclusion.<br><br>**PC.12.150, EP1-2:** Patients in behavioral healthcare settings must meet specified criteria before restraint/seclusion is stopped.<br><br>**PC.12.160, EP1-4:** The patient, family, and staff review each incident of restraint/seclusion following each incident. Staff document the reviews.<br><br>**PC.12.170, EP1-4:** Restraint/seclusion incidents must be documented in the patient's record.<br><br>**PC.12.180, EP1-8:** Data on restraint/seclusion in behavioral healthcare settings are collected and analyzed by the organization.<br><br>**PC.12.190, EP1-18:** The organization has appropriate policies and procedures on various components of restraint/seclusion in behavioral healthcare settings. |

*See next page for analysis/guidelines on §482.13(f)* >

## §482.13(f) Analysis/Guidelines

These standards are specific to emergency use of restraints in behavioral management and are not specific to any treatment setting. A restraint/seclusion for behavioral management is to be used as an emergency measure when a patient's behavior (e.g., aggressive, combative, violent) puts the patient or others in immediate danger. Less restrictive types of restraint should be considered first if at all possible. Unlike the restraints in acute medical or surgical care, both the CMS and JCAHO standards identify time limits for physical restraint/seclusion for behavioral management (i.e., four hours for adults over 18 years, two hours for patients 9–17 years, and one hour for patients <9 years). CMS has an additional requirement regarding reporting deaths associated with restraint/seclusion directly to CMS.

Survey Tips:

- Audit a sample of patient medical records who are/were in restraints during hospital admission to see whether orders are written, restraint was appropriate, and restraint episode was documented
- Collect data to determine whether there is a pattern between increased restraint use and staffing

Suggested Documents:

- Hospital restraint/immobilization policies for behavioral health patients

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| **§482.21 CoP: Quality Assessment and Performance Improvement** | **Improving Organization Performance (PI), Leadership (LD), Medical Staff (MS), Management of Human Resources (HR), Management of Information (IM)** |
| (a) Standard: Program scope<br><br>   (1)  The program must include, but not be limited to, an ongoing program that shows measurable improvement in indicators for which there is evidence that it will improve health outcomes (A-0143) and identify and reduce medical errors (A-0144).<br><br>   (2)  The hospital must measure, analyze, and track quality indicators, including adverse patient events, and other aspects of performance that assess processes of care, hospital service, and operations (A-0145). | **PI.2.10, EP1-5:** The organization collects, analyzes, displays, and compares data, both internally and externally, using statistical techniques.<br><br>**PI.2.20, EP1-10:** The organization conducts data analysis to see if trends exist. Areas required include transfusion reactions, adverse drug events, medication errors, sedation/anesthesia adverse events, staffing effectiveness, hazardous conditions, and ORYX indicators.<br><br>   • *Changes to PI.2.20—ORYX indicator data trends has been added in new EP3.*<br><br>**PI.3.20, EP1-9:** The organization takes a proactive approach to reducing patient safety risks.<br><br>**PC.17.30, EP1, 2, and 5:** The organization analyzes adverse events that occur with regard to donor tissues.<br><br>   • *Changes to PC.17.30—This is a new standard regarding adverse events with donor tissues.* |

**NEW for 2006**

**NEW for 2006**

## Analysis/Guidelines

CMS did a complete overhaul of this CoP. Previous standards focused on clinical plans, medically related patient care services, and implementation. Current standards have been expanded to focus on program scope, program data, program activities, performance improvement projects, and executive responsibilities. Both CMS and JCAHO put greater emphasis in the standards on patient safety than in the past. Not only must the hospital have an ongoing program, it must set priorities and expectations, allocate resources, and evaluate the effectiveness and outcomes of its activities. Simply collecting data is not enough; data must be analyzed and used on a regular basis to make decisions and improvements about quality, safety, and care outcomes in the hospital. Active participation from all levels of the organization must be demonstrated.

Survey Tips:

- Review data collection methods, analyze data, and identify trends with appropriate action plans
- Provide ongoing education/training to staff on quality processes, tools, hospitalwide projects, and patient safety goals and efforts
- Coach staff on the activities and projects underway within the organization
- Reinforce with executive leaders and the governing board the organization's priorities and responsibilities regarding quality and safety

Suggested Documents:

- Hospital's written quality improvement plan and organizational structure
- Hospital's patient safety program plan
- Quality improvement data collection and analysis
- Staffing effectiveness data
- Policy on sentinel events
- Incident reporting summary
- Quality committee meeting minutes
- Quality improvement reports to the governing body

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| **§482.21 CoP: Quality Assessment and Performance Improvement** | **Improving Organization Performance (PI), Leadership (LD), Medical Staff (MS), Management of Human Resources (HR), Management of Information (IM)** |
| (b) Standard: Program data<br><br>  (1) The program must incorporate quality indicator data including patient care data, and other relevant data, for example information submitted to, or received from, the hospital's QIO (A-0147).<br><br>  (2) The hospital must use the data collected to:<br><br>    (i) Monitor the effectiveness and safety of services and quality of care (A-0148)<br><br>    (ii) Identify opportunities for improvement and changes that will lead to improvement (A-0149)<br><br>  (3) The frequency and detail of data collection must be specified by the hospital's governing body (A-0150). | **PI.1.10, EP1-8, 10, 12-18, 29:** Data collection and monitoring occur throughout the organization. Areas include staff and patient satisfaction, medication management, restraint/seclusion use, invasive procedures, risk management, quality control, infection control, research, autopsies, and organ procurement data.<br>  • *Changes to PI.1.10—A new EP29 has been added related to organ procurement data and rates.*<br><br>**HR.1.30, EP1-11:** Staffing effectiveness data is collected and analyzed.<br>  • *Changes to HR.1.30—This standard has a new introduction, is slightly reworded, and has an expanded rationale section. In addition, EP1 through EP11 are either revised or new. The list of potential screening indicators has also been expanded.*<br><br>**LD.1.20, EP6:** The governing body oversees quality and patient safety activities within the organization. |

**NEW for 2006**

## Analysis/Guidelines

CMS did a complete overhaul of this CoP. Previous standards focused on clinical plans, medically related patient care services, and implementation. Current standards have been expanded to focus on program scope, program data, program activities, performance improvement projects, and executive responsibilities. Both CMS and JCAHO put greater emphasis in the standards on patient safety than in the past. Not only must the hospital have an ongoing program, it must set priorities and expectations, allocate resources, and evaluate the effectiveness and outcomes of its activities. Simply collecting data is not enough; data must be analyzed and used on a regular basis to make decisions and improvements about quality, safety, and care outcomes in the hospital. Active participation from all levels of the organization must be demonstrated.

Survey Tips:

- Review data collection methods, analyze data, and identify trends with appropriate action plans
- Provide ongoing education/training to staff on quality processes, tools, hospitalwide projects, and patient safety goals and efforts
- Coach staff on the activities and projects underway within the organization
- Reinforce with executive leaders and the governing board the organization's priorities and responsibilities regarding quality and safety

Suggested Documents:

- Hospital's written quality improvement plan and organizational structure
- Hospital's patient safety program plan
- Quality improvement data collection and analysis
- Staffing effectiveness data
- Policy on sentinel events
- Incident reporting summary
- Quality committee meeting minutes
- Quality improvement reports to the governing body

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| **§482.21 CoP: Quality Assessment and Performance Improvement** | **Improving Organization Performance (PI), Leadership (LD), Medical Staff (MS), Management of Human Resources (HR), Management of Information (IM)** |
| (c)  Standard: Program activities<br><br>(1)  The hospital must set priorities for its performance improvement activities that:<br><br>(i)  focus on high-risk, high-volume, or problem-prone areas;<br><br>(ii)  consider the coincidence, prevalence, and severity of problems in those areas;<br><br>(iii)  affect health outcomes and quality of care (A-0152)<br><br>(iv)  affect patient safety (A-0153)<br><br>(2)  Performance improvement activities must track medical errors and adverse patient events (A-0154), analyze their causes (A-0155), and implement preventive actions and mechanisms that include feedback and learning throughout the hospital (A-1056).<br><br>(3)  The hospital must take actions aimed at performance improvement (A-1057), and after implementing those actions, the hospital must measure its success (A-0158), and track performance to ensure that improvements are sustained (A-1059). | **PI.2.30, EP1-5:** The organization manages its sentinel event process.<br><br>**PI.3.10, EP1-5:** Following analysis of data, adjustments to policies, procedures, and processes are implemented to enhance quality and patient safety in the organization.<br><br>**HR.2.20, EP1-4:** Staff know their responsibilities regarding quality, patient safety, and reporting of events. |

## Analysis/Guidelines

CMS did a complete overhaul of this CoP. Previous standards focused on clinical plans, medically related patient care services, and implementation. Current standards have been expanded to focus on program scope, program data, program activities, performance improvement projects, and executive responsibilities. Both CMS and JCAHO put greater emphasis in the standards on patient safety than in the past. Not only must the hospital have an ongoing program, it must set priorities and expectations, allocate resources, and evaluate the effectiveness and outcomes of its activities. Simply collecting data is not enough; data must be analyzed and used on a regular basis to make decisions and improvements about quality, safety, and care outcomes in the hospital. Active participation from all levels of the organization must be demonstrated.

Survey Tips:

- Review data collection methods, analyze data, and identify trends with appropriate action plans
- Provide ongoing education/training to staff on quality processes, tools, hospitalwide projects, and patient safety goals and efforts
- Coach staff on the activities and projects underway within the organization
- Reinforce with executive leaders and the governing board the organization's priorities and responsibilities regarding quality and safety

Suggested Documents:

- Hospital's written quality improvement plan and organizational structure
- Hospital's patient safety program plan
- Quality improvement data collection and analysis
- Staffing effectiveness data
- Policy on sentinel events
- Incident reporting summary
- Quality committee meeting minutes
- Quality improvement reports to the governing body

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| **§482.21 CoP: Quality Assessment and Performance Improvement** | **Improving Organization Performance (PI), Leadership (LD), Medical Staff (MS), Management of Human Resources (HR), Management of Information (IM)** |
| (d) Standard: Performance improvement projects<br><br>As part of its QAPI program, the hospital must conduct performance improvement projects (A-1060).<br><br>(1) The number and scope of distinct improvement projects conducted annually must be proportional to the scope and complexity of the hospital's services and operations (A-0161).<br><br>(2) A hospital may, as one of its projects, develop and implement an information technology system explicitly designed to improve patient safety and quality of care. This project, in its initial stage of development, does not need to demonstrate measurable improvement in indicators related to health outcomes (A-0162).<br><br>(3) The hospital must document what quality improvement projects are being conducted (A-0163), the reasons for conducting these projects (A-0164), and the measurable progress achieved on these projects (A-0165).<br><br>(4) A hospital is not required to participate in a QIO cooperative project, but its own projects are required to be of comparable effort (A-0166). | **IM.3.10, EP1-4:** The organization has an information technology system in place that includes quality control systems.<br><br>• *Changes to IM.3.10—EP1 through EP3 are reworded/renumbered. EP4 (previously EP3 in 2005) focuses on quality control systems.*<br><br>**IM.4.10, EP1-3:** The organization has an information technology system in place that is used for making decisions in areas such as operations, performance improvement, and patient safety.<br><br>• *Changes to IM.4.10—Previously, there were seven EPs in this standard; they now are consolidated into three EPs.* |

**NEW for 2006**

## Analysis/Guidelines

CMS did a complete overhaul of this CoP. Previous standards focused on clinical plans, medically related patient care services, and implementation. Current standards have been expanded to focus on program scope, program data, program activities, performance improvement projects, and executive responsibilities. Both CMS and JCAHO put greater emphasis in the standards on patient safety than in the past. Not only must the hospital have an ongoing program, it must set priorities and expectations, allocate resources, and evaluate the effectiveness and outcomes of its activities. Simply collecting data is not enough; data must be analyzed and used on a regular basis to make decisions and improvements about quality, safety, and care outcomes in the hospital. Active participation from all levels of the organization must be demonstrated.

Survey Tips:

• Review data collection methods, analyze data, and identify trends with appropriate action plans
• Provide ongoing education/training to staff on quality processes, tools, hospitalwide projects, and patient safety goals and efforts
• Coach staff on the activities and projects underway within the organization
• Reinforce with executive leaders and the governing board the organization's priorities and responsibilities regarding quality and safety

Suggested Documents:

• Hospital's written quality improvement plan and organizational structure
• Hospital's patient safety program plan
• Quality improvement data collection and analysis
• Staffing effectiveness data

• Policy on sentinel events
• Incident reporting summary
• Quality committee meeting minutes
• Quality improvement reports to the governing body

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| **§482.21 CoP: Quality Assessment and Performance Improvement** | **Improving Organization Performance (PI), Leadership (LD), Medical Staff (MS), Management of Human Resources (HR), Management of Information (IM)** |

| | |
|---|---|
| (e) Standard: Executive responsibilities<br><br>The hospital's governing body (or organized group or individual who assumes full legal authority and responsibility for operations of the hospital), medical staff, and administrative officials are responsible and accountable for ensuring the following (A-0167):<br><br>(1) Defining, rolling out, and maintaining an ongoing program for quality improvement (A-0168) and patient safety, including the reduction of medical errors (A-0169).<br><br>(2) Ensuring that hospitalwide quality assessment and quality improvement efforts address priorities for improved quality of care (A-0170) and patient safety and that all improvement actions are evaluated (A-0171).<br><br>(3) Establishing clear expectations for safety (A-0172).<br><br>(4) Allocating adequate resources for measuring, assessing, improving, and sustaining the hospital performance and reducing risk to patients (A-0173).<br><br>(5) Conducting annually the determination of the number of distinct improvement projects (A-0174). | **LD.4.10, EP1-5:** Goals and plans for the organization's quality improvement program are established by the organization's leadership.<br><br>**LD.4.20, EP1-7:** New or revised processes include multiple factors (i.e., patient/staff needs, results of quality activities, information about patient risks, sentinel event information).<br><br>**LD.4.40, EP1-8:** The organization has a patient safety program in place.<br><br>**LD.4.50, EP1-3:** The organization sets priorities based on high-volume, high-risk, or problem-prone issues.<br><br>**LD.4.60, EP1-4:** Enough staff, time, and systems are provided to quality and patient safety activities.<br><br>**LD.4.70, EP1-3:** Quality and patient safety activities are assessed by the organization regularly.<br><br>**LD.5.10, EP1:** Clinical care paths/guidelines are used in quality and patient safety activities as appropriate.<br><br>**LD.5.40, EP1:** Clinical care paths/guidelines are evaluated as to patient outcomes.<br><br>**MS.3.10, EP1-11:** The organization's medical staff is involved in quality and patient safety activities.<br><br>**MS.3.20, EP1-5:** The organization's medical staff is involved in measuring and assessing quality and patient safety activities. |

*See next page for analysis/guidelines on §482.21 (e)*  >

# §482.21(e) Analysis/Guidelines

CMS did a complete overhaul of this CoP. Previous standards focused on clinical plans, medically related patient care services, and implementation. Current standards have been expanded to focus on program scope, program data, program activities, performance improvement projects, and executive responsibilities. Both CMS and JCAHO put greater emphasis in the standards on patient safety than in the past. Not only must the hospital have an ongoing program, it must set priorities and expectations, allocate resources, and evaluate the effectiveness and outcomes of its activities. Simply collecting data is not enough; data must be analyzed and used on a regular basis to make decisions and improvements about quality, safety, and care outcomes in the hospital. Active participation from all levels of the organization must be demonstrated.

Survey Tips:

- Review data collection methods, analyze data, and identify trends with appropriate action plans
- Provide ongoing education/training to staff on quality processes, tools, hospitalwide projects, and patient safety goals and efforts
- Coach staff on the activities and projects underway within the organization
- Reinforce with executive leaders and the governing board the organization's priorities and responsibilities regarding quality and safety

Suggested Documents:

- Hospital's written quality improvement plan and organizational structure
- Hospital's patient safety program plan
- Quality improvement data collection and analysis
- Staffing effectiveness data
- Policy on sentinel events
- Incident reporting summary
- Quality committee meeting minutes
- Quality improvement reports to the governing body

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| **§482.22 CoP:  Medical Staff** | **Medical Staff (MS), Improving Organization Performance (PI)** |
| The hospital must have an organized medical staff that operates under bylaws approved by the governing body and is responsible for the quality of medical care provided to patients by the hospital (A-0181).<br><br>(a) Standard: Composition of the medical staff<br>The medical staff must be composed of doctors of medicine or osteopathy and, in accordance with state law, also may be composed of other practitioners appointed by the governing body (A-0182).<br><br>   (1)  The medical staff must periodically conduct appraisals of its members (A-0183).<br><br>   (2)  The medical staff must examine credentials of candidates for medical staff membership and make recommendations to the governing body on the appointment of the candidates (A-0184). | **MS.1.10, EP1-6:** A single medical staff, with accountability to the governing body, is organized to oversee the quality of patient care and services provided by those medical staff with appropriate credentials and privileges.<br><br>**MS.1.40, EP1-12:** A medical staff executive committee exists within the hospital to carry out the responsibilities of the medical staff.<br><br>**MS.4.10, EP1-4:** A credentialing process exists for the medical staff and is outlined in the bylaws. Documentation of licensure, training/experience, and competence is verified by primary or secondary source verification or an equivalent source.<br>  • *No changes to standard or EP; added sources for verification.* |

**NEW for 2006**

## Analysis/Guidelines

The medical staff bylaws and policies/procedures should outline the processes necessary to meet both the CMS and JCAHO requirements regarding medical staff membership, organization, and accountability.

Survey Tips:

• Review bylaws for process and timeframes for medical staff appraisals and qualifications; ensure that requirements for H&P exam timelines are specified
• Review credential files to verify information is up to date and complete
• If there is a medical staff executive committee, verify that the majority of members are MDs and DOs

Suggested Documents:

• Medical staff bylaws/policies/procedures
• Medical staff organizational structure including reporting relationship to governing body
• Credentials committee meeting minutes
• Medical staff executive committee meeting minutes

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| **§482.22 CoP: Medical Staff** | **Medical Staff (MS), Improving Organization Performance (PI)** |
| (b) Standard: Medical staff organization and accountability The medical staff must be well organized and accountable to the governing body for the quality of the medical care provided to patients.<br><br>(1) The medical staff must be organized in a manner approved by the governing body.<br><br>(2) If the medical staff has an executive committee, a majority of the members of the committee must be doctors of medicine or osteopathy.<br><br>(3) The responsibility for organization and conduct of the medical staff must be assigned only to an individual doctor of medicine or osteopathy or, when permitted by state law, a doctor of dental surgery or dental medicine (A-0185). | **MS.1.10, EP1-6:** A single medical staff, with accountability to the governing body, is organized to oversee the quality of patient care and services provided by those medical staff with appropriate credentials and privileges.<br><br>**MS.1.20, EP1-19:** The medical staff has bylaws and rules/regulations that outline the medical staff's rights and responsibilities. Areas include roles and responsibilities, qualifications, medical staff executive committee, correction actions, fair hearing process, credentialing/privileging/ appointments, and related medical staff governance documentation.<br><br>• *Changes to MS.1.20—Most of the EPs have been slightly reworded and renumbered. A few have been consolidated (e.g., the revised EP12 is a combination of the previous EPs 12 and 13; the revised EP13 is a combination of the previous EPs 14 and 15). EP19 is new regarding medical staff governing documentation, but it does not go into effect until January 1, 2007.*<br><br>**MS.1.40, EP1-12:** A medical staff executive committee exists within the hospital to carry out the responsibilities of the medical staff. |

**NEW for 2006**

## Analysis/Guidelines

The medical staff bylaws and policies/procedures should outline the processes necessary to meet both the CMS and JCAHO requirements regarding medical staff membership, organization, and accountability.

Survey Tips:

• Review bylaws for process and timeframes for medical staff appraisals and qualifications; ensure that requirements for H&P exam timelines are specified
• Review credential files to verify information is up to date and complete
• If there is a medical staff executive committee, verify that the majority of members are MDs and DOs

Suggested Documents:

• Medical staff bylaws/policies/procedures
• Medical staff organizational structure including reporting relationship to governing body
• Credentials committee meeting minutes
• Medical staff executive committee meeting minutes

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| **§482.22 CoP: Medical Staff** | **Medical Staff (MS), Improving Organization Performance (PI)** |
| (c) Standard: Medical staff bylaws<br>The medical staff must adopt and enforce bylaws to carry out its responsibilities (A-0186). The bylaws must:<br><br>(1) be approved by the governing body (A-0187)<br><br>(2) include a statement of the duties and privileges of each category of medical staff (e.g., active, courtesy, etc.) (A-0188)<br><br>(3) describe the organization of the medical staff (A-0189)<br><br>(4) describe the qualifications to be met by a candidate in order for the medical staff to recommend that the candidate be appointed by the governing body (A-0190)<br><br>(5) include a requirement that a physical examination and medical history be done no more than seven days before or 48 hours after an admission for each patient by a doctor of medicine or osteopathy, or, for patients admitted only for oromaxillofacial surgery, by an oromaxillofacial surgeon who has been granted such privileges by the medical staff in accordance with state law (A-0191)<br><br>(6) Include criteria for determining the privileges to be granted to individual practitioners and a procedure for applying the criteria to individuals requesting privileges (A-0192) | **MS.1.20, EP1-19:** The medical staff has bylaws and rules/regulations that outline the medical staff's rights and responsibilities. Areas include roles and responsibilities, qualifications, medical staff executive committee, corrective actions, fair hearing process, credentialing/privileging/ appointments, and related medical staff governance documentation.<br><br>• *Changes to MS.1.20—Most of the EPs have been slightly reworded and renumbered. A few have been consolidated (e.g., the revised EP12 is a combination of the previous EPs 12 and 13; the revised EP13 is a combination of the previous EPs 14 and 15. EP19 is new regarding medical staff governing documentation, but it does not go into effect until January 1, 2007.* |

**NEW for 2006**

## Analysis/Guidelines

The medical staff bylaws and policies/procedures should outline the processes necessary to meet both the CMS and JCAHO requirements regarding medical staff membership, organization, and accountability.

Survey Tips:

• Review bylaws for process and timeframes for medical staff appraisals and qualifications; ensure that requirements for H&P exam timelines are specified
• Review credential files to verify information is up to date and complete
• If there is a medical staff executive committee, verify that the majority of members are MDs and DOs

Suggested Documents:

• Medical staff bylaws/policies/procedures
• Medical staff organizational structure including reporting relationship to governing body
• Credentials committee meeting minutes
• Medical staff executive committee meeting minutes

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| **§482.22 CoP: Medical Staff** | **Medical Staff (MS), Improving Organization Performance (PI)** |
| (d) Standard: Autopsies<br>The medical staff should attempt to secure autopsies in all cases of unusual deaths and of medical-legal and educational interest. The mechanism for documenting permission to perform an autopsy must be defined. There must be a system for notifying the medical staff, and specifically the attending practitioner, when an autopsy is being performed (A-0193). | **MS.3.10, EP9:** The medical staff is involved in quality improvement activities, including autopsy criteria.<br><br>**PI.1.10, EP18:** When autopsies are performed, data are incorporated into the organization's quality improvement activities. |

## Analysis/Guidelines

CMS focuses on getting permission to conduct an autopsy and notifying the attending practitioners when an autopsy is being performed; both are responsibilities of the medical staff. JCAHO focuses on the medical staff's responsibility to incorporate autopsy data into the overall quality improvement activities of the organization.

Suggested Documents:

- Policies/procedures outlining the process for obtaining permission for and performing autopsies
- Autopsy data and reports

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| **§482.23 CoP:  Nursing Services** | **Nursing (NR), Management of Human Resources (HR), Provision of Care (PC), Medication Management (MM), Management of Information (IM), Improving Organization Performance (PI)** |
| The hospital must have an organized nursing service that provides 24-hour nursing services. The nursing services must be furnished or supervised by a registered nurse (A-0199).

(a) Standard: Organization
   The hospital must have a well-organized service with a plan of administrative authority and delineation of responsibilities for patient care. The director of the nursing service must be a licensed registered nurse. He or she is responsible for the operation of the service, including determining the types and numbers of nursing personnel and staff necessary to provide nursing care for all areas of the hospital (A-0200). | **NR.1.10, EP1-7:** The organization's nursing service is organized under a nurse executive.

**NR.2.10, EP1-6:** The organization's nurse executive is qualified (by license, education and experience) in management.

**NR.3.10, EP1-4:** The organization's nurse executive creates policies and procedures and standards of care/practice related to nursing services within the organization. |

| **Analysis/Guidelines** |
|---|
| CMS and JCAHO are similar in the requirements for how the nursing services are organized and the qualifications and functions of the chief nursing officer/executive.

Survey Tips:

  • Verify the chief nursing officer/executive has a current job description and licensure
  • Review organizational structure for nursing services

Suggested Documents:

  • Organizational chart for nursing services
  • Job description for chief nursing officer/executive |

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| **§482.23 CoP: Nursing Services** | **Nursing (NR), Management of Human Resources (HR), Provision of Care (PC), Medication Management (MM), Management of Information (IM), Improving Organization Performance (PI)** |

| | |
|---|---|
| (b) Standard: Staffing and delivery of care<br>The nursing service must have adequate numbers of licensed registered nurses, licensed practical (vocational) nurses, and other personnel to provide nursing care to all patients as needed. There must be supervisory and staff personnel for each department or nursing unit to ensure, when needed, the immediate availability of a registered nurse for bedside care of any patient (A-0201). | **HR.1.10, EP1:** There must be adequate staffing within the organization. |
| | **HR.1.20, EP1-7, 18, 46:** Verification of licensure/certification/registration, credentials, education, criminal background check, and health screen is done. If no licensure/certification for patient care providers, accreditation decision will be impacted. |
| (1) The hospital must provide 24-hour nursing services furnished or supervised by a registered nurse and have a licensed practical nurse or registered nurse on duty at all times, except for rural hospitals that have in effect a 24-hour nursing waiver granted under §488.54 of this chapter (A-0202). | • *Changes to HR.1.20—EPs 1 and 2 remain unchanged. EPs 3–5 are reworded and renumbered. EP4 has three additional notes regarding primary source verification and credentials verification organizations (CVO). The 2005 EPs 18 and 19 were eliminated and new EPs 18 and 46 were added.* |
| (2) The nursing service must have a procedure to ensure that hospital nursing personnel for whom licensure is required have valid and current licensure (A-0203). | **HR.3.10, EP1-10:** Competencies are assessed and demonstrated for all staff.<br><br>**PC.2.130, EP3:** Nursing assessments of a patient's needs must be done by a nurse. |
| (3) A registered nurse must supervise and evaluate the nursing care for each patient (A-0204). | **PC.4.10, EP1, 2, 6, 12-14, 17:** Individual care plans are created for each patient. |
| (4) The hospital must ensure that the nursing staff develops, and keeps current, a nursing care plan for each patient (A-0205). | **PC.5.10, EP1:** A care plan is done for each patient. |
| (5) A registered nurse must assign the nursing care of each patient to other nursing personnel in accordance with the patient's needs and the specialized qualifications and competence of the nursing staff available (A-0206). | **PC.5.50, EP1:** The care plan is done in a collaborative manner.<br><br>**PC.5.60, EP1 & 5:** The care plan is coordinated in a timely manner. |
| (6) Non-employee licensed nurses who are working in the hospital must adhere to the policies and procedures of the hospital. The director of nursing service must provide for the adequate supervision and evaluation of the clinical activities of non-employee nursing personnel that occur within the responsibility of the nursing service (A-0207). | |
| | ***See next page for analysis/guidelines on §482.23 (b)  >*** |

**NEW for 2006**

## §482.23(b) Analysis/Guidelines

While CMS focuses specifically on nursing staffing and competencies, JCAHO standards encompass staffing and competencies throughout the entire organization. JCAHO does not have standards in the Nursing (NR) chapter that address these areas and instead includes them in the Management of Human Resources (HR) chapter. Regarding care plans, CMS focuses on the nursing part of the care plan; JCAHO's focus is more general, requiring that the individual's care plan be done collaboratively and in a timely manner with all disciplines.

Survey Tips:

- Verify that all nursing staff have updated credentials and a current valid license
- Review medical records to determine whether nursing care is provided as ordered/needed
- Interview charge nurses regarding what considerations are necessary when making staff assignments (e.g., patient needs, patient complexity, nurse qualifications or experience, etc.)

