IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| AMERICAN NURSES ASSOCIATION, <u>et al.</u>, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civ. Action No. 1:06cv1087 (HHK) |
| | ) | |
| MICHAEL O. LEAVITT, <u>et al.</u>, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**<u>DEFENDANTS' REPLY IN SUPPORT
OF THEIR MOTION TO DISMISS</u>**

OF COUNSEL:

DANIEL MERON
General Counsel

KATHLEEN H. MCGUAN
Associate General Counsel

MARK D. POLSTON
Deputy Associate General
Counsel

TRACEY GLOVER
Attorney
Department of Health
and Human Services

PETER D. KEISLER
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

SHEILA M. LIEBER
PETER ROBBINS
Department of Justice
20 Massachusetts Avenue, NW, Room 7142
Washington, D.C.  20530
Tel: (202) 514-3953

Attorneys for Defendants

## <u>TABLE OF CONTENTS</u>

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

   I.   PLAINTIFFS LACK STANDING TO SUE ON BEHALF OF THEIR MEMBERS. . . . . 2

       A.  Plaintiffs Have Not Shown that the Alleged Understaffing at Accredited
            Hospitals Is Caused by the Use of Sample-Based and Allegation-Driven
            Surveys.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

       B.  Plaintiffs' Alleged Injuries Would Not Be Redressed by the Requested Relief. . . 9

       C.  Plaintiffs Have Not Shown a Legally Cognizable Injury to Their Members. . . . 12

  II.   THIS COURT DOES NOT HAVE SUBJECT-MATTER JURISDICTION
       UNDER THE ADMINISTRATIVE PROCEDURE ACT. . . . . . . . . . . . . . . . . . . . . . . 16

 III.   PLAINTIFFS' CLAIMS LACK SUBSTANTIVE MERIT. . . . . . . . . . . . . . . . . . . . . 18

       A.  The Statutory Language in 42 U.S.C. § 1395e(5) Provides All the Authority
            the Secretary Needed to Promulgate the "Bedside Immediacy" Regulation. . . . . 18

       B.  The Joint Commission's Standards Are Not Facially Incompatible with the
            Secretary's Construction of "Bedside Immediacy".. . . . . . . . . . . . . . . . . . . . . . 23

       C.  The Secretary Has Delegated No Enforcement Authority to the Joint
            Commission. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

## INTRODUCTION

In their motion to dismiss, defendants argued that plaintiffs' complaint "rests on a simple misreading of the statutory and regulatory scheme."  Defendants' Memorandum in Support of Their Motion to Dismiss ("Def. Mem.") at 1.  Plaintiffs' opposition confirms the point.  The substantive issue here is simple:  whether, at hospitals accredited by the Joint Commission on Accreditation of Healthcare Organizations ("Joint Commission" or "JCAHO"), it is permissible for the Secretary of Health and Human Services to enforce the nurse-staffing regulation at 42 C.F.R. § 482.23(b) by means of the sample-based and allegation-driven surveys authorized by 42 U.S.C. §§ 1395aa(c) and 1395bb(d), rather than by means of the periodic surveys authorized by 42 U.S.C. § 1395aa(a), in circumstances where the Secretary has not made a determination whether or not the private accreditation standards are "at least equivalent" to the requirements of the regulation.  42 U.S.C. § 1395bb(a).  The Secretary contends that his current use of sample-based and allegation-driven surveys is a permissible enforcement policy because (a) an equivalency determination is necessary only where a regulation has been promulgated under the general "health and safety" provision in 42 U.S.C. § 1395x(e)(9) and (b) the nurse-staffing regulation at 42 C.F.R. § 482.23(b) was promulgated under the specific nurse-staffing provision in 42 U.S.C. § 1395x(e)(5).

To have standing to challenge the Secretary's view, the plaintiff nursing associations would have to show that either they or their members have suffered personal injury fairly traceable to the use of the complained-of enforcement track and that such injury is likely to be redressed by the requested relief.  In addition, plaintiffs must show that their claims are authorized by the only statutory scheme on which they rely for their cause of action, the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.  To succeed on the merits,

plaintiffs would have to show that the regulation at 42 C.F.R. § 482.23(b) can only reasonably be read as having been promulgated under 42 U.S.C. § 1395x(e)(9), even though the rulemaking preamble of the regulations mentions only subsection (e)(5). Plaintiffs' opposition memorandum establishes none of these points. Their complaint should therefore be dismissed for lack of subject-matter jurisdiction and failure to state a claim.[1]

## ARGUMENT

### I.  PLAINTIFFS LACK STANDING TO SUE ON BEHALF OF THEIR MEMBERS.

At the outset, plaintiffs do not attempt to defend their contention that they have standing to sue in their own right on the basis of any legally cognizable injury to their interests as organizations. Def. Mem. at 19-28. All that remains, therefore, is their contention that they have standing to sue on behalf of their member nurses. To have such organizational standing, plaintiffs must show, at a minimum, that their "members would have standing in their own right," Arizonans for Official English v. Arizona, 520 U.S. 43, 66 (1997), and that the court would otherwise have subject-matter jurisdiction over the members' claims. Shalala v. Illinois Council on Long Term Care. Inc., 529 U.S. 1, 24 (2000). Neither element has been established here.

---

[1] After defendants filed their motion to dismiss, plaintiffs filed an amended complaint. Where a motion to dismiss is pending and the complaint is later amended in a way that does not correct the defects identified in the motion to dismiss, the settled rule is that the defendant "should not be required to file a new motion to dismiss," but rather the court should "consider the motion as being addressed to the amended pleading." 6 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1476 at 558 (2d ed. 1990); see Rasul v. Bush, 215 F. Supp. 2d 55, 58 n.3 (D.D.C. 2002), aff'd, 321 F.3d 1134 (D.C. Cir. 2003), rev'd on other grounds, 542 U.S. 466 (2004); Nix v. Hoke, 62 F. Supp. 2d 110, 115 (D.D.C. 1999). However, to the extent that a motion to dismiss the amended complaint is necessary, defendants ask this Court to treat this reply as such a motion.

### A. Plaintiffs Have Not Shown that the Alleged Understaffing at Accredited Hospitals Is Caused by the Use of Sample-Based and Allegation-Driven Surveys.

