IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN NURSES ASSOCIATION, <u>et al.</u>, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )  Civ. Action No. 1:06cv1087 (HHK) |
| | ) |
| MICHAEL O. LEAVITT, <u>et al.</u>, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS' SECOND AMENDED COMPLAINT**

Pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6), defendants in the above-captioned action respectfully move this Court for an order dismissing plaintiffs' Second Amended Complaint on the grounds that it is not within the Court's subject-matter jurisdiction and that it fails to state a claim. For the reasons in support of this motion, defendants respectfully refer the Court to the attached memorandum of points and authorities.   A proposed order is also attached.

Respectfully submitted,

OF COUNSEL:
DANIEL MERON
General Counsel

CAROL J. BENNETT
Acting Associate General Counsel

MARK D. POLSTON
Deputy Associate General
Counsel for Litigation

LAWRENCE J. HARDER
Supervisory Trial Attorney
Department of Health
and Human Services

PETER D. KEISLER
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

/s/ Peter Robbins
————————————————
SHEILA M. LIEBER
PETER ROBBINS
Department of Justice
20 Massachusetts Avenue, N.W., Room 7142
Washington, D.C.  20530
Tel: (202) 514-3953
Attorneys for Defendants

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| AMERICAN NURSES ASSOCIATION, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civ. Action No. 1:06cv1087 (HHK) |
| | ) | |
| MICHAEL O. LEAVITT, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION
TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT**

OF COUNSEL:

DANIEL MERON
General Counsel

CAROL J. BENNETT
Acting Associate General Counsel

MARK D. POLSTON
Deputy Associate
General Counsel for Litigation

LAWRENCE J. HARDER
Supervisory Trial Attorney
Department of Health
and Human Services

PETER D. KEISLER
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

SHEILA M. LIEBER
PETER ROBBINS
Department of Justice
20 Massachusetts Avenue, N.W., Room 7142
Washington, D.C.  20530
Tel: (202) 514-3953

Attorneys for Defendants

**<u>TABLE OF CONTENTS</u>**

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

GENERAL BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

   A.  Conditions of Participation and Nurse-Staffing Requirements. . . . . . . . . . . . . . . . . . . . .  3

   B.  The State Survey. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

   C.  The Accreditation Survey. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

STATUTORY BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

   I.  PLAINTIFF NURSE ASSOCIATIONS LACK STANDING IN THEIR OWN
      RIGHT TO CHALLENGE COMPLIANCE POLICIES FOR ACCREDITED
      HOSPITALS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

        A.  The Plaintiff Associations Cannot Borrow Harms Allegedly Suffered
           by Medicare Beneficiaries to Establish an Injury to Themselves. . . . . . . . . . . . .  19

        B.  Plaintiffs Have Not Shown Any Causal Connection Between the Alleged
           Understaffing of Nurses and the Secretary's Choice of Survey Tracks. . . . . . . . .  21

        C.  Plaintiffs' Alleged Injuries Would Not Be Redressed by the Requested Relief.. . . .  27

        D.  Plaintiffs' Social Concern for the Welfare of Medicare Beneficiaries Does Not
           Establish an Injury to Themselves. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  28

        E.  The Organizational Interests of Nurse Associations Are Not Within the
           Zone of Interests of the Medicare Conditions of Participation. . . . . . . . . . . . . .  29

   II.  PLAINTIFFS LACK ASSOCIATIONAL STANDING TO ASSERT THE
      PUTATIVE RIGHTS OF THEIR MEMBER NURSES. . . . . . . . . . . . . . . . . . . . . . . .  30

  III.  REVIEW OF PLAINTIFFS' CLAIMS IS NOT AVAILABLE UNDER THE APA . . . . .  32

        A.  The Aggressiveness With Which the Secretary Enforces Nurse-Staffing
           Requirements is Committed to Agency Discretion by Law. . . . . . . . . . . . . . . . .  32

B.   The Comprehensive Enforcement Scheme Precludes a Private Cause
     of Action under the APA. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  34

IV.  PLAINTIFFS' CHALLENGES TO THE SECRETARY'S USE OF ACCREDITED
     STATUS TO SELECT SURVEY TRACKS FOR HOSPITALS LACK MERIT. . . . . . .  36

     A.   Because the Bedside-Availability Regulation Was Promulgated Under
          42 U.S.C. § 1395x(e)(5), It Does Not Matter Whether Accreditation
          Standards Are Equivalent. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  36

     B.   The Accreditation Standards of the Joint Commission Could Reasonably Be
          Construed to Be Equivalent to the Regulations. . . . . . . . . . . . . . . . . . . . . . . . .  40

     C.   The Secretary Has Not Unlawfully Delegated His Enforcement Authority
          to the Joint Commission. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  41

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  45

**INTRODUCTION**

For more than fifty years, the Secretary of Health and Human Services has successfully used a two-track system to enforce quality standards at hospitals that participate in the Medicare program.  Under the first track, hospitals that are accredited by a nationally-recognized private authority must be deemed initially to satisfy most requirements, including those related to the staffing of nurses.  See 42 U.S.C. § 1395bb(a) (cross-referencing 42 U.S.C. § 1395x(e)).  But compliance at accredited hospitals is subject to subsequent verification through enforcement surveys conducted on the basis of representative sampling and on the basis of substantial allegations of deficiencies at individual hospitals.  42 U.S.C. §§ 1395aa(c), 1395bb(d); 42 C.F.R. §§ 488.7, 488.10(c).  Under the second track, unaccredited hospitals enjoy no initial presumption of compliance and are surveyed on a periodic basis.  42 U.S.C. § 1395aa(a); 42 C.F.R. § 488.20.  Under both tracks, the enforcement surveys are conducted by the same state agencies, using the same methods and the same standards.  The only difference is in the timing of the surveys.

Plaintiffs in this action include three nursing organizations that apparently are dissatisfied with the level of registered-nurse staffing at some accredited hospitals.  Through a strained reading of the statutory scheme, they contend that accredited hospitals should not be placed on the first enforcement track with respect to one nurse-staffing regulation, which requires hospitals to have a supervisory registered nurse available for the bedside care of patients, when needed.  See 42 C.F.R. § 482.23(b).  Plaintiffs do not allege, however, that placement of accredited hospitals on the second enforcement track (applicable to unaccredited hospitals) would do anything to improve the complained-of staffing situation, and all evidence that they have previously submitted to this Court leads to the opposite conclusion.  Plaintiffs therefore lack standing to sue, either in their own right or as representatives of their member nurses.  Subject-matter jurisdiction to review the Secretary's

Medicare enforcement decisions is lacking for other reasons as well. In any event, plaintiffs' substantive theory of the case lacks merit, not only because it is based on a misreading of the applicable statutes and regulations, but also because it is predicated on an outdated version of the standards that are used to accredit hospitals. Their second amended complaint should therefore be dismissed for lack of subject-matter jurisdiction and failure to state a claim.[1]

## GENERAL BACKGROUND

Title XVIII of the Social Security Act, commonly known as the Medicare Act, 42 U.S.C. §§ 1395, et seq., establishes a federal program of health insurance for the elderly and disabled. A hospital that wishes to participate in Medicare must enter into an agreement with the Secretary, 42 U.S.C. § 1395cc, in which, it must, among other things, promise to comply with certain "conditions of participation." 42 U.S.C. § 1395cc(b)(2)(B). A hospital found to be out of compliance with any condition of participation is entitled to challenge the finding through a detailed administrative process, see 42 C.F.R. §§ 498.1-498.103, followed by review in district court. 42 U.S.C. § 1395cc(h)(1). Plaintiffs here essentially assume that all accredited hospitals are out of compliance with one particular condition (related to the staffing of registered nurses) and apparently ask this Court to create some new procedure to ensure their future compliance. To evaluate their position, defendants will begin by examining the requirements that hospitals must meet to participate in Medicare, the manner in which those standards are enforced by state

_____

[1] This is the second time this case has been briefed on a motion to dismiss. While the first motion to dismiss was pending, plaintiffs filed an amended complaint. (Doc. 14). Plaintiffs then requested a stay of proceedings while they pursued out-of-court discussions with the private authority that accredits hospitals. (Doc. 18). After plaintiffs indicated they no longer wished to continue the stay (Doc. 19), this Court then denied the motion to dismiss as "moot" because of the intervening filing of the amended complaint. (Doc. 20). Plaintiffs then filed a second amended complaint on October 25, 2007 (Doc. 23). Defendants move here to dismiss the second amended complaint and incorporate herein the arguments made in previous memoranda.

surveyors on behalf of the Secretary, and the manner in which similar monitoring is conducted for purposes of private accreditation. The statutes and regulations directly at issue in this action will then be examined in more detail.

### A. Conditions of Participation and Nurse-Staffing Requirements

The conditions that hospitals must meet to participate in Medicare are set forth in 42 U.S.C. § 1395x(e). For purposes of this case, the statute can be divided into two parts. The first eight paragraphs describe specific characteristics that a hospital must possess. 42 U.S.C. §§ 1395x(e)(1)-(8). The ninth paragraph is a catch-all provision that mandates compliance with "such other requirements as the Secretary finds necessary in the interest of the health and safety of individuals who are furnished services in the institution." 42 U.S.C. § 1395x(e)(9).

The portion of the statute relevant to this case is paragraph (5), which requires the hospital to provide "24-hour nursing service rendered or supervised by a registered professional nurse" and to have "a licensed practical nurse or registered professional nurse on duty at all times." 42 U.S.C. § 1395x(e)(5). Regulations interpreting this paragraph provide that the hospital "must have an organized nursing service that provides 24-hour nursing services" and those "nursing services must be furnished or supervised by a registered nurse." 42 C.F.R. § 482.23. To meet this standard, four features are necessary. First, the nursing service must be "well-organized" and governed by "a plan of administrative authority and delineation of responsibilities for patient care." 42 C.F.R. § 482.23(a). Second, the nursing service must be directed by "a licensed registered nurse," who is "responsible for the operation of the service, including determining the types and numbers of nursing personnel and staff necessary to provide nursing care for all areas of the hospital." Id. Third, nurses must administer drugs and biologicals in accordance with certain laws and standards. 42 C.F.R. § 482.23(c). Finally, the hospital must "have adequate numbers of licensed registered

nurses, licensed practical (vocational) nurses, and other personnel to provide nursing care to all

patients as needed," and "[t]here must be supervisory and staff personnel for each department or

nursing unit to ensure, when needed, the immediate availability of a registered nurse for bedside

care of any patient."  42 C.F.R. § 482.23(b).

### B.  The State Survey

Medicare conditions of participation are enforced through surveys conducted by state

agencies under contract with the Secretary.  In carrying out this function, surveyors are instructed to

conduct a "patient-focused" survey, State Operations Manual, App. A, Survey Protocol,

Regulations and Interpretative Guidelines for Hospitals, Introduction at 12 (HHS Rev. 1, May 21,

2004) ("State Operations Manual") (Def. Ex. A), that employs a combination of "observations,

interviews, and document/record reviews."  Id. at 4.  The survey is designed to "[f]ocus attention on

actual and potential patient outcomes," rather than merely verifying that a hospital formally

possesses institutional structures that correspond to the "required processes" set forth in the relevant

statutes and regulations.  Id. at 13.  The centerpiece of the survey is to select a sample of patients

whose care is "reflective of the scope of services provided by the hospital," id. at 12, and to then

undertake a "comprehensive review of care and services received by each patient in the sample."

