## UNITED STATES DISTRICT COURT
### FOR THE
### DISTRICT OF COLUMBIA

_____

AMERICAN NURSES ASSOCIATION, et al,          )
                                             )
    Plaintiffs,                              )
                                             )
    v.                                       )   Civ. Action No. 06-1087 (HHK)
                                             )
MICHAEL O. LEAVITT, et al.,                  )
                                             )
    Defendants.                              )
_____ )

### PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT

      Plaintiffs respectfully request that this Court deny Defendants' motion to dismiss.
For the reasons in support of this opposition, Plaintiffs refer the Court to the attached
memorandum of points and authorities.  Plaintiffs request that a hearing be set regarding
this matter.  A proposed order is also attached.

                Respectfully submitted,

                /s/
                _____
                Alice L. Bodley
                General Counsel
                D.C. Bar #939009

                Jocelyn Winston
                D.C. Bar #434639
                American Nurses Association
                8515 Georgia Avenue  Suite 400
                Silver Spring, MD 20910
                301-628-5127

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF COLUMBIA

_____

AMERICAN NURSES ASSOCIATION, <u>et al.</u>,    )
                                                )
          Plaintiffs,                           )
                                                )
          v.                                    )    Civ. Action No. 06-1087 (HHK)
                                                )
MICHAEL O. LEAVITT, <u>et al.</u>,              )
                                                )
          Defendants.                           )
_____   )

### <u>PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT</u>

Alice L. Bodley          American Nurses Association
General Counsel          8525 Georgia Avenue, Suite 400
D.C. Bar #939009         Silver Spring, MD 20910
301-628-5127

Jocelyn Winston          Attorneys for Plaintiffs
Senior Counsel
D.C. Bar #434639

Of  Counsel:
Maureen Cones
Senior Counsel

## **TABLE OF CONTENTS**

INTRODUCTION………………………………………………………………1

ARGUMENT …………………………………………………………......…4

I.      THE COURT HAS SUBJECT MATTER DURISDICTION AND THE
        DEFENDANT'S MOTION UNDER F.R. CIV.P. 12(b)(1) SHOUD BE
        DENIED……………………………………………………………..……..5

        A.     PLANTIFFS HAVE STANDING TO SUE IN THEIR OWN
                RIGHT……………………………………………………………6

        B.     PLAINTIFFS MEET THE REQUIREMENTS TO ESTABLISH
                ASSOCIATIONAL STANDING FOR THIS LAWSUIT……….…..11

                1.   Plaintiffs' Member Nurses Have Standing To Sue
                     In Their Own Right……………………………………...........12

                     a.   Plaintiffs' Members Have Suffered a Concrete and
                          Particularized Injury-in-Fact………………………….……12

                     b.   Plaintiffs' Members' Injuries are Traceable to
                          The Secretary's Inaction……………………………..…..16

                     c.   A Favorable Decision From the Court Will Likely
                          Redress the Injury to Plaintiffs………………..……....19

                2.   Plaintiffs' Seek to Protect an Interest Germane to Their Purpose...20

                3.   Plaintiffs' Suit Does Not Require the Participation of
                     Individual Members…………………………………………….…21

        C.     PLAINTISS'S CLAIMS ARE REVIEWABLE UNDER THE
                ADMINISTRATIVE PROCEDURE ACT……………………………...22

.

                1.   The Enforcement of the (e)(9) Health and Safety Nurse Staffing
                     Regulation is Mandatory, Non-delegable and Not Committed to
                     Agency Discretion by Law………………………………..…23

                     a.   The Statute Provides Substantive Guidelines for the
                          Secretary to Apply…………………………………..…..23

                     b.   "Agency Discretion" Does Not Permit Abdication of
                          Responsibility…………………………………………..25

2. The Enforcement Scheme Does Not Preclude a Private Cause of Action Under the Administrative Procedure Act…………………………………………………………………25

II. THE DEFENDENTS MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED SHOULD BE DENIED……………………………………………………...28

1. The Registered Nurse Staffing Standard was Promulgated Under 42U.S.C.§1395x(e)(9) Prompting a Requirement for the Joint Commission Standards to be Equivalent ……………………………29

a. Regulatory History Reveals the (e)(9) Foundation for the Registered Nurse Staffing Requirements …………………..…….…30

b. The Requirements of 42 C.F.R. § 482.23 Far Exceed the Statutory Requirement for Which the Joint commission Accreditation Is Automatically Deemed Sufficient………..…...34

c. The Joint Commission Standards are lower than Those Set by the Secretary……………………………………………………...37

d. Defendants May Not Delegate Enforcement…………….…..41

e. The Existence of Survey Options Does Not Undermine the Validity of Plaintiff's Claims…………………………….…..43

CONCLUSION………………………………………………………………..46

Exhibit A: Declaration of Linda J. Stierle In Support of Jurisdiction

Exhibit B: Declaration In Support of Jurisdiction from Tina Gerardi

Exhibit C: Declaration in Support of Jurisdiction from Judith A. Huntington

Exhibit D: American Nurses Association Certificate of Incorporation

Exhibit E: Linda H. Aiken et al., *Hospital Nurse Staffing and Patient Mortality, Nurse Burnout, and Job Dissatisfaction,* 288 JAMA 16, 1987-93 (2002).

Exhibit F: New York State Nurses Association, *The Nursing Shortage in New York City Public Hospitals: How is it Affecting Patients?,* October 18, 2005

Exhibit G: In the Matter of Grievance Arbitration between Sacred Heart Medical Center and Washington State Nurses Association (Arbitrator Levak, May 28, 2006).

Exhibit H: Cheryl A. Niespodziani, *The CMS-the Joint Commission Crosswalk: A Side-by-Side Analysis of the CMS Conditions of Participation and the Joint Commission Standards* (HCPro, Inc. 2006).

.

## TABLE OF AUTHORITIES

### CASES

*ACLU Found. of S. California v. Barr,* 952 F.2d 457 (D.C. Cir. 1991)…………………………29

*Allen v. Wright et al.,* 468 U.S. 737 (1984)…...………………………………………………11

*Am. Chiropractic Ass'n, Inc. v. Leavitt,* 431 F.3d 812 (2005)…………………………………...8

*Arizonans for Official English v. Arizona et al.,* 520 U.S. 43 (1997)………………………… .12

*Bartholet v. Reishauer A.G.,* 953 F.2d 1073 (7th Cir. 1992)……………………………………..29

*Block v. Cmty. Nutrition Inst.,* 467 U.S. 340 (1984)……………………………………………..25

*Bowen v. Michigan Acad. of Family Physicians et al.,* 476 U.S. 667 (1986)……………………26

*Clarke v. Sec. Indus. Ass'n,* 479 U.S. 388 (1987)………………………………………………..8

*Conley v. Gibson,* 355 U.S. 41 (1957)……………………………………………………………...28

*Dioguardi v. Durning,* 139 F.2d 774 (2d Cir. 1944)……………………………………………..29

*Dunlop v. Bachowski,* 421 U.S. 560 (1975)………………………………………………………...23

*Friends of the Earth, Inc. et al. v. Laidlaw Envtl. Serv. (TOC), Inc.,* 528 U.S. 167 (2000)……..12

*Gibson v. City of Chicago,* 910 F.2d 1510 (7th Cir. 1990)…………………………………………5

*Heckler v. Chaney,* 470 U.S. 821 (1985)………………………………………………………...23

*Heckler v. Ringer,* 466 U.S. 602 (1984)………………………………………………………27

*Hishon v. King & Spalding,* 467 U.S. 69 (1984)………………………………………………...28

*Hunt v. Washington State Apple Adver. Comm'n,* 432 U.S. 333 (1977)……………………..11, 21

*Linda R.C. v. Richard D. et al.,* 410 U.S. 614 (1973)……………………………………17, 18

*Lujan v. Defenders of Wildlife et al.,* 504 U. S. 555 (1992)……………………………………12

*Moore v. Bd. of Educ. of Chicago,* 300 F Supp. 2d 641 (N.D. Ill. 2004)………………………..5

*Nat'l Ass'n of Regulatory Utility Comm'r v. Fed. Communications Comm'n,* 737 F.2d 1095
    (D.C. Cir. 1984)…………………………………………………………………………...42

*Nat'l Athletic Trainers' Ass'n, Inc.  v. U. S. Dep't of Health and Human Serv., et al.,* 394
    F.Supp.2d 883 (N.D. Tex. 2005)…………………………………………………………26

*Nat'l Motor Freight Traffic Ass'n, Inc. et al. v. U.S. et al.,* 372 U.S. 246 (1963)………………11

*Nat'l Park and Conservation Ass'n v. Stanton,* 54 F.Supp.2d 7 (D.D.C. 1999)……………..42, 43

*Neitzke v. Williams,* 490 U.S. 319 (1989)………………………………………………..29

*Norton v. S. Utah Wilderness Alliance,* 542 U.S. 55 (2004)……………………………..22

*Pfizer, Inc. v. Heckler,* 735 F.2d 1502 (D.C. Cir. 1984)…………………………………26

*Raila v. U. S.,* 355 F.3d 118 (2d Cir. 2004)………………………………………………...5

*Royal v. Leading Edge Prods., Inc.,* 833 F.2d 1 (1ˢᵗ Cir. 1987)…………………………….5

*Scheuer v. Rhodes,* 416 U.S. 232 (1974)………………………………………………...29

*Sec. Investor Protection Corp. v. BDO Seidman, LLP,* 222 F.3d 63 (2d Cir. 2000)……………5

*Shalala v. Illinois Council on Long Term Care, Inc.,* 529 U.S. 1 (2000)………………………26

*Shook et al. v. D.C. Fin. Responsibility and Management Assistance Auth.,*
    132 F.3d 775 (D.C. Cir. 1998)……………………………………………………………42

*Sierra Club v. Morton,* 405 U. S. 727 (1972)……………………………………………13

*Sierra Club v. Sigler,* 695 F.2d 957 (5ᵗʰ Cir. 1983)……………………………………...42

*Travel All Over the World, Inc. v. Kingdom of Saudi Arabia,*
    73 F.3d 1423 (7ᵗʰ Cir. 1996)……………………………………………………………29

*Udall v. Tallman,* 380 U.S. 1 (1965)……………………………………………………36

*United Food and Commercial Workers Union Local 751 v. Brown Group, Inc. ,*
    517 U.S. 544 (1996)……………………………………………………………………21

*U.S. v. Giordano et al.,* 416 U.S. 505 (1974)……………………………………………42

*U.S. v. Widdowson,* 916 F.2d 587 (10ᵗʰ Cir. 1990)……………………………………42

*Utahns for Better Transp. v. U. S. Dept. of Transp.,* 295 F.3d 1111 (10ᵗʰ Cir. 2002)…………...11

*Warth et al. v. Seldin et al.,* 422 U.S. 490 (1975)………………………………………6

*Wells v. U. S.,* 851 F.2d 1471 (D.C. Cir 1988)……………………………………………………..29

**FEDERAL STATUTES AND REGULATIONS**

5 U.S.C. § 701 (2006)…………………………………………………………………………..22, 23
5 U.S.C. § 706 (2006)…………………………………………………………………………………22
42 U.S.C. § 1395aa (2006)………………………………………………………………………….43
42 U.S.C. § 1395bb (2005)………………………………………………………...  passim
42 U.S.C. § 1395ff (2006)…………………………………………………………………………26
42 U.S.C. § 1395hh (2005)………………………………………………………………………16
42 U.S.C. § 1395ii (2006)…………………………………………………………………….26, 27
42 U.S.C. § 1395x (2005)…………………………………………………………………...passim