Suggested Documents:

- Nurse staffing schedules/assignments
- Hospital personnel files (including contracts/qualifications/orientation of non-employee licensed registered nurses)
- Nursing care plans

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| §482.23 CoP: Nursing Services | Nursing (NR), Management of Human Resources (HR), Provision of Care (PC), Medication Management (MM), Management of Information (IM), Improving Organization Performance (PI) |

| | |
|---|---|
| (c) Standard: Preparation and administration of drugs<br>Drugs and biologicals must be prepared and administered in accordance with federal and state laws, the orders of the practitioner(s) responsible for the patient's care as specified under §482.12(c), and accepted standards of practice (A-0208).<br><br>(1) All drugs and biologicals must be administered by, or under supervision of, nursing or other personnel in accordance with federal and state laws and regulations, including applicable licensing requirements, and in accordance with the approved medical staff policies and procedures (A-0209).<br><br>(2) All orders for drugs and biologicals must be in writing and signed by the practitioner(s) responsible for the care of the patient as specified under §482.12(c) with the exception of influenza and pneumococcal polysaccharide vaccines, which may be administered per physician-approved hospital policy after an assessment for contraindications. When telephone or oral orders must be used, they must be (A-0210):<br><br>    (i) accepted only by personnel that are authorized to do so by the medical staff policies and procedures consistent with federal and state law (A-0211)<br><br>    (ii) signed or initialized by the prescribing practitioner as soon as possible (A-0212)<br><br>    (iii) used infrequently (A-0213)<br><br>(3) Blood transfusions and intravenous medications must be administered in accordance with state law and approved medical staff policies and procedures. If blood transfusions and intravenous medications are administered by personnel other than doctors of medicine or osteopathy, the personnel must have special training for this duty (A-0214).<br><br>(4) There must be a hospital procedure for reporting transfusion reactions, adverse drug reactions, and errors in administration of drugs (A-0215). | **MM.2.20, EP1-10 & 13:** Drugs and biologicals are stored safely and properly.<br><br>• *Changes to MM.2.20—EPs 6 and 8 have been reworded slightly and are no longer scored as part of this standard. EP6 is now scored at National Patient Safety Goal (NPSG) 3, Requirement 3C. EP8 is now scored at NPSG 3, Requirement 3B.*<br><br>**NPSG 3 (3B):** Drug concentrations are standardized in the organization.<br><br>**NPSG 3 (3C):** Look-alike/sound-alike drugs and biologicals are reviewed each year.<br><br>**NPSG 3 (3D):** All medications are labeled.<br><br>**NPSG 1 (1A):** Patients must be identified before giving medications, blood, or taking specimens.<br><br>**MM.3.20, EP1-10, 13:** Drug and biological orders are written legibly and accurately.<br><br>• *Changes to MM.3.20—The rationale section has been expanded. EP6 has definitions for different order types added. EPs 7–10 are reworded slightly. EP13, which states that medication order policies are implemented, is new.*<br><br>**MM.4.20, EP1-4:** Drugs and biologicals are safely prepared.<br><br>**MM.4.40, EP1-5:** Drugs and biologicals are safely dispensed.<br><br>• *Changes to MM.4.40—EP5 has been reworded slightly.*<br><br>**MM.5.10, EP1-8:** Medication administration is done safely and accurately following verification of order.<br><br>• *Changes to MM.5.10—A new EP1, which notes medication administration policies, has been added. EPs 2–8 have been renumbered and/or the order has been adjusted.*<br><br>**MM.5.20, EP1-3:** Medications self administered by the patient is done safely and accurately following verification of order. |

NEW for 2006

NEW for 2006

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| **§482.23 CoP: Nursing Services** | **Nursing (NR), Management of Human Resources (HR), Provision of Care (PC), Medication Management (MM), Management of Information (IM), Improving Organization Performance (PI)** |
|  | **MM.6.20, EP1-3:** The organization has a process for responding to adverse drug events or drug errors.<br><br>• *Changes to MM.6.20—EP2 is reworded slightly.*<br><br>**MM.7.10, EP1-3:** High-risk medications are identified and monitored.<br><br>• *Changes to MM.7.10—A new EP3 has been added, which states that medication processes are implemented.*<br><br>**MM.7.40, EP1-4:** Investigational drug administration is done safety and accurately following verification of order.<br>• *Changes to MM.7.40—This standard only had one EP in 2005; in 2006, the same components are split into four separate EPs and slightly reworded.*<br><br>**IM.6.50, EP1-4:** Verbal and telephone orders are written appropriately and transcribed only by qualified staff as designated by the organization.<br><br>• *Changes to IM.6.50—The standard was revised to specify telephone orders as well as verbal orders. EP4 has been reworded and is no longer scored in this standard; it is scored in NPSG 2, Requirement 2A.*<br><br>**NPSG 2 (2A):** Verbal/phone orders must be verified using the "read-back" method.<br><br>**PI.2.20, EP1-10:** Conduct data analysis to see whether trends exist. Areas required include transfusion reactions, adverse drug events, medication errors, sedation/anesthesia adverse events, staffing effectiveness, hazardous conditions, and ORYX indicators.<br><br>• *Changes to PI.2.20—ORYX indicator data trends has been added in a new EP3.*<br><br>**PI.2.30, EP2:** The organization manages its sentinel event process. |

**NEW for 2006**

*See next page for analysis/guidelines on §482.23 (c)   >*

## §482.23(c) Analysis/Guidelines

Like patient safety, medication management is a major component of hospital compliance. Both CMS and JCAHO standards high-light that drugs, biologicals, and blood products are ordered, prepared, dispensed, and administered safely and accurately. Should an error or adverse drug event occur, the hospital must have a process to respond. CMS also notes a training component for admin-istration of blood and IV medications.

Survey Tips:

- Review medical records for legibility, timeliness, dates, and authentication of drug and blood product orders
- Review medical records for transfusion and IV medication practices

Suggested Documents:

- Hospital policies/procedures on medication management
- Medical records
- Medical staff policies/procedures for drug ordering and which personnel can accept verbal/phone orders
- Blood transfusion policies
- Incident report summary regarding medication errors or adverse drug events
- Nursing policies/procedures
- Sentinel event policy
- Pharmacy committee meeting minutes

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| **§482.24  CoP: Medical Record Services** | **Management of Information (IM), Leadership (LD), Management of Human Resources (HR), Ethics, Rights & Responsibilities (RI), Medical Staff (MS)** |
| The hospital must have a medical record service that has administrative responsibility for medical records. A medical record must be maintained for every individual evaluated or treated in the hospital (A-0221).<br><br>(a) Standard: Organization and staffing<br>The organization of the medical record service must be appropriate to the scope and complexity of the services performed. The hospital must employ adequate personnel to ensure prompt completion, filing, and retrieval of records (A-0222). | **LD.1.20, EP4:** A written scope of service exists.<br><br>**LD.3.90, EP1–2:** The organization has policies and procedures for services.<br><br>**HR.1.10, EP1:** There must be adequate staffing within the organization.<br><br>**HR.1.20, EP1-7, 18, 46:** Verification of licensure/certification/registration, credentials, education, criminal background check, and health screen is done. If no licensure/certification for patient care providers, accreditation decision will be affected.<br><br>    • *Changes to HR.1.20—EPs 1 and 2 remain unchanged. EPs 3–5 are reworded and renumbered. EP4 has three additional notes regarding primary source verification and credentials verification organizations (CVO). The 2005 EPs 18 and 19 were eliminated and a new EP18 and EP46 were added.*<br><br>**HR.3.10, EP1–10:** The organization has in place a competency assessment process. |

**NEW for 2006**

## Analysis/Guidelines

An organized and adequately staffed medical records department is necessary in order to comply with CMS and JCAHO requirements as well as state and federal laws.

Survey Tips:

• Select a sample of discharged patients and request those medical records to see how quickly records can be retrieved
• Review personnel files to ensure they are up to date and complete

Suggested Documents:

• Scope of service for medical records department
• Personnel files
• Job descriptions and staffing schedules for medical records personnel
• Organizational chart for medical records department

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| **§482.24  CoP: Medical Record Services** | **Management of Information (IM), Leadership (LD), Management of Human Resources (HR), Ethics, Rights & Responsibilities (RI), Medical Staff (MS)** |

<table>
<tr><td>

(b) Standard: Form and retention of record

The hospital must maintain a medical record for each inpatient and outpatient. Medical records must be accurately written, promptly completed, properly filed and retained, and accessible. The hospital must use a system of author identification and record maintenance that ensures the integrity of the authentication and protects the security of all record entries (A-0223).

   (1) Medical records must be retained in their original or legally reproduced form for a period of at least five years (A-0224).

   (2) The hospital must have a system of coding and indexing medical records. The system must allow for timely retrieval by diagnosis and procedure, in order to support medical care evaluation studies (A-0225).

   (3) The hospital must have a procedure for ensuring the confidentiality of patient records. Information from or copies of records may be released only to authorized individuals (A-0226), and the hospital must ensure that unauthorized individuals cannot gain access to or alter patient records (A-0227). Original medical records must be released by the hospital only in accordance with federal or state laws, court orders, or subpoenas (A-0228).

</td><td>

**IM.2.10, EP1-8:** A patient's medical record is confidential and private.

- *Changes to IM.2.10—EP3, which states that the hospital's privacy/confidentiality/HIPAA policies are implemented, has been added. EPs 4–9 have been renumbered due to this addition and have been slightly reworded.*

**IM.4.10, EP1-3:** The organization has an information technology system in place that is used for making decisions in areas such as operations, performance improvement, and patient safety.

- *Changes to IM.4.10—Previously, there were seven EPs in this standard; they now have been consolidated into three EPs.*

**IM.6.10, EP1-9, 17, 18:** Every patient has an accurate record of the care/ treatment he or she received. Only designated staff can enter information into the medical record.

- *Changes to IM.6.10—EP4 is expanded to include authentication of medical records. EP9 expands the requirement of the time to complete a record following discharge (<30 days).*

**IM.6.20, EP1-3:** Patient records have specific clinical information documented.

- *Changes to IM.6.20—A new bullet under EP2 was added which addresses language needs of the patient/family.*

**IM.6.30, EP1-8, 10:** Operative procedures or use of sedation is documented in the medical record.

- *Changes to IM.6.30—EP1 and EP2 were revised. A new EP10, which was part of the 2005 EP1, was added. A new reference to standards PC.13.30 and PC.13.40 was added.*

**IM.6.40, EP1-3:** A problem/summary list is included in the medical record for outpatient services.

- *Changes to IM.6.40—The order of the EPs has been changed. EP3 (which was EP2 in 2005) has been reworded.*

</td></tr>
</table>

NEW for 2006

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| **§482.24  CoP: Medical Record Services** | **Management of Information (IM), Leadership (LD), Management of Human Resources (HR), Ethics, Rights & Responsibilities (RI), Medical Staff (MS)** |
| | **RI.2.130, EP1:** Protect confidentiality, privacy, and security for patients.<br><br>**RI.2.180, EP5:** Patients involved in research projects will have their information kept confidential. |

## Analysis/Guidelines

CMS and JCAHO require systems that protect the integrity and security of patient information yet provide timely retrieval as needed. HIPAA regulations play a large role in this area as well.

Survey Tips:

- Verify that an established system is in place that protects confidential medical information
- For electronic medical records, check security safeguards for access, altering, damage, or destruction
- Identify all locations in the hospital where records are stored and maintained

Suggested Documents:

- HIPAA policies
- Policies on confidentiality and record retention
- Research policies on confidentiality

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| §482.24  CoP: Medical Record Services | Management of Information (IM), Leadership (LD), Management of Human Resources (HR), Ethics, Rights & Responsibilities (RI), Medical Staff (MS) |

**NEW for 2006**

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| (c) Standard: Content of record<br><br>The medical record must contain information to justify admission and continued hospitalization, support the diagnosis, and describe the patient's progress and response to medications and services (A-229).<br><br>(1)  All entries must be legible and complete and must be authenticated and dated promptly by the person (identified by name and discipline) who is responsible for ordering, providing, or evaluating the service furnished (A-0230).<br><br>    (i)  The author of each entry must be identified and must authenticate his or her entry (A-0231)<br><br>    (ii)  Authentication may include signatures, written initials, or computer entry (A-0232)<br><br>(2)  All records must document the following, as appropriate (A-0233):<br><br>    (i)  Evidence of a physical examination, including a health history, performed no more than seven days prior to admission or within 48 hours after admission (A-0234)<br><br>    (ii)  Admitting diagnosis (A-0235)<br><br>    (iii)  Results of all consultative evaluations of the patient and appropriate findings by clinical and other staff involved in the care of the patient (A-0236)<br><br>    (iv)  Documentation of complications, hospital-acquired infections, and unfavorable reactions to drugs and anesthesia (A-0237)<br><br>    (v)  Properly executed informed consent forms for procedures and treatments specified by the medical staff, or by federal or state law if applicable, to require written patient consent (A-0238)<br><br>    (vi)  All practitioners' orders, nursing notes, reports of treatment, medication records, radiology, and | **IM.6.10, EP1-9,17, 18:** Every patient has an accurate record of the care/treatment he or she received. Only designated staff can enter information into the medical record.<br><br>    • *Changes to IM.6.10—EP4 is expanded to include authentication of medical records. EP9 expands the requirement of the time to complete a record following discharge (<30 days).*<br><br>**IM.6.20, EP1-3:** Patient records have specific clinical information documented.<br><br>    • *Changes to IM.6.20—A new bullet under EP2 was added to address language needs of the patient/family.*<br><br>**IM.6.30, EP1-8, 10:** Operative procedures or use of sedation is documented in the medical record.<br><br>    • *Changes to IM.6.30—EPs 1 and 2 were revised. A new EP 10, which was part of the 2005 EP1, was added. A new reference to standards PC.13.30 and PC.13.40 was added.*<br><br>**IM.6.40, EP1-3:** A problem/summary list is included in the medical record for outpatient services.<br><br>    • *Changes to IM.6.40—The order of the EPs has been changed. EP3 (which was EP2 in 2005) has been reworded.*<br><br>**MS.3.20, EP3:** Medical records are completed in an accurate, timely, and legible manner by medical staff. |

*continued on next page >*

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| laboratory reports, and vital signs and other information necessary to monitor the patient's condition (A-0239)<br><br>(vii) Discharge summary with outcome of hospitalization, disposition of care, and provisions for follow-up care (A-0240)<br><br>(viii) Final diagnosis with completion of medical records within 30 days following discharge (A-0241) | |

## §482.24(c) Analysis/Guidelines

A patient's medical record must have complete documentation at all times. The CMS and JCAHO standards are similar regarding legibility, authentication, timed/dated entries, and general content of the record. A hospital's medical staff should identify what components need to be included in a patient's H&P.

Survey Tips:

• Conduct regular medical record reviews/audits to verify whether documentation is complete and present in the chart

Suggested Documents:

• Medical record policies/procedures (including policies for electronic records)
• Medical staff bylaws/policies/procedures
• Policy on informed consent

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| **§482.25 CoP: Pharmaceutical Services** | **Medication Management (MM), Leadership (LD), Management of Human Resources (HR)** |
| The hospital must have pharmaceutical services that meet the needs of the patients. The institution must have a pharmacy directed by a registered pharmacist or a drug storage area under competent supervision. The medical staff is responsible for developing policies and procedures that minimize drug errors. This function may be delegated to the hospital's organized pharmaceutical service (A-0247).<br><br>(a) Standard: Pharmacy management and administration<br>The pharmacy or drug storage area must be administered in accordance with accepted professional principles (A-0248).<br>(1) A full-time, part-time, or consulting pharmacist must be responsible for developing, supervising, and coordinating all the activities of the pharmacy services (A-0249).<br><br>(2) The pharmaceutical service must have an adequate number of personnel to ensure quality pharmaceutical services, including emergency services (A-0250).<br><br>(3) Current and accurate records must be kept of the receipt and disposition of all scheduled drugs (A-0251). | **LD.1.20, EP4:** A written scope of service exists.<br><br>**LD.2.20, EP1–5:** Leaders for each area are effective, qualified, and accountable.<br><br>**LD.3.70, EP1-4:** Organization provides qualified staff (whether employees, non-employee individuals, or LIPs) and ensures appropriate privileging and credentialing of that staff.<br><br>   • *Changes to LD.3.70: The rationale section has been expanded and new EPs 3 and 4 have been added.*<br><br>**LD.3.90, EP1 and EP2:** The organization has policies and procedures for services.<br><br>**HR.1.10, EP1:** There must be adequate staffing within the organization.<br><br>**HR.1.20, EP1-7, 18, 46:** Verification of licensure/certification/registration, credentials, education, criminal background check, and health screen is done. If no licensure/certification for patient care providers, accreditation decision will be impacted.<br><br>   • *Changes to HR.1.20—EP1 and EP2 remain unchanged. EPs 3–5 are reworded and renumbered. EP4 has three additional notes regarding primary source verification and CVOs. The 2005 EP18 and EP19 were eliminated and new EPs 18 and 46 were added.*<br><br>**HR.3.10, EP1–10:** The organization has in place a competency assessment process |

NEW for 2006

NEW for 2006

## Analysis/Guidelines

This section includes similarities between CMS and JCAHO standards. Both require that activities of the pharmaceutical service be delineated and that the service is run by a qualified individual. CMS defines accepted professional principles as "compliance with applicable federal and state laws, regulations, and guidelines governing pharmaceutical services, as well as standards or recommendations promoted by nationally recognized professional organizations."

Survey Tips:

- Review pharmacy policies/procedures to see that they meet accepted professional principles regarding storage, control, compounding, dispensing, labeling, and administration
- Review pharmacy system(s) (e.g., unit dose system, individual prescriptions, floor stock system) for effectiveness
- Verify that pharmacy staff have current licenses and that competencies are up to date

Suggested Documents:

- Scope of service for pharmacy department
- Job descriptions of pharmacy director and personnel
- Pharmacy policies/procedures
- Pharmacy committee meeting minutes

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| §482.25 CoP: Pharmaceutical Services | Medication Management (MM), Leadership (LD), Management of Human Resources (HR) |

| | |
|---|---|
| (b) Standard: Delivery of services<br>In order to provide patient safety, drugs and biologicals must be controlled and distributed in accordance with applicable standards of practice, consistent with federal and state law (A-0252). | **MM.2.10, EP1-7:** A formulary exists within the organization for dispensing and administration of medications.<br>• *Changes to MM.2.10—Stock medications have been added to the standard.* |
| (1) All compounding, packaging, and dispensing of drugs and biologicals must be under the supervision of a pharmacist and performed consistent with state and federal laws (A-0253). | **MM.2.20, EP1-10 & 13:** Drugs and biologicals are stored safely and properly.<br>• *Changes to MM.2.20—EP6 and EP8 have been reworded slightly and are no longer scored as part of this standard. EP6 is now scored at National Patient Safety Goal (NPSG) 3, Requirement 3C. EP8 is now scored at NPSG 3, Requirement 3B.* |
| (2) Drugs and biologicals must be kept in a locked storage area (A-0254). | |
| (3) Outdated, mislabeled, or otherwise unusable drugs and biologicals must not be available for patient use (A-0255). | **NPSG 3 (3C):** Look-alike/sound-alike drugs and biologicals are reviewed each year. |
| | **NPSG 3 (3B):** Drug concentrations are standardized in the organization. |
| (4) When a pharmacist is not available, drugs and biologicals must be removed from the pharmacy or storage area only by personnel designated in the policies of the medical staff and pharmaceutical service, in accordance with federal and state law (A-0256). | **MM.2.30, EP2–3, 6–7:** Medications used in emergency situations are identified and made available in patient care areas.<br><br>**MM.4.10, EP1, 3–6:** All medication orders are reviewed by a pharmacist; if pharmacy is not open 24 hours a day, a pharmacist does this review retrospectively when pharmacy reopens. |
| (5) Drugs and biologicals not specifically prescribed as to time or number of doses must automatically be stopped after a reasonable time that is predetermined by the medical staff (A-0257). | **MM.4.20, EP1–4:** Drugs and biologicals are safely prepared.<br><br>**MM.4.30, EP1-4:** Drugs and biologicals are labeled properly.<br>• *Changes to MM.4.30—EP1 has been reworded slightly.* |
| (6) Drug administration errors, adverse drug reactions, and incompatibilities must be immediately reported to the attending physician and, if appropriate, to the hospitalwide quality assurance program (A-0258). | **MM.4.40, EP1-5:** Drugs and biologicals are safely dispensed.<br>• *Changes to MM.4.40—EP5 has been reworded slightly.* |
| (7) Abuses and losses of controlled substances must be reported, in accordance with applicable federal and state laws, to the individual responsible for the pharmaceutical service, and to the chief executive officer, as appropriate (A-0259). | **MM.4.50, EP1-4:** Medications are provided safely when pharmacy is closed.<br><br>**MM.4.70, EP1-3:** The organization has a process to recall drugs for safety purposes when directed by the manufacturer or FDA.<br>• *Changes to MM.4.70—EP2 has been reworded slightly.* |
| (8) Information relating to drug interactions and information of drug therapy, side effects, toxicology, dosage, | **MM.4.80, EP1-4:** Drugs or biologicals that are returned to the pharmacy are handled appropriately. |
| | *continued on next page >* |

NEW for 2006

NEW for 2006

NEW for 2006

continued on next page >

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| indications for use, and routes of administration must be available to the professional staff (A-0260).<br><br>(9) A formulary system must be established by the medical staff to ensure quality pharmaceuticals at reasonable costs (A-0261). | • *Changes to MM.4.80—The standard and EP4 have been reworded slightly.*<br><br>**MM.5.10, EP1-8:** Medication administration is done safely and accurately following verification of order.<br><br>• *Changes to MM.5.10—A new EP1, which notes medication administration policies, has been added. EPs 2–8 have been renumbered/the order has been adjusted.*<br><br>**MM.5.20, EP1–3:** Medications self administered by the patient are given safely and accurately following verification of order.<br><br>**MM.6.10, EP1–3:** The organization has a process to monitor medication effects.<br><br>**MM.6.20, EP1-3:** The organization has a process for responding to adverse drug events or drug errors.<br><br>• *Changes to MM.6.20—EP2 is reworded slightly.*<br><br>**MM.7.10, EP1-3:** High-risk medications are identified and monitored.<br><br>• *Changes to MM.7.10—A new EP3 has been added, which states that medication processes are implemented.*<br><br>**MM.7.40, EP1-4:** Investigational drug administration is done safety and accurately following verification of order.<br><br>• *Changes to MM.7.40—This standard only had one EP in 2005; in 2006, the same components are split out into four separate EPs and slightly reworded.*<br><br>**MM.8.10, EP 1-3:** The organization's medication management system is reviewed regularly.<br><br>• *Changes to MM.8.10—EP2 is reworded slightly to include performance improvement opportunities.* |

NEW for 2006

NEW for 2006

## §482.25(b) Analysis/Guidelines

The Medication Management (MM) chapter in the JCAHO manual meets the CMS requirements for drug selection, procurement, storage, ordering, transcribing, preparation, dispensing, administration, and monitoring. CMS specifically requires that information about drug interactions, side effects, indications for use, etc., be available to professional staff; JCAHO does not have a specific standard for this. On the other hand, JCAHO specifies the need for a drug recall system and addresses safe administration of investigational drugs, while CMS does not.

Survey Tips:

- Review medication orders and verify that appropriate drugs/biologicals were administered to the patient
- Observe the preparation of sterile products
- Inspect drug storage areas (including areas outside the pharmacy and on medication carts)
- Conduct spot checks for medications to identify expired, mislabeled, or unusable medications

Suggested Documents:

- Hospital drug formulary
- Pharmacy policies/procedures, including controlled drug policies
- Medication management policies
- Pharmacy committee meeting minutes
- Drug recall process

- Sentinel event policy
- List of high-alert drugs
- Medical staff bylaws/policies/procedures
- Incident report summary on medical errors/adverse drug events
- Drug information sheets/handouts

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| **§482.26 CoP:  Radiological Services** | **Provision of Care (PC), Management of the Environment of Care (EC), Leadership (LD), Medical Staff (MS), Management of Information (IM), Improving Organization Performance (PI)** |
| The hospital must maintain or have available diagnostic radiologic services. If therapeutic services are also provided, they, as well as the diagnostic services, must meet professionally approved standards for safety and personnel qualifications (A-0267).<br><br>(a) Standard: Radiology services<br>    The hospital must maintain, or have available, radiology services according to needs of the patients (A-0268). | **LD.1.20, EP4:** A written scope of service exists.<br><br>**LD.3.30, EP1:** The organization provides essential services including diagnostic radiology.<br><br>**LD.3.90, EP1 & 2:** The organization has policies and procedures for services.<br><br>**PC.2.20, EP1-4:** Patient information is gathered when patients are assessed or reassessed.<br><br>  • *Change to PC.2.20—A new rationale section regarding assessment data has been added.*<br><br>**PC.2.130, EP1-3:** Patients are assessed in all care settings. |

NEW for 2006

| **Analysis/Guidelines** |
|---|
| Both CMS and JCAHO are verifying that hospitals provide radiological services either directly or through a contractual agreement.<br><br>Suggested Documents:<br><br>  • Scope of service for radiology service |

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| **§482.26 CoP:  Radiological Services** | **Provision of Care (PC), Management of the Environment of Care (EC), Leadership (LD), Medical Staff (MS), Management of Information (IM), Improving Organization Performance (PI)** |
| (b) Standard: Safety for Patients and Personnel<br>The radiological services, particularly ionizing radiology procedures, must be free from hazards for patients and personnel (A-269).<br><br>  (1)  Proper safety precautions must be maintained against radiation hazards.  This includes adequate shielding for patients, personnel, and facilities, as well as appropriate storage, use and disposal of radioactive materials (A-0270).<br>  (2)  Periodic inspection of equipment must be made and hazards identified must be promptly corrected  (A-0271).<br>  (3)  Radiation workers must be checked periodically, by the use of exposure meters or badge tests, for amount of radiation exposure (A-0272).<br>  (4)  Radiology services must be provided only on the order of practitioners with clinical privileges or, consistent with state law, of other practitioners authorized by the medical staff and the governing body to order the services (A-0273). | **EC.3.10, EP5-13:** Hazardous waste systems are managed.<br><br>**EC.6.10, EP1-8:** Medical equipment is monitored and managed.<br><br>**EC.6.20, EP1-6:** Testing and regular inspections of medical equipment are done.<br><br>**PI.1.10, EP1-8, 10, 12-18, 29:** Data collection and monitoring occur throughout the organization. Areas include staff and patient satisfaction, medication management, restraint/seclusion use, invasive procedures, risk management, quality control, infection control, research, autopsies, and organ procurement data.<br><br>  • *Changes to PI.1.10—A new EP29 has been added related to organ procurement data and rates.*<br><br>**IM.6.50, EP1-4:** Verbal and telephone orders are written appropriately and transcribed only by qualified staff as designated by the organization.<br><br>  • *Changes to IM.6.50—The standard was revised to specify telephone orders as well as verbal orders. EP4 has been reworded and is no longer scored in this standard; it is scored in NPSG 2, Requirement 2A.*<br><br>**NPSG 2 (2A):**  Verbal/phone orders must be verified using the "read-back" method. |

**NEW for 2006**

## Analysis/Guidelines

CMS and JCAHO are similar when it comes to environment of care issues for hazardous waste (e.g., radioactive materials) and medical equipment management, testing, and inspections. CMS has an additional focus on radiation exposure badge checks that is not specified in the JCAHO standards.

Survey Tips:

- Verify that hospital policies/procedures address safety standards
- Verify that patient shielding aprons, etc., are routinely inspected
- Inspect where hazardous materials are stored for safety
- Conduct audits to see if radiology staff are wearing radiation exposure badges
- Review medical records for appropriate orders
- Verify that QC checks were performed regularly

Suggested Documents:

- Radiology policies and procedures
- Environment of care plans/procedures for hazardous wastes
- Environment of care plans/procedures for medical equipment

- Inspection logs for medical equipment checks
- QC check documentation
- Any OSHA documentation regarding radiology safety

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| **§482.26 CoP: Radiological Services** | **Provision of Care (PC), Management of the Environment of Care (EC), Leadership (LD), Medical Staff (MS), Management of Information (IM), Improving Organization Performance (PI)** |
| (c) Standard: Personnel<br><br>(1)  A qualified full-time, part-time, or consulting radiologist must supervise the ionizing radiology services and must interpret only those radiological tests that are determined by the medical staff to require a radiologist's specialized knowledge. For purposes of this section, a radiologist is a doctor of medicine or osteopathy who is qualified by education and experience in radiology (A-0275).<br><br>Only personnel designated as qualified by the medical staff may use the radiological equipment and administer procedures (A-0276). | **LD.3.90, EP1&2:** The organization has policies and procedures for services.<br><br>**MS.1.20, EP1-19:** The medical staff has bylaws and rules/regulations that outline the medical staff's rights and responsibilities. Areas include roles and responsibilities, qualifications, medical staff executive committee, correction actions, fair hearing process, credentialing/privileging/ appointments, and related medical staff governance documentation.<br><br>• *Changes to MS.1.20—Most of the EPs have been slightly reworded and renumbered. A few have been consolidated (e.g., the revised EP12 is a combination of the previous EPs 12 and 13; the revised EP13 is a combination of the previous EPs 14 and 15. EP 19 is new regarding medical staff governing documentation, but it does not go into effect until January 1, 2007.*<br><br>**MS.2.20, EP1-4:** Physicians, who have appropriate credentials and privileges, coordinate and manage the patient's medical care. |

**NEW for 2006**

## Analysis/Guidelines

This section focuses on who supervises the radiology services. A radiologist who is a member of the hospital's medical staff should be designated, following the credentialing and privileging criteria outlined in the medical staff bylaws/policies/procedures. CMS notes in the interpretative guidelines that "when telemedicine is used . . . the radiologist interpreting the radiological test must be licensed and/or meet the other applicable standards that are required by state or local laws in both the state where the practitioner is located and the state where the patient is located."

Survey Tips:

• Review credentialing files of radiologists on staff

Suggested Documents:

• Medical staff bylaws/policies/procedures
• Credentials files of radiologists

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| **§482.26 CoP: Radiological Services** | **Provision of Care (PC), Management of the Environment of Care (EC), Leadership (LD), Medical Staff (MS), Management of Information (IM), Improving Organization Performance (PI)** |

NEW for 2006

| | |
|---|---|
| (d) Standard: Records<br><br>    Records of radiology services must be maintained (A-0277).<br><br>  (1)  The radiologist or other practitioner who performs radiology services must sign reports of his or her interpretations (A-0278).<br><br>       The hospital must maintain the following for at least five years: Copies of reports and printouts and films, scans, and other image records, as appropriate (A-0279). | **IM.2.20, EP1-8:** The organization maintains security and integrity of data.<br><br>  • *Changes to IM.2.20—EP3, which states that the hospital's data security and integrity policies are implemented, has been added. EPs 4–8 have been renumbered due to this addition and have been slightly reworded.*<br><br>**IM.2.30, EP1-4:** The organization must have a disaster recovery plan.<br><br>  • *Changes to IM.2.30—Order of EPs has been adjusted. EP2 was part of the 2005 EP3. EP4 has been added as a separate item in 2006, but was part of EP1 in 2005.*<br><br>**IM.3.10, EP1-4:** The organization has an information technology system in place which includes quality control systems.<br><br>  • *Changes to IM.3.10—EPs 1–3 are reworded/renumbered. EP4 (previously EP3 in 2005) focuses on quality control systems.*<br><br>**IM.4.10, EP1-3:** The organization has an information technology system in place that is used for making decisions in areas such as operations, performance improvement, and patient safety.<br><br>  • *Changes to IM.4.10—Previously there were seven EPs in this standard; now they have been consolidated down to three EPs.*<br><br>**IM.6.10, EP1-9, 17, 18:** Every patient has an accurate record of the care/ treatment they received. Only designated staff can enter information into the medical record.<br><br>  • *Changes to IM.6.10—EP4 is expanded to include authentication of medical records. EP9 expands the requirement of the time to complete a record following discharge (<30 days).*<br><br><div align="right">*continued on next page >*</div> |

continued on next page >

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| §482.26 CoP: Radiological Services | Provision of Care (PC), Management of the Environment of Care (EC), Leadership (LD), Medical Staff (MS), Management of Information (IM), Improving Organization Performance (PI) |
|  | **IM.6.20, EP1-3:** Patient records have specific clinical information documented.<br>• *Changes to IM.6.20—A new bullet under EP2 was added which addresses language needs of the patient/family.*<br><br>**IM.6.60, EP1-2:** Patient information must be accessible when needed for patient care/treatment.<br><br>**NPSG 2 (2B):** The organization must use standardized abbreviations. |

**NEW for 2006**

## Analysis/Guidelines

CMS specifically states how long radiology records must be kept; JCAHO standards do not. The bottom line is that any radiology records must be secure and accessible when needed for patient care/treatment.