As defendants explained in their opening memorandum, standing requires "personal injury" that is both "fairly traceable to the defendant's allegedly unlawful conduct" and "likely to be redressed by the requested relief." DaimlerChrysler Corp. v. Cuno, 126 S. Ct. 1854, 1861 (2006) (quoting Allen v. Wright, 468 U.S. 737, 751 (1984)). To establish the traceability element in this case, plaintiffs must do more than merely allege that something bad is happening to their members and something wrong has been done by the Secretary. They must show a causal "connection" between "the alleged injury" and the complained-of "conduct." Vermont Agency of Natural Res. v. United States ex rel. Stevens, 529 U.S. 765, 771 (2000) (citing Simon v. E. Kentucky Welfare Rights Org., 426 U.S. 26, 41 (1976)). Where, as here, the "existence of one or more of the essential elements of standing 'depends on the unfettered choices made by independent actors not before the courts,'" it becomes "the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury." Lujan v. Defenders of Wildlife, 504 U.S. 555, 562 (1992) (citations omitted). Because hospitals, not nurses, are the "object of the government action or inaction" that plaintiffs challenge, standing is "'substantially more difficult to establish,'" id. (quoting Allen, 468 U.S. at 758), and the existence of standing is "particularly problematic when the only challenged action is the failure of the Executive Branch to impose penalties upon a third party." Talenti v. Clinton, 102 F.3d 573, 577 (D.C. Cir. 1996) (citing Linda R.S. v. Richard D., 410 U.S. 614, 614-19 (1973), and Branton v. FCC, 993 F.3d 906, 910-11 (D.C. Cir. 1993)). Contrary to plaintiffs' view, Pl. Mem. at 5, "[t]hese standing requirements apply with no less

force to suits brought by organizational plaintiffs." Common Cause v. FEC, 108 F.3d 413, 417 (D.C. Cir. 1997).

Plaintiffs simply have not met their standing burden here.  The injuries of which they complain all stem from the allegation that some accredited hospitals at which their members work are not employing what plaintiffs consider to be enough registered nurses and other staff. First Amended Complaint ("Compl.") at ¶¶ 42-50.  The Secretary does not hire nurses, however; hospitals do.  The government conduct of which plaintiffs complain is not that the Secretary is not enforcing nurse-staffing requirements at all; plaintiffs admit that he does enforce the requirements through sample-based and allegation-driven surveys.  Pl. Mem. at 32.  The gravamen of their complaint is that he has misread the authority under which one regulation – the "bedside immediacy" standard in 42 C.F.R. § 482.23(b) – was promulgated and, as a result, he is enforcing the standard only through sample-based and allegation-driven surveys authorized by 42 U.S.C. §§ 1395aa(c), 1395bb(d), rather than using the alternative periodic track authorized by 42 U.S.C. § 1395aa(a).  To establish causation, then, plaintiffs would have to allege that there is some reason to think that sample-based and allegation-driven surveys result in a higher rate of non-compliance with the bedside-immediacy standard than periodic surveys.  It would not, of course, be necessary to show the "superiority" of periodic surveys, Pl. Mem. at 3, to make an argument that periodic surveys are required as a matter of law.   But it would be necessary to allege the superiority of periodic surveys to show that use of a different enforcement track  is causing injury.  By gainsaying that such a causal connection between the complained-of government conduct and allegedly injurious staffing conditions must be shown at all, id. at 3-4, plaintiffs effectively concede that it does not exist.

-4-

To draw the necessary causal connection, plaintiffs would have to articulate some plausible reason to suppose that an accredited hospital would be more likely to risk violation of the bedside-immediacy standard (and thereby jeopardize millions of dollars in Medicare money) if it knew that the regulation was being enforced by means of sample-based and allegation-driven surveys.  See, e.g., Renal Physicians Ass'n v. HHS, 422 F. Supp. 2d 75, 81-86 (D.D.C. 2006) (causation lacking where sought-after change in Secretary's policy would not necessarily change compensation of doctors at dialysis facilities).  In their opening memorandum, defendants showed why such an assumption would be counter-intuitive.  Def. Mem. at 25-26.  There is no reason to assume that the use of sample-based or allegation-driven surveys reduces the number of registered nurses employed by accredited hospitals.  If anything, hospitals that compete for patients on the basis of their public reputations would presumably have more to fear from a compliance survey focused on a particular problem area, 42 C.F.R. § 488.7(a)(2), and conducted only after "substantial allegations of noncompliance" had been made.  42 C.F.R. § 488.7(a).  Plaintiffs' own evidence nicely confirms the point.

> Anyone in healthcare, from chief executive officers to front-line staff, dreads hearing, "We're here to do an unannounced site visit to your facility."  On any day of the week, unexpected surveyors who say these words can cause anxiety, stress and anguish in even the best-run organizations.

Cheryl A. Niespodiziani, HCPro's CMS-JCAHO Crosswalk " ("HCPro's Crosswalk") 5 (2006) (Pl. Ex. 2).

On the contrary, plaintiffs' amended complaint dramatizes just how much accredited hospitals potentially have to fear from allegation-driven surveys.  The new paragraphs added by plaintiffs demonstrate that their members have both an incentive and a willingness to keep meticulous daily records of any circumstances in which they believe (at least by their own lights)

that the hospitals at which they work have allowed staffing of registered nurses to fall, even for short periods of time, to levels that they consider unacceptably low. Compl. at ¶¶ 42-50. The evidence submitted by plaintiffs in support of their opposition memorandum further demonstrates that the nurse associations are not shy about raising such allegations with state authorities. New York State Nurses Association, <u>The Nursing Shortage in New York City Public Hospitals: How Is It Affecting Patients?</u> 3-4 (Oct. 18, 2005) (Pl. Ex. 3). With self-interested watchdogs like that on the premises 24-hours a day, seven days a week, an accredited hospital would be foolish to let its guard down.[2]

Nor have plaintiffs shown that the JCAHO accreditation process misses such a high rate of non-compliance with the bedside-immediacy requirement as to warrant the conclusion that a switch to periodic surveys would make any appreciable difference in the staffing decisions made by accredited hospitals. Once again, the evidence on which plaintiffs themselves rely proves exactly the opposite. The Government Accountability Office report cited by plaintiffs, <u>see</u> Pl. Mem. at 32-33, collected the results of compliance surveys conducted by state surveyors, pursuant to 42 U.S.C. § 1395aa(c) and 42 C.F.R. § 488.7, at 500 JCAHO-accredited hospitals during the fiscal years 2000 through 2002. <u>Medicare: CMS Needs Additional Authority to</u>

---

[2] The only portion of plaintiffs' amended complaint that even attempts to allege causation merely claims that "short staffing" by accredited hospitals is "attributable," in some unspecified way, to a generalized "failure" on the part of defendants "to enforce their own regulations" and that this purported failure stems from their policy of "permitting JCAHO accreditation to qualify hospitals for participation in the Medicare program without the necessary levels of registered nurses and other support staff to ensure the immediate availability of [a registered nurse] to render bedside care when needed." Compl. at ¶ 52. As was discussed in defendants' opening memorandum, however, accredited hospitals are not excused from the obligation to comply with the bedside-immediacy requirement, Def. Mem. at 10-16, and plaintiffs themselves admit that the Secretary does, in fact, enforce the regulation by means of sample-based and allegation-driven surveys. Pl. Mem. at 32.