Id. at 15.  During the course of this sample review, there are numerous ways in which deficiencies

in nurse staffing could come to light.

One part of the process requires the surveyors to physically "[v]isit patient care settings"

and "[o]bserve the actual provision of care and services to patients and the effects of that care," id.

at 13, "by stationing themselves as physically close to patient care as possible."  Id. at 15.  With

patient permission, the surveyors are instructed to "observe the care provided in a variety of

treatment settings," including "intravenous therapy, tube feedings, [and] wound dressing changes."

Id. This "[o]bservation of the care environment provides valuable information about how the care delivery system works and how hospital departments work together to provide care," id., including "staff interactions with patients, safety hazards, and infection control practices." Id. at 15-16. While conducting these observations, the surveyors also are instructed to "[m]aintain open and ongoing dialogue with the facility staff," id. at 15, and "afford[] facility staff the opportunity to present additional information or to offer explanations concerning identified issues." Id. Thus, if surveyors observed slowness in response to the needs of patients for immediate bedside care, they could investigate further to determine whether understaffing was a problem and could compare the answers given to that question by the registered nurse in charge, the other nurses on the floor, the hospital administration, and the patients themselves.

A second part of the process is to conduct interviews with patients and hospital staff, both "to collect information" in the first instance and "to verify and validate information obtained through observations." Id. at 16. Surveyors are instructed that "[p]atient interviews should include questions specific to the patient's condition, reason for hospital admission, quality of care received, and the patient[']s knowledge of their plan of care." Id. at 17. Similarly, staff interviews should gather "information about the staff's knowledge of the patient's needs, plan of care, and progress toward goals." Id. Surveyors are instructed to ask "open-ended questions" to patients about "the quality of the services received," id., and "to validate the patient's perception" against the perceptions of the staff. Id. The interview process is intended to be a flexible one that is used "throughout the duration of the survey" as the need for discussion arises. Id. at 16. Through these interviews, a nurse-staffing deficiency missed through physical observations might be identified separately.

The third part of the survey process focuses on documents.  At this stage, a "[p]atient's clinical records" are reviewed to "validate information gained during the interviews" and to "provide a broad picture of the patient's care."  Id. at 18.  Medical records may be used to "determine past practice," to evaluate "the scope or frequency of a deficient practice," and to "provide information about services that are not being provided."  Id.  The review also includes an examination of  "[s]taffing documents to determine if adequate numbers of staff are provided according to the number and acuity of patients," and of "[p]ersonnel files to determine if staff members have the appropriate educational requirements, have had the necessary training required, and are licensed, if it is required."  Id.  Once the "document review is completed," the surveyors are to "integrate the data obtained with data gathered through observations and interviews to decide if the hospital is in compliance."  Id.  During the document review, deficiencies in nurse-staffing previously missed by physical observations and interviews also might come to light.

In evaluating the hospital for compliance with nurse-staffing requirements specifically, surveyors are instructed to pay particular attention to two kinds of documents.  The first is the formal "nurse staffing schedule" used by the hospital.  State Operations Manual, Regulations and Interpretive Guidelines for § 482.23(b)(1) at A-0202.  The surveyors are instructed to examine this schedule "for a one-week period" to verify that "there is at least one [registered nurse] for each unit on each tour of duty, 7 days a week, 24 hours a day," id., and to determine that the written staffing schedules demonstrate that "there is supervision of personnel performance and nursing care for each department or nursing unit."  Id. for § 482.23(b) at A-0201.  A licensed practical nurse can be assigned to provide services to patients, so long as a registered professional nurse, "who is immediately available for the bedside care of those patients, supervises that care."  Id. for § 482.23(b)(1) at A-0202.  A registered nurse is not considered to be "immediately available" if he

or she is "working on more than one unit, building, [or] floor in a building" or is assigned to more than one health-care provider or more than one "distinct part" within the hospital (such as a psychiatric unit or skilled nursing facility).  Id. for § 482.23(b) at A-0201.  Aside from that formal requirement, the adequacy of the staffing schedule is otherwise evaluated in a flexible manner that takes into consideration the "[p]hysical layout and size of the hospital," the "[n]umber of patients," the "[i]ntensity of illness and nursing needs," the "[t]raining and experience of personnel," and the "[a]vailablity of nurses' aides and orderlies and other resources for nurses."  Id.

The examination of the nurse-staffing schedule is only the beginning of the document inquiry.  The second – and arguably more important – aspect of the process requires the surveyors to "[r]eview medical records to determine if patient care that is to be provided by nurses is being provided as ordered."  Id.  In this regard, the surveyors do not rely on any particular ratio of registered nurses to patients to determine whether appropriate care is being provided.  Rather, the survey focuses on "actual and potential patient outcomes," State Operations Manual, Introduction at 13, as indicators of whether the hospital is sufficiently staffed.  If the medical records indicate that patient outcomes which one would expect to be good if a hospital had adequate staffing of nurses are, in fact, not good, this circumstance is taken as a strong indication that nursing may be understaffed.  The mere fact that the formal staff schedule appears to have a full complement of appropriately credentialed nurses is not, standing alone, taken to be conclusive evidence of compliance with the nurse-staffing regulations.

**C.  The Accreditation Survey**

Most of the hospitals that participate in Medicare are accredited by a private body originally called the Joint Commission on Accreditation of Hospitals ("JCAH") and later renamed the Joint Commission on Accreditation of Healthcare Organizations ("JCAHO").  The accrediting body is

now known simply as the Joint Commission.  The Joint Commission is a non-profit corporation that sets "state-of-the-art standards" for the health-care industry, Joint Commission Facts at 1,[2] and conducts "accreditation programs in conjunction with those standards."  Wilk v. AMA, 895 F.2d 352, 372 (7th Cir. 1990).  Since its founding in 1951, the Joint Commission has been engaged in a continuous process of developing and refining its accrediting practices "in consultation with health care experts, providers, measurement experts, purchasers and consumers."  Joint Commission Facts at 1.  Accreditation by the Joint Commission is "recognized nationwide as a symbol of quality that reflects an organization's commitment to meeting certain performance standards."  Id.

To receive accreditation, hospitals must pass an initial survey.  Id. at ACC-7, ACC-13-ACC-14.  Accredited hospitals are then subject to "random" and "unannounced" surveys conducted by the Joint Commission "every 9 to 30 months."  Id. at ACC-40.  They also may be inspected on a"for-cause unannounced" basis whenever the Joint Commission "becomes aware of potentially serious standards compliance or patient care safety issues."  Id. at ACC-39a.  The methodology by which the various surveys are conducted combines observation, interviews, review of staffing plans, and analysis of patient outcomes in a manner similar to the state surveys used by the Secretary to enforce Medicare conditions of participation.

A central feature of the accreditation survey is an on-site visit that employs an approach, known as the "tracer methodology."  Comprehensive Accreditation Manual for Hospitals: The Official Accreditation Standards at ACC-2 (Joint Commission 2007) ("Joint Commission Manual") (Def. Ex. B).[3]  One part of the tracer methodology focuses on individual patients.  It follows "the

---

[2] Facts about the Joint Commission (Joint Commission 2007), accessible at http://www.jointcommission.org/AboutUs/joint_commission_facts (last accessed Nov. 14, 2007).

[3] The second amended complaint cites to the 2006 version of this publication.  Because plaintiffs seek prospective relief from the presumed infirmities associated with Joint Commission

course of a type of care, treatment, and service provided to the patient by the hospital," id. at ACC-26, through, among other means, discussions with staff members who actually provided the care. Id. at ACC-29b.  A second part of the tracer methodology focuses on the hospital systems in which individual patients are treated.  This process includes "interactive sessions with the surveyor(s) and hospital staff that explore the performance of important patient-related functions that cross the hospital." Id. at ACC-26.  These aspects of the accreditation survey bear obvious similarities to the observational and interview phases of the state surveys.  The accreditation survey also uses techniques similar to the state surveys to review staffing plans and patient outcomes.  In this connection, the hospital must "provide the right number of competent staff to meet patients' needs," id. at HR-1, including "appropriate types and numbers of qualified staff necessary to furnish the care, treatment, and services offered." Id. at HR-3.

The level of nurse staffing in general – and the number of registered nurses in particular – is an area of special concern.  To meet accreditation standards, the hospital must employ a nurse executive to ensure "the continuous and timely availability of nursing services," and "the quality of nursing standards of care and practice," id. at NR-1, by, among other things, developing a "nurse staffing" plan, id. at NR-2, as well as nursing policies and procedures to permit provision of "the nursing care, treatment and services required by all patients and patient populations served by the hospital." Id. at NR-4.  To be properly qualified, the nursing staff "must include Registered Nurses" and "may include others," including "Licensed Practical or Vocational Nurses." Id. at GL-15.  The nurse executive must ensure "the provision of nursing services 24 hours a day, 7 days a week," and must specifically ensure the provision of "at least one on-premise registered nurse (RN) furnishing or supervising the service 24 hours a day, 7 days a week." Id. at NR-4.

_____

surveys, we cite to the current version.

Once it is determined that a hospital has, on paper, a nurse-staffing plan that provides for 24-hour nursing services, the next step is to determine whether the hospital has "an adequate number and mix of staff" that is both "consistent with the hospital's staffing plan" and adequate "to meet the care, treatment, and service needs of the patients." Id. at HR-3. This inquiry involves more than "just 'numbers.'" Id. at HR-8. It focuses on the "effectiveness" of staffing "in relation to" the "provision of needed care and treatment." Id. at HR-6.

The analysis begins with the proposition that "[e]ffective staffing" is "linked to positive patient outcomes and improved quality and safety of care," id., a conclusion that has been repeatedly confirmed by scientific studies[4] and is endorsed by plaintiffs themselves.[5] To determine whether patient outcomes consistent with effective nurse staffing exist, the hospital is required to identify certain indicators that, based on "[k]nowledge about staffing issues likely to impact patient safety or quality of care," id. at HR-8, are both "nursing-sensitive" and "staffing-related," id. at HR-7, in that one would expect to find good results where hospitals were properly staffed and poor results where the hospital did not have enough nurses available. The hospital then must develop, through empirical analysis, baseline levels of "desired performance" for each indicator. Id. Where ongoing analysis reveals that nursing-sensitive outcomes "do not meet performance expectations," the "underlying causes" for the disparity are then investigated "to screen for possible nurse staffing issues," id., and the hospital is required to take "appropriate action in response." Id. at HR-9.

---

[4] See, e.g., Hospital Nurse Staffing and Quality of Care, 14 Research in Action March 2004, accessible at http://www.ahcpr.gov/research/nursestaffing/nursestaff.pdf (last accessed Nov. 14, 2007) (surveying government-funded, and other, research on the relationship of nurse staffing levels to adverse patient outcomes); Lucian L. Leape, et al., Systems Analysis of Adverse Drug Events, 274 JAMA 35, 39 (July 5, 1995) (medication errors correlate with nurse-staffing problems).

[5] See. e.g., ANA study: More nurses, better patient outcomes, American Nurse 2 (May/June 2000) (American Nurses Association finds nurse-staffing levels correlate with positive outcomes).

Four indicators are used to measure the adequacy of nurse staffing. Two of these measures must be "clinical/service indicators," id. at HR-8, that focus on patient outcomes. Id. at HR-7.[6] The other two must be "human resource" indicators, id., that focus on the attitudes and job performance of the nurses themselves.[7] By this means, the accreditation process is designed to "assess and continuously improve staffing effectiveness," id. at HR-2, through an "objective, evidence-based approach." Id. at HR-6-HR-7.