42 C.F.R. § 405.801 (2006)………………………………………………………………….26, 27
42 C.F.R. § 482.23 (2006)………………………………………………………………...passim
42 C.F.R. § 488.5 (2006)………………………………………………………………….35, 36
42 C.F.R. § 488.10 (2006)…………………………………………………………… ………17

Federal Health Insurance for the Aged, 31 Fed. Reg. 13,424 (Oct. 18, 1966), Attachment 1 30,31

Medicare and Medicaid Programs; Hospital Conditions of Participation; Provider Agreements
and Supplier Approval, 62 Fed. Reg. 66,727 (Dec. 19, 1997)……….…………………………..32

Medicare and Medicaid Programs; Conditions of Participation for Hospitals, 51 Fed. Reg.
22,018 (June 17, 1986)……………………………………………………………………...33

Medicare and Medicaid Programs; Conditions of Participation for Hospitals, 48 Fed. Reg. 299
(Jan. 4, 1983)………………………………………………………………………………..34


**OTHER AUTHORITIES**

the Joint Commission, *Comprehensive Accreditation Manual for Hospitals:*
     *The Official Handbook* (2006)…………………………………………………………..passim

*Medicare:  CMS Needs Additional Authority to Adequately Oversee Patient Safety in*
     *Hospitals,* GAO-04-850 at 11-12 (2004)……………………………………………………44

U.S. Dep't of Health and Human Serv., CMS Financial Report 126 (2005)…......................4, 25

## <u>INTRODUCTION</u>

Plaintiffs seek declaratory and injunctive relief from this Court to remedy Defendants' violation of specific, mandatory directives in the Social Security Act. In this case, Plaintiffs contend that the Defendants, through their inaction, have permitted the accreditation of hospitals by the Joint Commission on the Accreditation of Healthcare Organizations (the Joint Commission) to serve as a basis for hospitals' participation in the Medicare program, even when the Joint Commission standards are lower than the requirements, established by the Secretary, in the regulatory Conditions of Participation for Medicare. The Conditions of Participation require in pertinent part:

> (b) Standard: Staffing and delivery of care. The nursing service must have adequate numbers of licensed registered nurses, licensed practical (vocational) nurses, and other personnel to provide nursing care to all patients as needed. There must be supervisory and staff personnel for each department or nursing unit to ensure, when needed, the immediate availability of a registered nurse for bedside care of any patient.

42 C.F.R. § 482.23 (2006).

A "hospital" is defined, in part, as an institution which "provides 24-hour nursing service rendered or supervised by a registered professional nurse, and has a licensed practical nurse or registered professional nurse on duty at all times…" 42 U.S.C. § 1395x(e)(5) (2005), except for certain small, rural hospitals for which certain nursing service requirements are waived. 42 U.S.C. § 1395x(e)(5)(A) (2005). A "hospital" is also defined as an institution which "meets such other requirements as the Secretary finds necessary in the interest of the health and safety of individuals who are furnished services in the institution." 42 U.S.C. § 1395x(e)(9) (2006) (hereinafter referred to as the

Secretary's "(e)(9)" authority).    The registered nurse staffing standards quoted above is such a requirement.

The Joint Commission's accreditation is equivalent to approval for participation in the Medicare program, provided that the Joint Commission standards are as high as those set by HHS pursuant to the Secretary's (e)(9) authority.  *See* 42 U.S.C. § 1395bb(a)(4) (2005).  Plaintiffs contend that the Joint Commission standards for registered nurse staffing are not as high as those set by HHS, and therefore, the Joint Commission accreditation should not be presumed to qualify hospitals for participation in Medicare.  HHS, through its inaction, has permitted hospitals to participate in Medicare without the required enforcement of the Conditions of Participation, resulting in unnecessary risk and injury to patients and registered nurses alike.

The Joint Commission is a private, non-profit accrediting organization controlled by its sponsors, the American Medical Association, the American Hospital Association, the American College of Physicians-American Society of Internal Medicine, and the American Dental Association.  The Joint Commission receives its funding through fees paid by hospitals to receive accreditation review and through fees paid by hospitals to the Joint Commission's consulting arm that assists hospitals in trying to obtain the Joint Commission accreditation.  Through its benign neglect, HHS is permitting the Joint Commission, with its vested interest in accrediting hospitals, to avoid application of the mandatory and higher standards that are embodied in the Conditions of Participation.

In their defense of the inaction of HHS, Defendants contend that the government's verification of the Joint Commission's work through subsequent random

surveys or surveys that respond to complaints constitutes a system for ensuring that the Joint Commission's standards are as high as those of HHS.  See Defendants' Introduction to their Memorandum in Support of Defendants' Motion to Dismiss Second Amended Complaint ("Defs. Mot. to Dismiss 2nd A. Comp.") at 1-2.  Defendants' argument reveals a fundamental flaw in their analysis.  The hindsight view that these surveys provide does not constitute compliance with the law that defines the basis for accredited hospitals to be deemed to have met the conditions of participation by virtue of their accredited status.  In other words, given that the law grants accredited hospitals the presumption of having met the Medicare Program standards *if* the Joint Commission standards are as high as those established by the Secretary pursuant to the (e)(9) authority,  the Defendants cannot claim that after-the-fact reviews of the accredited and participating hospitals comply with the law.  Equivalent standards are a threshold requirement.  Hospitals must meet the HHS standard *before* they can be deemed to have met the Medicare Program Standards.

In building on this flawed analysis,  Defendants devote great effort at attempting to divert the Court's attention from the real issue in the case.  They correctly identify the statutory mechanisms for determining compliance with the Conditions of Participation, but then incorrectly attribute legal impact to those mechanisms.  Specifically, they point out that the non-Joint Commission accredited hospitals are reviewed by state agency contractors of HHS that conduct "periodic surveys" of the hospitals to determine if they meet the Conditions of Participation.  Defendants then argue that in order to establish jurisdiction, the Plaintiffs are required to allege and prove that the non- Joint Commission accredited hospitals reviewed on the periodic survey

3

track have better registered nurse staffing than the hospitals that are accredited by the Joint Commission  (Defs. Mot. to Dismiss 2nd A. Comp. at 5).[1]

Defendants tortured analysis begs the question.  Plaintiffs need not show that all other aspects of the Medicare program regarding the Conditions of Participation are working well, better than, or in compliance with law in order to show that the aspects of the program about which Plaintiffs complain do not comply with the law.  Rather, Plaintiffs contend that, as a matter of law, hospitals cannot participate in the Medicare Program if they do not have registered nurse staffing that complies with 42 C.F.R. §482.23 (2006).

The attempted reframing of the case by Defendants misses the point:  Plaintiffs contend that Defendants have done nothing to enforce the mandatory, higher RN staffing standard set forth in the Conditions of Participation.  (Compl. at ¶40, 48.)  Defendant CMS essentially acknowledged its inaction by noting its intention to develop "regulatory changes to implement the statutory requirement to deny deemed status where CMS requirements are higher than the requirements prescribed for accreditation by the Joint Commission."  U.S. Dep't of Health and Human Services, CMS Financial Report 126 (2005).  HHS and CMS inaction in the face of a statutory exclusion to the scope of the Joint Commission's accreditation cannot be hidden by multiple references to the ways hospitals are evaluated in other spheres and for other purposes.

## **ARGUMENT**

---

[1] Defendants essentially contend that the court should  dismiss plaintiffs' complaint for failing to plead and prove these allegations.  However, these allegations are not elements of a prima facie claim for injunctive or declaratory relief under any theory of liability asserted by plaintiff and Defendants cite to no authority to the contrary.

## I.  THE COURT HAS SUBJECT MATTER JURISDICTION AND THE DEFENDANT'S MOTION UNDER F.R. CIV. P. 12(b)(1) SHOULD BE DENIED

When ruling upon a 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, the court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of Plaintiffs.  Dismissal is inappropriate unless it appears beyond doubt that the Plaintiffs can prove no set of facts that would entitle them to relief. *See Raila v. U. S.,* 355 F.3d 118 (2d Cir. 2004) (*citing Sec. Investor Protection Corp. v. BDO Seidman, LLP,* 222 F.3d 63, 68 (2d Cir. 2000)).  The district court must construe the complaint liberally, treating all well-pleaded facts as true and drawing all reasonable inferences in favor of the plaintiffs.  *See Royal v. Leading Edge Prods., Inc.,* 833 F.2d 1, 1 (1st Cir. 1987).  The purpose of a motion to dismiss is to test the sufficiency of the complaint, not to decide its merits.  *Gibson v. City of Chicago,* 910 F.2d 1510, 1520 (7th Cir. 1990); *Moore v. Bd. of Educ. of Chicago,* 300 F. Supp. 2d 641 (N.D. Ill. 2004).

Plaintiffs acknowledge that "[i]n determining whether to grant a motion to dismiss for lack of subject matter jurisdiction, the Court may either consider the complaint alone, or the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Herbert v. Nat'l Acad. of Science,* 297 U.S. App. D.C. 406, 974 F.2d 192, 197 (D.C. Cir. 1992).  In this case, defendants ask this court to determine standing based on the complaint and facts that are in dispute, including the following facts, some of which are intertwined with the case on its merits:

        a. Whether the Joint Commission's standards are "at least equivalent to" the HHS participation requirements for RN staffing;

b. Whether plaintiffs' members have suffered harm as a result of

defendants' regulatory enforcement decisions;

c. Whether plaintiffs can demonstrate that the injuries of which they

complain are "traceable" to defendants' conduct[2] ; and

d. Whether plaintiffs' injuries are within the zone of interests to be

protected or regulated.

Plaintiffs have established standing as a matter of law.  However, in the event that the

Court determines that factual disputes exist which must be resolved before it can declare

that it has subject matter jurisdiction, an alternative Motion for Jurisdictional Discovery

is filed contemporaneously.

### A.  PLAINTIFFS HAVE STANDING TO SUE  IN THEIR OWN RIGHT

An organizational plaintiff may sue on its own behalf "to vindicate whatever

rights and immunities the association itself may enjoy…" *Common Cause v. Federal*

*Election Commission*, 33 U.S. App. D.C., 108 F. 3rd 413 (D.C. Cir. 1997), citing *Warth v.*

*Seldin*, 422 U.S. 490, 511, 45 L. Ed. 2d 343, 95 S.Ct. 2197 (1975).  An organization

suing in its own behalf must establish "concrete and demonstrable injury to the

organization's activities – with [a] consequent drain on the organization's resources –

constituting …more than simply a setback to the organization's abstract social

interests….Indeed the organization must allege that discrete programmatic concerns are

being directly and adversely affected by the challenged action." *National Taxpayers*

_____

 [2] Defendants use the term "traceability" interchangeably with "causally connected." Defs. Mot. to Dismiss 2nd A. Comp. at 21-27.  However, causation is an element of plaintiffs' claims on the merits.  Causation is not an element of standing.  Traceability is a lower standard than causation and the court should not hold plaintiffs to the higher causation standard in ruling upon defendants' 12(b)(1) motion.