Survey Tips:

• Check to see how long radiology records are kept
• Review records for appropriate signatures by radiologists

Suggested Documents:

• Medical record documentation (both paper and film/electronic versions)

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| **§482.27 CoP:  Laboratory Services** | **Provision of Care (PC), Leadership (LD)** |
| (a)  The hospital must maintain, or have available, adequate laboratory services to meet the needs of its patients. The hospital must ensure that all laboratory services provided to its patients are performed in a certified facility.  (A-0284)<br><br>(b)  Standard: Adequacy of laboratory services<br>The hospital must have laboratory services available, either directly or through a contractual agreement with a certified laboratory that meets requirements of Part 493 of this chapter (A-0285).<br><br>   (1)  Emergency laboratory services must be available 24 hours a day  (A-0286).<br><br>   (2)  A written description of services provided must be available to the medical staff (A-0287).<br><br>   (3)  The laboratory must make provision for proper receipt and reporting of tissue specimens (A-0288).<br><br>   (4)  The medical staff and a pathologist must determine which tissue specimens require a macroscopic (gross) examination and which require both macroscopic and microscopic examinations (A-0289). | **LD.1.20, EP4:** A written scope of service exists.<br><br>**LD.3.30, EP1:** The organization provides essential services including pathology and clinical laboratory.<br><br>**LD.3.90, EP1 & 2:** The organization has policies and procedures for services. |

**NEW for 2006**

## Analysis/Guidelines

CMS is more specific about availability for laboratory services and how tissue specimens are collected, preserved, transported, received, examined and reported. Emergency lab services must be available on site 24 hours a day/seven days a week at each location.

Survey Tips:

- Review all locations within the hospital system where laboratory services are provided and ensure all are integrated with the organization's quality assurance plan

Suggested Documents:

- Scope of service for laboratory services
- Laboratory policies/procedures (including how routine and stat are defined for reporting results)
- CLIA certificate (for all locations)
- CAP survey certificate (as applicable)
- Contracts for laboratory services

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| §482.27 CoP:  Laboratory Services | Provision of Care (PC), Leadership (LD) |

| | |
|---|---|
| (b) Standard: Potentially infectious blood and blood products | **PC.16.10, EP1-3:** The organization's laboratory has policies/procedures for waived tests and results. |
| (1)  Potentially human immunodeficiency virus (HIV) infectious blood and blood products are prior collections from a donor who tested negative at the time of donation but tests repeatedly reactive for the antibody to HIV on a later donation; and the FDA-licensed, more specific test or other follow-up testing recommended or required by FDA is positive, and the timing of seroconversion cannot be precisely estimated. | **PC.16.20, EP1-2:** Those staff involved with waived testing are identified.

**PC.16.30, EP1-8:** Staff are competent to performed waived testing.

**PC.16.40, EP1-4:** Policies/procedures on specimen collection, preservation, equipment calibration, quality control checks, and test performance must be in place. |
| (2)  Services furnished by an outside blood bank. If a hospital regularly uses the services of an outside blood bank, it must have an agreement with the blood bank that governs the procurement, transfer, and availability of blood and blood products. The agreement must require that the blood bank promptly notify the hospital of the following: | **PC.16.50, EP1-6:** Quality control checks are in place for each waived test.

**PC.16.60, EP1-4:** Documentation of tests and results are kept.

**PC.5.10, EP1&4:**  A care plan is done for each patient and patients are identified before testing is done. |
| (i)  If it supplied blood and blood products collected from a donor who tested negative at the time of donation but tests repeatedly reactive for the antibody to HIV on a later donation; and | • *Changes to PC.5.10—EP4 has been reworded to include specimens taken for clinical testing and is no longer scored as part of this standard. EP4 is now scored at NPSG 1, Requirement 1A.* |
| (ii)  The results of the FDA-licensed, more specific test or other follow up testing recommended or required by FDA completed within 30 calendar days after the donor's repeatedly reactive screening test. (FDA regulations concerning HIV testing and look back procedures are set forth at 21 CFR §610.45-et seq.) | **NPSG 1 (1A):** Patients must be identified before giving medications, blood, or taking specimens. |
| (3)  Quarantine of blood and blood products pending completion of testing.  If the blood bank notifies the hospital of the repeatedly reactive HIV screening test results as required by paragraph (c)(2)(i) of this section, the hospital must determine the disposition of the blood or blood products and quarantine all blood and blood products from previous donations in inventory. | |
| (i)  If the blood bank notifies the hospital that the result of the FDA-licensed, more specific test or other follow-up testing recommended or required by FDA is negative, absent other informative test | *continued on next page >* |

**NEW for 2006**

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| results, the hospital may release the blood and blood products from quarantine.<br><br>(ii)  If the blood bank notifies the hospital that the result of the FDA-licensed, more specific test or other follow-up testing recommended or required by FDA is positive, the hospital must dispose of the blood and blood products in accordance with 21 CFR §606.40 and notify all patients in accordance with paragraph (c)(4) of this section.<br><br>(4)  Patient notification. If the hospital has administered potentially HIV infectious blood or blood products (either directly through its own blood bank or under an agreement described in paragraph (c)(2) of this section) or released such blood or blood products to another entity or appropriate individual, the hospital must take the following actions:<br><br>(i)  Promptly make at least three attempts to notify the patient's attending physician (i.e., the physician of record) or the physician who ordered the blood or blood product that potentially HIV infectious blood or blood products were transfused to the patient.<br><br>(ii)  Ask the physician to immediately notify the patient, or other individual as permitted under paragraph (c)(8) of this section, of the need for HIV testing and counseling.<br><br>(iii)  If the physician is unavailable, declines to make the notification, or later informs the hospital that he or she was unable to notify the patient, promptly make at least three attempts to notify the patient or other individual as permitted under paragraph (c)(8) of this section, of the need for HIV testing and counseling.<br><br>(iv)  Document in the patient's medical record the notification or attempts to give the required notification.<br><br>(5)  Timeframe for notification. The notification effort begins when the blood bank notifies the hospital that it received potentially HIV infectious blood and blood products and continues for eight weeks unless: | |

*continued on next page >*

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| (i) The patient is located and notified; or<br><br>(ii) The hospital is unable to locate the patient and documents in the patient's medical record the extenuating circumstances beyond the hospital's control that caused the notification timeframe to exceed eight weeks.<br><br>(6) Content of notification. The notification given under paragraph (c)(4)(ii) and (iii) of this section must include the following information:<br><br>  (i) A basic explanation of the need for HIV testing and counseling.<br><br>  (ii) Enough oral or written information so that the transfused patient can make an informed decision about whether to obtain HIV testing and counseling.<br><br>  (iii) A list of programs or places where the patient can obtain HIV testing and counseling, including any requirements or restrictions the program may impose.<br><br>(7) Policies and procedures. The hospital must establish policies and procedures for notification and documentation that conform to federal, state, and local laws, including requirements for confidentiality and medical records.<br><br>(8) Notification to legal representative or relative. If the patient has been adjudged incompetent by a state court, the physician or hospital must notify a legal representative designated in accordance with state law. If the patient is competent, but state law permits a legal representative or relative to receive the information on the patient's behalf, the physician or hospital must notify the patient or his or her legal representative or relative. If the patient is deceased, the physician or hospital must continue the notification process and inform the deceased patient's legal representative or relative (A-0290). | |
| | *See next page for analysis/guidelines on §482.27 (b)*  > |

## §482.27(b) Analysis/Guidelines

CMS requirements are extremely detailed about HIV infectious blood and blood products. The organization is required to have an appropriate system in place for notification when blood products are at a higher risk for transmitting HIV. As stated in the interpretative guidelines, CMS regulations "apply only to transfusion services in hospitals that participate in Medicare, where the transfusion service does not include more than the performance of compatibility testing." FDA regulations "apply to facilities collecting, processing, and storing blood/blood products" as well as those facilities that do not participate in Medicare. FDA's regulation to the CMS requirements (21 CFR §610.45) require that within 72 hours blood banks notify the hospital it has supplied blood/blood products to about the increased risk of HIV infection and follow up within 30 days of the confirming test results for HIV. FDA also requires appropriate disposal of contaminated blood or blood products. Both CMS and JCAHO require the laboratory to have policies and procedures for notification, documentation, confidentiality, and medical records. JCAHO standards are geared toward waived testing.

Survey Tips:

- Review the laboratory (and blood bank if applicable) policies and procedures and verify that they are being followed
- Review the hospital's notification procedures
- Develop and review a written description of the organization's emergency lab services

Suggested Documents:

- Laboratory policies/procedures
- Blood bank policies/procedures
- CAP survey certificate (as applicable)
- AABB certificate (as applicable)

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| **§482.28 CoP: Food and Dietetic Services** | **Provision of Care (PC), Leadership (LD), Management of Human Resources (HR)** |
| The hospital must have organized dietary services that are directed and staffed by adequate qualified personnel. However, a hospital that has a contract with an outside food management company may be found to meet this CoP if the company has a dietician who serves the hospital on a full-time, part-time, or consultant basis, and if the company maintains at least the minimum standards specified in this section and provides for constant liaison with the hospital medical staff for recommendations on dietetic policies affecting patient treatment  (A-0295).<br><br>(a) Standard: Organization<br><br>    (1) The hospital must have a full-time employee who:<br><br>        (i)  Serves as director of the food and dietetic services;<br><br>        (ii)  Is responsible for daily management of the dietary services; and<br><br>        (iii)  Is qualified by experience or training (A-0297).<br><br>    (2) There must be a qualified dietitian, full-time, part-time or on a consultant basis (A-0298).<br><br>    (3) There must be administrative and technical personnel competent in their respective duties (A-0299). | **LD.2.20, EP1-5:** There is effective leadership in each area of the organization.<br><br>**HR.1.10, EP1:** There must be adequate staffing within the organization.<br><br>**HR.1.20, EP1-7, 18, 46:** Verification of licensure/certification/registration, credentials, education, criminal background check, and health screen is done. If no licensure/certification for patient care providers, accreditation decision will be affected.<br><br>    • *Changes to HR.1.20—EP1 and 2 remain unchanged. EP 3, 4, and 5 are reworded and renumbered CVOs. The 2005 EPs 18 and 19 were eliminated, and new EPs 18 and 46 were added.*<br><br>**HR.3.10, EP1-10:** The organization has in place a competency assessment process. |

**NEW for 2006**

---

## Analysis/Guidelines

Like other sections in this crosswalk, both CMS and JCAHO are looking to verify that areas of the hospital have qualified and competent leadership and staff. CMS requires that the director of food and dietetic services be a full-time employee; JCAHO does not get this specific.

Suggested Documents:

- Job description for food service director
- Job descriptions for food service personnel
- Job descriptions for dietetic personnel
- Personnel files

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| **§482.28 CoP: Food and Dietetic Services** | **Provision of Care (PC), Leadership (LD), Management of Human Resources (HR)** |

| | |
|---|---|
| (b)    Standard: Diets<br>Menus must meet the needs of the patients (A-0300). | **PC.2.20, EP1-5:** Patient information is gathered when patients are assessed or reassessed. |
| (1) Therapeutic diets must be prescribed by the practitioner or practitioners responsible for the care of the patients (A-0301). | • *Changes to PC.2.20—A new rationale section regarding assessment data has been added.* |
| (2) Nutritional needs must be met in accordance with recognized dietary practices and in accordance with orders of the practitioner(s) responsible for the care of the patients (A-0302). | **PC.2.120, EP4:** Within 24 hours of admission, patients receive a nutritional assessment.<br><br>**PC.2.130, EP1-3:** Patients are assessed in all care settings.<br><br>**PC.2.150, EP1:** Patients are reassessed in all care settings. |
| (3) A current therapeutic diet manual approved by the dietitian and medical staff must be readily available to all medical, nursing, and food services personnel (A-0303). | **PC.4.10, EP1, 2, 6, 12-14:** Each patient has a care plan.<br><br>**PC.5.50, EP1:** The care plan is done in a collaborative manner.<br><br>**PC.6.10, EP3:** Patient education occurs for nutritional topics including interventions, modified diets, and oral health. |
| | **PC.7.10, EP1-4, 6, 7, 11, 17:** Food/nutrition products are provided appropriately and safely. Special diets are available.<br><br>• *Changes to PC.7.10—A new EP17 has been added which outlines appropriate food preparation conditions.* |
| | **LD.3.30, EP1:** The organization provides essential services including dietetic services. |

**NEW for 2006**

## Analysis/Guidelines

JCAHO's Provision of Care chapter includes the standards around nutrition, food products, and diets. As part of medical record review, both CMS and JCAHO will look to see if nutritional assessments were done, how nutritional needs were met, and which patients need to be re-evaluated.

Survey Tips:

- Review diet orders and ensure patient received the correct diet
- Review entire food service/diet process
- Update the hospital's diet manual and have the medical staff approve
- Verify that therapeutic diet orders are ordered and authenticated by the provider(s) responsible for the patient's care

Suggested Documents:

- Hospital's diet manual
- Medical records
- Food service/nutrition policies/procedures
- Medical board meeting minutes

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| **§482.30 CoP: Utilization Review** | **Improving Organization Performance (PI), Leadership (LD)** |
| The hospital must have in effect a utilization review (UR) plan that provides for review of services furnished by the institution and by members of the medical staff to patients entitled to benefits under the Medicare and Medicaid programs (A-0308).<br><br>(a) Standard: Applicability<br>   The provisions of this section apply except in either of the following circumstances:<br><br>   (1) A utilization and quality control/quality improvement organization (QIO) has assumed binding review for the hospital.<br><br>   (2) CMS has determined that the UR procedures established by the state under Title XIX of the Act are superior to the procedures required in this section, and has required hospitals in that state to meet the UR plan requirements under §456.50 through §456.245 of this chapter (A-0309). | No applicable JCAHO standards for this section. |

| Analysis/Guidelines |
|---|
| This is the one section where CMS has several specific requirements around UR and JCAHO has three. CMS expects hospitals to have a UR committee and a UR plan. This plan should include a list of responsibilities and authority for the performance of UR activities. Procedures for the review of medical necessity of admissions, appropriateness of patient care setting, the medical necessity of extended stays, and professional services all should be established.<br><br>Suggested Documents:<br><br>• UR Committee documentation (membership, plan, policies and procedures) |

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| **§482.30 CoP:  Utilization Review** | **Improving Organization Performance (PI), Leadership (LD)** |
| (b) Standard: Composition of Utilization Review Committee<br>A UR committee consisting of two or more practitioners must carry out the UR function. At least two of the members of the committee must be doctors of medicine or osteopathy. The other members may be any of the other types of practitioners specified in §482.12(c)(1).<br><br>   (1)  Except as specified in paragraphs (b)(2) and (3) of this section, the UR committee must be one of the following:<br><br>      (i)  A staff committee of this institution;<br><br>      (ii)  A group outside the institution:<br><br>         a.  Established by the local medical society and some or all of the hospitals in the locality; or<br><br>         b.  Established in a manner approved by CMS.<br><br>   (2)  If, because of the small size of the institution, it is impracticable to have a properly functioning staff committee, the UR committee must be established as specified in paragraph (b)(1)(ii) of this section.<br><br>   (3)  The committee or group's reviews may not be conducted by any individual who:<br><br>      (i)  Has a direct financial interest (e.g., an ownership interest) in that hospital; or<br><br>      (ii)  Was professionally involved in the care of the patient whose case is being reviewed (A-0310). | **PI.1.10, EP14:** Data collection and monitoring occur throughout the organization including utilization management. |

## Analysis/Guidelines

This is the one section where CMS has several specific requirements around utilization review (UR) and JCAHO has three. CMS expects hospitals to have a UR committee and a UR plan. This plan should include a list of responsibilities and authority for the performance of UR activities. Procedures for the review of medical necessity of admissions, appropriateness of patient care setting, the medical necessity of extended stays and professional services all should be established.

Suggested Documents:

• UR committee documentation (membership, plan, policies, and procedures)

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| **§482.30 CoP:  Utilization Review** | **Improving Organization Performance (PI), Leadership (LD)** |
| (c)  Standard: Scope and frequency of review<br><br>   (1)  The UR plan must provide for review for Medicare and Medicaid patients with respect to the medical necessity of:<br><br>      (i)  Admissions to the institution;<br><br>      (ii)  The duration of stays; and<br><br>      (iii)  Professional services furnished including drugs and biologicals.<br><br>   (2)  Review of admissions may be performed before, at, or after hospital admission.<br><br>   (3)  Except as specified in paragraph (e) of this section, reviews may be conducted on a sample basis.<br><br>   (4)  Hospitals that are paid for inpatient hospital services under the prospective payment system set forth in Part 412 of this chapter must conduct review of duration of stays and review of professional services as follows:<br><br>      (i)  For duration of stays, these hospitals need review only cases that they reasonably assume to be outlier cases based on extended length of stay, as described in §412.80(a)(1)(i) of this chapter; and<br><br>      (ii)  For professional services, these hospitals need review only cases that they reasonably assume to be outlier cases based on extraordinarily high costs, as described in §482.80(a)(1)(ii) of this chapter (A-0311). | No applicable JCAHO standards for this section. |

## Analysis/Guidelines

This is the one section where CMS has several specific requirements around UR and JCAHO has three. CMS expects hospitals to have a UR committee and a UR plan. This plan should include a list of responsibilities and authority for the performance of UR activities. Procedures for the review of medical necessity of admissions, appropriateness of patient care setting, the medical necessity of extended stays, and professional services all should be established.

Suggested Documents:

• UR Committee documentation (membership, plan, policies, and procedures)

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| **§482.30 CoP:  Utilization Review** | **Improving Organization Performance (PI), Leadership (LD)** |
| (d) Standard: Determination regarding admissions or continued stays<br><br>(1)  The determination that an admission or continued stay is not medically necessary:<br><br>(i)  May be made by one member of the UR committee if the practitioner or practitioners responsible for the care of the patient concur with the determination or fail to present their views when afforded the opportunity; and<br><br>(ii)  Must be made by at least two members of the UR committee in all other cases (A-0312).<br><br>(2)  Before making a determination that an admission or continued stay is not medically necessary, the UR committee must consult the practitioner or practitioners responsible for the care of the patient, as specified in §482.12(c), and afford the practitioner(s) the opportunity to present their views.<br><br>If the committee decides that admission to or continued stay in the hospital is not medically necessary, written notification must be given, no later than two days after the determination, to the hospital, the patient, and practitioner or practitioners responsible for the care of the patient (A-0312). | **LD.3.15, EP1-9:** Patient flow processes, from admission through discharge, should be assessed and monitored for quality and patient safety.<br><br>• *Changes to LD.3.15—The rationale section has been expanded to include 12 key components for efficient patient flow when patients are placed in temporary locations.*<br><br>**LD.3.20, EP1-2:** All patients are treated the same, without regard to ability to pay.<br><br>• *Changes to LD.3.20—The rationale section has been expanded regarding patients with similar needs being treated the same.* |

**NEW for 2006**

## Analysis/Guidelines

This is the one section where CMS has several specific requirements around UR and JCAHO has three. CMS expects hospitals to have a UR committee and a UR plan. This plan should include a list of responsibilities and authority for the performance of UR activities. Procedures for the review of medical necessity of admissions, appropriateness of patient care setting, the medical necessity of extended stays, and professional services all should be established.

Suggested Documents:

• UR Committee documentation (membership, plan, policies, and procedures)

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| **§482.30 CoP:  Utilization Review** | **Improving Organization Performance (PI), Leadership (LD)** |
| (e)  Standard: Extended stay review<br><br>(1)  In hospitals that are not paid under the prospective payment system, the UR committee must make a periodic review, as specified in the UR plan, or each current inpatient receiving hospital services during a continuous period of extended duration. The scheduling of the periodic reviews may:<br><br>    (i)  Be the same for all cases; or<br><br>    (ii)  Differ for different classes of cases.<br><br>(2)  In hospitals paid under the prospective payment system, the UR committee must review all cases reasonably assumed by the hospital to be outlier cases because the extended length of stay exceeds the threshold criteria for the diagnosis, as described in §482.80(a)(1)(i). The hospital is not required to review an extended stay that does not exceed the outlier threshold for the diagnosis.<br><br>(3)  The UR committee must make the periodic review no later than seven days after the day required in the UR plan (A-0313). | No applicable JCAHO standards for this section. |

| Analysis/Guidelines |
|---|
| This is the one section where CMS has several specific requirements around UR and JCAHO has three. CMS expects hospitals to have a UR committee and a UR plan. This plan should include a list of responsibilities and authority for the performance of UR activities. Procedures for the review of medical necessity of admissions, appropriateness of patient care setting, the medical necessity of extended stays, and professional services all should be established.<br><br>Suggested Documents:<br><br>    • UR Committee documentation (membership, plan, policies, and procedures) |

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| **§482.30 CoP:  Utilization Review** | **Improving Organization Performance (PI), Leadership (LD)** |
| (f)  Standard: Review of professional services<br>The committee must review professional services provided to determine medical necessity and to promote the most effi-cient use of available health facilities and services (A-0314). | No applicable JCAHO standards for this section. |

## Analysis/Guidelines

This is the one section where CMS has several specific requirements around UR and JCAHO has three. CMS expects hospitals to have a UR committee and a UR plan. This plan should include a list of responsibilities and authority for the performance of UR activi-ties. Procedures for the review of medical necessity of admissions, appropriateness of patient care setting, the medical necessity of extended stays, and professional services all should be established.

Suggested Documents:

- UR Committee documentation (membership, plan, policies, and procedures)

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| **§482.41 CoP:  Physical Environment** | **Management of the Environment of Care (EC), Leadership (LD)** |
| The hospital must be constructed, arranged, and maintained to ensure the safety of the patient, and to provide facilities for diagnosis and treatment and for special hospital services appropriate to the needs of the community (A-0317).<br><br>(a) Standard: Buildings<br>   The condition of the physical plant and the overall hospital environment must be developed and maintained in such a manner that the safety and well being of patients are ensured (A-0318).<br><br>   (1)  There must be emergency power and lighting in at least the operating, recovery, intensive care, and emergency rooms, and stairwells. In all other areas not serviced by the emergency supply source, battery lamps, and flashlights must be available (A-0319).<br><br>   (2)  There must be facilities for emergency gas and water supply (A-0320). | **EC.1.10, EP1-9:** The organization ensures that buildings, grounds, equipment, and physical systems are safely managed.<br><br>**EC.1.20, EP1-3:** The organization's environment is safe.<br><br>**EC.2.10, EP1-10:** The organization's security systems are managed.<br><br>**EC.3.10, EP1-13:** Hazardous waste systems are managed.<br><br>**EC.6.10, EP1-8:** Medical equipment is monitored and managed.<br><br>**EC.6.20, EP1-6:** Testing and regular inspections of medical equipment are done.<br><br>**EC.7.10, EP7-16:** Utility systems are monitored and managed.<br><br>**EC.7.20, EP1-17:** Emergency power is available in identified areas, as required by the *LSC* occupancy requirements.<br><br>**EC.7.30, EP1-5:** Testing and regular inspections of utilities are done.<br><br>**EC.7.40, EP1-4:** Testing and regular inspections of emergency power systems are done.<br><br>**EC.7.50, EP1-3:** Testing and regular inspections of medical gas and vacuum systems are done.<br><br>**EC.8.10, EP1-5, 7, 11-12:** The physical environment (e.g., lighting, temperature, door locks, equipment, furnishings, etc.) is safe and functional.<br><br>*continued on next page >* |

NEW for 2006

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| §482.41 CoP:  Physical Environment | Management of the Environment of Care (EC), Leadership (LD) |
| | • *Changes to EC.8.10—The 2005 EP6 has been deleted. This EP was related to patients being able to control lighting and is not applicable to hospitals in 2006.* |
| | **EC.8.30, EP1-4:** When construction is being done within the organization, the organization's environment remains safe. |

**NEW for 2006**

## Analysis/Guidelines

The JCAHO standards are more detailed than CMS in this section. JCAHO has individual standards for security, safety, hazardous waste, medical equipment, utility systems, emergency power, and medical gas. CMS is more general in terms of looking at the overall hospital environment, emergency power and lighting, and emergency gas/water supplies. Both focus on emergency preparedness plans and capabilities for the organization.

Survey Tips:

• Conduct walk-throughs of hospital facilities (on campus and off campus) and observe the condition of the hospital (condition of ceilings, walls, floors, presence of patient hazards, etc.)

Suggested Documents:

• Facility management policies
• Emergency preparedness plans (for both internal and external disasters)
• Preventive maintenance schedules and inspection logs
• Contracts with utility companies and others for emergency sources of critical utilities

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| **§482.41 CoP:  Physical Environment** | **Management of the Environment of Care (EC), Leadership (LD)** |

| | |
|---|---|
| (b) Standard: Life safety from fire<br>(1)  Except as otherwise provided in this section, the hospital must meet the applicable provisions of the 2000 edition of the *Life Safety Code®* (*LSC*) of the National Fire Protection Association (NFPA). The director of the Office of the *Federal Register* has approved the NFPA 101 2000 edition of the *LSC*, issued January 14, 2000, for incorporation by reference in accordance with 5 U.S.C. 552(a) and 1 CFR Part 51 (A-0322).<br><br>    (i)   Chapter 19.3.6.3.2, exception number 2 of the adopted edition of the *LSC* does not apply to hospitals.<br><br>    (ii)  After consideration of state survey agency findings, CMS may waive specific provisions of the *LSC* that, if rigidly applied, would result in unreasonable hardship upon the facility, but only if the waiver does not adversely affect the health and safety of patients (A-0323).<br><br>    (iii) If CMS finds that the state has a fire and safety code imposed by state law that adequately protects patients, CMS may allow the state survey agency to apply the state's fire and safety code instead of the *LSC* (A-0324).<br><br>    (iv)  A hospital must be in compliance with the following provisions beginning on March 13, 2006:<br><br>        a.   Chapter 19.3.6.3.2 exception number 2.<br><br>        b.   Chapter 19.2.9 Emergency Lighting (A-0325).<br><br>(2)  The hospital must have procedures for the proper routine storage and prompt disposal of trash (A-0326).<br><br>(3)  The hospital must have written fire control plans that contain provisions for prompt reporting of fires; extinguishing fires; protection of patients, personnel, and guests; evacuation; and cooperation with firefighting authorities (A-0327).<br><br>The hospital must maintain written evidence of regular inspection and approval by State or local fire control agencies (A-0328). | **EC.5.10, EP1-5:** Fire systems and equipment are functional and safe.<br><br>**EC.5.20, EP1, 2, 5, 6:** Buildings comply with the Life Safety Code (LSC).<br>  •  *A new EP6, which requires assigning an experienced person to complete the organization's Statement of Conditions, has been added.*<br><br>**EC.5.30, EP1-8:** Fire drills are done in all buildings.<br><br>**EC.5.40, EP1-16:** Testing and inspection of fire extinguishers and other fire safety equipment are done.<br><br>**EC.5.50, EP1-3:** Interim life safety measures are implemented as needed.<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>***See next page for analysis/guidelines on §482.41 (b)  >*** |

**NEW for 2006**

# §482.41(b) Analysis/Guidelines

Both JCAHO and CMS survey hospitals using the 2000 edition of the *LSC*, which was issued in January 2000. In the past, different versions of the *LSC* were used by JCAHO and CMS, which made preparing for survey more challenging. Copies of the *LSC* can be obtained from the National Fire Protection Association, 1 Batterymarch Park, Quincy, MA 02269. Hospitals should already be conducting routine fire drills as part of the organization's safety plans.

Survey Tips:

- Review how hospital stores and disposes of trash (including biohazardous waste)
- Verify that fire control plans are up to date
- Ensure all areas of the hospital have conducted fire drills based on plan

Suggested Documents:

- Environment of care plans for life safety, fire safety, and hazardous materials
- Environment of care policies/procedures
- Fire drill schedules and logs
- Copies of inspection and approval reports from state and local fire control agencies
- Copies of *Statement of Conditions™* from previous surveys

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| **§482.41 CoP:  Physical Environment** | **Management of the Environment of Care (EC), Leadership (LD)** |
| (c) Standard: Facilities<br>The hospital must maintain adequate facilities for its services (A0329).<br><br>   (1) Diagnostic and therapeutic facilities must be located for the safety of patients (A-0330).<br><br>   (2) Facilities, supplies, and equipment must be maintained to ensure an acceptable level of safety and quality (A-0331).<br><br>   (3) The extent and complexity of facilities must be determined by the services offered (A-0332).<br><br>   There must be proper ventilation, light, and temperature controls in pharmaceutical, food preparation, and other appropriate areas (A-0333). | **EC.1.10, EP1-9:** The organization ensures that buildings, grounds, equipment, and physical systems are safely managed.<br><br>**EC.1.20, EP1-3:** The organization's environment is safe.<br><br>**EC.8.10, EP1-5, 7, 11, 12:** The physical environment (e.g., lighting, temperature, door locks, equipment, furnishings, etc.) is safe and functional.<br><br>  • *Changes to EC.8.10—The 2005 EP6 has been deleted. This EP was related to patients being able to control lighting and is not applicable to hospitals in 2006.*<br><br>**EC.8.30, EP1-4:** When construction is being done within the organization, the organization's environment remains safe. |

**NEW for 2006**

---

## Analysis/Guidelines

Both JCAHO and CMS survey hospitals using the 2000 edition of the *LSC*, which was issued in January 2000. In the past, different versions of the *LSC* were used by JCAHO and CMS, which made preparing for survey more challenging. Copies of the *LSC* can be obtained from the National Fire Protection Association, 1 Batterymarch Park, Quincy, MA 02269. Hospitals should already be conducting routine fire drills as part of the organization's safety plans.