Adequately Oversee Patient Safety in Hospitals ("GAO Report") 4, 10 (GAO-04-850 July 2004), http://www.gao.gov/new.items/d04850.pdf.  As was discussed in defendants' opening memorandum, sample-based surveys and periodic surveys are conducted by exactly the same state contractors using exactly the same procedures and standards.  They differ only in timing.  Thus, the report would provide a useful indication of how much more non-compliance, if any, would be likely to be uncovered if the Secretary routinely used periodic surveys, rather than sample-based and allegation-driven surveys, to enforce the bedside-immediacy regulation.

Out of the 500 surveys studied, the report found that there were only 10 instances where the state surveyors found what they considered to be a serious deficiency in the category labeled "[n]ursing services" and the JCAHO surveyors did not find the same problem.  Id. at 14.  A 98-percent consistency rate is, standing alone, astonishingly high.  See id. at 41, 46.  The actual consistency rate between state and JCAHO surveys for the bedside-immediacy requirement, however, can fairly be presumed to be considerably higher than that.  There are a total of sixteen sections and subsections in the nurse-staffing regulations at 42 C.F.R. § 482.23, and bedside immediacy is only the second sentence in one of them.  42 C.F.R. § 482.23(b).  The GAO report, in turn, did not attempt to break down the 10 deficiencies in "[n]ursing services" into sub-categories, but there is no reason to think that the staffing of registered nurses generally – let alone staffing for bedside immediacy in particular – accounted for more than a small fraction of them, if any.[3]

---

[3] In relying on the GAO report, plaintiffs neglect to point out that the majority of the differences between state survey findings and JCAHO findings did not have to do with quality of medical care at all, but rather involved requirements related to the "hospital's physical environment, which includes life safety code standards on fire prevention and safety."  GAO Report at 12.  And even in this context, the report emphasized that any disparities between state-survey and JCAHO-survey results "may be related to the difference in how state agencies

Actual state survey experience with accredited hospitals that are identified in plaintiffs' amended complaint as being deficient also appears to have produced results consistent with JCAHO accreditation-survey results.  Since 2002, non-allegation-driven surveys have been conducted at eight of the hospitals about which plaintiffs complain in their amended complaint, and allegation-driven surveys were conducted at four of these eight.  Declaration of Shonte Carter at ¶ 2 (Def. Ex. C) (attached to this reply).  No finding of a deficiency in compliance with 42 C.F.R. § 482.23(b) apparently resulted from any of these surveys.  Id.  Presumably, either the "short-staffing" perceived by plaintiffs at these hospitals was of a sporadic and short-lived duration or plaintiffs have a different concept than the state surveyors do of what constitutes an acceptable level of registered-nurse staffing under 42 C.F.R. § 482.23(b).  Either way, it is hard to see how forcing the Secretary to switch these hospitals from the sample-based and allegation-driven track to the periodic track would have any impact on what plaintiffs perceive to be injuries caused by hospital staffing decisions.  Plaintiffs have therefore failed to show the causation necessary for standing.[4]

_____

generally survey separately a hospital's compliance with the life safety code portion of the physical environment" condition of participation, while "JACHO surveys assess compliance with the life safety code using a combination of the hospital's self-assessment, a hospital building tour, and observations made by all surveyors during the survey process."  Id. at 13.  In addition, all of the GAO findings were made subject to the further caveat that the survey years studied ended before the Joint Commission adopted its current policy of conducting unannounced inspections and before JCAHO adopted the "tracer methodology" that today represents the centerpiece of the survey.  See Def. Mem. at 7-10.  The GAO report acknowledged that these innovations "have the potential to improve the detection of serious deficiencies," but stated that "it is too soon after its January 2004 implementation for a meaningful evaluation."  GAO Report at 16.

    [4] The Secretary's stated intention to "explore regulatory changes to implement the statutory requirement to deny deemed status where [regulatory] requirements are higher than requirements prescribed by JCAHO," CMS Financial Report Fiscal Year 2005 126 (2005), does not "recognize[]" any "lack[]" of enforcement of the bedside-immediacy requirement.  Pl. Mem. at 31.  The passage merely suggests, in the broadest possible terms, the possibility of enhancing

**B. Plaintiffs' Alleged Injuries Would Not Be Redressed by the Requested Relief.**

Even if plaintiffs could establish that the allegedly injurious nurse-staffing decisions of non-party hospitals could fairly be traced to the Secretary's complained-of choice of enforcement track, they fail to show that it is likely, as opposed to merely speculative, that such injuries would be redressed by the relief requested in their complaint. As explained above, the only remedial action that this Court would have authority to take to correct an alleged misplacement of the bedside-immediacy enforcement regulation on the sample-based and allegation-driven track would be an injunctive order requiring the Secretary to place enforcement of the bedside-immediacy regulation on the periodic track until such time, if any, that he determines that JCAHO accreditation standards are at least equivalent to the regulatory standard. Plaintiffs seek no such remedy here and, even if they did, there is no reason to think that a switch to periodic-track enforcement by the Secretary would alter the staffing decisions independently made by hospitals at which plaintiffs' members work. See, e.,g., Nat'l Wrestling Coaches Ass'n v. DOE., 366 F.3d 930, 936-45 (D.C. Cir. 2004) (finding lack of redressability where plaintiffs could not show that colleges would change their sports-funding practices if agency were forced to change its policies). Redressability is therefore lacking.

Furthermore, the remedy that plaintiffs do seek is beyond the power of the Court to grant. Plaintiffs' contention that "[a] favorable decision from the Court would redress Plaintiffs' injuries by requiring HHS to establish a system to ensure that JCAHO standards are at least equivalent to those established by the Secretary," Pl. Mem. at 13-14, incorrectly assumes that the Secretary has any legal authority to establish a system which ensures that JCAHO standards are at least

---

the Secretary's oversight authority consistent with is responsibilities to protect patient health and safety under 42 U.S.C. § 1395x(e)(9).

equivalent to those established by regulation. The Secretary has no power to make the Joint Commission do anything at all. As plaintiffs' own memorandum emphasizes, "JCAHO is a private, non-profit accrediting organization" whose accreditation standards are "controlled" exclusively by its own governing body. Id. at 2; see also Def. Mem. at 7, 18. Indeed, the GAO report on which plaintiffs themselves rely emphasizes that, "[b]ecause of JCAHO's unique legal status," the Secretary "cannot take action to address performance problems with JCAHO's hospital accreditation program," GAO Report at 20, and the report concludes that Congress would have to amend the Medicare Act in order for him to exercise any kind of superintending "authority" over the accreditation process. Id. at 28. Plaintiffs are, quite literally, asking the Court to legislate from the bench.