## STATUTORY BACKGROUND

The legal question that plaintiffs are apparently attempting to raise in this action concerns the frequency with which the Secretary must conduct surveys for compliance with the "bedside availability" standard in 42 C.F.R. § 482.23(b) at hospitals that have received accreditation from the Joint Commission. The Secretary surveys accredited hospitals for compliance with this and

---

[6] Clinical/service indicator subjects include areas such as complaints by patients and their family members, adverse drug events, injuries to patients, skin breakdown, pneumonia, post-operative infections, urinary tract infections, upper gastrointestinal bleeding, shock/cardiac arrest, length of stay, death among surgical inpatients with treatable serious complications (failure to rescue), pressure ulcer prevalence, falls prevalence, falls with injury, restraint prevalence, urinary catheter-associated urinary-tract infection for intensive-care unit patients, central line catheter-associated blood stream infection rate for intensive-care unit and high-risk nursery patients, ventilator-associated pneumonia for intensive-care unit and high-risk nursery patients, and smoking cessation counseling for acute myocardial infarction, heart failure and pneumonia patients. Joint Commission Manual at HR-9.

[7] These include personnel matters, such as overtime, staff vacancy rate, staff satisfaction, staff turnover rate, understaffing as compared to the organization's staffing plan, staff injuries on the job, on-call or per diem use, sick time, use of nurses from outside agencies, skill mix of nurses, nursing care hours per patient days, practice environment, and voluntary turnover. Joint Commission Manual at HR-10. The idea here is that deficiencies in nurse-staffing are likely to show up in job dissatisfaction and performance problems. The Joint Commission requires that "all nursing staff (including registered nurses, licensed practical nurses, and nursing assistants or aides)" must be included in the "human resource indicators," although "[d]ecisions regarding stratification of data by discipline are left to the hospital." Id. at HR-8 (emphasis omitted). In other words, so long as registered nurses are among the nursing employees included in the human resource indicator, it is not necessary to create a separate indicator solely to address their overtime, vacancy rates, staff satisfaction, etc.

-11-

most other Medicare conditions of participation on a representative-sample basis and in response to

substantial allegations of deficiencies at specific hospitals. 42 C.F.R. § 488.7. Although their

claims have never been a model of clarity, plaintiffs apparently think that the bedside-availability

standard – alone among the nurse-staffing requirements – should be enforced separately, either in

the same way as it is enforced at unaccredited hospitals or in some new way to be invented by this

Court. Defendants' response to this argument begins with a review of the historical development of

the relevant statutory scheme.

Medicare was originally conceived of as an "insurance program," 42 U.S.C. § 1395c, that

would pay benefits to the elderly and disabled in essentially the same manner as a private insurer.

See 42 U.S.C. §§ 1395h, 1395u (employing insurance companies to process claims as

"intermediaries" and "carriers"). Congress did not intend to create a regulatory program that would

police the medical professions or superintend the administration of hospitals. To emphasize this

point, the very first section of the Medicare Act states as follows:

> Nothing in this subchapter shall be construed to authorize any Federal officer or
> employee to exercise any supervision or control over the practice of medicine or the
> manner in which medical services are provided, or over the selection, tenure, or
> compensation of any officer or employee of any institution, agency, or person
> providing health services; or to exercise any supervision or control over the
> administration or operation of any such institution, agency, or person.

42 U.S.C. § 1395. Rather, the guiding philosophy of the Medicare program was "to support the

efforts of the various professional accrediting organizations sponsored by the medical and hospital

associations, health insurance plans, and other interested parties to improve the quality of care in

hospitals." S. Rep. No. 89-404 at 29 (1965), reprinted in 1965 U.S.C.C.A.N. 1943, 1969.

As originally enacted in 1965, the provision at 42 U.S.C. § 1395x(e) defined the term

"hospital" according to eight standards. The requirement for 24-hour nursing service and

supervision by a registered nurse was set forth in paragraph (5), using the same language that exists today.  42 U.S.C. § 1395x(e)(5) (Supp. IV 1965-69).  The catch-all provision for "such other requirements as the Secretary finds necessary in the interest of the health and safety of individuals" was originally in paragraph (8).  42 U.S.C. § 1395x(e)(8) (Supp. IV 1965-69).  Any requirement imposed under the catch-all provision could "not be higher than the comparable requirements prescribed for the accreditation of hospitals by the Joint Commission on Accreditation of Hospitals."  Id.  In addition, Congress mandated that "an institution shall be deemed to meet the requirements" under paragraph (5) and all but one other paragraph of § 1395x(e), "if such institution is accredited as a hospital by the Joint Commission on Accreditation of Hospitals."  42 U.S.C. § 1395bb (Supp. IV 1965-69).[8]  The confluence of these two provisions produced the result that accredited hospitals were "conclusively presumed" to meet nurse-staffing (and almost all other) conditions of participation without any compliance inspection whatsoever by any government official.  S. Rep. No. 89-404 at 29, reprinted in 1965 U.S.C.C.A.N. at 1970.  The Secretary's enforcement powers were limited exclusively to inspections of unaccredited hospitals (by means of surveys performed by state agencies under contract with the Secretary).  42 U.S.C. § 1395aa(a) (Supp. IV 1965-69).

This state of affairs swiftly ran into criticism.  In 1967, the Health Insurance Benefits Advisory Council ("HIBAC")[9] argued that it was "inappropriate to continue statutory delegation to

---

[8] The one hospital standard that was not automatically deemed to be satisfied by JCAH accreditation was the requirement for a utilization-review plan in paragraph (e)(6), which could be deemed to be satisfied "[i]f such Commission, as a condition of accreditation of a hospital, requires a utilization review plan or imposes another requirement which serves substantially the same purpose."  42 U.S.C. § 1395bb(a) (Supp. IV 1965-69).

[9] HIBAC was established in 1965 to monitor the Medicare program and make recommendations for changes in annual reports to Congress.  42 U.S.C. § 1395dd (1965).  Its function is now performed by the Medicare Payment Advisory Commission.  42 U.S.C. § 1395b-6.

a private agency of all the Government's authority to safeguard quality of care paid for by a government program," and it urged that the ultimate "authority to establish policy on minimum quality should be retained by the Government." HIBAC Annual Report on Medicare 9 (1966-67). The Council asked Congress to "remove the present limitations on the Secretary's authority to establish health and safety standards for hospitals." Id. at 10. Academic commentators also urged Congress to undertake a related reform that would have demoted accreditation from being a conclusive indicator of compliance to being merely "prima facie evidence of compliance," subject to verification through "certification inspection" by the state agencies that surveyed unaccredited hospitals. William Worthington & Laurens H. Silver, Regulation of Quality of Care in Hospitals: The Need for Change, 35 Law & Contemp. Probs. 305, 324 (1970). The 1965 statute, the reformers complained, gave "quasi-public status" to a "totally private body unaccountable to the public or to the government." Id. at 325.

    In 1972, Congress responded to these criticisms by agreeing that "[s]everal problems have arisen with respect to the JCAH role in the medicare certification process." S. Rep. No. 92-1230 at 61 (1972). One problem was that "the Federal agencies responsible to the Congress for the administration of medicare" were "not in a position to audit the validity of the overall JCAH survey process" and thus were "unable to determine the extent to which specific deficiencies may exist in the vast majority of participating hospitals." Id. A second problem was that the Medicare statute, as it then existed, served "as an almost total and blanket delegation of authority over hospital standards to a private agency," id. at 62, because "medicare is barred from setting any standards which are higher than comparable JCAH requirements" and "[t]his has been interpreted" by the Secretary "to also bar establishment of any standards in an area where JCAH has remained silent." Id. at 61-62.

-14-

To remedy these perceived problems, Congress enacted § 244 of the Social Security Act Amendments of 1972, Pub. L. No. 92-603, 86 Stat. 1329, 1422-23 (1972), which made three statutory changes. First, the amendments added a new subsection (c) to 42 U.S.C. § 1395aa, which authorized the Secretary to enter into agreements with state agencies to survey JCAH-accredited hospitals. These surveys of accredited hospitals were to be conducted "on a selective sample basis" and "where the Secretary finds that a survey is appropriate because of substantial allegations of the existence of a significant deficiency or deficiencies which would, if found to be present, adversely affect health and safety of patients." 42 U.S.C. § 1395aa(c); see also S. Rep. No. 92-1230 at 62. Second, Congress added a new subsection (b) to 42 U.S.C. § 1395bb which provided that an accredited hospital found (through a sample-based or allegation-driven survey) to have "significant deficiencies" shall "be deemed not to meet the requirements" of 42 U.S.C. § 1395x(e), "[n]otwithstanding any other provision of this subchapter." 42 U.S.C. § 1395bb(b) (1976). Finally, Congress amended 42 U.S.C. § 1395aa so as to not only remove the prohibition against "catch-all" health and safety requirements more stringent than accreditation standards, but to actually forbid the Secretary from granting "deemed" status with respect to JCAH standards less stringent than the Secretary's requirements, unless the Secretary made a finding that the JCAH standards were substantially equivalent. The effect of these changes was to restrict the statutory and regulatory requirements for which accreditation conferred "deemed" status and to convert the effect of "deemed" status from conclusive evidence of compliance to a provisional assumption of compliance subject to validation through sample-based and allegation-driven state surveys.

Since 1972, the statutory scheme has undergone several amendments (not relevant here) that, among other things, have broadened the range of accrediting authorities that are qualified to confer "deemed" status and the range of health-care entities subject to being granted such status.

The statutory language currently in effect provides that, if "an institution is accredited as a hospital" by the Joint Commission, 42 U.S.C. § 1395bb(a)(1), "then, such institution shall be deemed to meet the requirements," 42 U.S.C. § 1395bb(a), of, among other things, the "24-hour nursing service" provision in 42 U.S.C. § 1395x(e)(5).[10]  However, this "deemed status" is provisional only, and it may subsequently be revoked if "the Secretary finds that a provider entity has significant deficiencies," 42 U.S.C. § 1395bb(d), after a sample-based or allegation-driven validation survey is conducted pursuant to 42 U.S.C. § 1395aa(c).  Therefore, all hospitals, whether accredited or not, are required at all times to meet the nurse-staffing standards set forth in 42 U.S.C. § 1395x(e) and regulations promulgated thereunder, and no hospital can rest easy that substandard practices will go undetected by a government survey.

Although accredited hospitals enjoy "deemed status" for all nurse-staffing requirements promulgated under the authority of 42 U.S.C. § 1395x(e)(5), the same is not true with respect to "such other requirements as the Secretary finds necessary in the interest of the health and safety of individuals who are furnished services in the institution."  42 U.S.C. § 1395x(e)(9).  With respect to these other standards, an accredited hospital "shall be deemed to meet the requirements," 42 U.S.C. § 1395bb(a)(1), except for "any standard, promulgated by the Secretary" that "is higher than the requirements prescribed for accreditation" by the Joint Commission.  42 U.S.C. § 1395bb(a)(4). With respect to such higher paragraph (9) standards, accreditation is deemed to meet the regulatory requirements only if the Commission "imposes a standard which the Secretary determines is at least equivalent to the standard promulgated by the Secretary."  42 U.S.C. § 1395bb(a).