*Union Inc. v. United States*,  314 U.S. App. D.C. 377, 68 F.3d 1428, 1433 (D.C. Cir.

1995).  The plaintiffs in the instant case, unlike the plaintiffs in  *Common Cause* and

*National Taxpayers Union*, can establish the three bases for standing: (1) an injury in fact

(2)that is fairly traceable to the defendants' challenged conduct and (3) that is likely to be

redressed by a judicial decision granting plaintiffs' requested relief.

  The programmatic concerns of the Plaintiffs are being affected.  Safe staffing

levels is a programmatic concern of all three plaintiffs in this case.  A failure of

accredited hospitals to have sufficient RN staffing led the American Nurses Association

to develop and issue guidelines on safe staffing levels.  Declaration of Linda J. Stierle

(Stierle Decl.) para.7,  Pls. Ex.A.   The New York State Nurses Association (NYSNA)

"has expended and continues to expend financial resources of the association to monitor

registered nurse staffing levels in hospitals that have been accredited by the Joint

Commission and to respond to the problems of its registered nurse members arising from

insufficient registered nurse staffing."  Declaration of Tina Gerardi (Gerardi Decl.), para.

11.  Pls. Ex.B   The Washington State Nurses Association (WSNA) had to pursue an

arbitration case that involved, as the arbitrator found, staffing deficiencies.  See Exhibit

G.  WSNA "had to expend money on WSNA staff time and on legal fees" in connection

with that case.  Declaration of Judy Huntington (Huntington Decl.) para. 5,  Pls. Ex.C

   If  Defendants enforced the Conditions of Participation regarding RN staffing

levels necessary to provide immediate bedside care when needed in  Joint Commission-

accredited hospitals, plaintiffs would not be forced to take action and expend funds to

safeguard their programmatic interests and the health and safety interests of their

members and patients.  Defendants argue that Plaintiffs, as nurses associations, are not

within the zone of interests of the Medicare Conditions of Participation.  (Defs'. M. to

Dismiss 2nd A. Compl. at 29-30.)   At the outset, Plaintiffs note that the zone of interest

test relates to personal standing.  It is not an element of associational standing.

Defendants' argument to the contrary has no merit and has no support in the law.

However, even on the merits of the argument, it must fail.  Defendants argue that the

Plaintiffs are outside the zone of interest because the Medicare Act protects "individuals

who are age 65 and over and are eligible for retirement benefits, as well as certain

disabled persons and persons suffering from end-stage renal disease." *Id at 30.*  As stated

above, however, a contingent of Plaintiffs' members are registered nurses who are age 65

and older and are Medicare consumers and patients in Medicare-reimbursed hospitals.

Further, the 1917 articles of incorporation for the American Nurses Association provide

that one purpose of the Association is "to distribute relief among such nurses as may

become ill, disabled, or destitute."  Pls. Ex. D .  All three organizations include as part of

their missions the protection of patient health.  Stierle Decl. para. 4 .  (Pls. Ex.A );

Gerardi Decl., para.  4, 5 & 6, Pls. Ex. B;  Huntington Decl. para. 8, (Pls.Ex.C ).

        More importantly, Defendants apply the zone of interest test too stringently, thus

reaching the incorrect conclusion that Plaintiffs are excluded.  The zone of interests test is

not particularly demanding and "does not require an indication of congressional purpose

to benefit the would-be plaintiff." *Am. Chiropractic Ass'n, Inc. v. Leavitt*, 431 F.3d 812,

815 (2005) (*quoting Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399-400 (1987)).  Rather,

the D.C. Circuit Court has stated that the question is whether Congress meant to exclude

a particular class of plaintiffs from those who may sue to enforce the Act. *Am.*

*Chiropractic Ass'n, Inc.*, 479 U.S. at 815.

In *Am. Chiropractic Ass'n*, the D. C. Circuit court found that a chiropractic association had standing to file a complaint in district court alleging that the Secretary had misinterpreted a provision of the Medicare Act regarding which providers would be reimbursed for spine manipulation. *Id.* at 815-16.  The court found that the chiropractic association had more than enough to satisfy the "less-than-demanding" zone of interest test because the interests of Medicare enrollees and the interests of chiropractors converged where the chiropractors provided a service, the enrollees received the service and Medicare reimbursed for the service.  *Id.* at 815.  Plaintiffs in the current case similarly pass the zone of interest test.  The interests of Medicare enrollees and registered nurses in Medicare-reimbursed hospitals converge where the enrollees receive the services of registered nurses in accredited hospitals that participate in the Medicare Program.  Further, both the registered nurses and the Medicare enrollees have converged interests in an adequate level of registered nurse staffing and both are injured by the Secretary's failure to ensure this safe staffing.

For the reasons stated below, and incorporated herein, the Plaintiff associations can demonstrate that the injury they suffer as described above, through having to devote resources to address inadequate RN staffing at Joint Commission-accredited hospitals is fairly traceable to the Defendants' actions.

Defendants argue that plaintiffs' injuries cannot be traced to defendants' inaction because hospital employers are solely responsible for staffing levels.  However, defendants also contend that hospitals are responsive to the Joint Commission survey requirements. ("The prospect of losing accreditation through one of the Joint Commission's random or for-cause surveys would presumably be held in similar, if not

higher, regard [than through an allegation driven survey]"). Defs. Mot. to Dismiss 2nd A.

Comp. at 24.    Hospitals do care about accreditation and Medicare dollars and their

compliance with a better-defined Joint Commission standard would go far toward

improving compliance with the Conditions of Participation that accreditation of most of

the nation's hospitals is supposed to reflect.

 Plaintiffs' injuries are traceable to defendants' inaction because HHS permits all

Joint Commission-accredited hospitals to participate in the Medicare Program without

evaluating the sufficiency of the Joint Commission standard for RN staffing and, as a

result, hospitals without sufficient RN staffing remain below the HHS "radar screen" for

enforcement purposes.  Whether defendants' inaction rises to the level of proximate

cause is not relevant to a determination of standing.  The only question is whether

plaintiffs' injuries can be traced to defendants' conduct.  Clearly, in this case, for the

reasons set forth above, it can.

 Unlike the coaching organizations that lacked standing to contest U.S.

Department of Education guidelines, Plaintiffs can show that relief requested would

redress their injuries. Defendants rely upon *Nat'l Wrestling Coaches Ass'n v. DOE*, 366

F. 3d 930, 936-40, wherein the court determined that changing the requirement of

proportionality for men's and women's sports would  not necessarily result in the

reinstatement of men's college wrestling programs.  Contrary to college wrestling, as

Defendants have acknowledged, "millions of dollars in Medicare money [are] at stake"

for hospitals that do not comply with the Conditions of Participation .  Defs. M. to

Dismiss 2nd A Comp. at 23.  Whether the Court orders Defendants to grant provisional

status to Joint Commission-accredited hospitals, or whether the court requires Defendants

begin periodic surveys to evaluate hospital compliance, the Joint Commission will be

motivated to keep its accrediting business alive by amending its standards, and hospitals

will be motivated by the "millions of dollars in Medicare money" to comply with the RN

staffing Condition of Participation.  Thus, the injury will be redressed.

####    B.  **PLAINTIFFS MEET THE REQUIREMENTS TO ESTABLISH ASSOCIATIONAL STANDING FOR THIS LAWSUIT.**

Defendants erroneously argue that Plaintiffs do not have standing to bring this

suit.  It is well-settled law that an association "may have standing solely as the

representative of its members."  *Warth et al. v. Seldin et al.*, 422 U.S. 490, 511 (1975);

*See also Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333 (1977); *Nat'l*

*Motor Freight Traffic Ass'n, Inc. et al. v. U.S. et al.*, 372 U.S. 246 (1963); *Utahns for*

*Better Transp. v. U.S. Dept. of Transp.*, 295 F.3d 1111 (10th Cir. 2002).  Therefore, for

this court to exercise subject matter jurisdictions, Plaintiffs need only show that they meet

the requirements for associational standing.

In doing so, Plaintiffs rely on case law that specifically addresses associational

standing, starting with *Hunt*.  These cases are more applicable to Plaintiffs' case than

*Allen v. Wright et al.,* 468 U.S. 737 (1984) and others on which the Defendants rely,

many of which do not involve associations.  *See Allen,* 468 U.S. at 739 (involving a

challenge by parents of black public school children of the IRS's failure to deny tax-

exempt status to racially discriminatory private schools).  In *Hunt*, the Supreme Court

stated that an association has standing to sue on behalf of its members if three conditions

are met: 1) the association's members would otherwise have standing to sue in their own

right; 2) the interest the association seeks to protect is germane to the association's

purpose; and 3) neither the claim asserted, nor the relief requested, requires the

participation of individual members in the lawsuit.  432 U.S. at 344.[3]  Plaintiffs American

Nurses Association, New York State Nurses Association and Washington State Nurses

Association clearly establish associational standing because their members have standing

to sue in their own right, they seek to protect an interest germane to their purpose, and

their claims do not require the participation of individual members.

### 1. Plaintiffs' Member Nurses Have Standing to Sue in Their Own Right.

Nurse members of Plaintiff associations establish standing by showing a

concrete and particularized injury-in-fact, a causal connection between this injury and the

Secretary's inaction, and that the injury is likely to be redressed by a favorable decision

from the court.  *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992).  *See also*

*Arizonans for Official English v. Arizona et al.,* 520 U.S. 43, 65-66 (1997) (stating that an

association has standing if its members would have standing to sue in their own right);

*Friends of the Earth, Inc. et al. v. Laidlaw Envtl.  Serv. (TOC) Inc.*, 527 U.S. 167, 180-81

(2000).

### a.  Plaintiffs' Members Have Suffered a Concrete and Particularized Injury-in-fact.

Plaintiffs' members are suffering immediate and concrete injury because of the

Secretary's inaction and would establish standing had they themselves sued.  The

Defendants' failure to act has caused the invasion of Plaintiffs' members'  "legally

protected interests."  *See id.* at 560 (articulating the standard for showing an injury-in-

fact).  The injury-in-fact test also requires showing that Plaintiffs are within the zone of

---

[3] To the extent Defendants claim that Plaintiffs, as organizations, or their
missions, must be within the zone of interest of the Medicare laws, their argument is
misplaced.   The zone of interest requirement is an attribute of personal standing, not
associational standing.

interests protected by the law, or that the party seeking review is "himself adversely affected." *Sierra Club v. Morton*, 405 U.S. 727, 740 (1972). The purpose of this test is to "put the decision as to whether review will be sought in the hands of those who have a direct stake in the outcome."