Survey Tips:

• Review how hospital stores and disposes of trash (including biohazardous waste)
• Verify that fire control plans are up to date
• Ensure all areas of the hospital have conducted fire drills based on plan

Suggested Documents:

• Environment of care plans for life safety, fire safety, and hazardous materials
• Environment of care policies/procedures
• Fire drill schedules and logs
• Copies of inspection and approval reports from state and local fire control agencies
• Copies of *Statement of Conditions™* from previous surveys

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| **§482.42 CoP: Infection Control** | **Surveillance, Prevention, and Control of Infection (IC), Improving Organization Performance (PI)** |
| The hospital must provide a sanitary environment to avoid sources and transmission of infections and communicable diseases. There must be an active program for the prevention, control, and investigation of infections and communicable diseases (A-0338).<br><br>(a) Standard: Organization and policies<br>A person(s) must be designated as infection control officer(s) to develop and implement policies governing control of infections and communicable diseases (A-0339).<br><br>(1) The infection control officer(s) must develop a system for identifying, reporting, investigating, and controlling infections and communicable diseases of patients and personnel (A-0340).<br><br>(2) The infection control officer(s) must maintain a log of incidents related to infections and communicable diseases (A-0341). | **IC.1.10, EP1-7 & 9:** The organization has an infection control program with identified person(s) given authority to implement the program.<br><br>**IC.2.10, EP1-3:** Infection control surveillance is done for identified risk areas.<br><br>**IC.3.10, EP1-5:** The infection control program prioritizes goals and strategies.<br><br>**IC.4.10, EP1-8:** Risk reduction and surveillance are done, including hand hygiene, medical equipment/devices, and animals.<br><br>**IC.7.10, EP1-4:** A person(s) is identified to oversee the infection control program.<br><br>**NPSG 7 (7A):** CDC handwashing guidelines must be followed.<br><br>**PC.17.30, EP3&4:** The organization analyzes adverse events that occur with regard to donor tissues, including infections.<br><br>• *Changes to PC.17.30—This is a new standard regarding adverse events with donor tissues.* |

**NEW for 2006**

## Analysis/Guidelines

CMS and JCAHO are similar in regards to having a hospital-wide infection control program which is coordinated by a qualified individual. An infection control program should address issues like defining, identifying, investigating, and reporting healthcare-associated infections and communicable diseases; controlling post-operative infections; prevention of infections (e.g., those caused by antibiotic-resistant organisms, communicable disease outbreaks like TB, SARS, Hepatitis A, MRSA, etc.), isolation procedures and use of standard precautions, reporting requirements to state or local health agencies, etc. The program must include patients, patient care staff, and non-patient care staff.

Suggested Documents:

• Job description of infection control professional (hospital epidemiologist, infection control nurse, infection control director, etc.)
• Hospital's infection control plan
• Infection control policies/procedures
• Personnel files
• Log of infection control or communicable disease incidents and surveillance activity/plans
• Infection control committee meeting minutes

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| **§482.42 CoP: Infection Control** | **Surveillance, Prevention, and Control of Infection (IC), Improving Organization Performance (PI)** |
| (b) Standard: Responsibilities of chief executive officer, medical staff, and director of nursing services<br>The chief executive officer, the medical staff, and the director of nursing must:<br><br>(1) Ensure that the hospital-wide quality assurance program and training programs address problems identified by the infection control officer(s); and<br><br>(2) Be responsible for the implementation of successful corrective action plans in affected problem areas (A-0342). | **IC.5.10, EP1-7:** Effectiveness of the infection control program is analyzed and evaluated.<br><br>**IC.8.10, EP1-2:** The CEO, medical staff, and nursing leaders work together with infection control to run the infection control program.<br><br>**PI.1.10, EP16:** Infection control surveillance data are incorporated into the organization's quality improvement activities.<br><br>**NPSG 7 (7B):** Nosocomial infections that result in death or functional loss must be handled as a sentinel event. |

**NEW for 2006**

---

## Analysis/Guidelines

A hospital's infection control program must be integrated with the hospital's quality improvement program. Collaboration between the CEO, medical staff, and nursing leaders must be done in order to address problems identified through infection control activities and implement corrective action plans.

Suggested Documents:

- Hospital's infection control plan and quality improvement plan
- Infection control policies/procedures
- Infection control surveillance data
- Infection control committee meeting minutes

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| **§482.43 CoP:  Discharge Planning** | **Provision of Care (PC), Management of Information (IM)** |
| The hospital must have in effect a discharge planning process that applies to all patients. The hospital's policies and procedures must be specified in writing (A-0349).<br><br>(a) Standard: Identification of Patients in Need of Discharge Planning<br>The hospital must identify at an early stage of hospitalization all patients who are likely to suffer adverse health consequences upon discharge if there is no adequate discharge planning (A-0350). | **PC.5.60, EP1-5:** The care plan is coordinated in a timely manner.<br><br>**PC.15.10, EP1:** The organization has a process for care/treatment after discharge or transfer.<br><br>**PC.15.20, EP1-9:** Patients are discharged or transferred only after their needs are assessed.<br><br>**PC.15.30, EP1-2:** Patient information is shared with other care providers when patients are transferred to another healthcare facility or discharged to their primary provider. |

## Analysis/Guidelines

CMS and JCAHO are not specific in terms of timelines for discharge planning; it is left up to the organization to determine the timing, but it should be done as early as possible. CMS states it should be done "at an early stage of hospitalization" while JCAHO requires it to be done in a timely manner. In addition, there are no national criteria or standards for identifying patients who are likely to have adverse outcomes after discharge without adequate discharge planning.

Survey Tips:

- Interview staff about how and when discharge planning begins
- Review patient care plans for discharge information

Suggested Documents:

- Discharge planning policies/procedures
- Patient care plans

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| **§482.43 CoP:  Discharge Planning** | **Provision of Care (PC),<br>Management of Information (IM)** |
| (b) Standard: Discharge planning evaluation<br><br>(1)  The hospital must provide a discharge planning evaluation to the patients identified in paragraph (a) of this section, and to other patients upon the patient's request, the request of a person acting on the patient's behalf, or the request of the physician (A-0351).<br>(2)  A registered nurse, social worker, or other appropriately qualified personnel must develop, or supervise the development of, the evaluation (A-0352).<br>(3)  The discharge planning evaluation must include an evaluation of the likelihood of a patient needing post-hospital services and of the availability of the services (A-0353).<br>(4)  The discharge planning evaluation must include an evaluation of the likelihood of a patient's capacity for self-care or of the possibility of the patient being cared for in the environment from which he or she entered the hospital (A-0354).<br>(5)  The hospital personnel must complete the evaluation on a timely basis so the appropriate arrangements for post-hospital care are made before discharge, and to avoid unnecessary delays in discharge (A-0355).<br>(6)  The hospital must include the discharge planning evaluation in the patient's medical record for use in establishing an appropriate discharge plan and must discuss the results of the evaluation with the patient or individual acting on his or her behalf (A-0356). | **PC.6.10, EP3:** Patient education occurs for medical equipment and supplies and rehabilitation.<br><br>**IM.6.10, EPs 7 and 9:** Every patient has an accurate record of the care/treatment they received. A discharge summary must be included in the patient's medical record. Only designated staff can enter information into the medical record.<br><br>• *Changes to IM.6.10—EP4 is expanded to include authentication of medical records. EP9 expands the requirement of the time to complete a record following discharge (<30 days).*<br><br>**IM.6.20, EP1-3:** Patient records have specific clinical information documented.<br><br>• *Changes to IM.6.20—A new bullet under EP2 was added. It addresses language needs of the patient/family.* |

**NEW for 2006**

## Analysis/Guidelines

In most hospitals, discharge planning is coordinated by a central person; however, the responsibility is not limited to a single discipline. Nurses, physicians, social workers, other care providers, home health agencies, and the patient's primary care provider should all be involved as necessary based on the patient's needs. A discharge planning evaluation should outline what a patient's care needs will be once they leave the hospital setting. Both CMS and JCAHO expect hospitals to document the patient's discharge planning evaluation, steps for implementation, and that results are shared with the patient or their representative.

Survey Tips:

• Review discharge planning documents for accuracy, thoroughness, and timeliness

Suggested Documents:

• Discharge planning policies/procedures
• Patient medical records

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| **§482.43 CoP:  Discharge Planning** | **Provision of Care (PC), Management of Information (IM)** |
| (c)  Standard: Discharge plan<br><br>(1)  A registered nurse, social worker, or other appropriately qualified personnel must develop, or supervise the development of, a discharge plan if the discharge planning evaluation indicates a need for a discharge plan (A-0358).<br><br>(2)  In the absence of a finding by the hospital that a patient needs a discharge plan, the patient's physician may request a discharge plan. In such a case, the hospital must develop a discharge plan for the patient (A-0359).<br><br>(3)  The hospital must arrange for the initial implementation of the patient's discharge plan (A-0360).<br><br>(4)  The hospital must reassess the patient's discharge plan if there are factors that may affect continuing care needs or the appropriateness of the discharge plan (A-0361).<br><br>(5)  As needed, the patient and family members or interested persons must be counseled to prepare them for post-hospital care (A-0362). | **PC.2.150, EP1:** All patients are reassessed.<br><br>**PC.4.10, EP1, 2, 6, 12-14:** Each patient has a care plan.<br><br>**PC.15.10, EP1:** The organization has a process for care/treatment after discharge or transfer.<br><br>**PC.15.20, EP1-9:** Patients are discharged or transferred only after their needs are assessed. |

## Analysis/Guidelines

Once a discharge planning evaluation is done, it should be updated to address a patient's needs based on reassessments done. Educating the patient, the patient's family, and/or caregivers is an important component of implementing the discharge plan. Information and instructions for post-hospital care should be shared, including, for example, timing and dosage of medications and potential side effects, treatments, and therapy schedules and routines.

Survey Tips:

- Review hospital policies/procedures on discharge planning and reassessment
- Ask families/patients if discharge planning has been discussed with them by staff

Suggested Documents:

- Discharge planning policies/procedures
- Patient medical records
- Policies on patient/family education

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| **§482.43 CoP:  Discharge Planning** | **Provision of Care (PC),<br>Management of Information (IM)** |
| (d) Standard: Transfer or Referral<br>The hospital must transfer or refer patients, along with necessary medical information, to appropriate facilities, agencies, or outpatient services, as needed, for follow-up or ancillary care (A-0363). | **PC.15.30, EP1-2:** Patient information is shared with other care providers when patients are transferred to another healthcare facility or discharged to their primary provider. |

## Analysis/Guidelines

The CMS interpretative guidelines define "medical information" as necessary information such as functional capacity, requirements for healthcare services, discharge summaries, and referral forms. "Appropriate facilities" are those that will meet the patient's assessed needs on a post-discharge basis and that comply with federal and state health and safety standards.

Suggested Documents:

- Hospital referrals and transfer policies/procedures

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| **§482.43 CoP: Discharge Planning** | **Provision of Care (PC),<br>Management of Information (IM)** |
| (e) Standard: Reassessment<br>   The hospital must reassess its discharge planning process on an ongoing basis. The reassessment must include a review of discharge plans to ensure that they are responsive to discharge needs (A-0364). | The JCAHO has no applicable standards. |

## Analysis/Guidelines

JCAHO does not have a comparable standard that is specific to discharge planning process review. CMS encourages hospitals to include the following as part of their discharge planning reassessment: time effectiveness of criteria used to identify patients needing discharge plans, quality and timeliness for discharge evaluations and plans, hospital personnel maintain complete and accurate information on options, and the hospital has a coordinated discharge planning process that integrates quality and other functional areas.

Survey Tips:

• Review how the hospital's reassessment of its discharge planning process ties to its quality improvement program

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| **§482.45 CoP:  Organ, Tissue and Eye Procurement** | **Leadership (LD),**<br>**Ethics, Rights & Responsibilities (RI)** |

| | |
|---|---|
| Standard: Organ Procurement Responsibilities<br>The hospital must have and implement written protocols that (A-0370):<br><br>(1)  Incorporate an agreement with an organ procurement organization (OPO) designated under part 486 of this chapter, under which it must notify, in a timely manner, the OPO or a third party designated by the OPO of individuals whose death is imminent or who have died in the hospital. The OPO determines medical suitability for organ donation and, in the absence of alternative arrangements by the hospital, the OPO determines medical suitability for tissue and eye donation, using the definition of potential tissues and eye donor and the notification protocol developed in consultation with the tissue and eye banks identified by the hospital for this purpose (A-0371);<br><br>(2)  Incorporate an agreement with at least one tissue bank and at least one eye bank to cooperate in the retrieval, processing, preservation, storage, and distribution of tissues and eyes, as may be appropriate to ensure that all usable tissues and eyes are obtained from potential donors, insofar as such an agreement does not interfere with organ procurement (A-0372);<br><br>(3)  Ensure, in collaboration with the designated OPO, that the family of each potential donor is informed of its options to donate organs, tissues, or eyes or to decline to donate (A-0373). The individual designated by the hospital to initiate the request to the family must be an organ procurement representative or a designated requestor. A designated requestor is an individual who has completed a course offered or approved by the OPO and designed in conjunction with the tissue and eye bank community in the methodology for approaching potential donor families and requesting organ or tissue donation (A-0374);<br><br>(4)  Encourage discretion and sensitivity with respect to the circumstances, views, and beliefs of the families of potential donors (A-0375); | **LD.3.110, EP1-12:** The organization designates an OPO, one tissue bank, and one eye bank. Policies and procedures for organ procurement are in place within the organization.<br><br>**RI.2.80, EP9:** Organ donation wishes of the patient are documented by the organization.<br><br>**PC.17.10, EP1-10:** Tissues to be used in donations are processed appropriately.<br><br>  • *Changes to PC.17.10—This is a new standard regarding donor tissue processing.*<br><br>**PC.17.20, EP1-7:** Donor tissues must be tracked and recorded appropriately.<br><br>  • *Changes to PC.17.20—This is a new standard regarding donor tissue tracking and recording.*<br><br>**PC.17.30, EP1, 2, and 5:** The organization analyzes adverse events that occur with regard to donor tissues.<br><br>  • *Changes to PC.17.30—This is a new standard regarding adverse events with donor tissues.* |

NEW for 2006

*continued on next page >*

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| (5) Ensure that the hospital works cooperatively with the designated OPO, tissue bank and eye bank in educating staff on donation issues (A-0376); reviewing death records to improve identification of potential donors (A-0377); and maintaining potential donors while necessary testing and placement of potential donated organs, tissues, and eyes take place (A-0378). | |

## §482.45 Analysis/Guidelines

CMS requirements are more specific and detailed regarding organ procurement and transplantation; JCAHO has two standards that address this process. The responsibility of the hospital is particularly important to recognize because sensitivity, discretion, and respect are paramount when interacting with a grieving family. Staff training on policies/procedures and how to approach a family is also important. Organizations performing organ transplantation must be a member of the Organ Procurement and Transplantation Network (OPTN).

Survey Tips:

- Verify that written agreements with OPO, tissue and eye bank(s) are current
- Verify that organ donation program is incorporated in hospital quality improvement activities
- Check to ensure appropriate personnel have completed required training

Suggested Documents:

- Organ and tissue procurement and donation policies/procedures
- Copy of written agreements with designated OPO, tissue bank(s), and eye bank(s)
- Personnel files (for training documentation)
- Death records
- Organ donation data submitted to OPTN and the Scientific Registry

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| **§482.45 CoP:  Organ, Tissue and Eye Procurement** | **Leadership (LD),**<br>**Ethics, Rights & Responsibilities (RI)** |
| Standard: Organ transplantation responsibilities<br><br>(1) A hospital in which organ transplants are performed must be a member of the Organ Procurement and Transplantation Network (OPTN) established and operated in accordance with section 372 of the Public Health Service (PHS) Act (42 U.S.C. 274) and abide by its rules. The term "rules of the OPTN" means those rules provided for in regulations issued by the Secretary in accordance with section 372 of the PHS Act which are enforceable under 42 CFR 121/10. No hospital is considered to be out of compliance with section 1138(a)(1)(B) of the Act, or with the requirements of this paragraph, unless the Secretary has given the OPTN formal notice that he or she approves the decision to exclude the hospital from the OPTN and has notified the hospital in writing.<br>(2) For purposes of these standards, the term "organ" means a human kidney, liver, heart, lung, or pancreas.<br>(3) If a hospital performs any type of transplants, it must provide organ transplant related data, as requested by the OPTN, the Scientific Registry, and the organ procurement organizations. The hospital must also provide such data directly to the Department when requested by the Secretary (A-0379). | **LD.3.110, EP13 & 14:** Organizations must be a member of OPTN and submit data to all entities as required. |

## Analysis/Guidelines

CMS requirements are more specific and detailed regarding organ procurement and transplantation; JCAHO has two standards that address this process. The responsibility of the hospital is particularly important to recognize because sensitivity, discretion, and respect are paramount when interacting with a grieving family. Staff training on policies/procedures and how to approach a family is also important. Organizations performing organ transplantation must be a member of the Organ Procurement and Transplantation Network (OPTN).

Survey Tips:

• Verify that written agreements with OPO, tissue, and eye bank(s) are current
• Verify that organ donation program is incorporated in hospital quality improvement activities
• Check to ensure appropriate personnel have completed required training

Suggested Documents:

• Organ and tissue procurement and donation policies/procedures
• Copy of written agreements with designated OPO, tissue bank(s), and eye bank(s)
• Personnel files (for training documentation)
• Death records
• Organ donation data submitted to OPTN and the Scientific Registry

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| **§482.51 CoP:  Surgical Services** | **Leadership (LD), Medical Staff (MS), Management of Human Resources (HR), Management of Information (IM), Ethics, Rights & Responsibilities (RI)** |
| If the hospital provides surgical services, the services must be well organized and provided in accordance with acceptable standards of practice. If outpatient surgical services are offered, the services must be consistent in quality with inpatient care in accordance with the complexity of services offered (A-0384).<br><br>(a) Standard: Organization and staffing<br>    The organization of the surgical services must be appropriate to the scope of the services offered (A-0385).<br><br>    (1)  The operating rooms must be supervised by an experienced registered nurse or doctor of medicine or osteopathy (A-0386).<br><br>    (2)  Licensed practical nurses (LPNs) and surgical technologists (operating room technicians) may serve as "scrub nurses" under the supervision of a registered nurse (A-0387).<br><br>    (3)  Qualified registered nurses may perform circulating duties in the operating room. In accordance with applicable state laws and approved medical staff policies and procedures, LPNs and surgical technologists may assist in circulatory duties under the supervision of a qualified registered nurse who is immediately available to respond to emergencies (A-0388).<br><br>    (4)  Surgical privileges must be delineated for all practitioners performing surgery in accordance with the competencies of each practitioner. The surgical service must maintain a roster of practitioners specifying the surgical privileges of each practitioner (A-0389). | **LD.1.20, EP4:** A written scope of service exists.<br><br>**LD.2.20, EP1-5:** There is effective leadership in each area of the organization.<br><br>**LD.3.90, EP1 & 2:** The organization has policies and procedures for services.<br><br>**HR.1.10, EP1:** There must be adequate staffing within the organization.<br><br>**HR.1.20, EP1-7, 18, 46:** Verification of licensure/certification/registration, credentials, education, criminal background check, and health screen is done. If there is no licensure/certification for patient care providers, accreditation decision will be impacted.<br><br>  • *Changes to HR.1.20—EP1 and EP2 remain unchanged. EP 3–5 are reworded and renumbered. EP4 has three additional notes regarding primary source verification and CVOs. The 2005 EPs 18 and 19 were eliminated, and new EPs 18 and 46 were added.*<br><br>**HR.3.10, EP1-10:** The organization has in place a competency assessment process.<br><br>**MS.1.40, EP1-12:** A medical staff executive committee exists within the hospital to carry out the responsibilities of the medical staff.<br><br>**MS.4.10, EP1-4:** A credentialing process exists for the medical staff and is outlined in the bylaws. Documentation of licensure, training/experience, and competence is verified by primary or secondary source verification or an equivalent source.<br>  • *No changes to standard or EP; added sources for verification*<br><br>**MS.4.20, EP1-15:** The organization has a process for assigning clinical privileges.<br><br>**MS.4.30, EP1-7:** The organization has an expedited process for assigning clinical privileges.<br><br>**MS.4.40, EP1-5:** Clinical privileges can be renewed as outlined in bylaws.<br><br>*See next page for analysis/guidelines on §482.51 (a)*  **>** |

NEW for 2006

NEW for 2006

## §482.51(a) Analysis/Guidelines

Both CMS and JCAHO are verifying that hospitals provide surgical services either directly or through a contractual agreement. The services should be outlined along with staffing requirements and competencies.

Survey Tips:

- Verify that job descriptions and credentialing/privileging is up to date for surgical personnel
- Verify that current roster of practitioners' surgical privileges is accessible in the ORs and where surgery scheduling is done

Suggested Documents:

- Scope of service for surgical services
- Organizational chart showing relationship to other departments and lines of authority
- Personnel files
- Job descriptions for leaders in surgical services
- Medical staff credentials files
- Medical staff policies/procedures
- Staffing schedules
- Current roster listing each practitioner's surgical privileges

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| **§482.51 CoP:  Surgical Services** | **Leadership (LD), Medical Staff (MS), Management of Human Resources (HR), Management of Information (IM), Ethics, Rights & Responsibilities (RI)** |
| (b) Standard: Delivery of service<br>Surgical services must be consistent with needs and resources. Policies governing surgical care must be designed to assure the achievement and maintenance of high standards of medical practice and patient care (A-0390).<br>  (1) There must be a complete history and physical work-up in the chart of every patient prior to surgery, except in emergencies. If it has been dictated, but not yet recorded in the patient's chart, there must be a statement to that effect and an admission note in the chart by the practitioner who admitted the patient (A-0391).<br>  (2) A properly executed informed consent form for the operation must be in the patient's chart before surgery, except in emergencies (A-0392).<br>  (3) The following equipment must be available to the operating room suites: call-in system, cardiac monitor, resuscitator, defibrillator, aspirator, and tracheotomy set (A-0393).<br>  (4) There must be adequate provisions for immediate post-operative care (A-0394).<br>  (5) The operating room register must be complete and up to date (A-0395).<br>  (6) An operative report describing techniques, findings, and tissues removed or altered must be written or dictated immediately following surgery and signed by the surgeon (A-0396). | **RI.2.40, EP1-3:** A process to obtain informed consent from the patient/family exists.<br><br>**RI.2.50, EP1-7:** Consent from the patient/family is obtained before filming or recording the patient occurs.<br><br>**RI.2.60, EP1-2:** The patient/family is informed about their care provider(s).<br><br>**IM.6.30, EP1-8, 10:** Operative procedures or use of sedation is documented in the medical record.<br><br>  • *Changes to IM.6.30—EPs 1 and 2 were revised. A new EP 10, which was part of the 2005 EP1, was added. A new reference to standards PC.13.30 and PC.13.40 was added.* |

**NEW for 2006**

## Analysis/Guidelines

These requirements are verifying that the services provided in the surgical/OR suites are delivered according to standards of care. Policies, history and physicals (H&Ps) before surgical procedures, informed consent, available equipment, provisions for post-operative recovery, patient OR log, and documented OR reports are all included in the CMS requirements. JCAHO standards are not as specific but cover informed consent, operative reports, and policies.

Survey Tips:

• Review policies/procedures for surgical areas for accuracy and that they are up to date with current practice
• Conduct medical record reviews, especially focusing on informed consent, H&Ps, and operative reports
• Check that equipment in the ORs is in working order

Suggested Documents:

| | |
|---|---|
| • Surgical services policies/procedures | • Policy on Do Not Resuscitate (DNR) procedures |
| • Medical records | • Medical equipment preventive maintenance logs |
| • Policy on informed consent | • OR register/patient log |

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| **§482.52  CoP: Anesthesia Services** | **Provision of Care (PC), Leadership (LD), Medical Staff (MS)** |

| | |
|---|---|
| If the hospital furnishes anesthesia services, they must be provided in a well organized manner under the direction of a qualified doctor of medicine or osteopathy. The service is responsible for all anesthesia administered in the hospital (A-0416). | **LD.1.20, EP4:** A written scope of service exists. |
| | **LD.2.20, EP1-5:** There is effective leadership in each area of the organization. |
| (a) Standard: Organization and staffing | **LD.3.90, EP1 & 2:** The organization has policies and procedures for services. |
| The organization of anesthesia services must be appropriate to the scope of the services offered. Anesthesia must be administered only by: | **MS.2.10, EP1-11:** The medical staff provides leadership for patient care functions, including patient safety, patient satisfaction, and medical history & physical (H&P) exams. |
| (1) A qualified anesthesiologist; | **MS.2.20, EP1-4:** Physician who have appropriate credentials and privileges coordinate and manage the patient's medical care. |
| (2) A doctor of medicine or osteopathy (other than an anesthesiologist); | **MS.4.10, EP1-4:** A credentialing process exists for the medical staff and is outlined in the bylaws. Documentation of licensure, training/experience, and competence is verified by primary or secondary source verification or an equivalent source. |
| (3) A dentist, oral surgeon, or podiatrist who is qualified to administer anesthesia under state law; | • *No changes to standard or EP; added sources for verification* |
| (4) A certified registered nurse anesthetist (CRNA), as defined in §410-69(b) of this chapter, who, unless exempted in accordance with paragraph (c) of this section, is under the supervision of the operating practitioner or of an anesthesiologist who is immediately available if needed; or | **MS.4.20, EP1-15:** A clinical privileging process exists for the medical staff. The governing body approves clinical privileges. |
| (5) An anesthesiologist's assistant, as defined in §410.69(b) of this chapter, who is under the supervision of an anesthesiologist who is immediately available if needed (A-0417). | **MS.4.30, EP1-7:** The organization has an expedited process for assigning clinical privileges. |
| | **MS.4.40, EP1-5:** Clinical privileges can be renewed as outlined in bylaws. |

NEW for 2006

| Analysis/Guidelines |
|---|

Both CMS and JCAHO will verify that qualified member(s) of the medical staff with appropriate clinical privileges administer anesthesia/sedation. CMS outlines specific individuals who can do this; JCAHO is more general. However, the hospital should have this outlined in their medical staff bylaws/policies/procedures.