        The terms in which plaintiffs otherwise describe their requested relief likewise miss the mark. Their request for a judicial order instructing the Secretary to "set aside" an "acknowledgement of hospitals' participation in the Medicare program if their accreditation from JCAHO forms the basis for such participation," Pl. Mem. at 13, incorrectly implies that JCAHO accreditation in some way excuses a hospital from compliance with the conditions of participation that are necessary under the Medicare program. The basis for participation in the Medicare program is the hospital's agreement to comply with the conditions of participation, pursuant to 42 U.S.C. § 1395cc. Accreditation by JCAHO determines whether the Secretary may permissibly enforce a particular condition of participation by means of the periodic surveys authorized by 42 U.S.C. § 1395aa(a), or whether he is limited to enforcing the condition by means of the sample-based and allegation-driven surveys described in 42 U.S.C. § 1395aa(c). Accreditation has not excused any hospital's compliance with any condition of participation since 1972, when Congress deliberately stripped it of that significance. See Def. Mem. at 10-16.

Plaintiffs' request for relief merely reflects a failure to understand that those amendments reduced the importance of "deemed" status to determining little more than the manner in which the Secretary is authorized to allocate enforcement resources.[5]

It also is unclear what plaintiffs mean when they ask for a judicial order "requiring HHS to ensure that hospitals comply with the registered nurse staffing regulation." Pl. Mem. at 13. As defendants have repeatedly explained, the Secretary already endeavors to ensure that hospitals comply with the regulation, using the enforcement mechanisms he has been authorized to employ in 42 U.S.C. § 1395aa(a), 1395aa(c), 1395bb(a), and 1395bb(d). At unaccredited hospitals, all conditions of participation are enforced through periodic surveys conducted by state contractors. 42 C.F.R. §§ 488.11, 488.20. At accredited hospitals, conditions of participation that meet the requirements of 42 U.S.C. § 1395bb(a) are enforced through sample-based and allegation-driven surveys. 42 C.F.R. §§ 488.7, 488.10(c). The rest, if any, are enforced through the periodic surveys. To the extent that plaintiffs are asking this Court to compel the Secretary, through the use of these mechanisms, to achieve what they consider to be an acceptable degree of hospital compliance nationwide, they are seeking a form of judicial supervision over discretionary enforcement authority that is unarguably beyond the subject-matter jurisdiction of the Court. See Def. Mem. at 32-33 (citing, inter alia, Heckler v. Chaney, 470 U.S. 821, 831 (1985)). To the extent that plaintiffs are trying to say that sample-based and allegation-based surveys are not really a genuine enforcement mechanism, their argument is nicely refuted later in their own

---

[5] Plaintiffs' request for a remedial order requiring the Secretary to assure hospitals whose participation in Medicare is based on JCAHO accreditation with "provisional approval for participation in Medicare to ensure continuing access to health care services," Pl. Mem. at 13, suffers the same analytical flaw. Since ongoing hospital participation in Medicare is contingent on compliance with conditions of participation, not on accreditation, such an order would serve no purpose.

memorandum.  See Pl. Mem. at 32 ("Plaintiffs understand that HHS has the authority to find hospitals out of compliance, notwithstanding their accredited status, when deficiencies are identified.").  If plaintiffs think that the use of sample-based and allegation-driven surveys results in a "catch-as-catch-can" enforcement scheme that fails to meet their ideal, id. at 4, their argument should be addressed to Congress.  This Court cannot simply invent a new enforcement scheme for them.

The vague language in which plaintiffs couch their request for relief merely underscores the three fundamental defects in their theory of redressability:  this Court cannot give plaintiffs what they want, plaintiffs do not want the only form of relief the Court could even hypothetically grant, and the only remedy that the Court could hypothetically grant would not redress their perceived injuries.  Standing is therefore lacking.

### C.  Plaintiffs Have Not Shown a Legally Cognizable Injury to Their Members.

Because plaintiffs have failed to establish the elements of traceability and redressability, it is not necessary for this Court to address whether they have alleged any injury to their members over which the Court might otherwise have subject-matter jurisdiction.  But they have failed that test, as well.  The most dramatic allegation of injury in plaintiffs' original complaint was its admittedly compelling description of overworked registered nurses facing the imminent threat of physical injury from potentially violent patients on allegedly understaffed psychiatric units.  Complaint at ¶ 45.  The problem with this argument, however, is that nurse-staffing on psychiatric units is governed by an entirely separate scheme, 42 U.S.C. § 1395x(f), and entirely separate regulations, 42 C.F.R. § 482.62(d).  These provisions do not even have a "bedside-immediacy" component which the Secretary could even theoretically be accused of enforcing improperly, and they are not affected by the accreditation-related provision in 42 U.S.C.

-12-

§ 1395bb(a).  After defendants pointed out these defects, Def. Mem. at 28-30, plaintiffs dropped

the allegation from their amended complaint.  Plaintiffs' Memorandum in Support of Their

Motion to Amend Their Complaint at 4.

Plaintiffs' theory of standing is constricted further by their disavowal of any attempt to

"borrow" injuries allegedly being suffered by Medicare patients who are not members of the

plaintiff associations.  Pl. Mem. at 9.  The remaining references in their opposition memorandum

to the ways in which "the public" is purportedly being "harmed" by the enforcement policies of

the Secretary, id. at 7, can therefore be dismissed as an effort to spruce up the psychological

surroundings of a crumbling argument.  But to the extent that the plaintiff associations still are

attempting to assert that injuries allegedly experienced by non-member Medicare beneficiaries

can provide any basis for their member nurses to have standing in this Court, the argument

should be rejected for the unopposed reasons set forth in defendants' opening memorandum.

Def. Mem. at 20-22.

What is left of plaintiffs' injury theory are two different kinds of alleged harms.  First,

plaintiffs contend that some of their member nurses are suffering injuries qua nurses because

their workloads are too heavy to allow them (a) to provide services at the "high professional

standards" which they demand of themselves, Pl. Mem. at 7 (citation omitted), and (b) to take

"breaks" when they should.  Id. at 8.  As defendants explained in their opening memorandum,

Def. Mem. at 30, plaintiffs' job-satisfaction complaint is merely a variation on the "professional

nexus" theory that the Supreme Court found to be too nebulous establish standing in Defenders

of Wildlife, 504 U.S. at 565.  At the very least, however, it is hardly "likely, as opposed to merely

speculative," id. at 560, that any particular member of the plaintiff associations would enjoy more

happiness or break time on the job if the Secretary were required to enforce the bedside-

-13-

immediacy regulation by means of periodic, rather than sample-based and allegation-driven, compliance surveys.