------

[10] To achieve preliminary "deemed" status, the hospital must authorize the release of the most current accreditation survey and any related information that the Secretary may require (including corrective action plans), 42 U.S.C. § 1395bb(a)(2)(A), and the Commission must actually release the survey.  42 U.S.C. § 1395bb(a)(2)(B).

## STATEMENT OF THE CASE

Plaintiffs in this action are three professional associations that advocate the interests of member nurses. Second Amended Complaint ("Am. Compl.") at ¶¶ 9-11. The gravamen of their complaint is that the Secretary erred when he concluded that the regulation in 42 C.F.R. § 482.23(b) – which requires that supervising registered nurses be immediately available for bedside care, when needed – was promulgated pursuant to his authority to implement the nurse-staffing provision in 42 U.S.C. § 1395x(e)(5), rather than pursuant to his catch-all authority to establish "other" standards for health and safety under 42 U.S.C. § 1395x(e)(9). From this erroneous proposition, plaintiffs contend that two conclusions follow. The first is that it is unlawful for the Secretary to deem hospitals accredited by the Joint Commission to be in provisional compliance with the "bedside availability" portion of the nurse-staffing regulation, pursuant to 42 U.S.C. §§ 1395bb(a)(1)-(2). The second is that it is unlawful for him to rely on the sample-based and allegation-driven survey track in 42 U.S.C. § 1395aa(c) and 42 C.F.R. § 488.7 to enforce compliance with that particular provision, unless the Secretary first makes a finding that the accreditation standards are "at least equivalent" to the provision. 42 U.S.C. § 1395bb(a). Although the complaint does not say so in so many words, plaintiffs apparently believe that enforcement of the "bedside availability" regulation – but no other nurse-staffing standard – belongs on the periodic survey track described in 42 U.S.C. § 1395aa(a) and 42 C.F.R. § 488.20, and, for that reason, the Secretary has "failed to establish a system to ensure adequate registered nurse staffing, in violation of 42 C.F.R. [§] 482.23." Am. Compl. at ¶ 1; see also id. at ¶¶ 39-40. In addition, plaintiffs accuse the Secretary of "unlawfully delegating to a private party" – the Joint Commission – "the authority to determine the sufficiency of its standards when measured against the . . . Conditions of Participation." Id. at ¶ 2.

-17-

## ARGUMENT

Plaintiffs' claim is patently baseless on the merits.  No serious argument can be made that the bedside-availability standard nestled in the middle of the nurse-staffing regulation at 42 C.F.R. § 482.23 implements anything other than the statutory requirements in 42 U.S.C. § 1395x(e)(5), as the preamble to the regulation plainly states.[11]  The doubts that plaintiffs attempt to raise about whether the Joint Commission's nurse-staffing standards are equivalent to the regulation are legally irrelevant, since such equivalency could only matter here if the regulation were promulgated under 42 U.S.C. § 1395x(e)(9).  In any event, it is hard to see much difference between the requirement in the regulation that "[t]here must be supervisory and staff personnel for each department or nursing unit to ensure, when needed, the immediate availability of a registered nurse for bedside care of any patient," 42 C.F.R. § 482.23(b), and the requirement in the Joint Commission accreditation standards that nursing services must be provided "24 hours a day, 7 days a week with at least one on-premise registered nurse (RN) furnishing or supervising the service 24 hours a day, 7days a week."  Joint Commission Manual at NR-4.  At the threshold, however, plaintiffs' second amended complaint suffers from jurisdictional defects that make it unnecessary to even reach these issues.

## I.  PLAINTIFF NURSE ASSOCIATIONS LACK STANDING IN THEIR OWN RIGHT TO CHALLENGE COMPLIANCE POLICIES FOR ACCREDITED HOSPITALS.

At the outset, plaintiffs do not meet the requirements necessary to have standing to bring the suit at all, either as organizations in their own right or as representatives of their members.  It is well settled that "an asserted right to have the Government act in accordance with law is insufficient, standing alone, to confer jurisdiction on a federal court."  Allen v. Wright, 468 U.S.

---

[11] The regulatory preamble states that all nurse-staffing requirements were promulgated under "Section 1861(e)(5) of the Social Security Act."  51 Fed. Reg. 22,010, 22,018 (June 17, 1986).  The statute codified at 42 U.S.C. § 1395x(e)(5) is § 1861(e)(5) of the Social Security Act.

737, 754 (1984); see also Arizonans for Official English v. Arizona, 520 U.S. 43, 64 (1997) ("An

interest shared generally with the public at large in the proper application of the Constitution and

laws will not do.").  Rather, a plaintiff objecting to a government policy must allege four things.

First, he must show that he himself has suffered "personal injury."  Raines v. Byrd, 521 U.S. 811,

818 (1997) (quoting Allen, 468 U.S. at 751) (emphasis added in Raines).  Second, he must

demonstrate that the injury is "fairly traceable to the defendant's allegedly unlawful conduct,"

DaimlerChrysler Corp. v. Cuno, 126 S. Ct. 1854, 1861 (2006) (quoting Allen, 468 U.S. at 751), and

not to "the independent action of some third party not before the court."  Lujan v. Defenders of

Wildlife, 504 U.S. 555, 560 (1992) (quoting Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 41-

42 (1976)).  Third, "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be

'redressed by a favorable decision.'"  Id. at 561 (quoting Simon, 426 U.S. at 38, 43).  Finally, the

alleged injury must represent the "invasion of a legally protected interest," id. at 560, that "arguably

[falls] within the zone of interests to be protected or regulated," FEC v. Akins, 524 U.S. 11, 20

(1998) (citation omitted), by the specific source of law "whose violation forms the legal basis for

[the] complaint."  Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 883 (1990).  Plaintiffs fail those tests

here.

### A.  The Plaintiff Associations Cannot Borrow Harms Allegedly Suffered by Medicare Beneficiaries to Establish an Injury to Themselves.

The only injury to their own interests as organizations that the plaintiff nurse associations

allege that they have suffered is articulated in their complaint as follows:  the means by which the

Secretary currently enforces the bedside-availability regulation allegedly encourages accredited

hospitals to let putative deficiencies in "registered nurse staffing" go "unchecked," Am. Compl. at

¶ 53, and plaintiffs are "concerned" that resulting nurse-to-patient ratios might "seriously endanger

the health and well-being of the patients who seek Medicare-reimbursed health care services" at the allegedly understaffed hospitals.  Id. at ¶ 54.  However well-intentioned, concern for such an attenuated threat to the well-being of strangers is insufficient to establish standing.

In the first place, plaintiffs cannot simply borrow an injury allegedly faced by Medicare beneficiaries to support their own standing to sue in federal court.  The "Art. III judicial power exists only to redress or otherwise protect against injury 'to the complaining party.'"  Vermont Agency of Natural Res. v. United States ex rel. Stevens, 529 U.S. 765, 771 (2000) (quoting Warth v. Seldin, 422 U.S. 490, 499 (1975) (emphasis added in Vermont Agency).  To have the personal injury necessary for standing, a plaintiff must therefore allege that he has suffered "a distinct and palpable injury to himself," Gladstone Realtors v. Village of Bellwood, 441 U.S. 91, 100 (1979) (citation omitted) (emphasis added), and not merely "that injury has been suffered by other[s]," Warth , 422 U.S. at 502 ((emphasis added), even where the injury is alleged to be "shared by a large class of other possible litigants."  Id. at 501.  In the absence of a "next friend" or similar legal relationship that places the plaintiff directly in the shoes of the allegedly injured person, the Supreme Court has repeatedly held that a plaintiff cannot base his standing on injuries alleged to have been suffered by someone else.[12]  And the Supreme Court has instructed that this limitation should be enforced with particular care where the success of the plaintiff's case "may have an adverse effect on the person who is the source of the plaintiff's claimed standing."[13]

---

[12] Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1, 17 (2004) (non-custodial parent cannot complain of injuries to daughter over objection of custodial parent); Whitmore v. Arkansas, 495 U.S. 149, 154-66 (1990) (one prison inmate cannot complain of injuries allegedly suffered by another inmate during court proceedings); Conn v. Gabbert, 526 U.S. 286, 292-93 (1999) (lawyer cannot complain about injury to his client).

[13] Elk Grove, 542 U.S. at 17.

In this case, the plaintiff nurse associations claim no "next friend" or other legal relationship with Medicare beneficiaries, and the interests they seek to vindicate are potentially antagonistic to those of beneficiaries. As their complaint makes clear, plaintiffs' ultimate objective in the case is to produce a lower ratio of registered nurses to patients at accredited hospitals that participate in Medicare. Am. Compl. at ¶ 55. But a lower ratio of nurses to patients could be achieved in two ways. One way would be for the hospitals to hire more nurses, but a second way would be to reduce admissions. The latter expedient might serve the interests of registered nurses in having their workloads reduced to what they consider to be more manageable levels, but it might impair the ability of Medicare beneficiaries to obtain hospital care at all. Plaintiff nurse associations therefore would be a particularly poor champion for the interests of beneficiaries, even if they otherwise had standing to complain of alleged injuries to patients.[14]

## B. Plaintiffs Have Not Shown Any Causal Connection Between the Alleged Understaffing of Nurses and the Secretary's Choice of Survey Tracks.

Even if plaintiffs' claim of injury to their organizational interests could survive to this point, their amended complaint does not establish that the alleged injuries (either to themselves or to their members) are fairly traceable to the complained-of governmental conduct or likely to be redressed by a favorable decision. To establish traceability, plaintiffs must show, in some "concretely demonstrable way," Warth, 422 U.S. at 504, that there is "a connection between the alleged injury

---

[14] To the extent that plaintiffs seek to assert the putative rights of Medicare beneficiaries (as opposed to merely borrowing their alleged injuries), the complaint should also be dismissed because plaintiffs have not shown a separate injury to themselves, they do not have any contractual or other legally-relevant relationship with beneficiaries, and they have not alleged that beneficiaries suffer from an impairment that hinders them from defending their own putative rights. Plaintiffs therefore also fail the prudential test for third-party standing. See Powers v. Ohio, 499 U.S. 400, 411 (1991); see also Charles Alan Wright, Arthur R. Miller, Edward H. Cooper & Richard D. Freer, 13 Federal Practice and Procedure § 3531.4 at 945 (Supp. 2006) ("the rules that limit standing to assert the rights of others begin from the premise that a person who is not injured cannot rely on another's injury").

in fact and the alleged conduct of the defendant," Vermont Agency, 529 U.S. at 771 (citing Simon, 426 U.S. at 41), that is not "too attenuated," Allen, 468 U.S. at 752, to establish causation and redressability.  As the Supreme Court has explained, where "the plaintiff is himself an object of the action (or foregone action) at issue," there is "ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress" it. Defenders of Wildlife, 504 U.S. at 561-62.  Where, however, "a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of someone else, much more is needed," because "it becomes the burden of the plaintiff to adduce facts" showing that the injury-inducing "choices" made by "the regulated (or regulable) third party" are fairly traceable to a particular "government action or inaction" to which the plaintiff objects.  Id. at 562 (emphasis in original).  "Thus, when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish," id. at 562 (quoting Allen, 468 U.S. at 758, and citing Simon, 426 U.S. at 44-45, and Warth, 422 U.S. at 505), and the existence of standing is "particularly problematic when the only challenged action is the failure of the Executive Branch to impose penalties upon a third party." Talenti v. Clinton, 102 F.3d 573, 577 (D.C. Cir. 1996) (citing Linda R.S. v. Richard D., 410 U.S. 614, 614-19 (1973), and Branton v. FCC, 993 F.3d 906, 910-11 (D.C. Cir. 1993)).  These standing requirements "apply with no less force to suits brought by organizational plaintiffs."  Common Cause v. FEC, 108 F.3d 413, 417 (D.C. Cir. 1997).