     In this case, plaintiffs' members have suffered personal, physical injuries and have been forced to do without certain rights afforded to them under the terms of their collective bargaining agreements. They have suffered from high levels of fatigue and anxiety as a result of deficient staffing. Gerardi Decl.. para. 12 (Pls.' Ex. C) These injuries are sufficient proof that plaintiffs' members are themselves adversely affected and that their legally protected interests have been invaded. Moreover, Plaintiffs' nurse members have a direct stake in whether the Secretary adequately enforces the Conditions of Participation regarding nurse staffing and suffer on a daily basis in the workplace from the Secretary's failure to do so. As stated in Plaintiffs' Complaint, the Secretary's failure to enforce the Conditions has placed Plaintiff's members, "in the untenable position of providing health care services in a manner that does not comport with the high professional standards of the nurses who work for affected hospitals." (Pls. ['] Compl. at ¶ 43.) For example, Plaintiffs' nurse members, as well as the public, are harmed by a failure to require adequate staffing on medical/surgical units where registered nurse-to-patient staffing ratios of 1:8 result in patients being 28% more likely to die within 30 days than those in units with RN to patient ratios of 1:4, and complications such as urinary tract infections, pneumonia, shock and gastrointestinal bleeding are much more prevalent. (Pls. ['] Compl. at ¶ 44); Exhibit E: Linda H. Aiken et al., *Hospital Nurse Staffing and*

*Patient Mortality, Nurse Burnout, and Job Dissatisfaction,* 288 JAMA 16, 1987-93

(2002).

      Plaintiff NYSNA evaluated RN staffing at the Joint Commission accredited New

York City Health & Hospitals Corporation.  Exhibit F: New York State Nurses

Association, *The Nursing Shortage in New York City Public Hospitals: How is it*

*Affecting Patients?,* October 18, 2005.  In that report, NYSNA stated that more than

3,700 reports of assignments that, in the professional judgment of the RNs, put patients at

risk, were made between September 2003 and September 2005.  One report stated that,

on the Medical/Surgical Unit on January 6, 2004, there were two RNs on duty for 23

patients.  The NYSNA member wrote, "I've been assigned 12 patients. No head nurse.

Tasks include blood glucose monitoring, dressings, nasogastric tubes, suctioning,

medication administration through both IV and PO, full and safety rounds, assist and

supervise nurses' aides with total care, assist in feeding.  All patients over age 65."  *Id*. at

5.  The Report also notes that on the Medical/Surgical Observational Unit on December

14, 2002, "The assignment was not safe.  I was left alone on the medical/surgical

observation unit with two patient care associates.  At one point, I was told that I was

required to do admission and medication administration on the regular floor.  I reluctantly

complied with the request [leaving no RN in the unit]."  *Id*. at 6.  On the Intensive Care

Unit on March 21, 2005, an RN reported in the context of two RNs (one being a

temporary agency nurse), caring for 12 patients:  "Patient care and safety is being

jeopardized.  Very high risk for medication errors.  Nothing is being done concerning this

critical problem."  *Id*. at 6.

For further proof of how Plaintiffs' nurse members are injured as a result of the Secretary's inaction, Plaintiffs refer the Court to Exhibit G: In the Matter of Grievance Arbitration between Sacred Heart Medical Center and Washington State Nurses Association (Arbitrator Levak, May 28, 2006). Members of WSNA who work at this Joint Commission accredited facility were found to have often missed breaks because the hospital "simply failed to provide sufficient RN staff or other support staff to provide block break relief." Exhibit G at 4. The Arbitrator determined that "the overall record demonstrated that in the vast majority of cases missed breaks related to patient and treatment responsibilities and staffing deficiencies…" *Id.* at 13, n.6.[4]

Defendants make several attempts, all of which fail, to deny that Plaintiffs' members are suffering concrete and actual injuries. Defendants' first allege that Plaintiffs are "simply borrow[ing] an injury allegedly faced by Medicare beneficiaries" to establish standing. (Defs. M. to Dismiss 2nd A. Compl. at 20-21.) Plaintiffs need not "borrow" injuries from anyone. They suffer on a daily basis from arduous working conditions. *See* Exhibit G. They have been forced to work without the breaks that they are entitled to under the collective bargaining agreements. See Huntigton Decl. at para. 5 . They routinely suffer from fatigue and anxiety as a result of inadequate staffing. Huntington Decl. at para. 7 . Further, it is particularly futile for Defendants to assert that Plaintiffs are borrowing injuries from Medicare beneficiaries, as many of Plaintiffs'

---

[4] The foregoing information and attachments are presented in support of Plaintiffs' standing by providing to support for claims of injury. (Compl. at ¶ 42, 43, 44 and 46.) Plaintiffs are contemporaneously filing a Motion for Declaration, or in the Alternative, Motion for Jurisdictional Discovery.. For purposes of reviewing Defendants' Motion to Dismiss, the court is to assume the claimed facts are true and draw reasonable and favorable inferences therefrom to assess whether such claims support the legal theory sufficiently to proceed. See argument *infra* at 44. Plaintiffs' members suffer related harm sufficient to establish standing to proceed.

member nurses are Medicare beneficiaries themselves and consume Medicare-reimbursed

services in hospitals not meeting the RN staffing condition of Participation.  (Pls. [s]

Compl. at ¶ 46).  Plaintiffs' members suffer actual and concrete injury due to the

diminished level of care they receive as a result.[5]

### b.   Plaintiffs' Members' Injuries are Traceable to the Secretary's Inaction.

Plaintiffs' members' injuries from widespread and consistent understaffing of

registered nurses in hospitals across the country are traceable to the Secretary's failure to

enforce the Conditions of Participation.  Under the Social Security Act, the Secretary is

ultimately responsible for ensuring safeguards in the process of hospital accreditation for

the Medicare program and has failed to do so.  *See* 42 U.S.C. § 1395hh (2005) (stating

that the Secretary "shall prescribe such regulations as may be necessary to carry out the

administration of the insurance programs under this title").  The Conditions of

Participation state that:

> The nursing service must have adequate numbers of licensed registered nurses, licensed practical (vocational) nurses, and other personnel to provide nursing care to all patients as needed. There must be supervisory and staff personnel for each department or nursing unit to ensure, when needed, the immediate availability of a registered nurse for bedside care of any patient.

42 C.F.R. § 482.23 (2006).

Despite this standard, however, hospitals that fail to have a sufficient number of

registered nurses, as required by the regulation above, are currently participating in

---

[5] Plaintiffs do not understand why Defendants make their next argument, that Plaintiffs have no "next friend" claim with Medicare beneficiaries, Defs. Mot. to Dismiss 2d A. Comp. at 21, because Plaintiffs' never alleged such a relationship.  Plaintiffs need not claim a "next friend" relationship with Medicare beneficiaries because some of Plaintiffs' nurse members are Medicare beneficiaries.  In addition, Plaintiffs show sufficient injuries to nurse members so it is unnecessary to either "borrow" or adopt the claims of Medicare beneficiaries.

Medicare.  *See* Exhibits A, B (*infra*).  This oversight can be attributed to the Secretary's

failure to adequately supervise  the Joint Commission's role in the accreditation process.

The Medicare Act allows that a hospital may participate in Medicare by allowing the

Joint Commission to release its accreditation report to CMS.  42 C.F.R. § 488.10(b)(2)

(2006).  The Act further states that those hospitals, which are accredited by the Joint

Commission are "deemed to meet" the Conditions of Participation, but also specifically

carves out an exception in order to leave the final authority for determining a provider's

eligibility in the Secretary's hands.  The Act states that the Joint Commission-accredited

hospitals are not deemed to meet "any standard, promulgated by the Secretary pursuant to

paragraph (9) thereof, which is higher than the requirements prescribed for accreditation

by such Commission."  42 U.S.C. § 1395bb(a)(4) (2005).  Clearly, the Conditions of

Participation regarding nurse staffing are higher than the Joint Commission's standards,

which make no mention of having an adequate number of registered nurses to ensure the

immediate availability of a registered nurse for bedside care of any patient.  The

Secretary has failed to make certain that hospitals meet this higher standard; the

"deemed" status of hospitals participating in Medicare is assumed by HHS,

notwithstanding the higher requirements of HHS regarding nurse staffing.  Among many

other hospitals in the United States, the Joint Commission has accredited hospitals at

which members of NYSNA and WSNA work and are adversely affected by the

inadequate levels of RN staffing, yet these hospitals continue to receive funds from the

Medicare program.

Defendants rely on *Linda R.S. v. Richard D. et al.*, 410 U.S. 614 (1973), in

arguing that the connection between injury-inducing staffing practices and the Secretary's

failure to enforce the Conditions of Participation is "speculative." Defs. Motion to

Dismiss 2nd A. Comp. at 26-27. Defendants' reliance is misplaced, however, as *Linda*

*R.S.*, which involves a private citizen seeking an injunction against the allegedly

discriminatory enforcement of a Texas criminal statute involving failure to pay child

support, is not analogous to Plaintiffs' case. *Id.* at 614. In *Linda R.S.*, the mother of an

illegitimate child, who was injured because she was not receiving child support payments

from the child's father, challenged the Texas criminal statute because it only applied to

parents of legitimate children. *Id.* at 614-19. The Court found that the enforcement of

the statute against all parents would result in jailing the child's father, but would not

necessarily result in his payment of child support – thus the nexus between the injury and

the government action was "speculative." Clearly, Plaintiffs' case is different because

the Plaintiffs' injury – harm to nurses, nurse members who are patients, and patients

caused by unsafe registered nurse staffing levels – would certainly be remedied by

enforcement of the Conditions of Participation calling for an adequate number of

registered nurses to ensure the immediate availability of a registered nurse at the bedside

of any patient. Further, the Court in *Linda R.S.* specifically stated that its decision that

the plaintiff did not establish a sufficient nexus applied "in the unique context of a

challenge to a criminal statute." *Id.* at 617.

  Moreover, in support of Defendants' contention that plaintiffs have not suffered an

injury that is traceable to the Secretary's inaction, they state that the Joint Commission

standards are the same as the HHS regulations. Clearly, they are not. Round-the-clock

coverage by one registered nurse simply is not the same as having enough staff to provide

for the immediate availability of an RN to give bedside care as needed. Defendants

suggest throughout their memorandum that plaintiffs should proffer a reason why

surveys conducted by state agencies should catch more staffing problems than the Joint

Commission surveys do.  However, establishing traceability does not require Plaintiffs to

prove another case, i.e., that there are deficiencies in the periodic surveys.

### c.  A Favorable Decision from the Court Will Likely Redress the Injury to Plaintiffs.

Plaintiffs' have set out multiple ways in which their injuries would likely be

redressed by a favorable decision from the court.  Plaintiffs request a declaratory

judgment that determines that the failure of HHS to assure that the Joint Commission

imposes standards at least equivalent to the standards promulgated by the Secretary

constitutes an action unlawfully withheld and results in the improper participation of

hospitals in the Medicare program that do not have adequate nursing services that comply

with the Conditions of Participation.  Plaintiffs also request a declaratory judgment that

finds that through the failure of HHS to assure that the Joint Commission imposes

standards at least equivalent to the standards promulgated by the Secretary while

acknowledging the "deemed" status of the Joint Commission accredited hospitals as

required by law, HHS is engaging in an unlawful *de facto* delegation of its responsibility

to the Joint Commission.  Plaintiffs offer that the Court could redress their injuries by

issuing an order of the Court to (1) set aside HHS acknowledgement of hospitals'

participation in the Medicare program if their accreditation from the Joint Commission

forms the basis for such participation; (2) requiring HHS to provide these hospitals

provisional approval for participation in Medicare to ensure continuing access to health

care services; and (3) requiring HHS to ensure that hospitals comply with the registered

nurse staffing regulation. A favorable decision from the Court would redress Plaintiffs'

injuries by requiring HHS to establish a system to ensure that the Joint Commission standards are at least equivalent to those established by the Secretary of HHS.