Survey Tips:

- Verify that credentials and privileging for medical staff are current
- Update organizational chart and job descriptions as necessary

Suggested Documents:

- Scope of service for anesthesiology services
- Organizational charge for anesthesia department
- Job descriptions for leaders of anesthesia service
- Personnel files
- Medical staff credentials files
- Medical staff bylaws/policies/procedures

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| **§482.52  CoP: Anesthesia Services** | **Provision of Care (PC), Leadership (LD), Medical Staff (MS)** |
| (b) Standard: Delivery of services<br>    Anesthesia services must be consistent with needs and re-sources. Policies on anesthesia procedures must include the delineation of pre-anesthesia and post-anesthesia responsi-bilities. The policies must ensure that the following are provided to each patient (A-0418):<br><br>   (1)  A pre-anesthesia evaluation by an individual qualified to administer anesthesia under paragraph (a) of this section within 48 hours prior to surgery (A-0419)<br><br>   (2)  An intraoperative anesthesia record (A-0420)<br><br>   (3)  With respect to inpatients, a post-anesthesia follow-up report by the individual who administers the anesthesia that is written within 48 hours after surgery (A-0421)<br><br>   (4)  With respect to outpatients, a post-anesthesia evalua-tion for proper anesthesia recovery performed in accordance with policies and procedures approved by the medical staff (A-0422) | **PC.13.20, EP1-12:** Staff are qualified and trained in operative or invasive procedures and sedation or anesthesia.  A pre-anesthe-sia evaluation is provided to each patient.<br><br>  &bull; *Changes to PC.13.20—EP9 has been reworded and is no longer scored at this standard. It is scored at the NPSG Universal Protocol, Requirement 1C.*<br><br>**NPSG—Universal Protocol (1A, 1B, 1C):** Patients are identi-fied, operating site is marked, and a "time out" is conducted before the start of procedures.<br><br>**PC.13.30, EP1-2:** Patient monitoring occurs during sedation or anesthesia and is documented in the patient's record.<br><br>**PC.13.40, EP1-5:** Patient monitoring occurs after sedation or anesthesia including physiological, mental, and pain status. |

NEW for 2006

| Analysis/Guidelines |
|---|
| These requirements are verifying that the anesthesia services provided are delivered according to standards of care. Policies, pre-anesthesia evaluations, and intra- and post-anesthesia record documentation are outlined.<br><br>Survey Tips:<br><br>  &bull; Conduct medical record reviews, especially focusing on pre-anesthesia evaluations, operative anesthesia records, and post-anesthesia follow-up reports<br>  &bull; Review sedation practices and policies/procedures<br>  &bull; Review policies/procedures for anesthesia administration<br><br>Suggested Documents:<br><br>  &bull; Anesthesia services policies/procedures<br>  &bull; Medical staff bylaws/policies/procedures<br>  &bull; Sedation manual or policies/procedures<br>  &bull; Medical records |

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| §482.52  CoP: Anesthesia Services | Provision of Care (PC), Leadership (LD), Medical Staff (MS) |
| (c)  Standard: State exemption<br><br>(1)  A hospital may be exempted from the requirement for MD/DO supervision of CRNAs as described in paragraph (a)(4) of this section, if the state in which the hospital is located submits a letter to CMS signed by the governor, following consultation with the state's boards of medicine and nursing, requesting exemption from MD/DO supervision of CRNAs. The letter from the governor must attest that he or she has consulted with the state boards of medicine and nursing about issues related to access to and the quality of anesthesia services in the state and has concluded that it is in the best interests of the state's citizens to opt out of the current MD/DO supervision requirement, and that the opt-out is consistent with state law.<br><br>(2)  The request for exemption and recognition of state laws, and the withdrawal of the request may be submitted at any time, and are effective upon submission. | No applicable JCAHO standards for this section. |

| Analysis/Guidelines |
|---|
| This is a new standard in the Conditions of Participation. JCAHO has no applicable standards for this section. |

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| **§482.53 CoP: Nuclear Medicine Services** | **Provision of Care (PC), Leadership (LD), Medical Staff (MS), Management of the Environment of Care (EC), Management of Information (IM)** |
| If the hospital provides nuclear medicine services, those services must meet the needs of the patients in accordance with acceptable standards of practice (A-0428).<br><br>(a) Standard: Organization and staffing<br>    The organization of the nuclear medicine service must be appropriate to the scope and complexity of the services offered (A-0429).<br><br>    (1) There must be a director who is a doctor of medicine or osteopathy qualified in nuclear medicine (A-0430).<br><br>    (2) The qualifications, training, functions, and responsibilities of the nuclear medicine personnel must be specified by the service director and approved by the medical staff (A-0431). | **LD.1.20, EP4:** A written scope of service exists.<br><br>**LD.2.20, EP1-5:** There is effective leadership in each area of the organization.<br><br>**LD.3.30, EP1:** The organization provides essential services including nuclear medicine.<br><br>**LD.3.90, EP1 & 2:** The organization has policies and procedures for services.<br><br>**MS.4.10, EP1-4:** A credentialing process exists for the medical staff and is outlined in the bylaws. Documentation of licensure, training/experience, and competence is verified by primary or secondary source verification or an equivalent source.<br>  • *No changes to standard or EP; added sources for verification.*<br><br>**MS.4.20, EP1-15:** A clinical privileging process exists for the medical staff. The governing body approves clinical privileges.<br><br>**MS.4.30, EP1-7:** The organization has an expedited process for assigning clinical privileges.<br><br>**MS.4.40, EP1-5:** Clinical privileges can be renewed as outlined in bylaws.<br><br>**PC.2.20, EP1-5:** Patient information is gathered when patients are assessed or reassessed.<br>  • *Changes to PC.2.20—A new rationale section regarding assessment data has been added.*<br><br>**PC.2.130, EP1-3:** Patients are assessed in all care settings. |

**NEW for 2006** (×2)

| Analysis/Guidelines |
|---|
| This is an optional service for hospitals; however, if a hospital does provide nuclear medicine services, it is usually part of the radiological services area. The JCAHO standards for this entire section are the same as listed under the Radiological Services section. See §482.26 Radiological Services for analysis, survey tips, and suggested documents.<br><br>Both CMS and JCAHO are verifying that hospitals provide radiological services either directly or through a contractual agreement.<br><br>Suggested Documents:<br><br>• Scope of service for radiology service |

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| **§482.53 CoP: Nuclear Medicine Services** | **Provision of Care (PC), Leadership (LD), Medical Staff (MS), Management of the Environment of Care (EC), Management of Information (IM)** |
| (b) Standard: Delivery of service<br>Radioactive materials must be prepared, labeled, used, transported, stored, and disposed of in accordance with acceptable standards of practice (A-432).<br><br>(1) Inhouse preparation of radiopharmaceuticals is by, or under, the direct supervision of an appropriately trained registered pharmacist or a doctor of medicine or osteopathy (A-0433).<br><br>(2) There is proper storage and disposal of radioactive material (A-0434).<br><br>(3) If laboratory tests are performed in the nuclear medicine service, the service must meet the applicable requirement for laboratory services specified in §482.27 (A-0435). | **EC.3.10, EP1-13:** Hazardous waste systems are managed. |

## Analysis/Guidelines

CMS and JCAHO are similar when it comes to environment of care issues for hazardous waste (radioactive materials) and medical equipment management, testing, and inspections. CMS has an additional focus on radiation exposure badge checks that is not specified in the JCAHO standards.

Survey Tips:

- Verify that hospital policies/procedures address safety standards
- Verify that patient shielding aprons, etc., are routinely inspected
- Inspect where hazardous materials are stored for safety
- Conduct audits to see whether radiology staff are wearing radiation exposure badges
- Review medical records for appropriate orders
- Verify that quality control (QC) checks were performed regularly

Suggested Documents:

- Radiology policies and procedures
- Environment of care plans/procedures for hazardous wastes
- Environment of care plans/procedures for medical equipment
- Inspection logs for medical equipment checks
- QC check documentation
- Any OSHA documentation regarding radiology safety

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| **§482.53 CoP: Nuclear Medicine Services** | **Provision of Care (PC), Leadership (LD), Medical Staff (MS), Management of the Environment of Care (EC), Management of Information (IM)** |
| (c) Standard: Facilities<br><br>Equipment and supplies must be appropriate for the types of nuclear medicine services offered and must be maintained for safe and efficient performance (A-0436). The equipment must be:<br><br>(1) Maintained in safe operating condition; and<br><br>(2) Inspected, tested, and calibrated at least annually by qualified personnel (A-0437). | **EC.6.10, EP1-8:** Medical equipment is monitored and managed.<br><br>**EC.6.20, EP1-6:** Testing and regular inspections of medical equipment are done. |

## Analysis/Guidelines

This is an optional service for hospitals; however, if a hospital does provide nuclear medicine services, it is usually part of the radiological services area. The JCAHO standards for this entire section are the same as listed under the Radiological Services section. See §482.26 Radiological Services for analysis, survey tips, and suggested documents.

Both CMS and JCAHO are verifying that hospitals provide radiological services either directly or through a contractual agreement.

Suggested Documents:

- Scope of service for radiology service

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| **§482.53 CoP: Nuclear Medicine Services** | **Provision of Care (PC), Leadership (LD), Medical Staff (MS), Management of the Environment of Care (EC), Management of Information (IM)** |

| | |
|---|---|
| (d) Standard: Records<br>The hospital must maintain signed and dated reports of nuclear medicine interpretations, consultations, and procedures (A-0438).<br><br>(1) The hospital must maintain copies of nuclear medicine reports for at least five years (A-0439).<br><br>(2) The practitioner approved by the medical staff to interpret diagnostic procedures must sign and date the interpretations of these tests (A-0440).<br><br>(3) The hospital must maintain records of the receipt and distribution of radiopharmaceuticals (A-0441).<br><br>(4) Nuclear medicine services must be ordered only by practitioners whose scope of federal or state licensure and whose defined staff privileges allow such referrals (A-0442). | **IM.2.20, EP1-8:** The organization maintains security and integrity of data.<br><br>• *Changes to IM.2.20—EP3, which states that the hospital's data security and integrity policies are implemented, has been added. EPs 4–8 have been renumbered due to this addition and have been slightly reworded.*<br><br>**IM.2.30, EP1-4:** The organization must have a disaster recovery plan.<br><br>• *Changes to IM.2.30—Order of EPs has been adjusted. EP2 was part of the 2005 EP3. EP4 has been added as a separate item in 2006, but was part of EP1 in 2005.*<br><br>**IM.3.10, EP1-4:** The organization has an information technology system in place that includes quality control systems.<br><br>• *Changes to IM.3.10—EPs 1-3 are reworded and/or renumbered. EP4 (previously EP3 in 2005) focuses on quality control systems.*<br><br>**IM.4.10, EP1-3:** The organization has an information technology system in place which is used for making decisions in areas such as operations, performance improvement, and patient safety.<br><br>• *Changes to IM.4.10—Previously, there were seven EPs in this standard; now they have been consolidated down to three EPs.*<br><br>**IM.6.10, EP1-9, 17, 18:** Every patient has an accurate record of the care/ treatment they received. Only designated staff can enter information into the medical record.<br><br>• *Changes to IM.6.10—EP4 is expanded to include authentication of medical records. EP9 expands the requirement of the time to complete a record following discharge (<30 days).*<br><br>**IM.6.20, EP1-3:** Patient records have specific clinical information documented. |

NEW for 2006

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| **§482.53 CoP: Nuclear Medicine Services** | **Provision of Care (PC), Leadership (LD), Medical Staff (MS), Management of the Environment of Care (EC), Management of Information (IM)** |
| | • *Changes to IM.6.20—A new bullet under EP2 was added that addresses language needs of the patient/family.*<br><br>**IM.6.60, EP1-2:** Patient information must be accessible when needed for patient care/treatment. |

**NEW for 2006**

---

### Analysis/Guidelines

This is an optional service for hospitals; however, if a hospital does provide nuclear medicine services, it is usually part of the radiological services area. The JCAHO standards for this entire section are the same as listed under the Radiological Services section. See §482.26 Radiological Services for analysis, survey tips, and suggested documents.

Both CMS and JCAHO are verifying that hospitals provide radiological services either directly or through a contractual agreement.

Suggested Documents:

• Scope of service for radiology service

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| **§482.54 CoP: Outpatient Services** | **Leadership (LD),<br>Management of Human Resources (HR)** |
| If the hospital provides outpatient services, the services must meet the needs of the patients in accordance with acceptable standards of practice (A-0446).<br><br>(a) Standard: Organization<br>　Outpatient services must be appropriately organized and integrated with inpatient services (A-0447). | **LD.1.20, EP4:** A written scope of service exists.<br><br>**LD.3.90, EP1 & 2:** The organization has policies and procedures for services. |

## Analysis/Guidelines

Both CMS and JCAHO are verifying that hospitals that provide outpatient services, either directly or through a contractual agreement, do so according to standards of care and that services are provided consistently in all locations. The services should be outlined along with staffing requirements and competencies.

Survey Tips:

- Verify that policies/procedures and job descriptions are current
- Verify that outpatient services in all locations are tied with inpatient services (e.g., medical records, lab, other diagnostic services, etc.)

Suggested Documents:

- Scope of service for all outpatient service areas/clinics
- Organizational chart for outpatient service structure
- Outpatient service policies/procedures
- Personnel files and competency records
- Job descriptions
- Medical records
- Staffing logs

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| **§482.54 CoP: Outpatient Services** | **Leadership (LD),**<br>**Management of Human Resources (HR)** |
| (b) Standard: Personnel<br>The hospital must:<br><br>   (1)  Assign an individual to be responsible for outpatient services; and<br><br>   (2)  Have appropriate professional and nonprofessional personnel available (A-0448). | **LD.2.20, EP1-5:** There is effective leadership in each area of the organization.<br><br>**HR.1.10, EP1:** There must be adequate staffing within the organization.<br><br>**HR.1.20, EP1-7, 18, 46:** Verification of licensure/certification/ registration, credentials, education, criminal background check, and health screen is done. If there is no licensure/certification for patient care providers, accreditation decision will be affected.<br><br>  • *Changes to HR.1.20—EPs 1 & 2 remain unchanged. EPs 3, 4, and 5 are reworded and renumbered. EP4 has 3 additional notes regarding primary source verification and CVOs. The 2005 EPs 18 and 19 were eliminated and new EPs 18 and 46 were added.*<br><br>**HR.3.10, EP1-10:** The organization has in place a competency assessment process. |

NEW for 2006

## Analysis/Guidelines

Both CMS and JCAHO are verifying that hospitals that provide outpatient services, either directly or through a contractual agreement, do so according to standards of care and that services are provided consistently in all locations. The services should be outlined along with staffing requirements and competencies.

Survey Tips:

- Verify that policies/procedures and job descriptions are current
- Verify that outpatient services in all locations are tied with inpatient services (e.g., medical records, lab, other diagnostic services, etc.)

Suggested Documents:

- Scope of service for all outpatient service areas/clinics
- Organizational chart for outpatient service structure
- Outpatient service policies/procedures
- Personnel files and competency records
- Job descriptions
- Medical records
- Staffing logs

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| **§482.55 CoP: Emergency Services** | **Leadership (LD), Management of Human Resources (HR), Medical Staff (MS)** |
| The hospital must meet the emergency needs of patients in accordance with acceptable standards of practice (A-0452).<br><br>(a) Standard: Organization and Direction<br>   If emergency services are provided at the hospital (A-0453):<br><br>   (1) The services must be organized under the direction of a qualified member of the medical staff (A-0454).<br><br>   (2) The services must be integrated with other departments of the hospital (A-0455).<br><br>   (3) The policies and procedures governing medical care provided in the emergency service or department are established by and are a continuing responsibility of the medical staff (A-0456). | **LD.2.20, EP1-5:** There is effective leadership in each area of the organization. |

## Analysis/Guidelines

CMS and JCAHO are verifying that hospitals that provide emergency room services do so according to standards of care. The services should be outlined along with staffing requirements and competencies.

Suggested Documents:

- Scope of service for emergency services
- Medical staff credentials files
- Emergency department policies/procedures
- Organizational chart for emergency department
- Job descriptions of emergency service personnel (medical director, nurses, EMTs, mid-level practitioners)
- Staffing assignments/log

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| §482.55 CoP: Emergency Services | Leadership (LD), Management of Human Resources (HR), Medical Staff (MS) |
| (b) Standard: Personnel<br><br>(1) The emergency services must be supervised by a qualified member of the medical staff (A-0458).<br><br>(2) There must be adequate medical and nursing personnel qualified in emergency care to meet the written emergency procedures and needs anticipated by the facility. (A-0459). | **MS.2.10, EP1-11:** The medical staff provides leadership for patient care functions, including patient safety, patient satisfaction, and medical history & physical (H&P) exams.<br><br>**MS.2.20, EP1-4:** Physicians who have appropriate credentials and privileges coordinate and manage the patient's medical care.<br><br>**HR.1.10, EP1:** There must be adequate staffing within the organization.<br><br>**HR.1.20, EP1-7, 18, 46:** Verification of licensure/certification/registration, credentials, education, criminal background check, and health screen is done. If there is no licensure/certification for patient care providers, accreditation decision will be impacted.<br><br>• *Changes to HR.1.20—EPs 1 and 2 remain unchanged. EPs 3–5 are reworded and renumbered. EP4 has three additional notes regarding primary source verification and CVOs. The 2005 EPs 18 and 19 were eliminated and new EPs 18 and 46 were added.*<br><br>**HR.3.10, EP1-10:** The organization has in place a competency assessment process. |

**NEW for 2006**

## Analysis/Guidelines

CMS and JCAHO are verifying that hospitals that provide emergency room services do so according to standards of care. The services should be outlined along with staffing requirements and competencies.

Suggested Documents:

- Scope of service for emergency services
- Medical staff credentials files
- Emergency department policies/procedures
- Organizational chart for emergency department
- Job descriptions of emergency service personnel (medical director, nurses, EMTs, mid-level practitioners)
- Staffing assignments/log

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| **§482.56 CoP: Rehabilitation Services** | **Provision of Care (PC), Leadership (LD), Management of Human Resources (HR), Management of Information (IM)** |
| If the hospital provides rehabilitation, physical therapy, occupational therapy, audiology, or speech pathology services, the services must be organized and staffed to ensure the health and safety of patients (A-0463).<br><br>(a) Standard: Organization and staffing<br>The organization of the service must be appropriate to the scope of the services offered (A-0464).<br><br>   (1) The director of the services must have the necessary knowledge, experience, and capabilities to properly supervise and administer the services (A-0465).<br><br>   (2) Physical therapy, occupational therapy, speech therapy, or audiology services, if provided, must be provided by staff that meet the qualifications specified by the medical staff, consistent with state law (A-0466). | **HR.1.10, EP1:** There must be adequate staffing within the organization.<br><br>**HR.1.20, EP1-7, 18, 46:** Verification of licensure/certification/registration, credentials, education, criminal background check, and health screen is done. If no licensure/certification for patient care providers, accreditation decision will be affected.<br><br>   • *Changes to HR.1.20—EPs 1 and 2 remain unchanged. EPs 3-5 are reworded and renumbered. EP4 has three additional notes regarding primary source verification and CVOs. The 2005 EPs 18 and 19 were eliminated and new EPs 18 and 46 were added.*<br><br>**HR.3.10, EP1-10:** The organization has in place a competency assessment process.<br><br>**LD.2.20, EP1-5:** There is effective leadership in each area of the organization. |

*NEW for 2006*

## Analysis/Guidelines

CMS and JCAHO are verifying that hospitals that provide rehabilitation services do so according to standards of care. The services should be outlined along with staffing requirements and competencies.

Suggested Documents:

- Scope of service for rehabilitation services, including physical, occupational, and speech therapy
- Medical staff credentials files
- Medical staff bylaws/policies/procedures
- Rehabilitation policies/procedures
- Organizational chart for rehabilitation services
- Job descriptions and competency records
- Staffing assignments/log
- Patients' care plans

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| **§482.56 CoP: Rehabilitation Services** | **Provision of Care (PC), Leadership (LD), Management of Human Resources (HR), Management of Information (IM)** |
| (b) Standard: Delivery of Services<br><br>    Services must be furnished in accordance with a written plan of treatment.  Services must be given in accordance with orders of practitioners who are authorized by the medical staff to order the services, and the orders must be incorporated in the patient's record (A-0467). | **PC.5.60, EP1 & 5:** The care plan is coordinated in a timely manner.<br><br>**IM.6.50, EP1-4:** Verbal and telephone orders are written appropriately and transcribed only by qualified staff as designated by the organization.<br><br>    • *Changes to IM.6.50—The standard was revised to specify telephone orders as well as verbal orders. EP4 has been reworded and is no longer scored in this standard; it is scored in NPSG 2, Requirement 2A.*<br><br>**NPSG 2 (2A):** Verbal/phone orders must be verified using the "read-back" method. |

**NEW for 2006**

---

## Analysis/Guidelines

CMS and JCAHO are verifying that hospitals that provide rehabilitation services do so according to standards of care. The services should be outlined along with staffing requirements and competencies.

Suggested Documents:

- Scope of service for rehabilitation services, including physical, occupational, and speech therapy
- Medical staff credentials files
- Medical staff bylaws/policies/procedures
- Rehabilitation policies/procedures
- Organizational chart for rehabilitation services
- Job descriptions and competency records
- Staffing assignments/log
- Patients' care plans

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| **§482.57 CoP:  Respiratory Services** | **Provision of Care (PC), Leadership (LD), Medical Staff (MS), Management of Human Resources (HR), Management of Information (IM)** |
| The hospital must meet the needs of the patients in accordance with acceptable standards of practice (A-0471).<br><br>(a) Standard: Organization and staffing<br>The organization of the respiratory care services must be appropriate to the scope and complexity of the services offered (A-0471).<br><br>(1) There must be a director of respiratory care services who is a doctor of medicine or osteopathy with the knowledge, experience and capabilities to supervise and administer the services properly. The director may serve on either a full-time or part-time basis (A-0473).<br><br>(2) There must be adequate numbers of respiratory thera-pists, respiratory therapy technicians, and other per-sonnel who meet the qualifications specified by the medical staff, consistent with state law (A-0474). | **HR.1.10, EP1:** There must be adequate staffing within the organization.<br><br>**HR.1.20, EP1-7, 18, 46:** Verification of licensure/certification/ registration, credentials, education, criminal background check, and health screen is done. If there is no licensure/certification for patient care providers, accreditation decision will be affected.<br><br>• *Changes to HR.1.20—EPs 1 and 2 remain unchanged. EPs 3-5 are reworded and renumbered. EP4 has three additional notes regarding primary source verification and CVOs. The 2005 EPs 18 and 19 were eliminated and new EPs 18 and 46 were added.*<br><br>**HR.3.10, EP1-10:** The organization has in place a competency assessment process.<br><br>**LD.2.20, EP1-5:** There is effective leadership in each area of the organization.<br><br>**MS.2.10, EP1-11:** The medical staff provides leadership for patient care functions, including patient safety, patient satisfac-tion, and medical history & physical (H&P) exams.<br><br>**MS.2.20, EP1-4:** Physicians who have appropriate credentials and privileges coordinate and manage the patient's medical care. |

**NEW for 2006**

## Analysis/Guidelines

CMS and JCAHO are verifying that hospitals provide respiratory care services according to standards of care. The services should be outlined along with staffing requirements and competencies.

Suggested Documents:

- Scope of service for respiratory therapy/care services
- Medical staff credentials files
- Medical staff bylaws/policies/procedures
- Respiratory policies/procedures
- Organizational chart for respiratory services
- Job descriptions and competency records
- Staffing assignments/log
- Patients' care plans

| CMS CoPs (v2005) | JCAHO Hospital Standards (v2006) |
|---|---|
| **§482.57 CoP: Respiratory Services** | **Provision of Care (PC), Leadership (LD), Medical Staff (MS), Management of Human Resources (HR), Management of Information (IM)** |
| (b) Standard: Delivery of services<br>    Services must be delivered in accordance with medical staff directives (A-0475).<br><br>    (1) Personnel qualified to perform specific procedures and the amount of supervision required for personnel to carry out specific procedures must be designated in writing (A-0476).<br><br>    (2) If blood gases or other clinical laboratory tests are performed in the respiratory care unit, the unit must meet the applicable requirements for laboratory services specified in §482.27 (A-0477).<br><br>    (3) Services must be provided only on, and in accordance with, the orders of a doctor of medicine or osteopathy (A-0478). | **PC.5.60, EP1 & 5:** The care plan is coordinated in a timely manner.<br><br>**IM.6.50, EP1-4:** Verbal and telephone orders are written appropriately and transcribed only by qualified staff as designated by the organization.<br><br>    • *Changes to IM.6.50—The standard was revised to specify telephone orders as well as verbal orders. EP4 has been reworded and is no longer scored in this standard; it is scored in NPSG 2, Requirement 2A.*<br><br>**NPSG 2 (2A):** Verbal/phone orders must be verified using the "read-back" method. |

**NEW for 2006**

---

## Analysis/Guidelines

CMS and JCAHO are verifying that hospitals provide respiratory care services according to standards of care. The services should be outlined along with staffing requirements and competencies.

Suggested Documents:

- Scope of service for respiratory therapy/care services
- Medical staff credentials files
- Medical staff bylaws/policies/procedures
- Respiratory policies/procedures
- Organizational chart for respiratory services
- Job descriptions and competency records
- Staffing assignments/log
- Patients' care plans

# APPENDIX

## Policies for 482.13
Hospital policy on patient rights and responsibilities
Hospital policy about patient advocates/representatives
Hospital policy on advance directives
Hospital policies on restraint/immobilization

## Policy for 482.21
Policy on sentinel events

## Policy for 482.22
Medical staff bylaws/policies and procedures

## Policies for 482.23
Incident report summary regarding medication errors or adverse drug effects

## Policies for 482.26
Set policy to verify vendor's information
EC plans/procedures for medical equipment

## Policy for 482.28
Sample nutritional assessment form

## Policy for 482.41
Sample emergency management program
Sample fire drills policy

## Policies for 482.42
Sample infectious diseases influx policy
Sample standard precautions policy and procedure

## Policies for 482.43
Sample patient discharge instructions policy

## Policies for 482.45
Sample organ and tissue donation policy

**Policies for 482.13** —————————————————————————————

| HOSPITAL POLICY ON PATIENT RIGHTS AND RESPONSIBILITIES | | |
|---|---|---|
| **Department:** MEDICAL CENTER WIDE POLICY & PROCEDURE MANUAL | **Policy number:** | |
| **Section:** ETHICS, RIGHTS, AND RESPONSIBILITIES POLICIES | **Effective date:** | **Page:** |
| **Title:** PATIENT RIGHTS | ● **Non-clinical**<br>○ **Clinical** | |
| **Approved by:** MEDICAL EXECUTIVE COMMITTEE, PATIENT CARE AND SAFETY COMMITTEE, PERFORMANCE IMPROVEMENT COMMITTEE | **Review date:**<br>**Revision date:** | |

## Purpose:

A.  This policy establishes compliance of the _____ Medical Center with the requirements of accreditation standards, state regulation, and health care law.

B.  Medical Center respects the rights of the patient, recognizes that each patient is an individual with personal dignity and unique health care needs, and provides care focused upon these needs.

C.  Medical Center affirms the patient's right to make decisions regarding his/her medical care, including the decision to discontinue treatment, to the extent permitted by law.

D.  Medical Center assists the patient in the exercise of his/her rights and informs the patient of any responsibilities incumbent upon him/her in the exercise of those rights.

E.  Patient shall be defined as an individual with or without decision-making capacity including minors (neonate, child, or adolescent). In cases of an adult without decision-making capacity or a minor, these rights and responsibilities shall be exercised by the person(s) having legal responsibilities to make decisions regarding medical care on behalf of the patient. Minors capable of participating in treatment decisions shall be involved in these decisions along with the parent(s), guardian(s), or surrogate decision-maker.

## Policy:

It is the responsibility of every member of the health care team to ensure that every patient or surrogate decision-maker has the opportunity to exercise their rights in accordance with the applicable law, hospital policy, and accepted standards of patient care. Furthermore, the organization recognizes the responsibility to inform and educate staff to ensure adherence to this policy. Patients also have responsibilities, and it is the responsibility of every patient to make his/her needs and wishes known.

## HOSPITAL POLICY ON PATIENT RIGHTS AND RESPONSIBILITIES (CONT.)

A.  Patient rights

All patients, or the people who have legal responsibility to make decisions regarding medical care on behalf of the patient, shall have the following rights:

- Exercise these rights without regard to sex, economic status, educational background, race, color, religion, ancestry, national origin, sexual orientation, marital status, or the source of payment for care.

- Considerate and respectful care.

- Knowledge of the name of the physician who has primary responsibility for coordinating the care and the names and professional relationships of other physicians and non-physicians who will see the patient.

- Receive information about the illness, the course of treatment, and prospects for recovery in terms that the patient can understand.

- Receive as much information about any proposed treatment or procedure as the patient may need in order to give informed consent or to refuse this course of treatment. Except in emergencies, this information shall include a description of the procedure or the treatment, the medically signifi-cant risks involved in this treatment, alternate course of treatment or non-treatment and the risks involved in each, and to know the name of the person who will carry out the procedure or treatment.

- Participate actively in decisions regarding the patient's medical care. To the extent permitted by law, this includes the right to refuse treatment.

- Full consideration of privacy concerning the medical care program. Case discussion, consultation, examination, and treatment are confidential and should be conducted discretely. The patient has the right to be advised as to the reason for the presence of any individual.

- Confidential treatment of all communications and records pertaining to the care and the stay in the hospital. Written permission shall be obtained before the medical records can be made available to anyone not directly concerned with the care.

- Reasonable responses to any reasonable requests the patient made for service.

- Leave the hospital even against the advice of the patient's physicians.

## HOSPITAL POLICY ON PATIENT RIGHTS AND RESPONSIBILITIES (CONT.)

- Reasonable continuity of care and to know in advance the time and location of appointment, as well as the identity of persons providing care.

- Be advised if hospital/personal physician proposes to engage in or perform human experimentation affecting care or treatment. The patient has the right to refuse to participate in such research projects.

- Be informed of continuing health care requirements following discharge from the hospital.

- Examine and receive an explanation of the bill regardless of source of payment.

- Know which hospital rules and policies apply to patient conduct while a patient.

- Have all patient's rights apply to the people who may have legal responsibility to make decisions regarding medical care on behalf of patients.

- Designate visitors of his/her choosing, if patients have decision-making capacity whether or not the visitor is related by blood or marriage, unless

  - no visitors are allowed

  - the facility reasonably determines that the presence of a particular visitor would endanger the health and safety of a patient, a member of the health facility staff, or other visitor to the health facility, or would significantly disrupt the operations of the facility

  - the patient has indicated to the health facility staff that the patient no longer wants this person to visit

- Have patient wishes considered for purposes of determining who may visit if the patient lacks decision-making capacity and to have the method of that consideration disclosed in the hospital policy on visitation. At a minimum, the hospital shall include any person living in the household.

- This section may not be construed to prohibit a health care facility from otherwise establishing reasonable restrictions upon visitation, including restrictions upon the hours of visitation and number of visitors.

## HOSPITAL POLICY ON PATIENT RIGHTS AND RESPONSIBILITIES (CONT.)

B.  Patient responsibilities

It is the responsibility of all patients or people who have legal responsibility to make decisions regarding medical care on behalf of the patient

- to know the extent and limitations of his/her health care benefits
- to identify himself/herself
- to keep appointments
- to provide accurate and complete information
- to follow the treatment plan member and health professional agree on
- to recognize the effect of his/her lifestyle on health
- to be considerate of others
- to fulfill financial obligations

C.  Administrative responsibilities

All hospital and administrative staff are responsible for recognizing the rights and responsibilities of patients. Department supervisors and chiefs of service are responsible for developing policies and procedures, that ensure that patients are aware of their rights and responsibilities, and which implement this policy as specifically applicable within their department or service.

### References:

Joint Commission on Accreditation of Healthcare Organizations, state regulations, American Hospital Association Management Advisory on A Patient's Bill of Rights

# HOSPITAL POLICY ABOUT PATIENT ADVOCATES/REPRESENTATIVES

## Job duties

1. Ability to understand and interpret patient and family concerns regarding clinical or personal care that are received in person, by phone, or in writing by letter or patient survey.

2. Investigate and document complaints to appropriately categorize, respond, and report pursuant to policy.

3. Ability to triage patients to determine the immediacy for care and to facilitate access to care providers to the extent possible.

4. Interpersonal skills necessary to listen, respond, or negotiate with angry or upset patients and/or family members.

5. Identify risk management issues, applying an understanding of relevant patient facts and medical treatment to determine an appropriate response, including quality of care issues, which are reported to medical management.

6. Organize priorities based on the urgency of individual patient issues, the window of opportunity to effectively remedy them, as well as tracking unresolved issues across department lines or with multiple departments.

7. Knowledge of organization structure necessary to communicate and resolve issues across department lines or with multiple departments.

8. Adjustments to patient charges, up to $100, as appropriate, given the facts and circumstances of a complaint or grievance.

9. Computer skills necessary to enter, track, and report patient complaints quarterly to administration and medical management.

10. Establish and maintain center-required core competencies.

11. Administration of the referral/approval process on behalf of the center, applying state standards to all physician requests for numbers.