Even if plaintiffs' alleged injuries qua nurses survived this analysis, however, workload-related grievances of nurses cannot reasonably be said to be within the "zone of interests" protected or regulated by the Medicare program, when the first sentence of the statutory scheme states that

> [n]othing in this subchapter shall be construed to authorize any Federal officer or employee to exercise any supervision or control over the practice of medicine or the manner in which medical services are provided, or over the selection, tenure, or compensation of any officer or employee of any institution, agency, or person providing health services; or to exercise any supervision or control over the administration or operation of any such institution, agency, or person,

42 U.S.C. § 1395, and the legislative history goes on to emphasize that the regulations that now appear at 42 C.F.R. §§ 498.1-498.103 were intended to be "exclusive" means of enforcing the conditions of participation. S. Rep. No. 89-404 at 55 (1965), reprinted in 1965 U.S.C.C.A.N. 1943, 1995. It is hard imagine how Congress could have made it clearer that it "meant to exclude" nurses and other health-care professionals from using the Medicare Act and its regulations as a vehicle for airing workplace grievances against their hospital employers. Pl. Mem. at 10.[6]

_____

[6] The only zone-of-interests decision on which plaintiffs rely for a contrary proposition, Pl. Mem. at 10, is inapposite. The issue in American Chiropractic Association, Inc. v. Leavitt, 431 F.3d 812 (D.C. Cir. 2005), involved the Secretary's interpretation of a Medicare provision that delineated the range of reimbursable services that could be furnished by chiropractors, and a group of chiropractors brought suit seeking to prevent other health professionals from receiving reimbursement for what they considered their exclusive share of the Medicare market. Id. at 814-15. The Court of Appeals for this Circuit merely held that chiropractors had standing to defend what they contended was their rightful market share, id. at 815, for the same reasons that financial institutions were found to have standing to do the same thing in Clarke v. Securities Industry Association, 479 U.S. 388, 399-400 (1987). American Chiropractic would be analogous here only if the complained-of policy were to allow hospitals to receive payment for services

The second kind of injury alleged by plaintiffs – that their members suffer harms <u>qua</u> <u>hospital patients</u> – founders on the fact that plaintiffs raise no more than a "'conjectural'" possibility that such harm is conceivable, and not "'actual'" or "'imminent'" harm that is "concrete and particularized," <u>Defenders of Wildlife</u>, 504 U.S. at 560 (citations omitted), with respect to any specific member-patients in any specific accredited hospitals.  Although plaintiffs identify with some specificity hospitals at which they believe staffing deficiencies have existed on particular days in the past, Compl. at ¶¶ 42-50, they do not allege that any of their members were patients at these hospitals or, if they were, that they were placed on units with staffing deficiencies, let alone with particularized deficiencies that caused the unavailability of a registered nurse for bedside care, when needed.  As defendants explained in their opening memorandum, mere "'some day'" possibilities, without any description of "concrete" threats, or "indeed any specification of <u>when</u> the some day will be," do not suffice to establish "the 'actual or imminent' injury" that standing requires.  <u>Defenders of Wildlife</u>, 504 U.S. at 564 (emphasis in original); <u>see, e.g.</u>, <u>Dallas Gay Alliance, Inc. v. Dallas County Hosp. Dist.</u>, 719 F. Supp. 1380, 1390-91 (N.D. Tex. 1989) (bare allegation of understaffing insufficient to establish personal injury to patients).  In any case, there is only the most remote and speculative possibility that the health care being received by any hypothetical member-patients would be even marginally

---

performed by practical nurses that Medicare law said could only be provided by registered nurses.  Nothing in <u>American Chiropractic</u> suggests that chiropractors would have had standing to allege that they were unhappy with their job performance or that their employers were making them work through break time.

improved by the Secretary's switching from sample-based and allegation-driven surveys to periodic surveys to enforce the bedside-immediacy regulation at accredited hospitals.[7]

## II.  THIS COURT DOES NOT HAVE SUBJECT-MATTER JURISDICTION UNDER THE ADMINISTRATIVE PROCEDURE ACT.

Even if plaintiffs' complaint could survive standing analysis, their claims could not be maintained under the Administrative Procedure Act, 5 U.S.C. §§ 701-706.  First, plaintiffs' own evidence establishes that their newly-discovered grievance about being effectively forced to miss breaks is subject to resolution under a judicially-enforceable collective bargaining agreement, Pl. Mem. at 8 & Pl. Ex. 1, and the availability of this alternative "remedy in court" precludes APA review.  5 U.S.C. § 704; see Nat'l Wrestling Coaches Ass'n, 366 F.3d at 945-48.  Second, to the extent that plaintiffs are merely trying to allege that the Secretary has placed enforcement of the bedside-immediacy regulation on the wrong enforcement track at accredited hospitals because he has allegedly misconstrued the instructions in 42 U.S.C. § 1395bb(a), defendants have never denied that there is law to apply within the meaning of 5 U.S.C. § 701(a)(2).  But to the extent plaintiffs are trying to argue that the Secretary is not doing any enforcement at all, the allegation is contradicted by their own admission that he has the authority to conduct sample-based and allegation-driven surveys, Pl. Mem. at 32, their own evidence recognizing that he is conducting sample-based surveys, GAO Report at 10, and their failure to allege that he has ever refused to conduct an allegation-driven survey where allegations of substantial deficiencies have been brought to the attention of appropriate authorities.  Whether – or how vigorously – to enforce

---

[7] Plaintiffs also make no argument that providing heath care to their members, as opposed to furthering the workplace interests of nurses, is "germane to the organization's purpose," Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 181 (2000), and associational standard is lacking on that ground, as well.  See Pl. Mem. at 14-15.