    In this case, all of the injuries alleged to have been experienced by plaintiffs or their members, Am. Compl. at ¶¶ 42-56, stem from a single complained-of circumstance:  the allegation that "[t]here are hospitals" in the United States which "have consistently failed to provide sufficient registered nurse staffing to make a registered nurse immediately available when needed."  Id. at

¶ 41.  The Secretary, however, does not hire nurses through the Medicare program.  Hospitals hire

nurses through their own employment programs.  To establish causation, then, plaintiffs would

have to go one step further and allege that the putative understaffing by accredited hospitals that

occurs through the operation of independent hospital employment policies is directly attributable to

the placement of accredited hospitals on the sample-based and allegation-driven enforcement track,

rather than on the periodic track.  And this plaintiffs simply cannot do.

The only portion of plaintiffs' second amended complaint that even attempts to allege

causation merely claims that "short staffing" by accredited hospitals is "attributable," in some

unspecified way, to a generalized "failure" on the part of defendants "to enforce their own

regulations" and that this purported failure stems from the practice of "permitting JCAHO

accreditation to qualify hospitals for participation in the Medicare program without the necessary

levels of registered nurses and other support staff to ensure the immediate availability of [a

registered nurse] to render bedside care when needed."  Am. Compl. at ¶ 52.  The complaint does

not allege, however, that unaccredited hospitals (which do not enjoy "deemed" status and are

subject to periodic surveys) are staffed any more completely than accredited hospitals, so that it

might be possible to lay the discrepancy at the doorstep of the different survey tracks.  Nor is there

any logical reason to suppose that accredited hospitals subject to sample-based surveys might be

more likely to risk non-compliance with nurse-staffing regulations than unaccredited hospitals

subject to periodic surveys.  With millions of dollars in Medicare money at stake, it is hard to

imagine a hospital administrator deliberately willing to take such a chance.

Even if some hospital administrators were to calculate that the odds of getting caught

through sample-based surveys were sufficiently low to be worth the risk, the specter of an

allegation-driven survey surely would give them pause.  Inasmuch as hospitals compete with each

other based in large part on their reputations, it is not unreasonable to think that the allegation-driven survey (whether prompted by complaints from patients, watchdog groups, or the institution's own nurses) would have the greatest in terrorem effect of all.  The prospect of losing accreditation through one of the Joint Commission's random or for-cause surveys would presumably be held in similar, if not higher, regard.[15]  There is no reason, therefore, to think that compliance behavior on the part of hospitals is necessarily influenced in a more responsible direction by the threat of initial or periodic surveys by state agencies than by the combined threat of initial, randomly-recurring, and for-cause, accreditation surveys conducted by the Joint Commission and sample-based and allegation-driven surveys conducted by state agencies.[16]

On the contrary, plaintiffs' own complaint dramatizes just how much accredited hospitals potentially have to fear from for-cause and allegation-driven surveys.  The new paragraphs added in their amended complaint demonstrate that their members have both an incentive and a willingness to keep meticulous daily records of any circumstances in which they believe (at least by their own lights) that the hospitals at which they work have allowed staffing of registered nurses to fall (even for short periods of time) to levels that they consider unacceptably low.  Am Compl. at ¶¶ 42-50.  In addition, evidence previously submitted by plaintiffs shows that nurse associations are not shy

---

[15] See Cheryl A. Niespodziani, HCPro's CMS-JCAHO Crosswalk " ("HCPro's Crosswalk") 5 (2006) (Ex. 2) (attached to plaintiffs' opposition to defendants' motion to dismiss their original complaint) ("Anyone involved in healthcare, from chief executive officers to front-line staff, dreads hearing, 'We're here to do an unannounced site visit of your facility.'  On any day of the week, unexpected surveyors who say these words can cause anxiety, stress and anguish in even the best-run organizations.") (Doc. 12).

[16] See, e.g., Renal Physicians Ass'n v. HHS, 422 F. Supp. 2d 75, 81-86 (D.D.C. 2006) (causation lacking where sought-after change in Secretary's policy would not necessarily change compensation of doctors at dialysis facilities).

about raising complaints with state authorities.[17]  With self-interested watchdogs like that on the premises 24-hours a day, an accredited hospital would be foolish to let its guard down merely because it enjoys "deemed status" provisionally.

Furthermore, plaintiffs proffer no reason why surveys conducted by state agencies should necessarily be presumed to catch nurse-staffing deficiencies that accreditation surveys overlook. As was discussed above, the regulatory standards enforced by state surveyors and the accreditation standards currently enforced by the Joint Commission are nearly identical in their language regarding the availability of a supervising registered nurse on the hospital premises 24 hours a day. In addition, both survey methodologies employ what can be termed a "gauntlet-style" approach that assumes that deficiencies in nurse staffing will not escape notice when the hospital's operations are examined from a variety of different angles.  Both rely on direct observation of patient care.  Both rely on interviews with patients and staff.  Both examine nurse-staffing plans.  Both examine medical records to determine if patient outcomes are consistent with a well-staffed nursing service. The accreditation survey goes one step further by also examining whether human resource indicators are consistent with proper staffing.[18]

The only real difference between the two survey methods is one of wording.  The Secretary's manual states that a licensed practical nurse can provide care to patients, so long as a

---

[17] New York State Nurses Association, <u>The Nursing Shortage in New York City Public Hospitals:  How Is It Affecting Patients?</u> 3-4 (Oct. 18, 2005) (Ex. 3) (attached to plaintiffs' opposition to defendants' motion to dismiss their original complaint) (Doc. 12).

[18] Plaintiffs' contention that this <u>additional</u> measure used exclusively by the Joint Commission does not survey registered nurses separately from other nurses, Am. Compl. at ¶ 36, overlooks the fact that the state surveys do not use a human resources indicator <u>at all</u>.  Thus, whatever deficiencies in the staffing of registered nurses that plaintiffs believe "<u>may</u> go undetected" in the human-resources inquiry in the accreditation process, <u>id.</u> (emphasis added), are no more likely to be detected in the state survey.

supervising registered nurse is "immediately available for the bedside care of those patients," State

Operations Manual, Regulations and Interpretive Guidelines for § 482.23(b)(1) at A-0202, and it

adds that a registered nurse would not be considered to be "immediately available" if he or she were

assigned to two floors or units at the same time.  Id. for § 482.23(b) at A-0201.  The Joint

Commission demands that accredited hospitals provide "nursing services 24 hours a day, 7 days a

week with at least one on-premise registered nurse (RN) furnishing or supervising the service 24

hours a day, 7 days a week."  Joint Commission Manual at NR-4.  Unless the Joint Commission

takes the counter-intuitive position that a registered nurse is legitimately "furnishing or supervising

the service," id., even if she is so distant from her patients that she is unavailable to take over

bedside care when needed, it is hard to see any real difference between the two standards.

Nor is there any reason to think that a hospital so understaffed that it did not have a

registered nurse supervising each floor would escape the notice of the Joint Commission surveyors

during the combination of direct patient observations, staff and patient interviews, examination of

staffing plans, and evaluation of outcome-based indicators described above.  In light of the multi-

dimensional methodology and outcome-oriented focus of the accreditation inquiry, there is no

reason to suppose that state Medicare surveys and private accreditation surveyors produce different

results when it comes to the staffing of registered nurses.[19]  Plaintiffs have therefore failed to

establish that the connection between the allegedly injury-causing staffing practices (on the part of

---

[19] A report by Government Accountability Office, for instance, showed that nursing-related differences between the results of state surveys and Joint Commission surveys were found in only 10 of 500 samples, and, even then, the report did not identify a single instance where lack of bedside availability was a problem that was identified by state surveys but not by Joint Commission surveys.  Medicare:  CMS Needs Additional Authority to Adequately Oversee Patient Safety in Hospitals 14 (GAO-04-850 July 2004), http://www.gao.gov/new.items/d04850.pdf.  A 98-percent consistency rate is astonishingly high.  See id. at 41, 46.

third-party hospitals) and the complained-of government enforcement policy (on the part of the

Secretary) is more than merely "speculative."  Linda R.S. v. Richard D., 410 U.S. at 618.

### C.   Plaintiffs' Alleged Injuries Would Not Be Redressed by the Requested Relief.

Even if plaintiffs could establish causation, however, they fail to show that it is likely, as

opposed to merely speculative, that the complained-of understaffing of registered nurses is

redressable by the relief requested in their amended complaint.  The only remedial action that this

Court conceivably could take to correct an alleged misplacement of the bedside-availability

regulation on the sample-based and allegation-driven, rather than the periodic, enforcement track

would be to order the Secretary to temporarily put enforcement of the bedside-availability

regulation on the periodic track until such time, if any, that he determines that the Joint

Commission's accreditation standards are at least equivalent to the regulatory standard.  Plaintiffs

request no such remedy here, and, even if they did, there is no reason to think that even a temporary

switch to periodic enforcement track would alter the staffing decisions independently made by

accredited hospitals.  See, e.,g., Nat'l Wrestling Coaches Ass'n v. DOE., 366 F.3d 930, 936-45

(D.C. Cir. 2004) (finding lack of redressability where plaintiffs could not show that colleges would

change their sports-funding practices if agency were forced to change its policies).  Plaintiffs

therefore cannot obtain they only remedy they could legitimately seek.

The remedies plaintiffs do seek, in turn, are beyond the power of the Court to grant.  The

contention advanced by plaintiffs earlier in this litigation – that "[a] favorable decision from the

Court would redress Plaintiffs' injuries by requiring [the Secretary] to establish a system to ensure

that JCAHO standards are at least equivalent to those established by the Secretary," Plaintiffs'

Memorandum of Points and Authorities in Opposition to Defendants' Motion to Dismiss ("Pl.

Mem.") at 13-14 (Doc. 12), incorrectly assumes that the Secretary has any legal authority to dictate

anything to the Joint Commission.  As plaintiffs' own memorandum went on to emphasize, the

Joint Commission "is a private, non-profit accrediting organization" whose accreditation standards

are "controlled" exclusively by its own governing body.  Id. at 2.  The Secretary does not have any

power to tell the Joint Commission what it accreditation standards should be.  To the extent that

plaintiffs seek to change accreditation standards, they are, quite literally, asking this Court to

legislate from the bench.[20]

The language in which plaintiffs have previously described their requested relief merely

underscores the three fundamental defects in their theory of redressability:  this Court cannot give

plaintiffs what they want, plaintiffs do not want the only form of relief the Court could even

hypothetically grant, and the only remedy that the Court could hypothetically grant would not

redress their perceived injuries.  The redressability element of standing is therefore lacking.