### 2. Plaintiffs Seek to Protect an Interest Germane to Their Purpose.

Plaintiffs establish the second requirement for associational standing because they seek to protect an interest that is germane to their purpose. ANA, WSNA and NYSNA seek to protect patients' and nurses' interest in adequate registered nurse staffing levels in our nation's hospitals. Evidence that this interest is germane to the purpose of all three organizations is readily apparent from the Declarations of Stierle, Gerardi, and Huntington, Pls. Ex. A, B, & C. ANA's Bylaws provide that one of the purposes of the ANA is to "work for the improvement of health standards and the availability of healthcare services for all people…" Stierle Decl. para. 4, Pl. Ex. A., ¶ 4. WSNA's mission is to "provide leadership to the nursing profession and promote quality healthcare for consumers through education, advocacy and influencing health care policy in the State of Washington." Huntington Decl, Pl. Ex. C, ¶ 9. Among other things, NYSNA "works for the improvement of health standards and the availability of healthcare services for all people to aid citizens to enjoy a better healthcare benefit." Gerardi Decl., Pl. Ex. B, ¶4. Further, "[o]ne of NYSNA's core issues is to protect patients and nurses by ensuring an appropriate number and mix of nursing staff in health care facilities within the State of New York. *Id.* at ¶ 5.

ANA's implementation of its mission with respect to registered nurse staffing and healthcare has included the development of ANA's *Principles for Nurse Staffing*, a comprehensive policy statement regarding appropriate RN staffing. This work is in accord with ANA's "Core Issues" which include work "to protect patients and nurses by

ensuring an appropriate number and mix of nursing staff in health care facilities throughout the United States."  See, generally, Stierle Decl., Pls. Ex. A .

The Supreme Court has defined an interest that is "germane" to the association's purpose as one that is "central" to the association's purpose.  *Hunt*, 432 U.S. at 344. Based on the ANA's, WSNA's and NYSNA's statements of purpose and their implementation through an emphasis on staffing and patients safety, it is clear that protecting patients' rights and supporting an adequate staffing level of registered nurses is central to their purpose. See generally Pls. Ex. A, B & C.

### 3. Plaintiffs' Suit Does Not Require the Participation of Individual Members.

 The Supreme Court has held that a lawsuit brought by an association seeking prospective or injunctive relief for its members does not normally require individual participation.  *United Food and Commercial Workers Union Local 751(UFCW) v. Brown Group, Inc.*, 517 U.S. 544, 546 (1996) (*citing Hunt*, 432 U.S. at 343).  This element of associational standing is a prudential requirement and focuses on administrative convenience and efficiency, as opposed to elements of a case or controversy within the meaning of the Constitution.  *UFCW Union*, 517 U.S. at 557.  Further, individual participation is not required when the claims are "properly resolved in a group context." *Hunt*, 432 U.S. at 344.  In both *Hunt* and *UFCW Union*, the Court found that the association and the union, respectively, had standing to bring claims on behalf of their members for various forms of injunctive and declaratory relief.  *UFCW Union*, 517 U.S. at 546; *Hunt*, 432 U.S. at 344.  Plaintiffs' case clearly falls under the prevailing legal standard: individual participation is not required for standing where Plaintiffs seek declaratory relief for its members.  Plaintiffs ANA, WSNA and NYSNA do not seek

damages or another remedy that could possibly call into question their associational standing. Rather, Plaintiffs seek a declaratory judgment that HHS has failed to ensure adequate registered nurse staffing – a claim which is properly resolved in a group context.

### C.  PLAINTIFFS' CLAIMS ARE REVIEWABLE UNDER THE ADMINISTRATIVE PROCEDURE ACT.

The Administrative Procedure Act provides for judicial review except to the extent that "an agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2) (2006). "Agency action" is defined to include a failure to act. 5 U.S.C. § 551(13) (2006). Under 5 U.S.C. § 706(1), a federal court may "compel agency action unlawfully withheld or unreasonably delayed." Further, 5 U.S.C. § 706(2) provides that a "reviewing court shall --…(2) hold unlawful and set aside agency action …found to be – (A) arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law…" Required agency action includes "agency regulations that have the force of law." *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 65 (2004). While the Court in *Norton* limited judicial review of agency inaction to a failure to take a discrete action mandated by statute or regulation, this case falls within the scope of such required review. The Joint Commission's accreditation, according to Congress, deems a hospital compliant with the Medicare Act and Conditions of Participation except for the Secretary's more demanding (e)(9) regulations. If Defendants are not going to let the Joint Commission determine the sufficiency of its standards compared to the Secretary's higher health and safety requirements (an unlawful delegation), then the courts must be able to review Defendants' failure to act to enforce both the statute and its regulation.

**1.  The Enforcement of the (e)(9) Health and Safety Nurse Staffing Regulation is Mandatory and Not Committed to Agency Discretion by Law.**

The Supreme Court has stated that an agency's decision not to take enforcement action is presumed to be non-reviewable by the courts under 5 U.S.C. § 701(a)(2) as being "committed to agency discretion."  *Heckler v. Chaney*, 470 U.S. 821, 832 (1985). However, the presumption is rebuttable, and this case provides multiple bases for rebutting that presumption.

**a.  The Statute Provides Substantive Guidelines for the Secretary to Apply.**

Congress was clear and explicit with respect to the effect of accreditation.  It stated that accreditation by the Joint Commission on Accreditation of Hospitals will provide the basis for a hospital to:

> be deemed to meet the requirements of the numbered paragraphs of section 1861(e) [42 U.S.C. §1395x(e)]; except –
> (3) paragraph (3) thereof, and
> (4) any standard, promulgated pursuant to paragraph (9) thereof, which is higher than the requirements prescribed for accreditation by such Commission.

42 U.S.C. § 1395bb(a) (2005).  There is no statutory ambiguity here.  Congress wanted the accreditation process to take the place of HHS review, <u>except</u> with respect to compliance with the (e)(9) health and safety requirements, of which the registered nurse staffing requirement  is one.  The "deemed to meet" language simply does not apply when the requirements for accreditation are not equivalent to the health and safety requirements.

In *Heckler,* the Court cited *Dunlop v. Bachowski*, 421 U.S. 560 (1975) as a case that was decided on somewhat different grounds, but which was consistent with the Court's newly

described presumption of unreviewability of a decision not to initiate an enforcement

action.  In that case, the statutory language was quoted as, "[t]he Secretary shall

investigate such complaint, and if he finds probable cause to believe that a violation

…has occurred…he shall…bring a civil action . . . ."  *Heckler*, 470 U.S. at 833.  In

*Dunlop*, the Court determined that the Labor Management Reporting and Disclosure Act

(LMRDA) provided sufficient statutory guidance to provide the basis for judicial review

of the Secretary's determination not to file a suit.  The Court in *Heckler* noted that there

were "'clearly defined' factors" that would prompt the Secretary of Labor's filing of a

lawsuit.  *Heckler*, 470 U.S. at 834.

      Thus, the Court in *Heckler* determined that the finding of "probable cause to

believe that a violation has occurred" constituted sufficient statutory guidance to take the

matter out of agency discretion.  This LMRDA language is directly analogous to the

language in the Social Security Act:  if the Joint Commission standard is not equivalent

to an (e)(9) regulatory requirement, the Joint Commission accreditation shall not make a

hospital "deemed" to meet the requirements of Section 1861 for purposes of Medicare

Participation.  Note that in *Dunlop*, the Secretary of Labor had determined that the

election violations that he had found would not have affected the outcome of the election.

This agency determination did not deprive the court of the right to review the Secretary's

decision under the Administrative Procedures Act (APA), because, as the Court stated in

*Heckler,* "The statute being administered quite clearly withdrew discretion from the

agency and provided guidelines for exercise of its enforcement power."  *Id.* at 834.  The

"except" clause in 42 U.S.C. § 1395bb(a) also withdraws discretion from the Secretary,

since the HHS registered nurse staffing standard is higher than the Joint Commission

standards.

### b "Agency Discretion" Does Not Permit Abdication of Responsibility.

Finally, the Supreme Court has also recognized that "committed to agency

discretion" may not include a situation, as Plaintiffs identify in this case, where an agency

has "consciously and expressly adopted a general policy" that amounts "to an abdication

of its statutory responsibilities." *Id.* at 833 n.4. HHS has recognized that it lacks a

system for ensuring compliance with the Conditions of Participation, but has not

corrected it. In its Fiscal Year 2005, "CMS Financial Report" Defendant wrote:

"Additionally, we will explore regulatory changes to implement the statutory requirement

to deny deemed status where CMS requirements are higher than requirements prescribed

for accreditation by the Joint Commission." U.S. Dep't of Health and Human Services,

CMS Financial Report 126 (2005). Plaintiffs are unaware of, and Defendants have not

cited, any such regulatory change.

### 2. The Enforcement Scheme Does Not Preclude a Private Cause of Action Under the Administrative Procedure Act

Section 701(a)(1) does not preclude review by this court. Defendants'

erroneously rely on *Block v. Cmty. Nutrition Inst.* to conclude that Plaintiffs' claims are

barred because of statutory preclusion of judicial review. 467 U.S. 340 (1984); Defs. M.

to Dismiss 2nd A. Compl. at 34-35. *Block* is inapplicable, however, for multiple reasons.

First, statutory preclusion of judicial review is a statute-specific inquiry, and *Block*

involved the Agricultural Marketing Agreement Act of 1937, not the Social Security Act.

*See Block*, 467 U.S. at 341. Second, in *Block*, the Court cited the fact that consumers

were excluded from pursuing administrative remedies under the Agricultural Marketing Agreement Act as evidence that Congress did not intend for consumers to have judicial review either. *Id.* at 347. Under the Medicare Act, however, consumers of Medicare may avail themselves of administrative remedies. *See, e.g.,* 42 C.F.R. § 405.801 (2006) (describing when a beneficiary may appeal a Medicare carrier's determination for payment for Part B benefits).

Moreover, the Court has specifically addressed the issue of statutory preclusion of judicial review in the context of the Medicare Act, thus those cases more aptly apply. While most claims arising under the Medicare Act must first exhaust the administrative process before proceeding to district court, *Nat'l Athletic Trainers' Ass'n, Inc. v. U.S. Dep't of Health and Human Serv., et al.,* 394 F. Supp. 2d 883, 893 (N.D. Tex. 2005), the Supreme Court has recognized an exception to this rule. In *Bowen v. Michigan Acad. of Family Physicians*, the Court held that neither 42 U.S.C. § 1395ff nor § 1395ii barred judicial review of Medicare Part B regulations. *Id.* The Court drew the distinction that § 1395ff(b), which authorizes administrative and judicial review of benefit determinations, does not address challenges as to the *method* by which these benefit determinations are made. *Id.* (*emphasis added*). In addition, § 1395ii, which states that 42 U.S.C. § 405(h) is applicable to the Medicare program, does not preclude judicial review as the legislative history reveals "Congress' intent to foreclose review only of 'amount determinations,' not of substantial statutory and constitutional challenges to the Secretary's administration of Part B." *Id.*

 The Court's recent clarification of the *Michigan Academy* exception, in *Shalala v. Illinois Council on Long Term Care, Inc.,* does not limit its effect with respect to

Plaintiffs' case.  See 529 U.S. 1, 5 (2000).  In *Illinois Council*, nursing homes objected to

regulations which imposed sanctions on those homes who had deficiencies, as found by

an inspector, which could jeopardize their ability to receive payment under Part A for

certain beneficiaries.  *Id.* at 6.  The Court found that the jurisdictional bar applied even

though the suit was challenging the agency's *procedure* and was requesting a declaration

of invalidity, as opposed to the direction of payment.  *Illinois Council*, 529 U.S. at 12

(*emphasis added*) (*citing Heckler v. Ringer*, 466 U.S. 602 (1984), in which it held that

§405(h) barred jurisdiction to a suit brought by plaintiffs challenging the lawfulness of

the agency's decision not to provide reimbursement under Part A for a particular medical

operation).  The Court explained that "§ 1395ii does not apply § 405(h) where application

of § 405(h) would not simply channel review through the agency, but would mean no

review at all."  *Id.* at 19.