12. Maintain nursing department competency testing requirements, including age-specific.

13. Provide coverage for telephone and reception duties for administrative assistant when required.

14. Establish and maintain database for collecting and reporting internal patient satisfaction survey results.

*Source: Trover Foundation, Madisonville, KY. Reprinted with permission.*

# HOSPITAL POLICY ON ADVANCE DIRECTIVES

| Department: | MEDICAL CENTER WIDE POLICY & PROCEDURE MANUAL | Policy number: | |
|---|---|---|---|
| Section: | ETHICS, RIGHTS, AND RESPONSIBILITIES POLICIES | Effective date: | Page: |
| Title: | ADVANCE DIRECTIVES POLICIES | ○ Non-clinical<br>● Clinical | |
| Approved by: | MEDICAL EXECUTIVE COMMITTEE, PATIENT CARE AND SAFETY COMMITTEE, ETHICS COMMITTEE | Review date:<br>Revision date: | |

## Purpose:

A.  Describe a process, consistent with the Patient Self-Determination Act Omnibus Budget Reconciliation Act, 1990, Sec. 4206; Health Care Decisions Law, Probate Code Section 4600-4805, which is used to inform, support, and protect adult members' rights to participate in health care decision-making and to prevent discrimination based on whether they have executed an advance directive for health care.

B.  Describe the role and duties of _____ staff in fulfilling the requirements of this policy.

C.  Define documentation requirements for advance directives. (See Attachment A in this policy for Definition of Terms.)

## Policy:

This facility's policy is to support our patients' rights to make decisions regarding their health care. Patients have the right to have proposed medical interventions explained to their satisfaction and the right to refuse any unwanted care. If patients do not have decision-making capacity, or if they are unable to speak for themselves, they have the right to have a surrogate make treatment decisions for them. As provided for in the Patient Self-Determination Act, this facility is obligated to make the following information available to adult patients admitted to the hospital:

A.  Inform all adult patients (18 years and older) being admitted to an inpatient setting or a hospital sponsored outpatient surgery setting regarding our obligation to inquire about the presence of an advance directive and to provide education about advance directives.

B.  Provide adult patients with written information about their right to accept or refuse medical or surgical treatment and their right to formulate advance directives.

C.  Determine whether or not an adult patient has formulated an advance directive and document this information in the patient's medical record.

## HOSPITAL POLICY ON ADVANCE DIRECTIVES (CONT.)

D.  Provide education for staff and the community about advance directives.

    1.  Advance Health Care Directive (AHCD) forms are available for all members and patients at a variety of locations, such as health education, member services, social services, continuing care, home health, and hospice.

    2.  Members will be informed that an AHCD can be mailed to them by calling member services.

    3.  Members will be informed to mail a copy of their AHCD form, or any other form of advance directive they have, to the clinic(s) where they receive primary care.

    4.  Patients may be referred to social work services for counseling and advice as needed.

    5.  Member education classes about completion of advance directives should

- recommend members discuss any questions regarding their medical condition and prognosis with their physician.
- advise members to consider their complex and difficult choices and to discuss their values and wishes with their health care agent and loved ones.
- advise members to distribute their completed AHCD forms to their health care agent (attorney in fact), alternate agents, and loved ones. Patients should keep the original documents.
- make available educational videos, literature, and periodic informational classes to members.
- refer members' legal questions to their attorneys.

### Special considerations:

1.  Members completing the AHCD form must be 18 years of age or older, have decision-making capacity, and be acting upon their own free will.

2.  Although statutory changes have replaced Durable Power of Attorney for Health Care (DPAHC) and Natural Death Act Declaration (Declarations) forms with the AHCD form, executed DPAHCs and Declarations continue to be valid. DPAHCs executed after January 1, 1992, are valid until revoked, unless a shorter time period is stated on the form.

3.  Copies of written advance directives have the same effect as the original.

## HOSPITAL POLICY ON ADVANCE DIRECTIVES (CONT.)

4. A patient also can orally designate a Surrogate Decision-Maker by personally notifying the physician supervising the patient's care while in the hospital/hospice/or other agency providing health care. The physician must document this designation in the patient's medical record. This designation is effective only during the patient's stay in the hospital/health care agency or 60 days, whichever comes first unless the patient specifies a shorter time period. The surrogate designated by the patient during a stay in an institution has priority over an agent designated by the patient under power of attorney for health care. However, upon expiration of the surrogate's authority (either upon discharge or expiration of the 60 days), the authority of the agent is restored unless the patient communicates intent to permanently revoke the authority of an agent designated under a power of attorney for health care.

5. A person with an AHCD can revoke the designation of a Surrogate Decision-Maker or Health Care Agent by

   • personally notifying the supervising health care physician (this information will be documented in the patient's medical record).
   • a signed writing.
   • executing an AHCD.
   • dissolving or annulling the marriage to a spouse who was named as health care agent.

6. A person may revoke any other kind of advance directive (e.g., health care instructions) at any time and in any manner that communicates that intent.

7. The revoked form should not be discarded. "Revoked" should be written across the front of the form and either the patient or the physician to whom the patient indicated the intention to revoke should sign it. The patient should be offered the opportunity to execute a new form.

8. Information about a patient's wishes and a copy of the patient's AHCD should be provided to other health care providers and included in the documentation that accompanies any transfer, referral, or discharge.

9. _____ Medical Center's personnel, volunteers, and physicians may not serve as advance directive health care agents for members unless they are related to the member by marriage, adoption, or blood, or are registered domestic partners. Patients who are _____ Medical Center employees may appoint a coworker as Health Care Agent as long as that coworker is not directly involved in the provision of care for that patient. _____ Medical Center's personnel, volunteers, and physicians may not serve as witnesses for members' advance directives.

## HOSPITAL POLICY ON ADVANCE DIRECTIVES (CONT.)

**Procedure:**

A. Admitting staff responsibilities: Upon admission to the facility, admitting staff will provide patients with information and pamphlets which explain their rights to make health care decisions and execute advance directives. (There are several resources available, such as the "Inpatient Patient Information" booklet or "Who Will Speak for You?" pamphlet.)

   1. Admitting staff asks patient/family about the existence of an advance directive.

      • If the patient has an advance directive with him/her, it is copied and placed in the inpatient medical record.

      • If the patient has executed an advance directive but does not have it with him/her, the patient is asked to have his or her agent or surrogate retrieve it to be included in the inpatient medical record.

   2. A completed advance directive may also be obtained from the outpatient medical record if one is on file.

   3. Information obtained from the patient regarding the existence of an advance directive will be

      • entered into the computer system in the appropriate fields.

      • recorded on the "Patient Treatment Permit, Release, and Admission Agreements," which is placed into the inpatient medical record.

   4. If the patient is unable to respond to questions about advance directives because he or she is too ill or heavily medicated and no loved ones are available, admitting staff should note "patient unable to respond" on admitting form and every effort should be made to update this information when the patient can be interviewed more successfully.

B. Physician and nursing guidelines for acting on a patient's advance directive:

   1. When presented with an executed advance directive, the physician shall discuss the patient's intention, if the patient is competent, and confirm his/her desire to be bound by such a document.

   2. Every patient who has executed an advance directive shall have the following elements assessed by a physician (per the recent Health Care Decisions Law) upon admission to the hospital or upon

## HOSPITAL POLICY ON ADVANCE DIRECTIVES (CONT.)

presentation for hospital sponsored outpatient surgery and documented in the patient's medical record:

- existence of prior executed advance directives
- location/access of advance directive (at home, in medical record, to be brought in by family)
- whether or not patient has decisional capacity at time of admission
- validation of the content of advance directive
- modifications (verbal) to content of advance directive
- name of appointed health care surrogate/agent
- MD signature

3. A valid AHCD that designates a health care agent (attorney in fact) will be acted on if the designation is dated and signed by the patient following legal guidelines.

4. A valid copy of the AHCD is filed in the patient's medical record. If a copy is not available, the substance of the directive is documented in the patient's medical record.

5. The attending physician/designee has ultimate responsibility for determining that the patient's decision-making capacity before acting on a valid AHCD. This may be broadly applied based upon the physician's overall assessment of the patient's decision-making capacity or this assessment may be performed on a decision-specific basis.

6. The physician may use other consultants/disciplines to determine decisional capacity. Documentation in the medical record will include adequate medical evidence and the entry will be dated and timed.

7. The incapacitated patient's agent or attorney in fact has the authority to make health care decisions for the patient including the right to consent to or refuse medical care, unless that authority is limited in the advance directive. Health care professionals will seek input from this agent as they would have from the patient had he/she remained capable of making decisions.

8. If the patient is unable to communicate and there is no evidence that the patient has an advance directive, the physician should consult the patient's family or surrogate for clarification regarding the patient's wishes. In cases where termination of life support, intravenous nourishment, or hydration is considered, the physician must make a good faith effort to determine the desires of the patient to the extent he/she is able to communicate these wishes or they are known. The medical record must contain adequate documentation of this information.

# HOSPITAL POLICY ON ADVANCE DIRECTIVES (CONT.)

9.  The primary physician may identify a surrogate for a patient who has lost decision-making capacity and who has not designated a surrogate or agent through a valid written or oral directive, and if there is no court-appointed conservator for health care decision-making or if the designated surrogate, agent, or conservator is not reasonably available.

10. When possible, the physician must inform the patient of any decision made by a surrogate and the identity of that surrogate prior to implementation of the decision.

11. A health care provider may decline for reasons of conscience and an institution may decline due to pre-existing institutional policy to comply with the wishes of the patient or the patient's agent or surrogate or if the requested medical care would be medically ineffective or contrary to generally accepted standards. The physician must inform the patient and surrogate of such determination and seek agreement on a mutually acceptable plan of care.

    (a) Consultation with the ethics committee and legal counsel may be useful.
    (b) Care will continue to be provided until the conflict is resolved or, if the conflict cannot be resolved, the patient is transferred.

## HOSPITAL POLICIES ON RESTRAINT/IMMOBILIZATION

| Department: | | Policy number: | |
|---|---|---|---|
| Section: | RISK ASSESSMENT | Effective date: | Page: |
| Title: | RESTRAINT USE—MEDICAL SURGICAL AND BEHAVIORAL HEALTH | ○ Non-clinical<br>● Clinical | |
| Approved by: | MEDICAL EXECUTIVE COMMITTEE, PATIENT CARE AND SAFETY COMMITTEE, PERFORMANCE IMPROVEMENT COMMITTEE | Review date:<br>Revision date: | |

## PURPOSE

To guide the application of medical-surgical and behavioral health restraint in all settings with the goal of mini-mizing the frequency/duration of restraint use to that which is absolutely necessary for patient care and patient and provider safety.

## SCOPE

The following are not considered restraint under this policy:

- Standard healthcare practices that include limitation of mobility or temporary immobilization related to medical, dental, diagnostic, or surgical procedures and the related postprocedure care processes
- Adaptive support in response to assessed patient need
- Forensic or correctional restrictions used for security purposes

(Refer to attachments for alternatives to restraint and patient actions to be considered in the application of restraints.)

## POLICY

1. Seclusion will not be employed at this hospital.

2. Physical restraint may be used according to this policy when warranted by the patient's condition and ther-apy and when less-restrictive means of protecting the patient are not indicated.

3. All staff assigned to apply or monitor restraint will demonstrate corresponding competence (see Attachment A).

4. Staff will ensure that patients are treated with dignity and privacy, including during periods of restraint.

## HOSPITAL POLICIES ON RESTRAINT/IMMOBILIZATION (CONT.)

### PROCEDURE

**A. Medical restraint**

1. Definition

   Medical (as opposed to behavioral health) restraint means restricting a patient's movement to assist with the provision of medical or surgical care. Patient immobilization that is a normal component of a procedure (e.g., magnetic resonance imaging, surgery, etc.) is not considered restraint. (See Attachment D for examples of medical restraint.)

2. Indications

   Prior to the initiation and continuation of medical restraint, the patient must be assessed to determine whether he or she requires restraint to prevent interference with his or her treatment plan.

3. Consideration of less-restrictive means

   Prior to the initiation and continuation of restraint, alternative means of protecting the patient will be considered. (See Attachment A for examples of alternatives to the use of restraint.)

4. Conversation with patient and family

   To the extent practical, the issue of restraint will be discussed with the patient and family around the time of its use. Patient/family education will be documented.

5. Orders

   Restraint will be initiated or continued at the order of a treating physician with current privileges at this institution. Treating physicians in a postgraduate medical education program (i.e., residents) may also order restraint. The order for restraint will include the type and site(s) of restraint to be applied and the specific actions or conditions that indicate restraint. As needed (PRN) restraint orders will be neither issued nor accepted. If a patient has been removed from restraints but a valid order is still in effect, the registered nurse (RN) may reapply the restraint without obtaining a new order, as long as the patient is exhibiting the same behaviors that met the original indication.

6. Initiation without orders

   If a physician is not available, an RN may initiate restraint (subject to the assessments and indications mentioned elsewhere in this policy) without the prior order of a physician. If restraint was necessary due to a significant change in the patient's condition, the physician will be notified immediately for an order. Otherwise, the physician must be notified and a restraint order requested within 12 hours of its initiation.

## HOSPITAL POLICIES ON RESTRAINT/IMMOBILIZATION (CONT.)

7. Initial in-person physician assessment within 24 hours of initiation
The treating physician will perform an in-person assessment of the restrained patient within 24 hours of initiation to verify that restraint is needed and that less-restrictive means are not appropriate. The physician will re-order or discontinue restraint at the time of that evaluation.

8. Ongoing in-person physician assessments and continuation of restraint orders
The treating physician will perform in-person assessments of a restrained patient at least once every calendar day, at which time restraint will be either reordered or discontinued as necessary.

9. Early discontinuation of restraint
Restraint will be discontinued as soon as it is no longer warranted by the patient's actions or the nature of the patient's treatment plan. Restraint may be reapplied without a new order if the

   (a) patient again meets the indications that justified it
   (b) original restraint order has not expired

10. Patient monitoring
Monitor restrained patients as often as necessary to ensure safety and dignity and to attend to comfort needs. Patients will be observed at least every two hours to ensure that restraint remains necessary, that restraining devices remain safely applied, and that the patient remains as comfortable as possible.

11. Documentation
The following will be documented in the medical record whenever medical restraint is applied:

   (a) The patient's actions or condition that indicated the initial and continued use of restraint
   (b) The less-restrictive alternative(s) to restraint considered
   (c) Restraint orders
   (d) Patient monitoring
   (e) Significant changes in the patient's condition
   (f) Discussions and education with the patient and family (as appropriate) regarding restraint

**B. Behavioral health restraint**
1. Definition
Behavioral health restraint is the restriction of patient movement in response to severely aggressive, destructive, violent, or suicidal behaviors that place the patient or others in imminent danger.

## HOSPITAL POLICIES ON RESTRAINT/IMMOBILIZATION (CONT.)

2. Consideration of less-restrictive means

   Prior to the initiation and continuation of behavioral health restraint, alternate means of protecting the patient and others will be considered. (See Attachment A for examples of alternatives to the use of restraint.)

3. Conversation with patient and family

   To the extent practical, the issue of restraint will be discussed with the patient and the family around the time of its use. Patient and family education will be documented, as appropriate.

4. Discontinuation of restraint

   Behavioral health restraint will be discontinued as soon as it is no longer indicated by the patient's behavior or the nature of the patient's treatment plan.

5. Orders

   Behavioral health restraint will be initiated or continued upon the order of a treating physician with current privileges at this institution. Treating physicians in a postgraduate medical education program (residents) may also order restraint as allowed by their program or job description. The order for restraint will include the type of restraint to be applied and will be based on specific behaviors that indicate restraint. PRN restraint orders will not be issued or accepted. Behavioral health restraint may not be ordered for longer than four hours for adult patients, two hours for children between nine and 17 years old, and one hour for children eight years old or younger.

6. Initiation without orders

   An RN may initiate behavioral restraint in an emergency in advance of a physician's order. In such cases, a treating physician will perform a face-to-face assessment of the patient within one hour of its application.

7. Renewal of restraint orders

   Before the expiration of the original order, a behavioral health restraint may be reordered by the treating physician based on the assessment of the RN. However, the physician must perform an in-person assessment at least every eight hours for adults and at least every four hours for patients 17 years old or younger.

8. Notification of the nurse manager

   The nurse manager on duty will be notified of a) any behavioral health restraint that continues to be applied for more than eight hours and b) any reapplication of behavioral health restraint within 12 hours after discontinuation.

# HOSPITAL POLICIES ON RESTRAINT/IMMOBILIZATION (CONT.)

9. Patient monitoring

Appropriately trained staff will continuously observe patients in behavioral health restraint. Such monitoring will be documented at least every 15 minutes.

10. Documentation

Document the following in the medical record whenever behavioral health restraint is applied:

(a) The patient's actions or condition that indicated the initial and continued use of restraint

(b) The less-restrictive alternative(s) to restraint considered

(c) Restraint orders

(d) Patient monitoring

(e) Significant changes in the patient's condition

(f) Discussions and education with the patient and family (as appropriate) regarding restraint

**C. Chemical restraint**

1. Definition

A chemical restraint is a medication used to sedate the patient or restrict his or her freedom of movement that is not a standard part of the treatment for their medical or psychiatric condition. On the rare occasion that chemical restraint is used in the acute setting, it accompanies the initiation of physical behavioral health restraint. The protections afforded the patient for this physical restraint (see Section B, Behavioral Health Restraint, above) also ensure the patient's rights for chemical restraint.

**D. Reporting deaths related to restraint**

Staff will promptly notify management of the death of any patient during or within 24 hours of the end of an episode of restraint.

Management, in consultation with the department of quality, member and regulatory services, will notify the department of health services (on behalf of the Centers for Medicare & Medicaid Services) of any patient who dies during or within 24 hours of the end of an episode of behavioral health restraint.

The reporting of deaths related to medical restraint will be governed by medical center policy on reporting to external agencies.

## REFERENCES

The Joint Commission on Accreditation of Healthcare Organizations, Centers for Medicare & Medicaid Services, State Health Department

# ATTACHMENT A: RESTRAINT-USE DECISION TREE

**Observed patient actions**

**Medical:**
- Pulling tubes/lines
- Climbing out of bed
- Interfering with dressings, wounds, devices

**Behavioral health:**
- Severely aggressive
- Destructive
- Violent
- Actively suicidal

**Chemical:**
**Medication** given to address a patient behavior ONLY, not medical condition.

*Follow guidelines for behavioral health restraint.*

**Consider alternatives to restraint:**

**Medical:**
- Physical measures
- Psychological measures
- Physiological measures

**Behavioral health:**
- Spiritual needs
- Environmental measures

**No**
Restraint considered

◄ **Responsive to alternatives?** ►

**Yes**
Restraint not applied

**Consider use of restraints**

**MEDICAL** | **BEHAVIORAL HEALTH**

**Patient exhibiting medical actions:**
- Pulling tubes/lines
- Climbing out of bed
- Interfering with dressings, wounds, devices

**Patient exhibiting behavioral actions:**
- Severely aggressive
- Destructive
- Violent
- Actively suicidal/self-destructive

**Is physician available to write restraint orders?**

**Is physician available to write restraint orders?**

**Yes**
Order to include:
- Type of restraint
- Reason for use
- Must be renewed within 24 hours of application
- MD face-to-face assessment and reorder needed every day for continued use of restraint

**No**
- RN may initiate restraint and obtain telephone order within 12 hrs of application
- MD must perform face-to-face patient assessment and sign verbal order within 24 hours of application

**Yes**
Order to include:
- Type of restraint
- Reason for use
- Time-specific with maximum of:
  - Adults, four hours
  - Ages nine to 17 years, two hours
  - Eight years and younger, one hour

**No**
- RN may initiate, then obtain, telephone/verbal order
- MD face-to-face assessment documented within one hour of application

**Patient care/monitoring**
- Appropriate application of least-restrictive restraint
- Patient care needs/observations/assessment of need for restraint use minimum of every two hours
- Restraint released two hours for every two hours for at least five minutes

**Patient care/monitoring**
- Continuous observation
- Documented observation of every 15 minutes

**Renewal of orders:**
- MD must reorder and perform face-to-face assessment every day

**Renewal of orders:**
- MD must reorder & perform face-to-face assessment for
  - Adults every eight hours
  - 17 years old and younger, every four hours

**Documentation must include:**
- Patient's actions/condition that indicated use of restraint
- Consideration of alternatives/less restrictive means of restraint
- Orders for all episodes of restraint
- Results of patient care needs/observation
- Time restraint discharged or off for trial period
- Significant changes in patient condition
- Discussion with patient/family regarding restraint

**ATTACHMENT B: DOCTOR'S ORDER AND RECORD FOR BEHAVIORAL HEALTH RESTRAINT**

## Doctor's Order & Record For Behavioral Health Restraint

Patient's Room Number _____

### PATIENT RESTRAINT ORDERS

**Doctor's Orders:**
I have completed an in-person assessment of the patient and determined that restraint is required for the following reason(s):
- ❑ Severely aggressive
- ❑ Violent against self or others

Check ONLY the type of restraint to be used:
- ❑ Vest (jacket) restraint
- ❑ Soft wrist restraint      -bilateral    right    left
- ❑ Soft ankle restraint      -bilateral    right    left
- ❑ Hard wrist restraint      -bilateral    right    left
- ❑ Hard ankle restraint      -bilateral    right    left
- ❑ Other (specify): _____

Length of time to be restrained:
- ❑ 1 hr,      ❑ 3 hrs.
- ❑ 2 hrs.     ❑ 4 hrs.
- • Adults no longer than 4 hrs.
- • 9-17 yrs - no longer than 2 hrs.
- • 8 yrs or less - no longer than 1 hr.

Date _____    Time _____    Physician Signature _____

Date _____    Time _____    Telephone Order / RN Signature _____

Physician "In-Person" assessmemt required: • within 1 hr of emergency application • at least every 8 hrs. for adults • at least every 4 hrs. for 17 yrs/ or younger.

| DATE/TIME | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Use explained to pt or S.O. | | | | | | | | | | | | | | |
| Sleeping | q 15 min. | | | | | | | | | | | | | |
| Awake | q 15 min. | | | | | | | | | | | | | |
| ✓ for signs of injury* | q 15 min. | | | | | | | | | | | | | |
| Circulation | q 15 min. | | | | | | | | | | | | | |
| Hygiene | q 15 min. | | | | | | | | | | | | | |
| Toileting | q 15 min. | | | | | | | | | | | | | |
| Extremity ROM | | | | | | | | | | | | | | |
| Amount of food & fluids taken | | | | | | | | | | | | | | |
| Continued Need Assessment (See Legend) | q 15 min. | | | | | | | | | | | | | |
| Blood Pressure | q 15 min. | | | | | | | | | | | | | |
| Pulse | q 15 min. | | | | | | | | | | | | | |
| Respirations | q 15 min. | | | | | | | | | | | | | |
| Restraint Off | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |

(Left margin vertical text: PATIENT ASSESSMENT DURING RESTRAINT USE)

**COMMENTS/ ALTERNATIVES ATTEMPTED OR CONSIDERED:** (Time and Sign each entry)

Continuous observation provided by:
❑ RN        ❑ Security        ❑ Sitter        ❑ Law Enforcement Officer

| Signature/Title | Initials | Signature/Title | Initials |
|---|---|---|---|
| | | | |
| | | | |

NS-9109 (7-02)

CONTINUED NEED ASSESSMENT:  **Adults: no longer than 4 hrs, Ages 9-17: no longer than 2 hrs, Ages 8 or <: no longer than 1 hr for 24 hrs max.**
Doctor's Orders:  SA = Severely aggressive    VS = Violent against self    VO = Violent against others          * Injury Documented in Nursing Notes

ORIGINAL - MEDICAL RECORD      PINK COPY - DEPARTMENT

## ATTACHMENT C: BEHAVIORAL HEALTH RESTRAINT DOCUMENTATION GUIDELINES

### DEFINITION OF BEHAVIORAL HEALTH RESTRAINT

The restriction of patient movement in response to severely aggressive, destructive, violent, or suicidal behaviors that place the patient or others in imminent danger.

### PHYSICIAN ORDER

1.  A verbal order must be obtained within one hour of application of the restraint.

2.  Behavioral health restraint may not be ordered for longer than four hours for adult patients, two hours for children between nine and 17 years old, and one hour for children eight years old or younger.

3.  The order must include the reason, type, and length of time of restraint use.

4.  For the renewal of the restraint order, the physician must perform an in-person assessment at least every eight hours for adults and at least every four hours for patients 17 years old or younger.

### NURSING DOCUMENTATION

Patients in behavioral restraint must be under continuous observation.

- "Use explained to pt or S.O."—education to the patient/significant other is provided by explaining the reason for restraint use, alternatives attempted, and the goal of early termination of restraint.

- "Sleeping; awake"—the patient's state of consciousness is documented.

- "Check for signs of injury"—the patient is assessed for physical injury, and specific information is documented in the nursing notes.

- "Circulation"—the patient's circulation is checked at sites affected by the restraint.

- "Hygiene; toileting"—patient's hygiene is assessed and attended to; patient is assessed for the need to void/move bowels.

- "Extremity ROM"—the affected extremity/other nonmobile extremities are provided range of motion.

## ATTACHMENT C: BEHAVIORAL HEALTH RESTRAINT DOCUMENTATION GUIDELINES (CONT.)

- "Amount of food and fluids taken"—indicate the percentage of meals and cc's of fluid taken by the patient.

- "Continued need assessment"—the patient's continued need for restraint use is assessed as follows:

    - Adults: every four hours; Ages six to 17: every two hours

    - Ages younger than than nine: every one hour

    - Document the reason for continued need as follows: severely aggressive (SA), danger to self (DS), danger to others (DO).

- "Blood pressure; pulse; respirations"—vital signs are documented every 15 minutes.

Alternatives attempted are activities used to reduce the need for restraint.

## NURSE MANAGER MUST BE NOTIFIED OF

a.  any behavioral health restraint that continues to be applied for more than 8 hours

b.  any reapplication of behavioral health restraint within 12 hours after discontinuation

c.  any patient death which occurs while in behavioral health restraint or within 24 hours of the end of an episode of restraint use

# ATTACHMENT D: DOCTOR'S ORDER AND DAILY RECORD FOR MEDICAL RESTRAINT

## Doctor's Order & Daily Record For Medical Restraint

**Patient's Room Number _____**

### PATIENT RESTRAINT ORDERS

**Doctor's Orders:**
I have completed an in-person assessment of the patient and determined that restraint is required for the following reason(s):

Reason for Use: (Check all that apply)
- ❑ Pulling at tubes / lines
- ❑ Interfering with dressings, wounds, or devices
- ❑ Climbing out of bed
- ❑ _____

Check ONLY the restraint to be used:
- ❑ Vest (jacket) restraint
- ❑ Soft wrist restraints    -bilateral    right    left
- ❑ Soft ankle restraints    -bilateral    right    left
- ❑ Other (specify): _____

(If restraint used is to be continued, orders must be renewed each calendar day)

Date _____    Time _____    Physician Signature _____

Date _____    Time _____    Telephone Order / RN Signature _____

**DATE:**

| | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Restraint: On | | | | | | | | | | | | | | | | | | | | | | | | |
| Rest. Eval. (pt. Care/observ) | | | | | | | | | | | | | | | | | | | | | | | | |
| Release (q2h minimum) | | | | | | | | | | | | | | | | | | | | | | | | |
| Restraint: Off | | | | | | | | | | | | | | | | | | | | | | | | |

**NURSING RESTRAINT DOCUMENTATION**

| SHIFTS | DAY 8 hr / 12hr | EVENING 8 hr | NIGHT 8 hr / 12hr |
|---|---|---|---|
| • Type of restraint | ❑ Mittens ❑ Wrist ❑ Ankle ❑ R ❑ L ❑ R ❑ L ❑ R ❑ L ❑ Vest ❑ Vail Bed ❑ Other_____ | ❑ Mittens ❑ Wrist ❑ Ankle ❑ R ❑ L ❑ R ❑ L ❑ R ❑ L ❑ Vest ❑ Vail Bed ❑ Other_____ | ❑ Mittens ❑ Wrist ❑ Ankle ❑ R ❑ L ❑ R ❑ L ❑ R ❑ L ❑ Vest ❑ Vail Bed ❑ Other_____ |
| • Rationale for Use: Describe patient action(s) requiring restraint | ❑ Pulling at tubes / lines ❑ Interfering with dressings, wounds, or devices ❑ Climbing out of bed ❑ _____ | ❑ Pulling at tubes / lines ❑ Interfering with dressings, wounds, or devices ❑ Climbing out of bed ❑ _____ | ❑ Pulling at tubes / lines ❑ Interfering with dressings, wounds, or devices ❑ Climbing out of bed ❑ _____ |
| • Alternatives Considered / Attempted: | ❑ Reorient ❑ Increased observation ❑ Family at bedside ❑ Assess / treat cause ❑ Hide / DC tubes / lines ❑ Evaluate Medication ❑ Other_____ | ❑ Reorient ❑ Increased observation ❑ Family at bedside ❑ Assess / treat cause ❑ Hide / DC tubes / lines ❑ Evaluate Medication ❑ Other_____ | ❑ Reorient ❑ Increased observation ❑ Family at bedside ❑ Assess / treat cause ❑ Hide / DC tubes / lines ❑ Evaluate Medication ❑ Other_____ |
| • Less Restrictive Restraint Attempted: | ❑ Mittens vs Wrist ❑ 1 limb vs 2 ❑ N/A ❑ Other_____ | ❑ Mittens vs Wrist ❑ 1 limb vs 2 ❑ N/A ❑ Other_____ | ❑ Mittens vs Wrist ❑ 1 limb vs 2 ❑ N/A ❑ Other_____ |
| • Restraint Use Explained to: | ❑ Patient ❑ Family / S.O._____ | ❑ Patient ❑ Family / S.O._____ | ❑ Patient ❑ Family / S.O._____ |

**COMMENTS: (Time and Sign each entry)**

| | | | | | | |
|---|---|---|---|---|---|---|

| Signature/Title | Initials | Signature/Title | Initals |
|---|---|---|---|
| | | | |
| | | | |

NS-9115 (7-02)        ORIGINAL - MEDICAL RECORD        PINK COPY - DEPARTMENT

## ATTACHMENT E: MEDICAL RESTRAINT DOCUMENTATION GUIDELINES

### DEFINITION OF RESTRAINT

Any method of restricting an individual's freedom of movement, physical activity, or normal access to the body.

### MD ORDER

1. A telephone order must be obtained within 12 hours of initiation.
2. The first order for renewal must be written within 24 hours.
3. The order must be renewed each calendar day after face-to-face assessment by the physician.