-16-

conditions of participation by means of a lawful survey process is left to the Secretary's unreviewable discretion. Def. Mem. at 32-33 (citing Chaney, 470 U.S. at 831).[8]

Finally, APA review is precluded under 5 U.S.C. § 701(a)(1) because the comprehensive statutory scheme, which invests the power to enforce hospital conditions of participation exclusively in the Secretary, 42 U.S.C. § 1395cc, forecloses suits by private attorneys general. Def. Mem. at 33-35. In making this argument, defendants obviously have no quarrel with the proposition that beneficiaries have a right to sue under 42 U.S.C. § 1395ff where they have been denied benefits to which they believe they are entitled under Medicare Parts A or B. See Pl. Mem. at 34. But neither beneficiaries nor nurses have been given any similar right to sue to enforce the hospital terms and conditions in 42 U.S.C. § 1395cc. The only entity to which Congress has given that enforcement power is the Secretary, id., and the legislative history states in no uncertain terms that this enforcement scheme was intended to be "exclusive." S. Rep. No. 89-404 at 55, reprinted in 1965 U.S.C.C.A.N. at 1995. From this, it can reasonably be inferred that Congress intended to preclude private actions to enforce conditions of participation, for the obvious reason that it did not want to give private champions of the public interest a chance to muddy the enforcement policies developed by the executive branch of government.[9]

---

[8] Indeed, technically speaking, the statutory scheme does not even mandate enforcement; it merely authorizes enforcement by means of periodic surveys, 42 U.S.C. § 1395aa(a), and sample-based and allegation-driven surveys. 42 U.S.C. § 1395aa(c).

[9] For purposes of this analysis, it is not necessary to address the circumstances when exhaustion of administrative remedies would be necessary for a hospital to challenge an adverse enforcement action. Illinois Council, 529 U.S. at 10-24. Similarly, the issue is not whether 42 U.S.C. § 1395ii expressly precludes federal question jurisdiction under the reasoning in American Chiropractor, 431 F.3d at 816-17, but whether the comprehensive enforcement scheme under 42 U.S.C. § 1395cc implicitly forecloses APA review under the reasoning in Block v. Community Nutrition Institute, 467 U.S. 340, 347-48 (1984). Plaintiffs' reliance on the former line of authority, Pl. Mem. at 34-36, is misplaced.

-17-

### III.  PLAINTIFFS' CLAIMS LACK SUBSTANTIVE MERIT.

Even if plaintiffs' complaint could survive to this point, they have not stated a claim upon which relief can be granted because their substantive legal theory is without merit.  The Secretary has reasonably construed the authority under which he promulgated the bedside-immediacy regulation, and he has not delegated any authority to the Joint Commission.

### A.  The Statutory Language in 42 U.S.C. § 1395e(5) Provides All the Authority the Secretary Needed to Promulgate the "Bedside Immediacy" Regulation.

Plaintiffs' contention that the bedside immediacy regulation "can only have been adopted" under the Secretary's catch-all authority in 42 U.S.C. § 1395x(e)(9) "to impose additional requirements to protect the health and safety of the consumer," Pl. Mem. at 21, incorrectly assumes that the Secretary's authority to interpret the meaning of 42 U.S.C. § 1395x(e)(5) by regulation is limited to repeating the statutory language verbatim.  Under the Medicare Act, the Secretary is authorized to promulgate "such regulations as may be necessary to carry out the administration of the insurance programs under this subchapter," 42 U.S.C. § 1395hh, and the language of 42 U.S.C. § 1395x(e)(5) is not self-executing.  It obviously requires some interstitial interpretation to clarify what it means to say that a hospital is genuinely furnishing "24-hour nursing service" to its patients and what it means to say that the nursing service is genuinely being "rendered or supervised by a registered professional nurse."  Id.  So long as the Secretary's view with respect to when nursing care can legitimately be said to be performed under the bona fide supervision of a registered nurse is "within the bounds of reasonable interpretation," Your Home Visiting Nurse Servs., Inc. v. Shalala, 525 U.S. 449, 453 (1999), the Secretary needed no other statutory authority to promulgate the bedside-immediacy standard in 42 C.F.R. § 482.23(b).

Plaintiffs' apparent view – that only the narrowest possible reading of subsection (e)(5) is "within the zone of reasonable interpretation," Verizon Commc'ns., Inc. v. FCC, 535 U.S. 467, 501 (2002), has no basis in law or logic.  Under the Secretary's construction of the statute, it is not necessary for a registered nurse to always be available at the bedside of every patient in order for it to be said that a registered nurse is providing meaningful supervision over the services being furnished by the rest of the nursing staff.  But it is necessary for the hospital to do something more than merely employ a registered nurse and give him or her a supervisory title. The hospital must at least take the minimal step of employing sufficient "supervisory and staff personnel" to "ensure, when needed, the immediate availability of a registered nurse for bedside care of any patient."  42 C.F.R. § 482.23(b) (emphasis added).  A hospital that does not meet that requirement is out of compliance with the conditions of participation because it is not doing what it takes to provide "24-hour nursing service rendered or supervised by a registered professional nurse," 42 U.S.C. § 1395x(e)(5), not because it is out of compliance with an additional requirement imposed under 42 U.S.C. § 1395x(e)(9).  The regulation does not go "over and above" what the statute requires.  Pl. Mem. at 21.  It defines with greater precision what the statute requires.

Because the four corners of subsection (e)(5) are entirely sufficient, standing alone, to authorize the regulation, it was not necessary for the Secretary to reach to the general health-and-safety provision in 42 U.S.C. § 1395x(e)(9) to locate his statutory authority.  It follows, in turn, that it is perfectly permissible for him to monitor compliance at accredited hospitals by means of sample-based and allegation-driven surveys, 42 U.S.C. §§ 1395aa(c), 1395bb(d), and to do so without first making any determination as to whether accreditation standards are equivalent to

regulatory standards. 42 U.S.C. § 1395bb(a). Indeed, that is the <u>only</u> way that Congress permits

him to enforce a regulation promulgated under subsection (e)(5) at accredited hospitals.

Plaintiffs' contention that the Secretary <u>himself</u> really thinks that the bedside-immediacy

regulation was promulgated under 42 U.S.C. § 1395x(e)(9), rather than 42 U.S.C. § 1395x(e)(5),

Pl. Mem. at 20, strains credulity. The portion of the preamble to the current regulations that

explains the Secretary's statutory authority for the nursing staffing regulations states, in its

entirety, as follows: "Section 1861(e)(5) of the Social Security Act requires that a hospital

provide 24-hour nursing services." 51 Fed. Reg. 22,010, 22,018 (June 17, 1986). (Section

1861(e)(5) is codified at 42 U.S.C. § 1395x(e)(5)). The preamble goes on to explain that the

regulations which "implement <u>this</u> statutory requirement," <u>id</u>. (emphasis added), consist of two

parts: a "condition statement with the statutory language that requires 24-hour nursing care be

furnished or supervised by a registered nurse" and "requirements on organization, staffing,

administration of drugs, and delivery of care." <u>Id</u>. The general condition statement appears in

the first paragraph. 42 C.F.R. § 482.23. The more specific requirements follow immediately

thereafter. 42 C.F.R. §§ 482.23(a)-(c). The latter requirements do not go <u>beyond</u> the statutory

language. They merely elaborate in greater detail on what the statutory language <u>means</u>. That is

the function of interstitial rulemaking. <u>See, e.g.</u>, <u>Smiley v. Citibank (South Dakota), N.A.</u>, 517

U.S. 735, 740-41 (1996) ("Congress, when it left ambiguity in a statute meant for implementation

by an agency, understood that the ambiguity would be resolved, first and foremost, by the

agency"). If the Secretary thought it was necessary to reach beyond his authority under

subsection (e)(5) and invoke the authority under subsection (e)(9), the preamble would have said

so expressly. And surely it would have said so expressly if, as plaintiffs contend, <u>every</u>

-20-

paragraph of the regulations other than the first two sentences was promulgated under subsection (e)(9) and not subsection (e)(5).