> **D.  Plaintiffs' Social Concern for the Welfare of Medicare Beneficiaries Does Not Establish an Injury to Themselves.**

Even if causation and redressability were established, however, plaintiffs could not rest their

standing to sue, as organizations, merely on their generalized desire to "actively promote[]" what

they conceive to be "patient safety"  and  "appropriate staffing" in hospitals.  Am. Compl. at ¶ 9.  It

is well-settled that the federal courts are not a soapbox for "organizations or individuals who seek

to do no more than vindicate their own value preferences," Sierra Club v. Morton, 405 U.S. 727,

---

[20] Plaintiffs' further request for a judicial order instructing the Secretary to "set aside" an "acknowledgment of hospitals' participation in the Medicare program if their accreditation from JCAHO forms the basis for such participation," Pl. Mem. at 13, incorrectly implies that accreditation somehow excuses a hospital from compliance with the conditions of participation.  As was discussed earlier, it does not.  The basis for participation in the Medicare program is the hospital's agreement to comply with the conditions of participation, pursuant to 42 U.S.C. § 1395cc, and accreditation has not excused compliance since 1972, when Congress deliberately stripped it of that significance.  Plaintiffs' request for relief reflects a failure to understand that those amendments reduced the importance of "deemed" status to determining little more than the manner in which the Secretary is authorized to allocate enforcement resources.

740 (1972), or assert "generalized grievances more appropriately addressed in the representative branches." Elk Grove, 542 U.S. at 12 (citation omitted); see also Arizonans, 520 U.S. at 64-65 (quoting Diamond v. Charles, 476 U.S. 54, 62 (1986) ("The decision to seek review 'is not to be placed in the hands of 'concerned bystanders''' or "persons who would seize it 'as a vehicle for the vindication of value interests'"). Thus, a mere policy "'interest in a problem,' no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem" is insufficient to create standing. Sierra Club, 405 U.S. at 739. Because plaintiffs' "[f]rustration" with the Secretary's Medicare enforcement policies is merely a policy-oriented "[c]onflict between a defendant's conduct and an organization's mission," it is precisely "the type of abstract concern that does not impart standing." Ctr. for Law & Educ. v. Dep't of Educ., 396 F.3d 1152, 1161-62 (D.C. Cir. 2005) (quoting NTEU v. United States, 101 F.3d 1423, 1429 (D.C. Cir. 1996)). Plaintiffs have therefore alleged no legally cognizable injury to themselves, as organizations.

### E. The Organizational Interests of Nurse Associations Are Not Within the Zone of Interests of the Medicare Conditions of Participation.

In any event, even if plaintiffs could show some injury to their ability to function as advocacy organizations, standing would still be lacking because their ability to function as advocacy organizations is not within the "zone of interests protected by the law invoked." Elk Grove, 542 U.S. at 12 (quoting Allen, 468 U.S. at 751). A plaintiff cannot meet the zone-of-interests test merely by alleging that a regulatory scheme protects or regulates someone else's interests in a way that might indirectly affect his own. See Air Courier Conference v. Am. Postal Workers Union, 498 U.S. 517, 522-31 (1991); Lujan v. Nat'l Wildlife Fed'n, 497 U.S. at 883. He must show that "the procedures in question are designed to protect [or regulate] some concrete interest of his that is the ultimate basis of his standing. " Ctr. for Law, 396 F.3d at 1157 (quoting

Defenders of Wildlife, 504 U.S. at 573 n.8) (emphasis in Ctr. for Law).  The Medicare Act, in turn, establishes a medical insurance program for "individuals who are age 65 and over and are eligible for retirement benefits," as well as certain disabled persons and persons suffering from end-stage renal disease.  42 U.S.C. § 1395c (emphasis added).  It is for the protection of those individuals that the conditions of participation exist.  The parties regulated by the conditions of participation are hospitals.  These sources of law simply make no "mention of advocacy organizations' interests." Ctr. for Law, 396 F.3d at 1157.  Nor do they regulate the conduct of advocacy groups.  Any effect on nurses is incidental.[21]  An association representing the interests of nurses would therefore fall outside the zone of interests of the Medicare conditions of participation.

## II.  PLAINTIFFS LACK ASSOCIATIONAL STANDING TO ASSERT THE PUTATIVE RIGHTS OF THEIR MEMBER NURSES.

Plaintiffs fare no better to the extent that they seek to bring suit on behalf of their member nurses.  To have standing to represent their members, plaintiffs must first establish that the "members would have standing in their own right," Arizonans, 520 U.S. at 66, and that the members' claims are otherwise within the court's subject-matter jurisdiction.  Shalala v. Illinois Council on Long Term Care, Inc., 529 U.S. 1, 24 (2000).  They must also show that "the interests at stake are germane to the organization's purpose" and that "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 181 (2000).  All the claims plaintiffs seek to bring here on behalf of their members fail the first test, and some fail the second, as well.

---

[21] See Air Courier Conference, 498 U.S. at 522-31 (work-related interests of postal employees found to be outside zone of interests of statute regulating international mail); Nat'l Wildlife Fed'n, 497 U.S. at 883 (hypothetical interests of court reporters in gainful employment would be outside zone of interests of statute mandating on-the-record hearings).

Like the injuries asserted by plaintiffs as organizations, each of the harms that plaintiffs allege their members may suffer, Am. Compl. at ¶¶ 43-56, stems from the underlying assertion that hospitals "have consistently failed to provide sufficient registered nurse staffing to make a registered nurse immediately available when needed." Id. at ¶ 41. For the same reasons as their parent associations, plaintiffs' individual members therefore fail the tests of traceability and redressability. The analysis of associational standing can end here.

Little discussion need be devoted to plaintiffs' additional contention that the use of sample-based and allegation-driven surveys to enforce the bedside-availability standard causes understaffing that, in turn, places "registered nurses in the untenable position of providing health care services in a manner that does not comport with the high professional standards of the nurses who work for affected hospitals." Am. Compl. at ¶ 54. Assuming, arguendo, that "decreased job satisfaction" can theoretically qualify as a "noneconomic injury" sufficient to support standing in some circumstances, Minn. Fed'n of Teachers v. Randall, 891 F.2d 1354, 1358 n.6 (8th Cir. 1989), nurse job satisfaction is not within the zone of interests protected or regulated by the Medicare statutes. The conditions of participation regulate hospitals for the benefit of patients. Any effect on the professional satisfaction of nurses who work at regulated hospitals is purely incidental. Air Courier Conference, 498 U.S. at 522-31; Nat'l Wildlife Fed'n, 497 U.S. at 883.

Finally, plaintiffs' contention that their members may someday be "consumers" of hospital care as Medicare patients themselves and may experience harm to their health care because of nurse understaffing caused by the use of sample-based and allegation-driven surveys, Am. Compl. at ¶ 56, is creative, but unavailing. In the absence of a particularized allegation that a particular nurse-member is currently a Medicare patient in actual or imminent danger of suffering a particularized diminution in the quality of medical service, the allegation is merely an example of the kind of

"some day" worries that are too nebulous to sustain standing.  <u>Defenders of Wildlife</u>, 504 U.S. at

564.  In addition, the purpose of the plaintiff associations is to assert the professional interests of

their members, not to provide their members with nursing care.  The alleged injury to plaintiffs'

members <u>qua</u> patients is therefore not germane to the mission of the plaintiff associations <u>qua</u>

associations.

### III.  REVIEW OF PLAINTIFFS' CLAIMS IS NOT AVAILABLE UNDER THE APA.

Even if plaintiffs' complaint could survive its standing defects, their claims cannot be

maintained under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.  Although the

APA generally grants a right of judicial review to parties aggrieved, 5 U.S.C. § 702, by final agency

action so long as there is no other remedy available in court, 5 U.S.C. § 704, it contains two

important exceptions.  One precludes judicial review where "agency action is committed to agency

discretion by law."  5 U.S.C. § 701(a)(2).  The other precludes review where "statutes preclude

judicial review."  5 U.S.C. § 701(a)(1).  Both exceptions are relevant here.

### A.  The Aggressiveness With Which the Secretary Enforces Nurse-Staffing Requirements is Committed to Agency Discretion by Law.

To the extent that plaintiffs are merely attempting to allege, in a generalized sense, that the

Secretary is not using enough vigor to enforce compliance with conditions of participation related

to hospital staffing of registered nurses, the complaint clearly should be dismissed because the

manner in which the Secretary chooses to commit his "finite compliance resources" to enforce

regulations, <u>Bowen v. Am. Hosp. Ass'n</u>, 476 U.S. 610, 647 (1986), is "committed to agency

discretion by law," 5 U.S.C. § 701(a)(2), and there is "no law to apply."  S. Rep. No. 79-752 at 26

(1945).  The analysis begins and ends with the leading case, <u>Heckler v. Chaney</u>, 470 U.S. 821

(1985), in which the Supreme Court held that the Secretary's "refusal to take requested enforcement

action" with respect to a particular statutory scheme committed to his administration must be presumed to be "committed to an agency's absolute discretion," id. at 831, unless "the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers."  Id. at 833.  This principle applies with full force to the Secretary's decisions "whether to undertake an enforcement action" with respect to Medicare conditions of participation.  Beverly Health & Rehab. Servs., Inc. v. Thompson, 223 F. Supp. 2d 73, 89 (D.D.C. 2002); see also id. at 93 & n.18; cf. Arent v. Shalala, 70 F.3d 610, 614 (D.C. Cir. 1995) (Secretary's refusals to take "enforcement action" entitled to presumption of unreviewability).

In this case, the only guideline that Congress has provided to the Secretary for enforcement of hospital conditions of participation in general is that he must make an agreement with any state willing and able to do so that the state will survey hospitals for compliance with conditions of participation, 42 U.S.C. § 1395aa(a), and plaintiffs do not allege that the Secretary has failed to do so here.  The only other relevant mandate is that the Secretary may not deem a hospital accredited by the Joint Commission to be in provisional compliance, 42 U.S.C. § 1395bb(a), and therefore subject to the sample-based and allegation-driven survey track, 42 U.S.C. §§ 1395aa(c), 1395bb(d), with respect to a "catch-all" regulation promulgated under 42 U.S.C. § 1395x(e)(9), where (a) the paragraph (9) standard "is higher than the requirements prescribed for accreditation," 42 U.S.C. § 1395bb(a)(4), and (b) the Secretary has not determined that the Joint Commission standard is "at least equivalent" to the standard promulgated by the Secretary.  42 U.S.C. § 1395bb(a).  To the extent that the complaint alleges a more generalized "failure to act" to "ensure adequate registered nurse staffing," Am. Compl. at ¶¶ 1, 5, it is merely objecting to enforcement discretion committed to agency discretion by law.

**B.  The Comprehensive Enforcement Scheme Precludes a Private Cause of Action under the APA.**

Anything that might remain of the complaint to this point also should be dismissed on the ground that "statutes preclude judicial review" within the meaning of 5 U.S.C. § 701(a)(1).  In Block v. Community Nutrition Institute, 467 U.S. 340 (1984), the Supreme Court found review to be precluded in a case similar to this one where a statutory scheme gave administrative and judicial remedies to certain regulated entities (milk processors known as "handlers"), but not to the public or other interested parties.  Noting that "[w]hether and to what extent a particular statute precludes judicial review is determined not only from its express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved," id. at 345, the Court held that Congress intended for APA review to be limited to the claims of those regulated entities.

> The regulation of agricultural products is a complex, technical undertaking. Congress channelled disputes concerning marketing orders to the Secretary in the first instance because it believed that only he has the expertise necessary to illuminate and resolve questions about them.  Had Congress intended to allow consumers to attack provisions of marketing orders, it surely would have required them to pursue the administrative remedies [available to regulated parties] as well. The restriction of the administrative remedy to handlers strongly suggests that Congress intended a similar restriction of judicial review of market orders.