 Plaintiffs' case clearly differs from *Illinois Council* and falls under the *Michigan

Academy* exception where application of § 405(h) would mean no review at all.  The fact

that HHS and CMS are failing to enforce the Medicare Conditions of Participation

regarding registered nurse staffing levels cannot be addressed in the Medicare

administrative review process because this process is designed only to review payment

determinations.  42 C.F.R. § 405.801 (2006).  As a result, Plaintiffs can obtain review

only in a federal question suit.  In addition, unlike in *Illinois Council*, Plaintiffs will not

later seek money or some other benefit from HHS or CMS; in fact, their claim has

nothing to do with payments or methods of payments for Medicare benefits.  Plaintiffs

have no other agenda than to compel HHS and CMS to enforce their regulations, and a

bar to federal review would mean no review at all.[6]

## II.  DEFENDANTS MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED SHOULD BE DENIED

A court should not dismiss a complaint for failure to state a claim unless it

appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim,

which would entitle him to relief.  *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984);

*Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).  In ruling on a motion to dismiss for failure

---

[6] The Court of Appeals for the District of Columbia recently addressed this issue, in *Am. Chiropractic Ass'n v. Shalala*, reasoning that the crucial question was "whether the Association could get its claims heard administratively and whether it could receive judicial review after administrative channeling."  369 U.S. App. D.C. at 816.  The court found that the association could get administrative review for both remaining claims which alleged (1) that the Secretary illegally allowed HMOs to require, as a condition of coverage, that the enrollee obtain a referral from a medical doctor for a chiropractic procedure and (2) that the Secretary misinterpreted the Medicare Act to allow medical doctors, osteopaths and chiropractors to perform the corrective procedure.  *Id.* at 816-17.  As a result, the court found that the district court did not have jurisdiction.  *Id.* at 814.  Clearly, Plaintiffs' case differs from *Am. Chiropractic Ass'n* as Plaintiffs' claims could not become the subject of an administrative proceeding.  With respect to the first claim in *Am. Chiropractic Ass'n*, the court reasoned that the issue could be decided in the course of a payment claim review because an enrollee could obtain a chiropractor's services without first getting a referral, submit this claim to his HMO, and then file a grievance with the HMO after the HMO denied the claim based on the enrollee's failure to obtain a referral.  *Id.* Plaintiffs' claims, however, are not even remotely related to reimbursement, conditions of payment, or covered services under Medicare HMOs, thus Plaintiffs' claims could not be addressed in a payment review hearing.  With respect to the second claim in *Am. Chiropractic Ass'n*, the court also found that this issue could become the subject of a payment claim if an enrollee obtained services from a chiropractor, the chiropractor attempted to get payment from a Medicare HMO, and the HMO denied payment stating that it had adopted a rule that only medical doctors and osteopaths could provide spine manipulation.  *Id.* at 817.  In this case, the chiropractor could file an administrative claim arguing that the HMO must reimburse him.  *Id.*  Again, because Plaintiffs are not challenging a reimbursement issue, nor regulations governing a reimbursement issue, Plaintiffs' claims could not be channeled, as in *Am. Chiropractic Ass'n*, through administrative review, and federal jurisdiction is proper.

to state a claim, the court considers "whether relief is possible under any set of facts that could be established consistent with the allegations." *Bartholet v. Reishauer A.G.*, 953 F.2d 1073, 1078 (7th Cir. 1992). A claim may be dismissed only if it is beyond doubt that under no set of facts would the plaintiff's allegations entitle him to relief. *Travel All Over the World, Inc. v. Kingdom of Saudi Arabia,* 73 F.3d 1423, 1429-30 (7th Cir. 1996).

Rule 12(b)(6) is not a device for testing the truth of what is asserted or for determining whether a plaintiff has any evidence to back up what is in the complaint. *Dioguardi v. Durning,* 139 F.2d 774 (2d Cir. 1944). If a complaint's factual allegations, and the reasonable inferences derived from them, would support a legal theory entitling the plaintiff to some relief, a Rule 12(b)(6) motion should be denied. *Wells v. U.S.,* 851 F.2d 1471, 1473 (D.C. Cir. 1988), *cert. denied,* 488 U.S. 1029 (1989). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test." *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974). "Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations," *Neitzke v. Williams,* 490 U.S. 319, 327 (1988), or, we add, a judge's belief that the plaintiff cannot prove what the complaint asserts. *See ACLU Found. of S. California v. Barr*, 952 F.2d 457 (D.C. Cir. 1991). Evaluation of the Defendants' 12(b)(6) motion may not rely upon the extrinsic evidence provided in connection with the jurisdictional questions.

**1.  The Registered Nurse Staffing Standard was Promulgated Under 42 U.S.C. §1395x(e)(9)Prompting a Requirement for the Joint Commission Standards to be Equivalent.**

Defendants concede that there is a statutory mandate to the effect that the

Secretary may not deem a hospital accredited if it has passed the Joint Commission

accreditation with the Joint Commission standards that are not "at least equivalent" to the

standards promulgated by the Secretary pursuant to 42 U.S.C. § 1395x(e)(9).    (Defs.

Mot. to Dismiss 2nd A. Comp. at 15,16.)  However, they argue that the regulation at issue,

42 CFR § 482.23, was *not* promulgated pursuant to the Secretary's (e)(9) authority.

Defs Mot. to Dismiss 2nd A. Comp. at 36- 38.  This argument fails, as it contradicts the

history of the regulation and the numerous statements made by HHS regarding the basis

for the additional requirement of immediate availability of RNs for bedside care.

### a. Regulatory History Reveals the (e)(9) Foundation for the Registered Nurse Staffing Requirement.

The characterization of the nursing service regulation as being promulgated

pursuant to the Secretary's (e)(9) authority is consistent, going back to the initial set of

implementing regulations.   In 1966, the Secretary of Health, Education and Welfare

published the first Conditions of Participation for the Medicare Program.  At that time,

the relevant statutory sections provided that a "hospital" was one that:

> (5) provides 24 hour nursing service rendered or supervised by a registered professional nurse, and has a licensed practical or registered nurse on duty at all times;
>  ….
> (8) meets such other requirements as the Secretary finds necessary in the interest of the health and safety of individuals who are furnished services in the institution…[7]

Federal Health Insurance for the Aged, 31 Fed. Reg.13, 424 (Oct. 18, 1966).

The secretary stated in the final regulations:

> In order to participate as a hospital in the health insurance program for the aged, an institution must be a "hospital within the meaning of section

---

[7] This is now codified as subsection (9).

> 1861(e) of the Act.  This section of the law states a number of specific
> requirements that must be met by participating hospitals and authorizes the
> Secretary of Health, Education and Welfare to prescribe other
> requirements considered necessary in the interest of health and safety of
> the beneficiaries.

*Id.* (*emphasis added*).  Further, the final regulations stated that "the requirements

included in the statute and those additional health and safety requirements

prescribed by the Secretary are set forth in the Conditions of Participation for

Hospitals."  *Id*. at 13,425 (*emphasis added*).  The specific statutory requirements

are clearly distinguished from the additional regulatory requirements promulgated

pursuant to the Secretary's (e)(9) authority.

 In 1966, as noted above, the statutory requirement was that there be "a 24 hour

nursing service rendered or supervised by a registered professional nurse, and has

a licensed practical nurse or registered professional nurse on duty at all times."

42 U.S.C. § 1395x(e)(5) (1966).  The 1966 Conditions of Participation introduced

the additional requirement that there be "supervisory and staff personnel for each

department or nursing unit to insure the immediate availability of a registered

professional nurse for bedside care of any patient when needed..."  Federal Health

Insurance for the Aged, 31 Fed. Reg. 13,434 (Oct. 18, 1966).

        This regulatory standard is among several that are different from and greater than

the basic statutory prescription.  Indeed, it would be possible under (e)(5) to have a 24

hour nursing service supervised by an RN, with only an LPN on duty at all times under

the statute.  Or, the statute would have permitted the nursing service to have a supervisor

who was present, but otherwise engaged, and not immediately available for bedside care.

The regulatory requirement in 42 C.F.R. § 483.23 of having a registered nurse

immediately available is over-and-above the statutory minimum and can only have been

adopted pursuant to the Secretary's determination that it was one of "such other

requirements" in the interest of the health and safety of the patients, pursuant to (e)(9).

By way of further example, in a Notice of Proposed Rulemaking, published on

December 19, 1997, HHS described the statutory foundation for the Conditions of

Participation as follows:

> Sections 1861(e) (1) through (8) of the Social Security Act (the Act)
> provide that a hospital participating in the Medicare program must meet
> certain specified requirements.  Section 1861(e)(9) of the Act specifies
> that a hospital also must meet such other requirements as the Secretary
> finds necessary in the interest of the health and safety of the hospital's
> patients.  Under this authority, the Secretary has established the
> requirements that a hospital must meet to participate in Medicare in
> regulations at 42 C.F.R. Part 482, Conditions of Participation for
> Hospitals.

Medicare and Medicaid Programs; Hospital Conditions of Participation; Provider

Agreements and Supplier Approval, 62 Fed.  Reg. 66,727 (Dec. 19, 1997).  Under the

HHS description quoted immediately above, the statutory requirements of (1) through (8)

are juxtaposed against all of the requirements set forth under  42 C.F.R. § 482, pursuant

to the Secretary's authority under section (e)(9).  While the proposed regulations were

never adopted, the HHS description belies the argument Defendants now make that the

nursing service standards set forth in 42 C.F.R. § 482.23 were promulgated under Section

1861(e)(5) and not under section 1861(e)(9).  Mot. to Dismiss at 37.

The Defendants claim that the 1986 "preamble . . . plainly states" that the nursing

standards in 42 CFR § 482.23 were developed "exclusively" under 42 U.S.C. §

1395x(e)(5) (identifying the need to provide a 24 hour nursing service) instead of (e)(9)

(identifying the need to meet the requirements that the Secretary finds necessary in the

interest of the health and safety of the patients).  (Mot. to Dismiss at 37 *citing* 51 Fed.
Reg. 22,018).  In reviewing that preamble, it is clear that Defendants are dramatically
overstating their inference, as they must be relying solely on the statement that, "We
[HHS] believe that several of the standards for the condition that implement this statutory
requirement [of Section 1861(e)(5) of the Social Security Act] are overly prescriptive,
inflexible, and, in some areas, overlapping."  Medicare and Medicaid Programs;
Conditions of Participation for Hospitals, 51 Fed. Reg. 22,018 (June 17, 1986).
Defendants fail to note that the preamble goes on to state that the "condition statement"
would be replaced by the statutory language regarding 24-hour nursing care, and that
staffing "requirements", among others, would be retained.  *Id.*  The staffing requirements
are expressly identified as distinct from the statutory condition statement and, more
importantly for this question, are identified as distinct from the (e)(5) "implementing"
standards that were deleted as unnecessary.