### NURSING DOCUMENTATION

- "On"—Restraints are secure/tied.

- "Eval"—The registered nurse (RN) has assessed the patient's hygiene, hydration, elimination, nutrition, any injury associated with restraint and readiness for discontinuation every two hours.

- "Release"—The untying/release for five minutes, range of motion, circulation check every two hours.

- "Off"—Removal of restraint. The patient's actions no longer require restraint.

**Restraint orders** are required for each calendar day. If restraint has been removed and the patient exhibits the same actions that met the initial restraint criteria, the RN may reapply within that day.

**Type and side of restraint** needs to be specified in the MD order and nursing documentation.

**Rationale for restraint** is the observed patient actions, not preventive measures.

**Alternatives for restraints** are activities used to reduce the need for restraint.

**Less restrictive means of restraint** is documented if able to implement a lesser restraint than ordered.

**Education** to the patient and family is provided by explaining the reason for restraint use, alternatives attempted, and the goal of early termination of restraint.

**\*Notify the nurse manager of any patient who expires while in restraint.**

## ATTACHMENT F: ALTERNATIVES TO THE USE OF RESTRAINTS

| PHYSICAL MEASURES | SPIRITUAL NEEDS |
|---|---|
| • Exercise & activities (arts, crafts, hobbies, coloring books, crossword puzzles, videos, books & magazines) | • Contact patient's pastor, minister, priest, rabbi |
| • Anticipate & provide for basic needs of hunger (snacks), thirst & toileting | • Offer sacraments of Communion, Reconciliation, and Anointing of the sick |
| • Promote normal sleep patterns | • Use sitter or volunteer to read to patient |
| • Relaxation techniques | • Use audio tapes |
| • Use of lap belt in chair as a reminder | |
| • Provide glasses, hearing aid, dentures | |
| • Tape foley to abdomen of male patient | |

| PSYCHOLOGICAL MEASURES | ENVIRONMENTAL MEASURES |
|---|---|
| • Explain all procedures, be aware of fear of the unknown | • 1:1 communication to inform patient of safety precautions & orient to environment |
| • Orient patient to reality often | • Use of cushions/pads to maintain safety (mattress on the floor) |
| • Provide for companionship: family, friends, church members, volunteers, sitters | • Locate patient next/close to Nurse's Station |
| • Holding/cuddling infants & young children | • Use appropriate lighting - night light, increase or decrease light in room depending on patient's eyesight or medical condition |
| • Use TV, radio, or music as diversion | • Use of Geri chair |
| • Allow patient to wear street clothes, underwear or shoes | • Use bed alarms, door alarms |

| PHYSIOLOGICAL MEASURES | |
|---|---|
| • Review medications for side effects & interactions | • Decrease or control noise level |
| • Review lab results for abnormals | • Call light within reach |
| • Collaborate with other healthcare team members & evaluate treatment plan | • Floor or room uncluttered |
| • Initiate frequent bathroom rounds | • Urinal or bedpan within reach |
| • Provide adequate pain medication | • Position commode, walker, cane, prosthetic devices near bedside |
| • Eliminate itch (if scratching) | • Position tubes/drains out of site |
| | • Control activity level (visitors, coordinate activities/treatments) |
| | • Schedule family/friends to stay with patient |

**PATIENT ACTIONS TO BE CONSIDERED IN THE APPLICATION OF RESTRAINTS**

| ACTION | EXAMPLE OF DEVICE | TYPE OF RESTRAINT |
|---|---|---|
| Patient severely combative or violent due to mental state | Hard Restraints (leathers) 4 Point Soft Restraints | Behavioral Health Restraint |
| Restricting movement of confused patient from removing medical device (IV, endotracheal tube, catheter, drains, etc) | Soft Wrist Ties Posey Vest Mittens | Medical Restraint |
| Confused patient attempting to climb out of bed | Bed Rails | Medical Restraint |
| Post-op patient needs to lay on her side without rolling out of bed | Bed Rails | Not Restraint |
| Patient with poor posture while sitting in chair | Posey Vest | Not Restraint |
| Patient sliding out of chair | Posey Vest Overbed portable table Lap Belt | Not Restraint |
| Patient immobilized during MRI, circumcision, operative procedure | Soft Wrist Restraints Safety Belt | Not Restraint |
| Protection patient from falling out of bed, using side rails | Bed Rails | Not Restraint |
| Patient transported via gurney or wheelchair | Safety Belt | Not Restraint |
| Patient with head injury, at risk for falls | Helmet | Not Restraint |
| Patient under arrest, being guarded by Deputy Sheriff | Handcuffs | Not Restraint |

3/02

**Policy for 482.21**

## POLICY ON SENTINEL EVENTS

| Department: | | Policy number: | |
|---|---|---|---|
| Section: **MANAGEMENT** | | Effective date: | Page: |
| Title: **GENERAL SAFETY GUIDELINES SUMMARY CHECKLIST** | | ○ **Non-clinical**<br>○ **Clinical** | |
| Approved by: **MEDICAL EXECUTIVE COMMITTEE PATIENT CARE AND SAFETY COMMITTEE** | | Review date:<br>Revision date: | |

## PURPOSE

To describe our organization's mechanism for identifying, responding to, and reporting significant events that occur in the organization, including sentinel events or the risk thereof ("near misses"), for purposes of performance improvement. When warranted, these events may be evaluated by conducting a thorough and credible root-cause analysis. The goal of this process is to improve care, maintain a safe environment, and focus attention on the underlying causes to promote risk reduction.

## SCOPE

This is a medical center–wide policy, and as such it applies to all inpatient and outpatient care settings.

## DEFINITIONS

A. Sentinel event

A sentinel event is defined as an unexpected occurrence involving death or serious physical injury or the risk thereof. Serious injury includes loss of limb or function. The phrase "or risk thereof" includes any process variation for which the recurrence would carry a significant chance of a serious adverse outcome.

Examples of occurrences that would meet the definition of a sentinel event include

- an unexpected patient death not related to the patient's underlying physical condition or disease process

- a patient death or major permanent loss of function associated with a delay in treatment

- a patient death, paralysis, coma, or other major permanent loss of function associated with a medication error

- suicide of a patient in a setting where the patient is housed around-the-clock, including suicides following elopement from such a setting

## POLICY ON SENTINEL EVENTS (CONT.)

- elopement (i.e., unauthorized departure) of a patient from an around-the-clock care setting resulting in a temporally related death (suicide or homicide) or major permanent loss of function

- procedures performed on the wrong patient, wrong side of the body, or wrong organ

- assault, homicide, or other crime in a care setting resulting in patient death or major permanent loss of function

- a patient fall that results in death or major permanent loss of function as a direct result of the injuries sustained in the fall

- hemolytic transfusion reaction involving major blood group incompatibilities

- infant abduction or discharge to the wrong family

- confirmed rape occurring in a care setting

- death due to healthcare-acquired infection

## SERIOUS INJURY

A serious injury is further defined as one that results in a transfer to a higher level of care, extended hospital stay, or additional medical treatment.

## RISK THEREOF

For the purposes of this policy, the phrase "or risk thereof" is defined as an event that did not result in death or serious injury but carries a significant chance of recurring—the recurrence of which may indeed have a more untoward outcome to determine the risk of an event recurring, use the following guidelines:

- Processes involved in the event that are not well codified or standardized across the organization are more likely to result in the recurrence of the event

- Processes that cross multiple disciplines and department lines and involve multiple steps in the process are more likely to result in the recurrence of the event

- Processes that demonstrate significant variation (i.e., lack of stability) are more likely to result in the recurrence of the event

## POLICY ON SENTINEL EVENTS (CONT.)

### MAJOR PERMANENT LOSS OF FUNCTION

Major permanent loss of function includes sensory, motor, physiological, or intellectual impairment, not present upon entry into the care setting, that requires continued and ongoing treatment or life-style change.

### ROOT-CAUSE ANALYSIS

A root-cause analysis (RCA) is defined as a process for identifying the basic and causal factor(s) that underlie variation in performance, including the occurrence or possible occurrence of a sentinel event. A root cause is that most fundamental reason why a problem—i.e., a situation where performance does not meet expectations—has occurred.

RCAs focus primarily on systems and processes, not on individual performance. They progress from special causes in clinical processes to common causes in organizational processes, and they identify potential improvements in processes or systems that would tend to decrease the likelihood of such events in the future. They also determine, after analysis, whether no such improvement opportunities exist. If individual performance issues are identified that potentially represent inappropriate care related to practitioner competency, those issues will be addressed by the appropriate peer review or human resource system for that individual.

1.  An RCA is considered thorough if it includes the following:
    a.  A determination of the human and other factors most directly associated with the sentinel event, and the process(es) and systems related to its occurrence
    b.  Analysis of the underlying systems and processes through a series of "Why?" questions to determine where redesign might reduce risk
    c.  Identification of risk points and their potential contributions to this type of event
    d.  A determination of potential improvement in processes or systems that would tend to decrease the likelihood of such events in the future, or a determination, after analysis, that no such improvement opportunities existed
    e.  The minimum scope of analysis required for specific types of sentinel events as outlined in Attachment A.

2.  An RCA is considered credible if the following can be demonstrated:
    a.  It includes participation by organization leadership and by the individuals most closely involved in the processes and systems under review
    b.  It is internally consistent; that is, it does not contradict itself or leave obvious questions unanswered
    c.  It provides an explanation or rationale for a finding in which no problem was identified, or it provides an investigation into a process or system deemed nonapplicable to the analysis
    d.  It includes consideration of any relevant literature

## POLICY ON SENTINEL EVENTS (CONT.)

3. Action plan
The product of the RCA that identifies the strategies an organization intends to implement to reduce the risk of similar events occurring in the future. An appropriate action plan should demonstrate the following:

    a. Identification of changes that can be implemented to reduce risk, or formulation of a rationale for not undertaking such changes.

    b. The plan should address responsibility for implementation, oversight, pilot testing as appropriate, timelines, and strategies for measuring the effectiveness of the actions.

## POLICY

A. Identification of a sentinel event
Any potential sentinel event is to be reported immediately to the senior administrative representative in the house. Upon notification, this individual will undertake or direct an initial investigation to determine whether the occurrence is indeed a sentinel event as defined by this policy.

B. Notification/Communication of sentinel events
Upon determination that a sentinel event has occurred, the senior administrative representative in the house will notify key representatives of the organization's leadership team

C. Formation of a Sentinel Event Response Team
1. A team is to be formed to respond to a sentinel event. The team should include, but not necessarily be limited to, the following:

    a. Appropriate representatives of administration, medical staff, legal, risk, quality, and public relations

    b. Those individuals directly involved in the event

2. The purpose of the team will be to coordinate an investigation into the incident, conduct an RCA, and determine corrective actions to undertake in response to findings/identified opportunities for improvement.

D. Protection from discovery
All activities undertaken by the team should be done under the auspices of the medical staff quality assurance/peer review process. Other legal protections are to be implemented as determined by legal counsel.

## POLICY ON SENTINEL EVENTS (CONT.)

E.  Immediate remediation

The team will undertake those actions necessary to remediate any immediate threat or likelihood of the sentinel event recurring

F.  Investigation of event/Conducting an RCA

The team is to undertake a thorough and credible RCA of the sentinel event. The RCA should be completed within 45 days of the organization becoming aware of the event, unless a longer period of time is necessary for the RCA to be truly thorough and credible.

G.  Developing and implementing an action plan

Once the RCA has been completed, the team is to develop and implement a corrective action plan that will address both direct and root causes as well as—when appropriate—special and common cause variation. The plan for corrective action implementation (e.g., pilot testing, education, etc.) will include target dates for completion and follow-up monitoring for effectiveness. The quality department will be assigned the responsibility to monitor the completion of the implementation of all corrective actions and the effectiveness of the process changes. Results of the changes will be reported to the hospital patient safety committee.

H.  Internal reporting

A summary (blind) of the sentinel event, the root cause(s) identified, and the corrective actions taken will be reported to the medical executive committee and to the governing body. The corrective action plan will also be communicated to other appropriate parties within the organization.

I.  Reporting to the department of health services

A sentinel event that resulted in death or serious physical injury or that carried a risk of such to a significant percentage of the patient population would be considered an unusual occurrence, and it to be reported to the State Department of Health Services where appropriate.

J.  Reporting of sentinel events to the JCAHO

No sentinel event is to be self-reported to the Joint Commission on Accreditation of Healthcare Organizations (JCAHO) until an appropriate risk/benefit analysis has been conducted by administration. If the decision of the team is to self-report, then the report shall be made by the chief executive officer, or designee, following consultation and guidance from legal counsel.

Advantages to self-reporting of a reviewable sentinel event:

1.  Early reporting provides an opportunity for consultation with the JCAHO staff during the development of the RCA and action plan.

## POLICY ON SENTINEL EVENTS (CONT.)

    2. The event is added to the JCAHO's Sentinel Event Database, contributing to the general knowledge about sentinel events.

    3. In collaboration with the Joint Commission to understand how the event happened and what can be done to reduce the risk of such an event in the future, the organization sends a message to the public that it is doing everything possible to ensure such an event will not happen again.

K. Reporting of sentinel events during JCAHO accreditation survey

The organization will report the occurrence of a sentinel event, documentation of the subsequent RCA, and the corrective action plan to the JCAHO during the next scheduled accreditation survey. Joint Commission personnel may then conduct an on-site review during the survey. No document should be transmitted to the Joint Commission without prior approval from legal counsel.

L. Recordkeeping

A record of the investigation into the sentinel event, the subsequent RCA, and any performance improvement activities undertaken is to be maintained by the medical staff office and should be constructed in such a way as to be afforded statutory protection from discovery.

## REFERENCES

The Joint Commission on Accreditation of Healthcare Organizations

# ATTACHMENT A: MINIMUM SCOPE OF RCA FOR SPECIFIC TYPES OF SENTINEL EVENTS

| Process | Suicide 24H Care | Medication Error | Procedure Complication | Wrong Site Surgery | Treatment Delay | Restraint Death | Elopement Death | Assault Rape, Homicide | Transfusion Death | Infant Abduction |
|---|---|---|---|---|---|---|---|---|---|---|
| Behavioral assessment process (1) | X | | | | | X | X | X | | |
| Physical assessment process (2) | X | | | | | X | X | X | | |
| Patient identification process | | X | | X | | | | | X | |
| Patient observation procedures | X | | | | | X | X | X | | |
| Care planning process | X | | | | | X | X | | | |
| Staffing levels | X | X | X | X | X | X | X | X | X | X |
| Orientation and training of staff | X | X | X | X | X | X | X | X | X | X |
| Competency assessment/credentialing | X | X | X | X | X | | X | X | X | X |
| Supervision of staff (3) | X | X | X | | X | | | | X | |
| Communication with patient/family | X | | | | X | X | X | | | |
| Communication among staff members | | X | X | X | X | X | X | X | X | X |
| Availability of information | | X | X | X | X | | X | X | X | |
| Adequacy of technological support | | X | X | | | | | | | |
| Equipment maintenance/management | | X | X | | | X | | | | |
| Physical environment (4) | X | X | | | | | X | X | X | X |
| Security systems and processes | X | X | | | | | | X | X | X |
| Control of medications: storage/access | | X | | | | | | | | |
| Labeling of medications | | X | | | | | | | | |

(1) Includes the process for assessing patient's risk to self (and to others, in cases of assault, rape, or homicide where patient is the assailant)

(2) Includes search for contraband

(3) Includes supervision of physicians-in-training

(4) Includes furnishings, hardware (e.g., bars, hooks, rods), lighting, etc.

**Policy for 482.22**

## MEDICAL STAFF BYLAWS/POLICIES AND PROCEDURES

### ARTICLE IV: Medical staff organization

Section 1—Organization of the medical staff

1.1 The medical of [hospital name] shall be organized as a [non] departmental staff. [The current departments organized by the medical staff and formally recognized by the medical executive committee (MEC) are listed in the organization and function manual.]
[Or, optional:] The medical staff of [hospital name] shall be organized as a departmentalized staff, including anesthesia, emergency, family practice, medicine, OB/GYN, pathology, pediatrics, radiology, surgery, etc. Each [department/division] shall have a [chair/chief] with overall responsibility for the supervision and satisfactory discharge of assigned functions as listed in the organization and functions manual.]

1.2 The MEC may recognize any group of practitioners who wish to organize themselves into a clinical [service/section]. Any clinical [service/section], if organized, shall not be required to hold regularly scheduled meetings, nor shall attendance be required. Clinical [services/sections] are completely optional and shall exist to perform any of the following activities:

1.2.1 Continuing education/discussion of patient care
1.2.2 Grand rounds
1.2.3 Discussion of polices and procedures
1.2.4 Discussion of equipment needs
1.2.5 Development of recommendations for department [chairs/chiefs] or MEC
1.2.6 Participation in the development of criteria for clinical privileges (when requested by department [chairs/chiefs] or the MEC)
1.2.7 Discussion of a specific issue at the request of a department [chairs/chiefs] or the MEC

1.3 Except in extraordinary circumstance, no minutes or reports shall be required when reflecting the activities of the clinical [services/sections]. Only when a clinical [services/sections] is making formal recommendations shall a report be required documenting the clinical [services'/sections'] specific position. The current clinical [services/sections] that shall be organized by the medical staff and formally recognized by the MEC shall be listed in the organization and functions manual.

*Source: The Greeley Company, Marblehead, MA. © 2004.*

**Policies for 482.23**

## INCIDENT REPORT SUMMARY REGARDING MEDICATION ERRORS OR ADVERSE DRUG EFFECTS

| Department: | | Policy number: | |
|---|---|---|---|
| Section: | **MEDICATION** | Effective date: | Page: |
| Title: | **ADVERSE DRUG REACTION REPORTING** | ○ **Non-clinical**<br>● **Clinical** | |
| Approved by: | **MEDICAL EXECUTIVE COMMITTEE, PATIENT CARE AND SAFETY COMMITTEE, LEGAL DEPARTMENT** | Review date:<br>Revision date: | |

## PURPOSE

To provide a comprehensive program of hospitalwide surveillance to identify, evaluate, report, and prevent untoward drug experiences.

## SCOPE

The policy covers all drugs (established and investigational) prescribed for/used by patients, including over the counter (OTC) drugs and diagnostic agents.

The policy includes patients who experience an adverse drug reaction (ADR), which is the primary or secondary cause of hospitalization, as well as patients who experience an ADR while hospitalized.

The policy provides for prospective, concurrent/ongoing, and retrospective methods of data collection. For best results, information should be collected concurrently.

The data sources include the following:

a.  Voluntary reporting from physicians, nurses, pharmacists, or any caregiver who may administer drugs or have knowledge of patient outcome.

   Trigger drugs would be used to initiate the ADR process. Examples of these trigger drugs would be antihistamines, steroids, protamine, epinephrine, and antidotes (naloxone, Vitamin K, etc.).

b.  Medical records E codes (ICD-9-CM codes received via health information services).

c.  Adverse reactions occurring due to a vaccine should all be reported through the vaccine adverse event reporting system (VAERS).

## INCIDENT REPORT SUMMARY REGARDING MEDICATION ERRORS OR ADVERSE DRUG EFFECTS (CONT.)

    d.   ADR telephone hotlines.

    e.   Any other report of suspected ADR not covered above (e.g., patient call, outpatient clinic information, etc.).

Side effects with expected, well-known reactions resulting in little or no change in patient management (e.g., drowsiness or dry mouth due to administration of certain antihistamines or nausea associated with the use of antineoplastics) shall not be reported as an ADR. It is an effect with predictable frequency and an effect whose intensity and occurrence are related to the size of the dose. Additionally, drug withdrawal, drug-abuse syndromes, accidental poisoning, reactions due to blood or blood products, and drug-overdose complications should not be defined as ADRs.

The following examples highlight the differences between a side effect and an ADR.

- **Side effect:** One month following the initiation of high-dose ibuprofen therapy, a patient experiences dyspepsia and mild nausea. The patient consults his physician, and the ibuprofen is discontinued.

- **ADR:** One month following the initiation of high-dose ibuprofen therapy, a patient experiences melena. Hemoptysis and dizziness occur one week later. The patient is admitted to the emergency department and is diagnosed with an acute gastrointestinal bleed secondary to ibuprofen.

## DEFINITIONS

**FDA**—Food and Drug Administration
**UOR**—Unusual Occurrence Report
**Significant ADR**—any expected, unintended, undesired, or excessive response to a drug that

- requires discontinuing the drug (therapeutic or diagnostic)
- requires changing the drug therapy
- requires modifying the dose (except for minor dosage adjustments)
- necessitates admission to a hospital
- prolongs stay in a healthcare facility
- necessitates supportive treatment
- significantly complicates the diagnosis
- negatively affects prognosis
- results in temporary or permanent harm, disability, or death
- produces allergic reactions
- produces idiosyncratic reactions

**INCIDENT REPORT SUMMARY REGARDING MEDICATION ERRORS OR ADVERSE DRUG EFFECTS (CONT.)**

## CLASSIFICATIONS

**A. ADR severity:**

**Mild**—bothersome but requiring no intervention or treatment beyond discontinuation of the medication or decreasing the dose. Does not significantly affect the patient's outcome or hospital course.

**Moderate**—a deterioration of patient status, which requires intervention and results in a therapy change/minor treatment.

**Severe**—event characterized by one or more of the following:

    a. Threatening life (real risk of dying)
    b. Caused disability (persistent, prolonged, or permanent)
    c. Resulted in hospitalization or prolonged hospital stay
    d. Resulted in a congenital anomaly
    e. Required intervention to prevent permanent impairment or damage
    f. Required significant therapy changes

**Death**—The use of the medication in the patient was a confirmed contributing factor to his or her death.

**B. ADR probability:**

Probability of the ADR will be assessed by the pharmacist using the ADR probability scale described below. The probability of the ADR is determined by the highest category to which all statements apply.

    **Definite**
    a. Follows a reasonable temporal sequence from the time of drug administration or from the time the drug level has been established in body fluids or tissues
    b. Follows a known response pattern to the suspected drug
    c. Is confirmed by improvement after discontinuing the drug/reappearance of the reaction on repeat exposure

    **Probable**
    a. Follows a known response pattern to the suspected drug
    b. Is confirmed by discontinuing drug
    c. Cannot be reasonably explained by the known characteristics of the patient's clinical state or other drug administrations

## INCIDENT REPORT SUMMARY REGARDING MEDICATION ERRORS OR ADVERSE DRUG EFFECTS (CONT.)

**Possible**

a. Follows a known response pattern to the suspected drug

**C.  ADR preventability**

Preventability of the ADR is assessed initially by a pharmacist using the following criteria as a tool.  Other specific circumstances may also warrant the ADR to be considered preventable. The pharmacy and therapeutics (P&T) committee will consider the probability and severity of the ADR prior to making the final determination of preventability.

a.  The dose, route, or frequency of administration was not appropriate for the patient's age, weight, or disease state

b.  There was a documented history of allergy or previous reaction to the drug and other medications were available and appropriate to use

c.  The patient had experienced a prior severe reaction to the drug, and was not desensitized prior to reuse

d.  The patient's clinical status precluded the use of the drug, and other viable alternatives were available

e.  A drug-drug/drug-food interaction was involved in the reaction

f.  Required therapeutic drug monitoring or other necessary laboratory tests were not performed

g.  The ADR was caused by patient nonadherence to a medication regimen/pertinent laboratory monitoring, and there was no documentation of a patient education

**Preventability (suggested ADRs to report if preventable)**

|  | Probability | | |
|---|---|---|---|
|  | Definite | Probable | Possible |
| Severe | X | X |  |
| Moderate | X | X |  |
| Mild |  |  |  |

**INCIDENT REPORT SUMMARY REGARDING MEDICATION ERRORS OR ADVERSE DRUG EFFECTS (CONT.)**

## POLICY

A. To increase patient safety in drug therapy, all ADRs are reported immediately to the patient's physician or to the prescribing physician if different than the patient's physician. They are subsequently reported by the inpatient pharmacy director or designee to the P&T committee at least quarterly. ADRs will then be reported to the executive committee. When appropriate, ADRs will also be reported to one or more of the following:

- Inpatient/outpatient health information services for flagging of the patient's chart to indicate an allergy, drug hypersensitivity, or any other reaction deemed appropriate by the P&T committee.

- Outpatient and inpatient pharmacy computer system databases for all patients with reported allergies, drug hypersensitivities, or any other reaction deemed appropriate by the P&T committee.

- Primary and prescribing physicians will be notified of patients having a reaction that is classified as a severe and allergy/hypersensitivity reaction.

- Patients will be notified by their primary physician or designee of all allergy or hypersensitivity reactions at the physician's discretion.

- The Food and Drug Administration (FDA) Medical Products Reporting Program (MedWatch) shall be used to report ADRs as determined by the P&T committee.

B. Adverse drug reactions received from all data sources will be systematically evaluated by a pharmacist trained in the ADR reporting/evaluation process.

C. Reactions will be assessed for severity, probability, and preventability (see Definition section).

D. The P&T committee provides support and leadership to the ADR process. ADRs deemed preventable by the P&T committee will be forwarded to the appropriate clinical department(s) to be addressed via the quality review and peer review processes (if applicable).

E. ADR rates will be trended annually in a report to the P&T committee and thereafter to the executive committee, in order to analyze and follow up with

- ADRs causing hospital admissions
- high-risk populations

**INCIDENT REPORT SUMMARY REGARDING MEDICATION ERRORS OR ADVERSE DRUG EFFECTS (CONT.)**

- high-risk classes of drugs
- patterns of ADRs

F.  Findings from the ADR program will be utilized to

- assess the safety of drug therapies, especially recently approved drugs
- educate health professionals about drug effects and increase their awareness regarding actual and potential reactions
- document individual patient sensitivities to alert health professionals to potential reactions
- monitor the safety of drug use in high-risk populations
- identify high-risk medications and take steps to minimize their risk of harm
- complement organizational risk-management activities and efforts to minimize liability
- measure ADR incidence
- provide a quality assurance screening tool for further medication usage evaluation
- be used in the credentialing process of the medical staff

## PROCEDURE

| | |
|---|---|
| Physician | Initiates appropriate clinical interventions to minimize severity of ADR sequelae. |
| Physician/nurse/pharmacist | 1.  Reports all suspected ADRs promptly to the attending physician or physician on call. |
| | 2.  Calls the ADR hotline or completes the ADR reporting form or unusual occurrence report (UOR), as applicable. ADR reporting, UOR forms, and VAERS forms are available. |
| | 3.  Sends the form to the pharmacist on duty upon completion. In the case of a vaccine, the VAERS form must also be completed and sent to the appropriate agency. |
| Health information services | 4.  Pulls medical records with ICD-9-CM E codes (which identify drugs and medicinal and biological substances causing adverse effects in therapeutic use) monthly to the inpatient pharmacies. |

## INCIDENT REPORT SUMMARY REGARDING MEDICATION ERRORS OR ADVERSE DRUG EFFECTS (CONT.)

| | |
|---|---|
| Inpatient pharmacist/physician | 5. After reviewing the patient's chart and appropriate literature, determines ADR probability using established criteria, recommends FDA reporting using MedWatch criteria, recommends flagging charts to indicate allergy/sensitivity, and completes and signs the form. The information shall be recorded on the form, which serves as the worksheet for evaluation of the reaction. |
| Inpatient pharmacy/QA designee | 6. Information on the form is typed into database for tracking purposes. |
| P&T/designee | 7. Reviews all reports of suspected adverse drug reactions. |
| | 8. Recommends that patients' charts be flagged to indicate drug allergy/sensitivity or whether the FDA shall be notified. Also identifies potential preventable ADRs. |
| Inpatient pharmacy designee | 9. Prepares ADR summary for P&T committee to be reported at least quarterly. |
| | 10. Reports ADR rate to the board of directors. |
| P&T committee | 11. Reviews the ADR summary report and authorizes recommendations and actions on the reporting form of reactions to be flagged or whether the FDA shall be notified. Authorizes review of preventable ADRs by the appropriate clinical department(s) through forwarding to the quality assessment and improvement department. |
| | 12. The P&T committee minutes will reflect the above noted summary review and actions taken and any additional recommendations. |
| Inpatient pharmacy | 13. Forwards drug allergy/sensitivity information and P&T committee recommended actions to primary and prescribing physician, health information services, and  designee to update PIMS computer systems. |

## INCIDENT REPORT SUMMARY REGARDING MEDICATION ERRORS OR ADVERSE DRUG EFFECTS (CONT.)

|  |  |
|---|---|
|  | 14. If the FDA is to be notified, completes MedWatch form FDA 3500. Submits original copy as required and retains file copy. |
| Primary/prescribing physician | 15. Receives patient-specific ADR information from P&T indicating how the chart will be flagged (i.e., allergy or sensitivity). |
|  | 16. If appropriate, notifies the patient of the drug allergy/sensitivity, etc. |
| Pharmacy operations | 17. Flags patient's chart with drug allergy/sensitivity warning. If sensitivity, also indicates type of reaction. |
|  | 18. Enters allergy/sensitivity information into outpatient pharmacy computer system. |
|  | 19. Enters allergy/sensitivity information into inpatient pharmacy computer system. |
| Medical center quality director | 20. Promptly routes ADR-related UORs to the inpatient pharmacy director or designee. |
|  | 21. Communicates reports of preventable ADRs from the P&T committee to the appropriate clinical department for quality review and peer review if applicable. Communicates replies from the clinical department regarding their assessment of the ADRs preventability and opportunities for improvement back to the P&T committee. |
|  | 22. Incorporates findings into hospital performance improvement program. |

**REFERENCES**

The Joint Commission on Accreditation of Healthcare Organizations, State Health Department

## ATTACHMENT A: SAMPLE ADVERSE DRUG REACTION POLICIES AND PROCEDURES FLOW DIAGRAM

# ATTACHMENT B: SAMPLE REPORT OF SUSPECTED ADVERSE DRUG REACTION

## REPORT OF SUSPECTED ADVERSE DRUG REACTION

Date of reaction:

Name:

Suspected Drug:

MR#:

Prescribing MD:

Age:

Primary MD (if different from prescribing):

Sex:

ADDRESSOGRAPH

Wt:

Patient Area: ☐ Hospital (specify area) _____ ☐ Clinic (specify) _____  ☐ Home Health  ☐ Urgent Care Clinic  ☐ Emergency Area

Type of reaction: ☐ Anaphylaxis  ☐ Hives/Swelling    ☐ Rash (generalized without hives/swelling)
☐ GI Distress  ☐ Other _____

Additional description or contributing factors:

Reported by (print name, title)    Signature    Today's Date

MD signature (required for outpatients)

(MD assessment for outpatients at time of encounter)
☐ Allergy to: _____    ☐ Sensitivity to: _____

## PHARMACIST FOLLOW-UP FOR HOSPITAL PATIENTS BELOW THIS LINE

TREATMENT GIVEN:
☐ Drug DC'd only  ☐ Drug DC'd and treated with _____
☐ Other: _____

ASSESSMENT/RECOMMENDATIONS:
☐ Allergy  ☐ Sensitivity to: _____

☐ Reaction not drug related
☐ Reaction is expected side effect of drug
☐ Cannot determine cause of reaction

OUTCOME:
☐ No sequelae  ☐ Hospitalization - caused or prolonged
☐ Required intervention to prevent permanent impairment/damage
☐ Life threatening  ☐ Death  ☐ Other: _____

CLASSIFICATION:
☐ Mild  ☐ Moderate  ☐ Severe  ☐ Death    Reportable to FDA? ☐ Yes  ☐ No

PROBABILITY: (see rating tool on back of form)
☐ High  ☐ Intermediate  ☐ Low

PREVENTABLE?
☐ Yes  ☐ No

IF PREVENTABLE?
☐ Known history of reaction to same drug/class  ☐ Improper dose/regimen
☐ Known drug - drug interaction  ☐ Other: _____

Reviewed by: (Print name)    Signature:    Date

Signature of P&T Committee designee    Date

Pharmacy and Therapeutics Committee recommendations and actions:
☐ Flag inpatient and outpatient records  ☐ Flag outpatient records only  ☐ Refer to prescribing MD department (all preventable reactions)
☐ Notify FDA  ☐ Other:

NS-7944(9-95)    WHITE - INPATIENT PHARMACY    CANARY - OUTPATIENT CHART    PINK - HOSPITAL CHART

## Policies for 482.26

### SET POLICY TO VERIFY VENDOR'S INFORMATION

**Purchase policy**

From time to time, vendors approach our practice selling equipment, drugs, and devices that will enable us to offer new or improved services to our patients. To ensure informed decision making regarding such purchases, please adhere to the following policy.