Plaintiffs' suggestion that this Court look to the original bedside-immediacy regulation promulgated in 1966 to find the Secretary's "longstanding" interpretation of his statutory authority, Pl. Mem. at 21, reminds one of the Chinese proverb about being careful what one wishes for. The proposed rule cited § 1861(e) as its authority for the entire regulation without reference to subsections, 31 Fed. Reg. 2,748, 2,748 (Feb. 15, 1966), but the language of the regulation itself supports the conclusion that the original bedside-immediacy regulation was merely intended to explain what 42 U.S.C. § 1395x(e)(5) means. Using language similar to that in the current regulations, the original rules provided that a "licensed registered professional nurse" must be "on duty at all times," 42 C.F.R. § 405.1024 (1967), and must be "available for all patients on a 24-hour basis." 42 C.F.R. § 405.1024(b) (1967). Those requirements obviously interpret the meaning of 42 U.S.C. § 1395x(e)(5), and could be promulgated without reference to 42 U.S.C. § 1395x(e)(9). The regulation then went on to list "[t]he factors explaining the standard," id. (emphasis in original), including specific requirements that "[t]he staffing pattern insures the availability of registered professional nursing care for all patients on a 24-hour basis every day," 42 C.F.R. § 405.1024(b)(1) (1967), and that care provided by a licensed practical nurse must be supplemented by the presence of "a registered professional nurse supervisor who makes frequent rounds and is immediately available to give skilled nursing care when needed." 42 C.F.R. § 1024(b)(2) (1967). Those provisions are the predecessors to the regulation that exists today in 42 C.F.R. § 482.23(b). The current regulation therefore explains the statutory standard in subsection (e)(5) in exactly the same way that the predecessor regulations have explained the statutory standard since the beginning of the Medicare program, and the "history of

-21-

the regulation," Pl. Mem. at 17, refutes plaintiffs' view that the bedside-immediacy regulation was ever promulgated under subsection (e)(9) or its predecessor statute.

Defendants, of course, have no quarrel with the proposition that there are many regulations in 42 C.F.R. Part 482 that were promulgated only under the authority of subsection (e)(9), <u>see</u> Pl. Mem. at 21, but that does not support plaintiffs' assumption that the bedside-immediacy regulation is necessarily one of them.  In Subpart D, for instance, there are subsection (e)(9) rules,[10] but the regulatory history expressly states that they were promulgated under 42 U.S.C. § 1395x(e)(9).  48 Fed. Reg. 299, 303 (Jan. 4, 1983).  Similarly, in Subparts B and C, there are many regulations that are authorized only by subsection (e)(9),[11] but the regulatory history for such regulations is, once again, replete with express references to subsection (e)(9).[12]

_____

[10] 42 C.F.R. § 482.51 (surgical services); 42 C.F.R. § 482.52 (anesthesia services); 42 C.F.R. § 482.53 (nuclear medicine services); 42 C.F.R. § 482.54 ((outpatient services); 42 C.F.R. 482.55 (emergency services); 42 C.F.R. § 482.56 (rehabilitation services); 42 C.F.R. § 482.57 (respiratory care services).

[11] These include, for example, patients' rights, 42 C.F.R. § 482.13; radiologic services, 42 C.F.R. § 482.26; laboratory services, 42 C.F.R. § 482.27; fire safety and other aspects of the hospital's physical environment; 42 C.F.R. § 482.41; infection control, 42 C.F.R. § 482.42; and organ procurement.  42 C.F.R. § 482.45.

[12] 70 Fed. Reg. 6,140, 6,158-59 (Feb. 4, 2005) (organ procurement); 68 Fed. Reg. 1374, 1374 (Jan. 10, 2003) (fire safety); 66 Fed. Reg. 54,179, 54,179-80 (Oct. 26, 2001) (fire safety); 62 Fed. Reg. 66,726, 66,729-31 (Dec. 19, 1997) (patient rights); id. at 66,748 (organ procurement); 55 Fed. Reg. 31,196, 31,198 (Aug. 1, 1990) (fire safety); 52 Fed. Reg. 2430, 2430 (Jan. 22, 1987) (fire safety); 51 Fed. Reg. 22,010, 22,012-13 (June 17, 1986) (laboratory services and radiologic services); id. at 22,026 (physical environment); 48 Fed. Reg. 299, 303 (Jan. 4, 1983) (physical environment, infection control); see also 71 Fed. Reg. 60,532, 60,532 (Oct. 13, 2006) (patient information collection); 59 Fed. Reg. 64,141, 64,144 (Dec. 13, 1994) (extension of discharge planning requirements to non-Medicare patients); 59 Fed. Reg. 32,086, 32,106 (June 22, 1994) (requirements for reporting "anti-dumping" violations).  One regulation, published at 42 C.F.R. § 482.22, even contains paragraphs promulgated under different subsections of 42 U.S.C. 1395x(e).  The medical-staff bylaws requirement in 42 C.F.R. § 482.22(c) implements the requirement in subsection (e)(3) of the statute, while the qualifications for the medical staff and medical director, 42 C.F.R. § 482.22(a), are promulgated under subsection (e)(9).  Once again,

The fact that the preamble to the nurse-staffing regulations in 42 C.F.R. § 482.23 expressly relies on subsection (e)(5) for authority and makes no mention of subsection (e)(9) unarguably supports the conclusion that the Secretary intended for the nurse-staffing regulation to implement the language in subsection (e)(5) and did not require any reliance on (e)(9). At the very least, however, it pulverizes any argument that the Secretary has any longstanding view that the regulation could only permissibly have been issued under subsection (e)(9).

> **B. The Joint Commission's Standards Are Not Facially Incompatible with the Secretary's Construction of "Bedside Immediacy."**

Because the bedside-immediacy regulation at issue here may reasonably be viewed as having been promulgated under 42 U.S.C. § 1395x(e)(5) and not § 1395x(e)(9), it was not necessary for the Secretary to make any determination under 42 U.S.C. §1395bb(a) as to whether JCAHO standards are equivalent in order to place accredited hospitals on the sample-based and allegation-driven survey track. If this Court were to disagree, however, the only remedy would be to remand to the Secretary with instructions to stop using the sample-based and allegation-driven track until such time that he found JCAHO standards to be equivalent. It is not proper for plaintiffs to ask this Court to make that legal determination before the Secretary himself has spoken.