Id. at 347.  Because the statutory scheme gave the Secretary the responsibility for protecting the interests of the public, the Court concluded, "[a]llowing consumers to sue the Secretary would severely disrupt this complex and delicate administrative scheme."  Id. at 348.  The Court therefore held that the absence of "an express provision for participation by consumers" in "a complex scheme of this type" is "sufficient reason," standing alone, to conclude "that Congress intended only producers and handlers, and not consumers, to ensure that the statutory objectives would be

-34-

realized" and that "Congress intended to foreclose consumer participation in the regulatory process" and to foreclose an action by consumers under the APA. Id. at 347.

The circumstances here similarly support a conclusion that a claim by nursing associations or other public interest groups to enforce hospital conditions of participation is foreclosed by the comprehensive remedial scheme established by Congress for hospitals. As was discussed above, the Medicare statutes conceive of compliance with conditions of participation as part of an agreement between the Secretary and hospitals, 42 U.S.C. § 1395cc(b)(2), which the Secretary is able to enforce through a comprehensive administrative review process, 42 C.F.R. §§ 498.1-498.103, at the end of which hospitals can seek judicial review of the Secretary's enforcement action in federal court. 42 U.S.C. § 1395cc(h)(1). The legislative history of the Medicare Act expressly states that Congress intended for "the remedies provided by this review procedure" to be "exclusive." S. Rep. No. 89-404 at 55, reprinted in 1965 U.S.C.C.A.N. at 1995. Furthermore, in Illinois Council, the Supreme Court held that this statutory scheme "demands the 'channeling' of virtually all legal attacks" involving conditions of participation through this administrative process, 529 U.S. at 13, and only after an issue has been "so channeled" may it be heard in district court. Id. at 23. Judicial review is therefore limited to claims brought by hospitals for the same reasons that it was limited to claims brought by milk handlers in Community Nutrition.[22]

---

[22] In Community Nutrition, the Supreme Court also emphasized that allowing members of the public to sue under the APA to challenge market orders "would provide handlers with a convenient device for evading the statutory requirement that they first exhaust their administrative remedies" because a "handler may also be a consumer" and, in any event, would only need to find a consumer who is willing to join in or initiate an action in district court. 467 U.S. at 348. The same concern is present here. If a lawsuit alleging too-lenient enforcement of conditions of participation can be brought today by associations friendly to professional registered nurses, a suit alleging too-strict enforcement could presumably be brought tomorrow by friends of hospitals or licensed practical nurses. Congress vested responsibility for protecting the interests plaintiffs seek to vindicate here in the Secretary. If plaintiffs think that a right of action should also be given to public interest groups, their remedy is political, not judicial. See also United States v. Fausto, 484

## IV.  PLAINTIFFS' CHALLENGES TO THE SECRETARY'S USE OF ACCREDITED STATUS TO SELECT SURVEY TRACKS FOR HOSPITALS LACK MERIT.

For the reasons stated above, plaintiffs' complaint should be dismissed for lack of subject-matter jurisdiction.  The reasons why the complaint should be dismissed on the merits are no less important, but require considerably less discussion.  Simply put, plaintiffs' reading of the relevant statute and regulation is clearly erroneous, and whatever theory they are attempting to advance under the "non-delegation doctrine" makes no sense.

### A.  Because the Bedside-Availability Regulation Was Promulgated Under 42 U.S.C. § 1395x(e)(5), It Does Not Matter Whether Accreditation Standards Are Equivalent.

The statute on which plaintiffs rely provides that, with certain exceptions, "an institution" which "is accredited as a hospital" by the Joint Commission, 42 U.S.C. § 1395bb(a)(1), "shall be deemed to meet the requirements of the numbered paragraphs" in 42 U.S.C. § 1395x(e), including the 24-hour nursing requirement in paragraph (5).  42 U.S.C. § 1395bb(a) (emphasis added).  A hospital deemed to meet these requirements by receiving Joint Commission accreditation can be placed only on the sample-based and allegation-driven survey track, 42 U.S.C. § 1395aa(c), and its ability to participate in Medicare can be terminated only if that enforcement mechanism reveals "significant deficiencies."  42 U.S.C. § 1395bb(d).  The Secretary is not authorized to use periodic surveys under 42 U.S.C. § 1395aa(a) to enforce paragraph (5) nursing requirements at accredited hospitals.  He has no discretion in this regard.  The "deemed" status of accredited hospitals and the corresponding limitations on survey options are both mandatory.

---

U.S. 439, 448 (1988) ("comprehensive" statutory scheme that gives "administrative and judicial review" only to certain employees is "manifestation of a considered congressional judgment" that other employees should not have claim to raise same issues); Morris v. Gressette, 432 U.S. 491, 500-07 (1977) (private action to challenge Attorney General's failure to make objection to reapportionment plan precluded by statutory scheme of Voting Rights Act).

The exception on which plaintiffs attempt to rely forbids the Secretary from granting deemed status to accredited hospitals with respect to "any standard, promulgated by the Secretary pursuant to paragraph (9) thereof, which is higher than the requirements prescribed for accreditation" by the Joint Commission, 42 U.S.C. § 1395bb(a)(4), unless the Joint Commission "imposes a standard which the Secretary determines is at least equivalent to the standard promulgated by the Secretary." 42 U.S.C. § 1395bb(a). The need to evaluate equivalency arises only with respect to the additional paragraph (9) requirements that "the Secretary finds necessary in the interest of the health and safety of individuals who are furnished services in the institution," 42 U.S.C. § 1395x(e)(9), and only when the Secretary "identifies" the requirements "as being higher or more precise than the requirements for accreditation," after "consulting with" accrediting authorities. 42 C.F.R. § 488.5(a)(3). The regulation that plaintiffs claim is not being properly enforced – 42 C.F.R. § 482.23(b) – simply does not meet these tests.

The analysis begins with the proposition that the Secretary's "construction of [his] own regulations is entitled to substantial deference," Shalala v. Guernsey Mem'l Hosp., 514 U.S. 87, 95 (1995) (quoting Lyng v. Payne, 476 U.S. 926, 939 (1986)), and "must be given 'controlling weight unless it is plainly erroneous or inconsistent with the regulation.'" Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994) (quoting Udall v. Tallman, 380 U.S. 1, 16 (1965), and Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 414 (1945)). In this case, the Secretary's interpretation of his own regulations could not be clearer. The preamble to the regulation at issue here plainly states that the nursing standards in 42 C.F.R. § 482.23 were promulgated exclusively under "Section 1861(e)(5) of the Social Security Act" (which is codified at 42 U.S.C. § 1395x(e)(5)), 51 Fed. Reg. at 22,018, and not under Section (e) (9). To confirm the point, the Secretary has never made a finding under 42 C.F.R. § 488.5(a) as to whether the Joint Commission's accreditation

standards for nursing are higher or more precise than the regulations.  Clearly, he intended for enforcement of the nursing regulations at accredited hospitals to be subject to deeming and placed on the appropriate survey track.

An examination of the regulation's text and structure only confirms the point.  As was discussed earlier, 42 U.S.C. § 1395x(e)(5) states, in pertinent part, that a hospital must provide "24-hour nursing service rendered or supervised by a registered professional nurse" and have "a licensed practical nurse or registered professional nurse on duty at all times."  The regulation promulgated at 42 C.F.R. § 482.23 merely elaborates on the features a hospital must possess to meet these requirements.

Tracking the language of the statute, the regulation generally provides that the hospital "must have an organized nursing service that provides 24-hour nursing services" and the "nursing services must be furnished or supervised by a registered nurse."  42 C.F.R. § 482.23.  Subsection (a) goes on to define what circumstances must exist for the nursing service to be considered "well-organized."  42 C.F.R. § 482.23(a).  Subsections (b) and (b)(1) define what circumstances must exist for there to be a bona fide 24-hour service rendered or supervised by a registered nurse.  To meet this test:

- "The nursing service must have adequate numbers of licensed registered nurses" and other personnel "to provide nursing care to all patients as needed."  42 C.F.R. § 482.23(b).

- "There must be supervisory and staff personnel for each department or nursing unit to ensure, when needed, the immediate availability of a registered nurse for bedside care of any patient."  Id.

- The nursing services must actually be provided on a "24-hour" basis.  42 C.F.R. § 482.23(b)(1).

- The services "must be furnished or supervised by a registered nurse."  Id.; and

-38-

- With exceptions not relevant here, the hospital must "have a licensed practical nurse or registered professional nurse on duty at all times."  Id.

The regulation then goes on to mandate that the nursing service "must have a procedure to ensure that hospital nursing personnel for whom licensure is required have valid and current licensure," 42 C.F.R. § 482.23(b)(2); "the nursing care of each patient" must be supervised and evaluated by a "registered nurse," 42 C.F.R. § 482.23(b)(3); the hospital must develop and keep current a nursing care plan for each patient, 42 C.F.R. § 482.23(b)(4); nursing care must be assigned "in accordance with the patient's needs," 42 C.F.R. § 482.23(b)(5); and, where a hospital employs an outside nursing service, nurses employed by the service must meet the same standards as employee-nurses. 42 C.F.R. § 482.23(b)(6).  The last subsection of the regulation deals with how nurses should prepare and administer drugs and injections.  42 C.F.R. § 482.23(c).

The bedside-availability test in 42 C.F.R. § 482.23(b) can reasonably be construed as part of the integrated whole of the regulation at 42 C.F.R. § 482.23, which defines what it means to have a "24-hour nursing service rendered or supervised by a registered professional nurse" and what it means to have "a licensed practical nurse or registered professional nurse on duty at all times."  42 U.S.C. § 1395x(e)(5).  It cannot plausibly be read as an oasis in which the Secretary, sub silentio, placed a totally separate, paragraph (9) requirement "in the interest of the health and safety" of patients.  42 U.S.C. § 1395x(e)(9).  The Secretary is therefore expressly required to deem hospitals accredited by the Joint Commission as meeting the bedside-availability regulation, 42 U.S.C. § 1395bb(a)(1), and he is required to place accredited hospitals on the sample-based and allegation-driven survey track for enforcement of the requirement, 42 U.S.C. §§ 1395aa(c), 1395bb(d), regardless of whether the accreditation standards are equivalent to the bedside-availability regulation or, for that matter, whether the Joint Commission has any nursing-related standards at

-39-

all. If plaintiffs believe that the accreditation standards are objectively "lower" than the regulatory standards with respect to nurse-staffing, Am. Compl. at ¶ 37, their remedy is to ask the Joint Commission to raise its standards. Their argument has no relevance to whether the Secretary has properly placed accredited hospitals on the right survey track for purposes of enforcement.

### B. The Accreditation Standards of the Joint Commission Could Reasonably Be Construed to Be Equivalent to the Regulations.

For the reasons stated above, plaintiffs have not established that the bedside-availability regulation at 42 C.F.R. § 482.23(b) was promulgated under 42 U.S.C. § 1395x(e)(9), and therefore it is not necessary to consider whether the regulation is "higher than the requirements prescribed for accreditation" by the Joint Commission, 42 U.S.C. § 1395bb(a)(4), or whether the accreditation standards are "at least equivalent" to the regulation. 42 U.S.C. § 1395bb(a).[23] Even when plaintiffs' claim is taken on its own terms, however, there is simply no merit in their contention that the bedside-availability standards in the regulation <u>must</u> be construed to be either higher or substantially more stringent than the standards for registered-nurse staffing used in the private accreditation process.