The final regulation that follows the preamble does indeed recite the statutory
requirement of (e)(5) ("The hospital must have an organized nursing service that provides
24 hour nursing services.  The nursing services must be furnished or supervised by a
registered nurse.") 51 Fed. Reg.22, 108.  The final regulations also retain the staffing
standard which is at the crux of this case, and which is over and above the statutory
requirement.  Given that the staffing regulation requires sufficient numbers of registered
nurses to be immediately available for bedside care, it can only have been adopted under
the Secretary's authority to impose additional requirements to protect the health and
safety of the consumer.

Further, even if the Defendants' strained reading of the 1986 preamble reference to "implementing" (e)(5) were correct, this reference is at odds with the 1983 Notice of Proposed Rulemaking on which it is based.  In the Notice, the Secretary described the Conditions of Participation as the requirements embodied in 21 Conditions, containing 126 Standards.  Medicare and Medicaid Programs; Conditions of Participation for Hospitals, 48 Fed. Reg. 299 (Jan. 4, 1983).  Clearly, these go beyond the eight statutory requirements and must include (e)(9) provisions.  The imprecision of language used in one section of the 1986  preamble does not defeat the longstanding HHS description of the regulatory Conditions of Participation as the exercise of the Secretary's authority to impose additional requirements for hospitals pursuant to (e)(9).

Thus, contrary to Defendants' argument, the Conditions of Participation were not promulgated to implement the specific definitional subsections of 1861.  In fact, the descriptions used by the HHS Secretaries in 1966 and in 1997 suggest the opposite:  that the specific statutory statement of what an institution must provide or do to be a "hospital" is distinct from the (e)(9) requirements that are included in the regulatory Conditions of Participation.  This is borne out by the fact that the regulatory RN staffing standard in the Conditions of Participation imposes a standard that is explicitly higher than the specific statutory standard found in 42 U.S.C. § 1395x(e)(5) (2005).

### b. The Requirements of 42 CFR § 482.23 Far Exceed the Statutory Requirement for Which the Joint Commission Accreditation Is Automatically Deemed Sufficient.

In this case, the statutory requirement was, and is, that a hospital:  "provides 24 hour nursing service rendered or supervised by a registered professional nurse, and has a licensed practical nurse or registered professional nurse on duty at all times."  42 U.S.C.

§ 1395x(e)(5) (2005).  The (e)(9) health and safety regulation states:  "the nursing service

must have adequate numbers of licensed registered nurses, licensed practical (vocational)

nurses, and other personnel to provide nursing care to all patients as needed.  There must

be supervisory and staff personnel for each department or nursing unit to ensure, when

needed, the immediate availability of a registered nurse for bedside care of any patient."

42 C.F.R. § 482.23(b) (2006).

Going far beyond the statutory element of a 24-hour nursing service, the

regulation at issue not only requires the immediate availability of an RN, but also

requires sufficient "other personnel" to support that immediate availability of a registered

nurse for bedside care.  Too often, Joint Commission accredited hospitals do without

support staff such as unit clerks or orderlies, which limits the registered nurse

availability, as they must accomplish paper work or transport of patients.  Hospital

staffing plans, on which the Joint Commission standard is based, assume proper levels of

tertiary support, which is frequently not the case.  While a schedule for RNs may look

adequate on the face of it, if RNs must transport patients or serve as the unit clerk,

availability for bedside care is impaired.

 Defendants cite 42 C.F.R. § 488.5(a)(3) and argue that if the nurse staffing regulation is

an (e)(9) regulation, the Secretary must identify the requirements contained therein as

being higher or more precise than the requirements of accreditation after consulting with

the Joint Commission.  See generally Defs. Mot. to Dismiss 2nd A. Compl at 37-38.

Defendants claim that the Secretary's failure to do so reveals an intention to enforce

nursing regulations through validation surveys after the hospitals are deemed qualified to

participate in the Medicare program.  *Id.* at 38.  The argument is circular and flawed.

Defendants are claiming that because they have not identified the RN staffing regulation as higher than the Joint Commission standard, it cannot be higher. It is because the Secretary has failed to act to enforce his own regulations – as required by statute - that Plaintiffs have brought this suit.

Defendants call for deference to their interpretation of the regulations, Defs.' Mot. to Dismiss at 37-40, when in fact, they are calling upon the Court to ignore their inaction in the face of a statutory mandate. It is the law: hospitals may not participate in the Medicare program if they do not meet the (e)(9) health and safety standards that are higher than the accrediting body's standards. The HHS regulation states that even if the regulations are "more precise" than the Joint Commission standards, accreditation will not be deemed to meet the Conditions of Participation. 42 C.F.R. § 488.5(a) (2006). HHS' failure to act through its on-going avoidance of identifying and enforcing the higher regulations is what prompted this lawsuit. The Defendants *post hoc* interpretation of its regulations is not entitled to deference when, as here, it is clearly inaccurate. In any event, a court is to defer to an agency's interpretation of its rule only "if the meaning of the words used is in doubt." *Pfizer, Inc. v. Heckler,* 735 F. 2d 1502, 1509 (D.C. Cir. 1984) (*citing Udall v. Tallman*, 380 U.S. 1, 16 (1945)).

The Defendants contend that the Joint Commission standards can be read as "virtually identical" to the HHS standard. Defs. Mot. To Dismiss 2nd A. Comp. at 41. This contention presumes facts not in evidence, as the Defendants imagine that "so long as the Joint Commission interprets the word 'supervising' as connoting the availability of a registered nurse to supervise (or take over) bedside care, when needed, it would not be unreasonable for the Secretary to conclude that the accreditation standard is at 'least

equivalent'… to the regulatory requirement…"  *Id.*  A rational reading of the two standards, however, does not lead to the leap of faith posited in the Defendants' brief. The Joint Commission's newly added requirement as an element of performance  for NR.3.10, infra at    to have "at least one on-premise registered nurse (RN) furnishing or supervising the service 24 hours a day, 7 days a week" cannot magically mean that there are enough RNs to be immediately available to render bedside care to the patients as needed.[8]  If Defendants' believe that to be the case, they should be put to the test on the merits of Plaintiffs' claims, rather than allowing them to make wild claims regarding the Joint Commission's possible interpretation.  Even if the Joint Commission did make such an interpretation, the words and standards are so far apart, such an interpretation cannot be credited.

Here, the higher level of staffing required by 42 C.F.R. § 482.23(b) makes clear that it is a health and safety provision with which a hospital must demonstrate compliance if the Joint Commission standard is not at least equivalent.  Defendants cannot be excused because they have not consulted with the Joint Commission and identified the problem.

### c.  The Joint Commission Standards are Lower Than Those Set by the Secretary.

One need not look any further than the Joint Commission's own standards to see that they are lower than the HHS standard for registered nurse staffing.  The Joint

---

[8] The addition of the "24 hours a day, 7 days a week" requirement for at least one RN to be on site does not equate to requirements regarding the immediate availability of a registered nurse to render bedside care as needed.

Commission standards include nothing about RN staffing.  the Joint Commission's

nursing standards provide:

> NR.1.10.   A nurse executive directs the hospital's nursing
> services.
>
> NR.2.10.   The nurse executive is a licensed professional registered
> nurse qualified by advanced education and management
> experience.
>
> NR.3.10.   The nurse executive establishes nursing policies and
> procedures, nursing standards of patient care, treatment, and
> services, standards of nursing practice and a nurse staffing plan(s).

The Joint Commission, *Comprehensive Accreditation Manual for Hospitals:  The Official*

*Handbook* at NR-2 (2006).   The elements of performance for the Joint Commission

standard 3.10 regarding a hospital's nurse staffing plan are as follows:

> 1. The nurse executive, registered nurses, and other designated nursing
> staff members write nursing policies and procedures; nursing standards of
> patient care, treatment and services; standards of nursing practice; a nurse
> staffing plan(s); and standards to measure, assess, and improve patient
> outcomes.
>
> 2. The nurse executive is responsible for ensuring that nursing policies,
> procedures, and standards describe and guide how the nursing staff
> provides the nursing care, treatment, and services required by all patients
> and patient populations served by the hospital and as defined in the
> hospital's plan(s) for providing nursing care, treatment, and services.
>
> 3. All nursing policies, procedures, and standards are defined, documented,
> and accessible to the nursing staff in written or electronic format.
>
> 4. The nurse executive or a designee(s) exercises final authority over those
> associated with providing nursing care, treatment, and services.

The Joint Commission, *Comprehensive Accreditation Manual for Hospitals:  The Official*

*Handbook* at NR-8 (2006).  While there is a requirement for a nurse staffing plan, there is

nothing specific about registered nurses, (as distinct from other nursing staff) except for

the new performance element that requires a registered nurse on-premises 24 hours per

day, 7 days per week.; there is certainly no requirement concerning the immediate

availability of a registered nurse to render bedside care to the patients.  Instead, the Joint

Commission standards focus on the role of the nurse executive and his or her adoption of

policies, procedures and plans.  The Joint Commission standards is process-oriented and

not content-based, i.e., it is, as the Joint Commission touts, non-prescriptive.  Because the

Joint Commission nursing standards do not specify the nature of the staffing plans for

registered nurses that are required of accredited hospitals, these the Joint Commission

standards are not equivalent to the HHS standard, which calls for staffing plans that

"ensure, when needed, the immediate availability of a registered nurse for bedside care of

any patient."  42 C.F.R. § 482.23 (2006).

   The deficiency in the Joint Commission nursing standard is not remedied in the

Joint Commission's general human resource standards, which state:

> HR.1.10.  The hospital provides an adequate number and mix of staff that
> are consistent with the hospital's staffing plan.
>
> HR.1.20.  The hospital has a process to ensure that a person's
> qualifications are consistent with his or her job responsibilities.
>
> HR.1.30.  The hospital uses data from clinical/service screening indicators
> and human resource screening indicators to assess and continuously
> improve staffing effectiveness.

the Joint Commission, *Comprehensive Accreditation Manual for Hospitals:  The Official*

*Handbook* at HR-2 (2006) (*emphasis added*).  The starting point for this standard is the

hospital's own staffing plan, not the regulatory requirement set by HHS.  The Joint

Commission Element of Performance for HR. 1.10 is that "The hospital has an adequate

number and mix of staff to meet the care, treatment, and service needs of the patients."

the Joint Commission, *Comprehensive Accreditation Manual for Hospitals: The Official Handbook* at p. HR-7 (2006). The failure of this standard to prompt adequate RN staffing is evident from the numerous the Joint Commission accredited hospitals that have abysmal RN staffing levels with the resulting lack of immediate RN availability.