If a vendor offers a product that you think our practice should consider for purchase, please:

1.  Approach [insert name of designated radiologist] with the vendor's literature and request an investigation of the product. [Insert name of designated radiologist] will do a literature search and conduct other relevant research to determine whether the product is clinically effective and appropriate for our practice.

2.  When [insert name of designated radiologist] has determined that our practice should consider such a purchase, I (or my designee) will investigate whether any special supplies, equipment, or storage procedures are necessary to use the product properly. I will gather information about the cost of such supplies, equipment, and processes, along with any available reimbursement information for these ancillary necessities.

3.  Simultaneously, [insert name of designated biller] (or other designated person) will contact the AMA, our specialty society, our major payors, as well as our Medicare carrier, as appropriate, to determine proper coding for the procedure(s) our practice is considering adding and the levels of reimbursement that we can expect.

4.  All the information gathered pursuant to steps 1-3 above will be presented to all partners of our practice within 60 days. No decision will be made until all such information has been presented.

Arnold Administrator

## EC PLANS/PROCEDURES FOR MEDICAL EQUIPMENT

# ABC Medical Center

| | | | |
|---|---|---|---|
| **SUBJECT:** | Medical equipment and medical device incident reporting | **MANUAL:** | Safety manual |
| | | **SECTION:** | |

## I. Policy

In compliance with the Safe Medical Device Act of 1990, the hospital will report all medical device–related or suspected medical device–related deaths, serious illnesses, or injuries to the U.S. Food and Drug Administration (FDA) and the manufacturer. The hospital will investigate and document all such incidents.

***Definitions:***

A serious illness or injury as defined by the act is life threatening, results in permanent (nonreversible) impairment of a body function or permanent damage to a body structure, or necessitates immediate medical or surgical intervention to preclude permanent impairment of a body function or permanent damage to a body structure. ("Necessitates immediate medical or surgical intervention," means an event involving a medical device that requires timely medical or surgical intervention.)

The FDA defines a medical device as any instrument, machine, or other article used to help prevent, diagnose, or treat a disease or that affects the structure or function of the body, with the exception of drugs. For example, a medical device includes, but is not limited to, ventilators, monitors, dialyzers, infusion pumps, pacemakers, endotrachial tubes, implants, catheters, thermometers, patient restraints, and syringes.

## II. Procedure

A. Any hospital employee or physician who discovers, witnesses, or is notified of a medical device/ equipment incident that causes or is suspected of causing a death, serious illness, or injury will immediately notify the attending physician and department manager. Within 24 hours of the incident, the employee who discovered or witnessed the incident will complete the unusual-occurrence form and forward it to his or her supervisor.

B. The department manager will immediately notify risk management and direct biomedical engineering to secure the device/equipment and keep it from further use.

C. Biomedical engineering personnel will ensure that

1. all tubing, connections, wires, packaging, lot and serial numbers, and other accessories and attachments remain with/attached to the device/equipment

## EC PLANS/PROCEDURES FOR MEDICAL EQUIPMENT (CONT.)

   2.  equipment settings remain the same
   3.  repairs are not made

D.  The medical personnel reporting the adverse incident will document the following:

   1.  The patient's name
   2.  The patient's room number
   3.  The notified attending physician's name
   4.  The product name
   5.  The product's location
   6.  The product's identification number
   7.  The product's serial number
   8.  The product's model number
   9.  The manufacturer's name, if known
   10. A brief description of the incident, including the date and time
   11. An indication that the device has been taken out of service
   12. The location of the out-of-service device

E.  Investigation of the medical device incident

   1.  Risk management will conduct an investigation and determine with the help of biomedical engi-
       neering whether to impound the medical device and take similar devices/equipment out of service
   2.  Risk management personnel will maintain the investigation documentation
   3.  The biomedical engineering department will assist as requested

F.  Submission of adverse medical device incident reports

   1.  Deaths
       When a patient dies while under treatment and the hospital has information that reasonably sug-
       gests that a device may have caused or contributed to that death, it will report the incident to the
       FDA and send a copy to the manufacturer within 10 working days.

   2.  Serious illness or injury
       When the hospital has information that reasonably suggests that a device has caused or con-
       tributed to the serious injury or illness of a patient, the risk management department must report the
       incident to the manufacturer. If the manufacturer is not known, the incident will be reported to the
       FDA. The hospital will submit this report within 10 working days.

## EC PLANS/PROCEDURES FOR MEDICAL EQUIPMENT (CONT.)

3. Semiannual reports—Twice each year, the risk management department will send the FDA a summary of all adverse medical device reports. All reports will contain the following information:

    a. Name, address, telephone number, type of facility

    b. The product name

    c. The product's serial number

    d. The product's model number

    e. The manufacturer's name and address

    f. A brief description of the event

G. Responsible party

The risk management department will oversee the hospital's medical device incident reporting program. It will submit appropriate reports to the FDA and/or the medical device manufacturer in accordance with federal laws and regulations. It will also incorporate all data collected from the hospital medical device incident reporting program into the hospitalwide incident-reporting program, the results of which are communicated to hospital administration, the safety committee, and the insurance carrier.

## III. References

2004 JCAHO EC.1.10, 6.10

**Policy for 482.28**

## SAMPLE NUTRITIONAL ASSESSMENT FORM

**Subjective:**

| |
|---|
| Appetite: good/fair/poor   Diet history: |
| Food allergies/intolerances: |
| Patient comments: |

**Objective:**

| |
|---|
| Diet order: |
| Height:_____ Weight:_____ BMI:_____ ABW:_____ UBW:_____ |
| Weight changes: |
| Diagnosis: |
| History: |
| Pertinent medications: |
| |
| Pertinent lab: |
| |
| Nausea     Vomiting     Diarrhea     Constipation     Difficulty chewing or swallowing |

**Assessment:**

| |
|---|
| Level of nutritional risk: |
| Estimated caloric needs: |
| Estimated fluid needs: |
| Comments: |
| |

**Plan:**

| |
|---|
| Recommended diet change: |
| Monitor intake/calorie count: |
| Between meal nourishment/supplement: |
| Provide diet counseling: |
| Monitor diet tolerance/diet progression: |
| Reassess in _____ days: |
| Goals: |

Dietitian signature: _____ Date: _____

*Source: Keokuk (IA) Area Hospital. Reprinted with permission.*

**Policy for 482.41**

## SAMPLE EMERGENCY MANAGEMENT PROGRAM

## ABC Medical Center

| **SUBJECT:** | Emergency management program | **MANUAL:** | Safety manual |
|---|---|---|---|
| | | **SECTION:** | |

### I. Policy

The hospital will maintain an effective emergency management program to respond to natural disasters and other emergencies that disrupt its ability to care for and treat patients.

### II. Procedure

A. The safety committee and its emergency management committee are responsible for maintaining an effective, up-to-date emergency management program. These committees will review the effectiveness of the program each year.

B. The objectives of the emergency management program are the following:

   1. To maintain a current hazard vulnerability analysis (HVA) and related written emergency plans
   2. To ensure all personnel receive information about emergency plans
   3. To conduct regular drills to test the plans and train personnel

C. The written emergency program should address the following:

   1. Management of a variety of emergencies identified in the HVA

   2. Medical, nursing, and support services' responsibilities during an emergency

   3. The hospital's role in communitywide disaster plans, including specific relationships with other health care organizations and civil services

   4. Management of staff, including distribution and assignment of responsibilities and functions, and support for staff

   5. Management of patients, including scheduling services, controlling patient information, and admission, transfer, relocation, and discharge of patients

## SAMPLE EMERGENCY MANAGEMENT PROGRAM (CONT.)

6.  Management of supplies, communications, and utilities

7.  Education and training of staff

D.  The hospital will put the plan into action twice a year, four to eight months apart, either as drills or in response to actual emergencies.

E.  The effectiveness of the hospital's emergency management program will be evaluated annually and the results reported to hospital administration and department managers.

### III. References

2004 JCAHO EC.4.10–4.20

## SAMPLE FIRE DRILLS POLICY

# ABC Medical Center

| **SUBJECT:** Fire drills | **MANUAL:** Safety manual |
|---|---|
| | **SECTION:** |

## I. Policy

The hospital will conduct a quarterly fire drill for each shift. Hospital personnel will be familiar with the appropriate procedure for responding to a fire or fire drill in any area of the hospital.

## II. Procedure

A. Fire drills will test staff knowledge of the use and function of fire alarm systems, transmission of alarms, containment of smoke and fire, transfer to areas of refuge, fire extinguishment, assignment of specific duties, and preparation for building evacuation.

B. Follow "R-A-C-E" if you discover the fire as described in policy 5-1, "Fire response."

   **R**escue
   **A**larm
   **C**onfine
   **E**xtinguish

C. Scheduling fire drills

   1. The hospital holds fire drills quarterly on each shift throughout the facility to test employee responses and verify the performance of the hospital's fire safety system. The hospital will conduct a minimum of one drill per shift, per quarter. Off-site clinics will stage a minimum of one fire drill per shift, per year, unless the state requires more.

   2. Prior to initiating a fire drill, the engineering department will notify the fire department.

D. Fire drill monitoring

   1. The safety officer or an experienced engineer may conduct the drill and serve as the drill captain.

   2. Staff will monitor the following smoke compartments:

## SAMPLE FIRE DRILLS POLICY (CONT.)

      a. The point of origin of the fire drill

      b. The compartment immediately adjacent to the fire drill location (if one exists)

3. The drill captain distributes the drill report form to the other monitor and assigns the monitoring area. The drill captain observes the response at the point of origin.

4. The drill is initiated when the drill captain activates the fire "flag" and places the "flag" in the location of the simulated fire.

5. The monitoring team members observe employees' response and complete the drill report forms.

6. When the drill is complete, the drill captain secures the emergency drill with the operator. The operator announces three times, "Fire drill, all clear."

7. At the conclusion of the drill, the drill captain ensures that the fire alarm system is reset and tells the operator to advise that the drill is over and that any future calls should be considered real fires.

8. The drill captain coaches drill participants on both good performance and areas needing improvement.

9. The drill captain collects the drill report form from the other monitoring team members and attaches it to the point of origin form.

10. The safety officer and safety committee receive drill documentation and notification of any fire safety issues or problems that occur as a result of the fire drill.

E. In the annual evaluation, address the effectiveness of the fire drills for the past year.

## III. References

2004 JCAHO EC.5.10, 5.30

**Policies for 482.42**

## SAMPLE INFECTIOUS DISEASES INFLUX POLICY

To deal with a surge of infected patients, your facility will implement its general emergency management policies. In addition to these policies, address the following issues for infectious diseases:

### Community resources
Determine whether this is a communitywide event and whether other facilities, shelters, hotels, etc., are also accepting infectious patients. If so, coordinate decision-making with community disaster agencies and local and state public health departments.

### Type of infectious disease/mode of transmission
Determine what types of infectious disease the patients have and the modes of transmission. For modes of transmission that require more than standard precautions, decide the following:

1. Are rooms needed with negative pressure for isolation?

   • If yes, does the facility have adequate negative pressure rooms or can rooms be retrofitted for negative pressure?

   • Can several patients fit into the available negative pressure rooms and thus accommodate the influx?

   • Can a wing of the building that does not share an air system with the rest of the building be used for the infectious patients?

   • Does the entire building need to be emptied of patients without the infectious disease so the building can be used for only patients with the infectious disease?

   • Does an outdoor temporary shelter need to be implemented to house the infectious patients?

2. What if negative pressure is not needed but contact or droplet precautions are needed?

   • Does the facility have adequate rooms/space to group together the patients with the infectious disease

## SAMPLE INFECTIOUS DISEASES INFLUX POLICY (CONT.)

- Does the building or a section of the building need to be emptied of the less ill patients to accommodate those with the infectious disease?

- Is the influx so large that a temporary shelter needs to be implemented for the infectious patients?

### Supplies

Are adequate supplies available for personal protective equipment and hand hygiene? If not, order the necessary supplies.

### Staffing for infectious patients

If this is a disease to which some healthcare workers have immunity, consider assigning staff with immunity to care for the infectious patients.

### Medications for treatment and prophylaxis

If there is an indication for specific drug treatment of the infectious patients or prophylaxis for exposed persons, obtain those medications in adequate quantity.

*Adapted from the book,* Infection Control Compliance Guide: Understanding the JCAHO's Standards, *by Gail Bennett, RN, MSN, CIC, and published by HCPro, Inc.*

## SAMPLE STANDARD PRECAUTIONS POLICY AND PROCEDURE

# ABC Medical Center

| | | |
|---|---|---|
| **SUBJECT:** | Infection control during construction/renovation | **MANUAL:** Safety manual |
| | | **SECTION:** |

## I. Policy

During construction and maintenance projects, the hospital will contain dust, airborne fungi, and vapors within construction and maintenance areas to reduce the potential for health care–acquired infections in susceptible patients.

## II. Procedure

A.  The infection control department will review all projects with the potential for releasing dust or mold spores in patient care areas.

B.  Aspergillus background

   1.  Aspergillus, an airborne fungal spore, lives on wood, paper, and in the space above false ceilings; consequently, it is often found in construction dust.

   2.  Aspergillus poses serious risks to patients who are immunocompromised or have respiratory illnesses or difficulties. It is imperative that these patients not be exposed to any dust particles.

   3.  Whenever there is construction or an open passageway (e.g., spaces due to the removal of ceiling tiles, open access hatches) to the space above the ceiling, contaminated air may enter patient areas.

C.  Dust control

   1.  Engineering personnel and outside contractors will take appropriate infection control precautions to keep dust particles to a minimum during construction. They must follow the appropriate procedures as determined by the patient risk classification and construction activity. These procedures are in the infection control policy.

   2.  Keep construction and renovation projects separate from patient care areas and areas that prepare patient care items with barriers to keep dust inside the work site.

   3.  Transport construction waste in sealed containers as appropriate.

## SAMPLE STANDARD PRECAUTIONS POLICY AND PROCEDURE (CONT.)

4. Terminally clean the construction area and surrounding areas upon completion of the project.

5. Establish barriers and other measures when dictated by the type of construction activity and the patient risk group.

D. Standard operating procedures

1. Prior to construction, engineering personnel will review projects with infection control personnel to verify infection control policy compliance

2. Apply all infection control measures before any construction begins

3. Follow all infection control operations procedures throughout the duration of the project

4. If current patient and employee traffic patterns will be affected by construction, designate alternative routes to reduce risk of exposure to infectious agents

E. Responsibility and accountability

1. The engineering department will notify the infection control department of any planned construction work in or adjacent to high-risk patient areas.

2. The engineering department will work directly with the infection control department to review the integrity of protective barriers.

3. The engineering department will inform all departments adjacent to the construction site of the scope of work and the estimated time of completion.

4. The infection control department will routinely inspect the work area. The infection control department will promptly inform the engineering department if it finds any violations.

## III. References

2004 JCAHO EC.3.10, IC.1.10, IC.4.10

## Policies for 482.43

### SAMPLE PATIENT DISCHARGE INSTRUCTIONS POLICY

| Department: | MEDICAL CENTER WIDE POLICY & PROCEDURE MANUAL | Policy number: | |
|---|---|---|---|
| Section: | PATIENT CARE POLICIES | Effective date: | Page: |
| Title: | PATIENT DISCHARGE INSTRUCTIONS | ○ Non-clinical ● Clinical | |
| Approved by: | MEDICAL EXECUTIVE COMMITTEE, PATIENT CARE AND SAFETY COMMITTEE | Review date: Revision date: | |

## Purpose:

To provide follow-up care instructions to patients and their families upon discharge from the hospital.

## Policy:

A.  Discharge instructions will be provided to all patients discharged from the hospital.

B.  Any licensed or certified health care worker may enter data on the form. The registered nurse (RN), in collaboration with other disciplines involved in the care of the patient, will ensure that the information provided to the patient is appropriate and complete.

C.  The signature of the patient or surrogate will be obtained after the RN determines that the discharge instructions are understood.

D.  The original copy of the "Discharge Instructions" will be placed in the patient's medical record. The patient will receive a copy and a copy will be forwarded to the patient's primary physician.

E.  Patients under 18 years old must be discharged to a parent or legal guardian, unless the patient is an emancipated minor.

## Procedure:

A.  Stamp the form with the patient's identification card in the upper right hand corner of the page.

B.  The document is an NCR form and is folded in half. Open the form before completing filling it out.

C.  The RN will indicate the patient's final diagnosis on discharge from the hospital.

D.  The RN will instruct the patient about the problems that require a telephone call to the physician. Include the physician's name and telephone number. Document the telephone number of the Emergency Department.

## SAMPLE PATIENT DISCHARGE INSTRUCTIONS POLICY (CONT.)

E.  Reinforce the use of educational materials provided to the patient and surrogate. Review the patient's and surrogate's level of understanding, special instructions, diet, activities, equipment, supplies and available community resources.

- If the patient has a diagnosis of heart failure, instruct the patient to weigh daily at the same time of day and using the same scale. Provide a log for recording weight.

- If the patient has smoked within the past 12 months, include quitting smoking advice and the telephone number to the smoker's help line.

- Record any special educational materials given to the patient.

F.  Supplemental discharge instructions may be provided by other health care disciplines.

G.  Record the patient's appointment dates, times, locations, physician name, and phone numbers.

H.  Document medication information on the form.

I.  All disciplines involved in the discharge process will sign and initial the form.

J.  Document where, how, when, and with whom the patient was discharged.

K.  The patient/surrogate will sign the form.

L.  The RN will witness, date, time, and sign the form.

## ATTACHMENT A: DISCHARGE INSTRUCTIONS

**DISCHARGE INSTRUCTIONS**

Dear Patient:  The following instructions will help you continue your care. Please read these instructions and follow them carefully. Please bring this form with you to your next appointment.

Diagnosis: _____

IMPRINT  ID CARD HERE

Problems to report to your doctor:

Doctor: _____ Phone Number: _____ Emergency Number: _____

Special instructions:

| Diet: | Activity: ❑ No restrictions    ❑ Return to work/school: _____ |
| | ❑ Limitations: _____ |

Equipment / Supplies / Community resources:

See:  ❑ Physical Therapy    ❑ Occupational Therapy    ❑ Speech Pathology Discharge Instructions

### APPOINTMENT/REFERRALS

| Doctor/Other | Day - Date | Time | Location | Phone |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**PEDIATRICS ONLY**
❑  California Seat Belt / Safety Seat Law Reviewed
Driver's License / Identification #: _____

NS-9475 (12-02) FRONT

## ATTACHMENT A: DISCHARGE INSTRUCTIONS (CONT.)

| I | ❑  STOP Taking These Medications |
|---|---|
| | |
| | |
| | |
| | |

| II | MEDICATIONS TO TAKE AT HOME | | | |
|---|---|---|---|---|
| | Rx – Medication / Dose / How often | Recommended Time | Next Dose | REASON / SPECIAL INSTRUCTIONS |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

| DATE | SIGNATURE/TITLE | INIT. | DISCIPLINE | DATE | SIGNATURE/TITLE | INIT. | DISCIPLINE |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

**Discharge to:**          **per:**                **accompanied by:**              **Time:**
**I have reviewed and understood the above instructions.**

Patient/Family Signature/Date/Time                    Signature/Date/Time

NS-9475  (12-02)  BACK          WHITE – HOSPITAL CHART/FAX TO PHARMACY          CANARY – PATIENT COPY          PINK – CLINIC CHART

**Policies for 482.45** ────────────────────────────────────

| | SAMPLE ORGAN AND TISSUE DONATION POLICY | | |
|---|---|---|---|

| Department: | MEDICAL CENTER WIDE POLICY & PROCEDURE MANUAL | Policy number: | |
|---|---|---|---|
| Section: | ETHICS, RIGHTS, AND RESPONSIBILITIES POLICIES | Effective date: | Page: |
| Title: | ORGAN AND TISSUE DONATION | ○ Non-clinical ● Clinical | |
| Approved by: | MEDICAL EXECUTIVE COMMITTEE, ETHICS COMMITTEE, AND PATIENT CARE AND SAFETY COMMITTEE | Review date: Revision date: | |

## Purpose:

To provide guidelines related to anatomical donation of organs, tissue, and eyes for transplantation in accordance with the wishes of the decedent donor, his/her family, and in compliance with federal and state regulations.

## Policy:

In order to comply with legal requirements related to the voluntary donation of organs and tissues under the Conditions of Participation in the Medicare Program, _____ Medical Center has an agreement with an Organ Procurement Organization (OPO) designated by the Centers for Medicare & Medicaid Services (CMS).

## Definitions:

**Brain death**: An irreversible cessation of brain and brain stem function. Two licensed physicians must examine the patient and declare brain death; both physicians must document in the medical record that the patient is brain dead. These notes must state, unequivocally, that the patient is brain dead and must include the date and time of declaration. Neither physician may assist in the recovery or transplantation of the donated organs.

**Designated requestor**: An individual who has completed a course offered or approved by the OPO and designed in conjunction with the tissue and eye bank community in the methodology of approaching potential donor families and requesting organ/tissue donation.

## Procedure:

A. Organ and tissue donation involves a complex series of events requiring coordinated teamwork among physicians, nurses, hospital staff, procurement, and transplant teams. The major steps that generally define the donation process include the following:

   1. Identification and referral
   2. Consent
   3. Evaluation and maintenance
   4. Recovery

## SAMPLE ORGAN AND TISSUE DONATION POLICY (CONT.)

These steps will always occur, though the order and time frame may vary from case to case. From the moment of family consent to the actual organ and tissue donation, the elapsed time may vary from a few hours to many hours.

B. Identification and referral of potential donors

1. All deaths of patients, beginning at age newborn (gestational age of 36 weeks) must be referred to the OPO for evaluation of medical suitability for organ/tissue donation. This referral should be made at or near the time of cardiac death or imminent brain death. Any hospital representative may make the referral call. The OPO is available 24 hours a day to assist with the implementation of donation.

2. Each OPO has its own upper age criteria for death notification. The majority of OPOs want to be notified via phone about deaths through age 70. Some will accept donors through age 80. The hospital is required to comply with the death notification age requirements of its designated OPO. All deaths that fall outside the required age ranges established by the designated OPOs, must be reported in writing on a regular basis (usually quarterly) established by the OPO.

C. Consent

1. The family of each medically suitable potential donor identified by the OPO must be advised of the right to allow donation or decline to donate.

2. OPO staff or hospital staff specified as a designated requestor must make the request for donation. This should be a collaborative approach process with the OPO as the primary authority.

3. The family's response to the request and the name of the person who made the request should be documented in the progress notes/death form.

4. Consistent with state law, any member of the following classes of persons, in the order of priority listed, may consent to the donation of organs, tissues, or eyes:

   • The attorney-in-fact under a valid durable power of attorney that expressly authorizes the attorney-in-fact to make an anatomical gift of all or part of the decedent's body.

   • The spouse of the decedent. ("Spouse" does not include the decedent's former spouses.)

## SAMPLE ORGAN AND TISSUE DONATION POLICY (CONT.)

(Hospital personnel should check with legal counsel when a person asserts that he or she is the decedent's common-law spouse.)

- An adult son or daughter of the decedent.

- Either parent of the decedent.

- An adult brother or sister of the decedent.

- A grandparent of the decedent.

- A guardian or conservator of the person of the decedent at the time of death.

D.  Potential donor evaluation and maintenance

1.  Organ donor evaluation:

    - The OPO will determine the medical suitability of organ donations. The process of determining suitability may require OPO staff to examine the body, conduct tests, review medical records, and obtain medical information from the family and physicians.

    - All hospital charges that are incurred after the patient is declared dead and donation consent is given by the family (including those charges incurred during the evaluation process) will be billed to the OPO.

    - The OPO may accept or reject the donation.

2.  Organ donor maintenance:
    Organ donors will be maintained on life support (ventilatory and cardiovascular systems mainte-nance) in critical care units under the medical direction of the OPO in conjunction with the trans-plant physician and_____ Medical Center physicians until the organs are recovered.

    Hospital staff will provide supportive medical management to potential organ donors to ensure viability of the organs for transplantation. Medical management will continue while the OPO deter-mines medical suitability. The OPO will provide the hospital with donor management guidelines as a resource.

## SAMPLE ORGAN AND TISSUE DONATION POLICY (CONT.)

3. Tissue and eye donor evaluation:

   If the OPO does not have an arrangement by which the local tissue/eye bank are notified of a potential donor then the hospital must establish a protocol to incorporate the tissue and eye bank in the death notification process.

   A tissue/eye bank coordinator will conduct a telephone evaluation of the potential tissue donor to determine medical suitability.

4. Tissue and eye donor maintenance:

   • Tissue donors do not require cardiorespiratory support prior to recovery.

   • If the patient is a potential tissue donor, the body can be transferred to the morgue. Refrigeration time should be documented.

E. Recovery and donation process

   1. Organ donation:

      Organ donation may take place when brain death has been established and ventilatory and cardiovascular support has been maintained. Organs considered for donation include heart, lung(s), liver, pancreas, kidney(s), and small bowel.

      • Organ recovery process:

      – The clinical nurse manager or designee will assist as needed in making arrangements for scheduling operating room time once consent is given.

      – The hospital will make an operating room suite available for the organ/tissue recovery process. The hospital will also provide anesthesia support, whenever necessary, and one scrub technician/registered nurse (RN) and one circulating RN.

      – Donated organs are recovered in the operating room under strict aseptic technique. The time of surgery is to be determined by the OPO and the operating room supervisor. The donor is transferred to the operating room only when a member of the transplant team is present under the supervision of that team.

      – The OPO will continue to provide support and communication to the donor family throughout the donation process.

## SAMPLE ORGAN AND TISSUE DONATION POLICY (CONT.)

- The OPO will coordinate with the transplant center to ensure timely arrival of the recovery team.

- The OPO will assist with postmortem care after recovery and will ensure appropriate disposition of the body.

2. Tissue recovery process:

- Tissue donations include, eyes, bone, connective tissues, dura mater, skin grafts, heart for valves, saphenous veins, and other tissue for transplantation or research purposes. Varying criteria for age and premortem medical conditions have been established by tissue donor services. Each hospital is expected to comply with the requirements established by their designated tissue and eye donation organizations.

- Tissue donors do not require cardiopulmonary support prior to recovery.

- If a patient is a potential tissue donor, transfer patient to the morgue as soon as possible for refrigeration (document the time of refrigeration).

Tissue donations may take place in the operating room, morgue, mortuary, or coroner's office.

F. Coroner cases

1. If the case comes under jurisdiction of the coroner, the OPO coordinator will advise the office of the coroner that a request for anatomical donation has been made.

2. The coroner must give authorization before the donation can proceed. If authorization is verbal, the name of the person giving consent and the date/time of consent must be documented.

3. Appropriate documentation will be prepared for the coroner, including appropriate and requested portions of the clinical documentation (medical record) and a copy of the donation consent form.

G. Mortuary

1. The OPO coordinator will notify the nursing supervisor after the organ/tissue recoveries have been completed.

## SAMPLE ORGAN AND TISSUE DONATION POLICY (CONT.)

 2.  The OPO coordinator will facilitate the removal of the body.

H.  Documentation

 1.  The hospital staff member notifying the OPO about impending brain death or actual cardiac death documents the name of the OPO person receiving the notification along with the date, time, and directives for further management given by the OPO.

 2.  The details of the discussion concerning impending brain death or actual cardiac death is documented in the patient's medical record by the physician as appropriate.

 3.  When the condition of brain death is established (with appropriate cardioventilatory support being maintained), the "Determination and Declaration of Brain Death Form" is completed, signed, dated, and timed by two licensed physicians. This form established that the patient is unequivocally brain dead.

 4.  The OPO coordinator completes the "Request for Consent" form and a copy is included in the patient's medical record. This form is provided by the OPO.