Even if this Court were to address the question on plaintiffs' terms, however, there is no merit in their contention that the relevant portion of the JCAHO accreditation manual does not mention any need for the presence of registered nurses. At the time plaintiffs filed their original complaint, the manual expressly stated that a hospital must have a "qualified staff" that "provides

---

however, the Secretary's reliance on subsection (e)(9) as authority for the latter regulations is expressly stated in the regulatory history. 59 Fed. Reg. at 64,151.

-23-

patient care and nursing services on a continuous basis 24 hours a day, 7 days a week,"
Comprehensive Accreditation Manual for Hospitals:  The Official Handbook NR-1 (JCAHO
2006) (Def. Ex. B) (attached to defendants' motion to dismiss), and it stated that "nursing staff"
"must include Registered Nurses."  Id. at GL-14 (emphasis added).  That these requirements
appeared in the portion of the nursing standards entitled "Overview" (as clarified in the glossary),
rather than a section entitled "Nursing Standards" or "Elements of Performance"  is
inconsequential.  In any event, however, the Joint Commission has since re-edited its manual to
insert an "Element of Performance" that states as follows:  "The nurse executive assures the
provision of nursing services 24 hours a day, 7 days a week with at least one on-premise
registered nurse (RN) furnishing or supervising the service 24 hours a day, 7 days a week."
Revision:  Nursing Chapter for Critical Access Hospitals and Hospitals, 26 Joint Commission
Perspectives 11 (Nov. 2006) (emphasis in original) (Def. Ex. D) (attached to this reply).  So long
as the Joint Commission interprets the word "supervising" as connoting the availability of a
registered nurse to supervise (or take over) bedside care, when needed, it would be "at least
equivalent," 42 U.S.C. § 1395bb(a), to the regulatory requirement at 42 C.F.R. § 482.23(b).[13]

_____

[13] In determining the meaning of the JCAHO manual, the pamphlet which plaintiffs
themselves recognize as authoritative cautions against reading the portion labeled "Nursing
Standards" in isolation from the rest of the manual because, at least prior to the November 2006
editorial change, the manual did not "have standards in the Nursing (NR) Chapter that addresses
those areas and instead includes them in the Management of Human Resources (HR) chapter."
HCPro's Crosswalk at 43.  As defendants discussed at length in their opening memorandum, the
JCAHO manual, when read as a whole, employs a combination of "tracer" investigation, staff
and patient interviews, evaluation of patient records, and analysis of nursing-sensitive outcome
indicators that is very similar to the approach used by state surveys when enforcing nurse-staffing
regulations on behalf of the Secretary.  Def. Mem. at 3-10.  The only basic difference is that
the state-survey manual includes an instruction to make sure that the same registered nurse is not
assigned to more than one floor or unit at the same time, id. at 6, and the JCAHO manual leaves
that kind of judgment up to the common sense of the surveyor.  It would be up to the Secretary,
in the first instance, to determine whether accreditation standards were "equivalent" to the

**C.  The Secretary Has Delegated No Enforcement Authority to the Joint Commission.**

Finally, there is no merit in plaintiffs' improper-delegation theory.  Pl. Mem. at 29-32.

The short answer to their argument is that the Secretary has not delegated any of his authority to

the Joint Commission, either to establish regulatory standards or to enforce them.  He has merely

placed accredited hospitals on the survey-based and allegation-driven enforcement track in

circumstances where he believes accredited status requires that result under 42 U.S.C.

§§ 1395aa(c), 1395bb(a) and 1395bb(d).  That is what the statutes instruct.  Any role that

JCAHO could be said to play is derived from those statutes exclusively, and not from any

delegation (or subdelegation) of administrative authority by the Secretary.  Since plaintiffs do not

contend that those statutes are unconstitutional, there is simply nothing left to discuss of their

non-delegation theory.  The Joint Commission itself has received no authority from the Secretary

to either issue regulations or to enforce them.[14]

---

regulations within the meaning of 42 U.S.C. § 1395bb(a), if this Court deemed that such a determination were necessary.  But, at the very least, a reasonable person could view any differences between the two survey regimes to be minor.  There would be no basis, therefore, on which this Court could second-guess agency judgment on the question.

[14] Plaintiffs' reliance on Hishon v. King & Spaulding, 467 U.S. 69, 73 (1984), and Conley v. Gibson, 355 U.S. 41, 45-46 (1957), in an effort to save their complaint from dismissal, Pl. Mem. at 37, is futile.  The substantive issue in this case – whether the Secretary has correctly interpreted the statutory authority under which he promulgated the bedside-immediacy regulation – is quintessentially a question of law that can be decided without regard to evidence under Fed. R. Civ. P. 12(b)(6).  With respect to jurisdictional issues, a court may always "look beyond the pleadings" to decide a motion to dismiss under Fed. R. Civ. P. 12(b)(1).  Sierra Club v. Browner, 130 F. Supp. 2d 78, 82 n.6 (D.D.C. 2001 (citing Land v. Dollar, 330 U.S. 731, 735 n.4 (1947), aff'd, 285 F.3d 63 (D.C. Cir. 2002)).  In any event, however, the JCAHO manual is incorporated by reference in plaintiffs' complaint, Compl. at ¶¶ 31-36, and its contents may be considered on a motion to dismiss for failure to state a claim.  EEOC v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624 (D.D. Cir. 1997).  The state-survey manual also may be considered because it is a public record.  Covad Commc'ns. Co. v. Bell Atlantic Corp., 407 F.3d 1220, 1222 (D.C. Cir. 2005).  Plaintiffs' objection to the use of evidence, Pl. Mem. at 37-38, therefore lacks merit.

## CONCLUSION

For the reasons stated, defendants' motion to dismiss should be granted.

Respectfully submitted,

OF COUNSEL:
DANIEL MERON
General Counsel

PETER D. KEISLER
Assistant Attorney General

KATHLEEN H. MCGUAN
Associate General Counsel

JEFFREY A. TAYLOR
United States Attorney

MARK D. POLSTON
Deputy Associate General
Counsel

/s/ Peter Robbins
SHEILA M. LIEBER
PETER ROBBINS

TRACEY GLOVER
Attorney
Department of Health
and Human Services

Department of Justice
20 Massachusetts Avenue, NW, Room 7142
Washington, D.C.  20530
Tel: (202) 514-3953
Attorneys for Defendants

-26-