To meet the requirements of the Medicare regulations, a hospital "must have an organized nursing service that provides 24-hour nursing services," 42 C.F.R. § 482.24; those "nursing services must be furnished or supervised by a registered nurse," <u>id</u>., and "[t]here must be supervisory and staff personnel for each department or nursing unit to ensure, when needed, the immediate availability of a registered nurse for bedside care of any patient." 42 C.F.R. § 482.23(b). To meet the Joint Commission's accreditation standards, the hospital must similarly provide "nursing

---

[23] Furthermore, as was discussed above, even if plaintiffs could make a case on the merits, the only relief for which they should be asking is a remand to the Secretary to make an equivalency determination and to place accredited hospitals on the periodic survey track in the meantime.

services 24 hours a day, 7 days a week," Joint Commission Manual at NR-4; the hospital must have a "qualified staff," id. at HR-3, that includes "[r]egistered [n]urses," id. at GL-15; it must provide "the right number of competent staff" – including registered nurses – "to meet patients' needs," id. at HR-1; and there must be "at least one on-premise registered nurse (RN) furnishing or supervising the service 24 hours a day, 7 days a week." Id. at NR-4. The two standards could reasonably be read as virtually identical. It would not be implausible for the Secretary to construe them as at least substantially equivalent.[24] So long as the Joint Commission interprets the word "supervising" as connoting the availability of a registered nurse to supervise (or take over) bedside care, when needed, it would not be unreasonable for the Secretary to conclude that the accreditation standard is "at least equivalent," 42 U.S.C. § 1395bb(a), to the regulatory requirement at 42 C.F.R. § 482.23(b).[25]

### C. The Secretary Has Not Unlawfully Delegated His Enforcement Authority to the Joint Commission.

Plaintiffs' only other argument on the merits – that the Secretary is "unlawfully delegating to a private party" the "authority to determine the sufficiency of its standards when measured against the . . . Conditions of Participation," Am. Compl. at ¶ 2 – makes little sense. Although a

---

[24] The word "'[e]quivalent'" is "a term capable of broad interpretation," Cospito v. Heckler, 742 F.2d 72, 88 (3d Cir. 1984), and it connotes approximate similarity, not exact sameness. See Black's Law Dictionary 581 (8th ed. 2004) ("[e]qual in value, force, amount, effect, or significance;" "[c]orresponding in effect or function;" "nearly equal;" "virtually identical"); Random House-Webster's Unbridged Dictionary 657 (2d ed. 2001) ("equal in value, measure, force, effect, significance, etc.;" "corresponding in position, function").

[25] In their second amended complaint, plaintiffs overlook the specific reference to registered nurses that now appears in the Joint Commission's "elements of performance" for nursing. Joint Commission Manual at NR-4. Their averment that the accreditation standards "are totally devoid of standards and requirements concerning the immediate availability of a registered nurse to render bedside care to patients," Am. Compl. at ¶ 33, therefore appears to be a relic accidentally left over from earlier versions of the complaint.

"legislature cannot delegate its power to make a law," it "can make a law to delegate a power to determine some fact or state of things upon which the law makes or intends to make its own action depend." United States v. Grimaud, 220 U.S. 506, 520 (1911) (quoting Marshall Field & Co. v. Clark, 143 U.S. 649, 694 (1892)). Making government action contingent on a circumstance that comes into being through the actions of a private party does not delegate any governmental authority to the private party. See Perot v. FEC, 97 F.3d 553, 559-60 (D.C. Cir. 1996) (finding no delegation of authority where regulations permit non-profit organizations to stage candidate debates, so long as the organizations have their own "objective criteria" for deciding which candidates may participate). In this case, the Secretary does not delegate any authority of any kind to the Joint Commission when he determines whether to enforce nurse-staffing requirements by means of periodic surveys, 42 U.S.C. § 1395aa(a); 42 C.F.R. § 488.20, or sample-based and allegation-driven surveys. 42 U.S.C. § 1395aa(c); 42 C.F.R. § 488.7. He merely takes notice (as the statutory scheme instructs him to do) of a fact (whether or not a hospital is accredited by the Joint Commission) when he determines which of the two survey tracks applies to the enforcement of nurse-staffing requirements at a particular hospital. 42 U.S.C. § 1395bb(a). The mere circumstance that a government regulator attaches significance to whether or not a hospital is accredited when it enforces regulatory standards does not "imbue" the accrediting body "with the authority of the state" nor "shift the responsibility" for regulation to the accrediting body. McKeesport Hosp. v. Accreditation Council for Graduate Med. Educ., 24 F.3d 519, 524 (3d Cir. 1994).[26]

---

[26] Accord Shoemaker v. Accreditation Council for Graduate Med. Educ., 1996 WL 341935 at *1 (9th Cir. June 19, 1996) (same); see also Hickey v. D.C. Ct. App., 457 F. Supp. 584, 587 n.2 (D.D.C. 1978) (conditioning admission to state bar on graduation from accredited law school generally not held to delegate governmental authority to law schools or accrediting bodies) (citing Potter v. N.J. Sup. Ct., 403 F. Supp. 1036, 1040 (D.N.J. 1975), aff'd mem., 546 F.2d 418 (3d Cir.

To the extent that plaintiffs are attempting to argue that the <u>statutory scheme</u> itself is unconstitutional because <u>Congress</u> has unlawfully delegated lawmaking authority to the Joint Commission, the claim has equally little merit. Although in <u>Carter v. Carter Coal Co.</u>, 298 U.S. 238 (1936), the Supreme Court expressed doubt about whether it was permissible for Congress to give private-industry representatives the unfettered ability to set prices, <u>id</u>. at 311, the Court subsequently upheld an amended version of the statute that used private-industry standards "as an aid" to price-setting, subject to the "surveillance and authority" of a federal commission. <u>Sunshine Anthracite Coal. Co. v. Adkins</u>, 310 U.S. 381, 388 (1940). In fact, the Supreme Court has twice held that the non-delegation doctrine does not forbid statutory price-control schemes where private producers enjoyed the collective power to veto government marketing orders by majority vote. <u>United States v. Rock Royal Co-Op, Inc.</u>, 307 U.S. 533, 577-78 (1939); <u>Currin v. Wallace</u>, 306 U.S. 1, 15-16 (1939).[27] Taken together, these decisions stand for the proposition that federal regulatory schemes may permissibly rely heavily on the industry standards of "non-governmental expert organizations with specific expertise," at least so long as federal authorities "maintain responsibility for the final conclusion" of the regulatory process in some manner. <u>EMR Network v. FCC</u>, 391 F.3d 269, 273 (D.C. Cir. 2004); <u>see also</u> <u>NARUC v. FCC</u>, 737 F.2d 1095, 1144 (D.C. Cir. 1984) (reliance on private-industry standards permissible where federal agency retains "final authority").

---

1976)).

[27] <u>See also</u> <u>St. Louis, Iron Mountain & S. Ry. v. Taylor</u>, 210 U.S. 281, 287 (1908) (upholding regulation of railroads based on industry standards); <u>Buttfield v. Stranahan</u>, 192 U.S. 470, 492-97 (1904) (upholding regulation of trade based on industry standards); <u>Butte City Water Co. v. Baker</u>, 196 U.S. 119, 126-27 (1905) (recognizing validity of statute that gave legal effect to rules developed by miners).

In Cospito v. Heckler, the Court of Appeals for the Third Circuit applied this principle to a (now repealed) statutory scheme once used to enforce the conditions of participation at psychiatric hospitals accredited by the Joint Commission.  Although the scheme compelled the Secretary to give "special attention" to the accredited status of the hospital, the Court held that it did not offend the non-delegation doctrine because the Secretary retained the power to "independently determine whether a particular institution was qualified for participation" by means of his own "de novo evaluation" of "the adequacy of a hospital's facilities" and he retained the power to "decertify the institution" if he found that it had "serious deficiencies."  742 F.2d at 88.  "Since, in effect, all actions of JCAH are subject to full review by a public official who is responsible and responsive to the political process," the Court held that "there has been no real delegation of authority to JCAH" because the statutory scheme did not "tether[] the Secretary to the JCAH's leash, such that JCAH's promulgated standards must automatically be adopted as the Secretary's standards."  Id. at 89.  The dissenting judge agreed that if the statutory scheme had allowed the Secretary to "correct adjudicatory errors in the JCAH's application of its own regulations," and to "also correct problems with the JCAH's rules themselves," then it would not run afoul of the non-delegation doctrine, id. at 90 (Becker, J., dissenting), although he questioned whether the statute actually retained as much ultimate authority in the Secretary as the majority thought.

In the regulatory scheme at issue in this case, the Secretary retains ultimate authority to determine whether accredited hospitals meet the nurse-staffing requirements of the conditions of participation.  As discussed earlier, it is true that accreditation by the Joint Commission was accorded conclusive weight in the original Medicare Act, but the 1972 amendments changed all that, giving the Secretary the power to conduct his own surveys on a sample-based and allegation-driven basis, 42 U.S.C. § 1395aa(c), and to take corrective action against any accredited hospital

-44-

that does not meet the standards.  42 U.S.C. § 1395bb(d).  There is no question that the Secretary can conduct his own validation survey "to determine whether the accredited hospital does, in fact, meet Medicare/Medicaid participation standards," Evelyn V. v. Kings County Hosp. Ctr., 956 F. Supp. 288, 291 (E.D.N.Y. 1997), and can terminate participation "if his own survey indicates 'significant deficiencies.'"  Woe by Woe v. Cuomo, 729 F.2d 96, 107 n.11 (2d Cir. 1984).  The mere fact that the statutory scheme takes indirect advantage of the Joint Commission's expertise when it establishes survey priorities does not offend the non-delegation doctrine.[28]

## CONCLUSION

For the reasons stated, defendants' motion to dismiss should be granted.

|  |  |
|---|---|
| | Respectfully submitted, |
| OF COUNSEL:<br>DANIEL MERON<br>General Counsel | PETER D. KEISLER<br>Assistant Attorney General |
| CAROL J. BENNETT<br>Acting Associate General Counsel | JEFFREY A. TAYLOR<br>United States Attorney |
| MARK D. POLSTON<br>Deputy Associate<br>General Counsel for Litigation | /s/ Peter Robbins<br>SHEILA M. LIEBER<br>PETER ROBBINS<br>Department of Justice |
| LAWRENCE J. HARDER<br>Supervisory Trial Attorney<br>Department of Health<br>and Human Services | 20 Massachusetts Avenue, N.W., Room 7142<br>Washington, D.C.  20530<br>Tel: (202) 514-3953<br>Attorneys for Defendants |

---

[28] See also Hays v. Hoffman, 325 F.3d 982, 988 (8th Cir. 2003) (Medicare permissibly delegates authority to private contractors); Ass'n of Am. Physicians & Surgeons v. Weinberger, 395 F. Supp. 125, 139-40 (N.D. Ill. 1975), aff'd, 423 U.S. 975 (1975) (upholding authority of Secretary to delegate authority to private organizations to make Medicare decisions, so long as administrative appeal is available); Simon v. Cameron, 337 F. Supp. 1380, 1383 (C.D. Cal. 1970) (upholding state statute that "entrust[s] a private body with law making functions in order to take advantage of [its] expertise and experience in a particular area requiring the exercise of professional judgment and specialized skills").