The element of performance for Standard 1.30 for testing the adequacy of staffing plans permits a hospital to bypass RN-specific data, though allowing data review of, "[a]ll nursing staff (including registered nurses, licensed practical nurses, and nursing assistants or aides)…," leaving to hospitals the discretion on stratification of data by discipline. The Joint Commission, *Comprehensive Accreditation Manual for Hospitals: The Official Handbook* at NR-8 (2006). Thus, specific information about RN staffing can easily go undetected. Further, the Joint Commission standard for Human Resources staffing does not result in adequate registered nurse staffing, as it is applicable to all staff, and the self-assessment tools do not ensure compliance with the HHS nursing standard for registered nurse availability. *See* 42 C.F.R. § 482.23(b) (2006). Accordingly, the Joint Commission standard is a lower standard – or certainly a much less precise standard - than the Conditions of Participation.

While Defendants argue that the Joint Commission standards could be reasonably construed as equivalent to the HHS standards for registered nurse staffing, Defs.' Mot. to Dismiss 2nd A. Comp. at 40-41, it is clear to those who work in the field that the standards are not equivalent, and Plaintiffs oppose dismissal so that they can develop a full record. For example, while the analysis is not dispositive, one leading healthcare consulting firm has evaluated the Joint Commission and CMS [HHS] standards for nursing services and has concluded that they are different. *See* Exhibit H: Cheryl A.

Niespodziani, *The CMS-the Joint Commission Crosswalk: A Side-by-Side Analysis of the CMS Conditions of Participation and the Joint Commission Standards* (HCPro, Inc. 2006). This analysis offers a side-by-side comparison of the CMS Conditions of Participation and the Joint Commission standards regarding nursing services. *Id.* at 34-39. The analysis states that while CMS focuses specifically on nursing staffing and competencies, the Joint Commission standards encompass staffing and competencies throughout the entire organization. *Id.* at 36. Except for the requirement adopted in 2007 that nursing services be provided 24 hours a day, the Joint Commission does not have standards in the Nursing chapter that address staffing and competency, and instead, includes these topics in the Human Resources chapter. *Id.* The analysis also states that regarding care plans, CMS focuses on the nursing part of the care plan where the Joint Commission's focus is more general, requiring that the individual's care plan be done collaboratively and in a timely manner with all disciplines. *Id.* [9]

### d. Defendants May Not Delegate Enforcement.

The wholesale failure of Defendants to demand compliance with the RN staffing requirement, as required by statute, results in a de facto delegation to the Joint Commission, to both set the standard and determine compliance with the Conditions of Participation. It is well settled that a federal agency may not delegate to a private entity the agency's statutory obligations.[10] "[T]he case law strongly suggests that

---

[9] As noted elsewhere in this Opposition, Plaintiffs' references that support their factual claims are not intended as a substitute for the evidence that they will present at the close of discovery, but rather, is offered to rebut Defendants' claim that the Court should dismiss the case because of their contention that the Joint Commission standards are equivalent to the CMS standard.

subdelegations to outside parties are assumed to be improper absent an affirmative

showing of congressional authorization. *See Shook v. D.C. Fin. Responsibility and*

*Management Assistance Auth.*, 132 F.3d 775, 783-84, n.6 (D.C. Cir. 1998). *See also Nat'l*

*Ass'n of Regulatory Utility  Comm'r  v. Fed. Communications Comm'n*, 737 F.2d 1095,

1143-44, n.41 (D.C. Cir. 1984); *Nat'l Park and Conservation Ass'n v. Stanton*, 54

F.Supp.2d 7, 18-20 (D.D.C. 1999).  The courts have determined that an agency may not

permit a private sector organization to perform the agency's duties if it is clear that

Congress did not intend to permit the agency to delegate the duties.  *U. S.  v. Widdowson,*

916 F.2d 587, 592 (10th Cir. 1990) (*citing U. S. v. Giordano*, 416 U.S. 505 (1974)).  This

is particularly important point when the organization to which the duty is delegated has a

conflict of interest.  *See Sierra Club v. Sigler*, 695 F.2d 957, 962 (5th Cir. 1983) (court in

dictum stated that private consulting firm with a conflict of interest should not prepare

environmental impact statement that is not given a truly independent review by the EPA).

    In the case at bar, it is the Secretary's duty to preclude participation in the

Medicare program when standards used by the Joint Commission are not at least

equivalent to the HHS standard.  There is nothing in the law that suggests that the

Secretary could leave it to the Joint Commission to determine whether its standards are at

least equivalent to the HHS standard.  Indeed, one assumes that that the Joint

Commission wants to have standards that are equivalent to the Conditions of

Participation and would not identify lower standards that would adversely affect its

deeming authority.  The net effect of defendants' failure to identify the lack of

---

[10] The legal doctrine is occasionally referred to as the doctrine of unlawful
subdelegation, because the Congress originally delegates to the agency, "and the
delegation from the agency to a third party is deemed a subdelegation." *National Park
and Conservation Ass'n,* 54 Supp. 2d at 32 n.5.

equivalency between the Joint Commission standards and the HHS registered nurse staffing standard is the unspoken and unlawful delegation of HHS' review authority regarding standards equivalency.  General statements that the HHS retains ultimate authority or has a regulation that identifies its ability to declare the Joint Commission standards to be less exacting does not override the reality of the unlawful delegation.  *See Nat'l Park and Conservation Ass'n,* 54 Supp. 2d at 38 -39 (court rejects defendants' argument that they retain "supervisory power" and "ultimate accountability and authority" and therefore have not unlawfully delegated their responsibility to manage a nationally protected scenic river).

### e. The Existence of Survey Options Does Not Undermine the Validity of Plaintiff's Claims

Defendants suggest that the Secretary already has a system in place to address lower Joint Commission standards, but this it not so.  Defendants argue that the "sample based" and "allegation driven" surveys authorized by 42 U.S.C. § 1395aa(c) provide the basis for HHS to correct registered nurse staffing deficiencies.  Defs. Mot. to Dismiss 2d Am. Comp. at 23, 24.  The fact that HHS may come behind the Joint Commission and find deficiencies does not correct the fundamental legal problem complained of in this lawsuit – that the law prohibits HHS from recognizing the Joint Commission accredited hospitals from being deemed to meet the Conditions of Participation when HHS standards are higher.  Plaintiffs understand that HHS has the authority to find hospitals out of compliance, notwithstanding their accredited status, when deficiencies are identified.  42 U.S.C. § 1395bb(d).  Defendants' statement that the "deemed" status has always been viewed as provisional approval to receive Medicare payments because of the ability to disqualify a hospital misses the point.  Defs. Mot. to Dismiss 2d Am. Comp. at

16.  The after-the-fact look is not what Congress intended when it unequivocally stated

that the hospital was not to be deemed to meet the Conditions of Participation at the

outset, if the Joint Commission standards were lower than the (e)(9) requirements.

        If one were to ignore statutory language regarding the exception to the "deemed"

to meet status of the Joint Commission accredited hospitals and rely solely on the

"sample based" and "allegation driven" surveys, compliance levels would not be assured.

The U.S. Government Accountability Office (GAO) reviewed the state agencies'

validation study material for fiscal years 2000 through 2002 and found that "the Joint

Commission did not identify three-quarters of the hospitals that state survey agencies

found to have serious deficiencies" and "the Joint Commission did not detect two-thirds

of the serious deficiencies identified by state survey agencies." *Medicare:  CMS Needs*

*Additional Authority To Adequately Oversee Patient Safety In Hospitals*, GAO-04-850 at

11-12 (2004).[11] Changes made by the Joint Commission in its procedures since the GAO

report have not been shown to be more effective in identifying hospitals' failure to meet

the Conditions of Participation.

---

[11] Defendants state that "only" 10 additional nursing related deficiencies were found by
the CMS validation surveys performed at the Joint Commission accredited hospitals.
Defs. Mot. to Dismiss  2nd A. Comp. at 26, n. 19.  The GAO stated, however, that
"…when the[] quality-of-care COPs [Conditions of Participation] are combined, the
proportion of serious deficiencies the Joint Commission missed is almost 60 percent of
the total  number of serious deficiencies identified by state survey agencies."  Medicare:
CMS Needs Additional Authority to Adequately Oversee Patient Safety in Hospitals 15
(GAO-04-850 July 2004), http://www.gao.gov/new.items/d04850.pdf.      These facts
reveal the impact of  Defendants' failure to require the Joint Commission standards to be
equivalent to the health and safety standards embodied in the Conditions of Participation,
and to the extent the Defendants' argument that the selected survey tracks used by the
Defendants are discretionary, goes to the 12(b)(1) motion and may be considered if
relevant.  If, however, Defendants are attempting to argue the effectiveness of the
validation surveys in the merits of their 12(b)(6) motion, the Court should refrain from
leaving the four corners of the complaint to assess whether a claim for relief has been
stated.

The "periodic survey" by state agencies is geared more toward enforcement of the HHS Conditions of Participation than is the Joint Commission survey. For example, "document review focuses on a facility's compliance with the CoP." (Defs. Mot. to Dismiss 2d Am. Comp. Ex. A at 18.) The Condition of Participation for registered nurse staffing is referenced in and appended as a part of the State Operations Manual protocol for review of hospital compliance with the Conditions of Participation. (Id.; Attach.). Further, state agencies are to use the interpretive guidelines and other CMS policy statements, and staffing documents are to be reviewed to determine if "adequate numbers of staff are provided according to the number and acuity of patients." (Id. Ex. A at 18.)

The Joint Commission process described in Defs. ['] Ex. H requires, as of January 1, 2006, hospitals to use the Priority Focus Process and the Periodic Performance review.[12] The review and survey methodologies described in Exhibit H and described above do not focus on registered nurse staffing in the way the state survey protocol does, nor in the way the Conditions of Participation would suggest as necessary to be equivalent.

As stated above, Plaintiffs need not prove their facts in response to a motion to dismiss under Federal Rule 12(b)(6), but rather, need to point out the manner in which they could prevail if the facts claimed are proven. Defendants' claim that "So long as the Joint Commission interprets the word 'supervising' as connoting the availability of a registered nurse to supervise (or take over) bedside care, when needed, it would not be unreasonable

---

[12] By responding to Defendants' attachments, Plaintiffs do not intend to ask this court to decide the 12(b)(6) motion to dismiss based upon extrinsic evidence  The issues raised in this case are complex, and the mere statement of a process in the Joint Commission publication should not be the final word. Plaintiffs plan to engage in vigorous discovery regarding the Joint Commission accreditation process to ultimately assist the Court in assessing the Plaintiffs' claims.

for the Secretary to conclude that the accreditation standard is 'at least equivalent,' 42

U.S.C. §1395bb(a), to the regulatory requirement at 42 C.F.R. § 482.23(b)." Defs. Mot.

to Dismiss 2nd A Comp. at 41.  Defendants thus seek the dismissal of the complaint based

on what is surmised to be a possibility.  However, under a motion to dismiss for a failure

to state a claim, Plaintiffs should be given the opportunity to prove the facts that support

their claim – that the Joint Commission's standards are not equivalent to the mandatory

health and safety Condition of Participation regarding RN staffing

## **CONCLUSION**

Plaintiffs, for the aforementioned reasons, respectfully request that Defendants'

motion to dismiss be  **DENIED**.

Respectfully submitted,

/s/

_____

Alice L. Bodley
General Counsel
D.C. Bar #939009

Jocelyn Winston
D.C. Bar #434639
American Nurses Association
8515 Georgia Avenue
Suite 400
Silver Spring, MD 20910
301-628-5127