Schwerin, Campbell, Bernard, LLP 206-378-4132

BEFORE THOMAS F. LEVAK, ARBITRATOR

In the Matter of the Grievance
Arbitration Between

SACRED HEART MEDICAL CENTER

    The Employer or the Center

and

WASHINGTON STATE NURSES
ASSOCIATION

    The Association

REST PERIOD GROUP
GRIEVANCE

FMCS No. 050324-54496-7

ARBITRATOR'S OPINION
AND AWARD

This matter came for hearing before the Arbitrator on February 27 & 28 and March 1, 2006, at Spokane, Washington. The Employer was represented by Mark R. Busto of Sebris Busto James and the Association by David Campbell of Schwerin Campbell Bernard. Testimony and documentary evidence were received. The proceedings were reported by Jea H. Oh, CSR. Post-hearing briefs were received on May 9, 2006. Based upon the evidence and the arguments of the parties, the Arbitrator decides and awards as follows.

OPINION

I. THE ISSUE.

This case concerns an August 24, 2004 group grievance which asserted that the Employer violated Article 8.5 of the parties' 2004–2006 collective bargaining agreement (the "Agreement") by failing to provide the 15-minute breaks required by that provision. The stipulated issue is:

> Whether the Employer violated the Agreement by failing to provide rest periods as required by Article 8.5? If so, what is the appropriate remedy?

The parties further stipulated that no questions of substantive or procedural arbitrability exist. In addition, the parties stipulated that should the Arbitrator find in favor of the Association,

SacredHeart/WSNA—Levak Award—5/28/06                                    Page 1 of 15

he should render a general award and retain jurisdiction for 90 days to resolve any dispute concerning remedy.

## II. THE AGREEMENT

### ARTICLE 8 – HOURS OF WORK

8.4 Overtime. All work in excess of a basic work day *** must be authorized and shall be compensated for at the rate of one and one-half (1 ½) times the nurse's regular rate of pay ***. ***

*** Overtime must be authorized and documented on the Overtime Log.

***

8.4.2 Overtime Requests. Staff nurses shall communicate their perceived need for overtime as soon as they become aware of it to their Nurse Manger (sic), Assistant Nurse Manager or Charge Nurse.

***

A Staffing Analysis Form can be completed if the nurse is dissatisfied with the implementation of this article. ***

8.5 Rest and Meal Periods. Rest periods of fifteen (15) minutes for each four (4) hour work period shall be provided. ***

### ARTICLE 9 – EMPLOYMENT PRACTICES

9.14 Staffing. ***

9.14.1 Staffing Levels. ***

4. Nurses concerned about unresolved staffing problems, implementation of this article or guideline changes are encouraged to complete the Staffing Analysis forms. ***

## ARTICLE 14 – COMMITTEES

14.2 Conference Committee. All nurse (sic) covered by this Agreement in the Medical Center constitute a Local Unit and the elected representatives of the Local Unit and designated representatives of the Medical Center management become the Conference Committee. The Conference Committee shall meet regularly and on a permanent basis to discuss matters relating to nursing care, safety and difficulties that may arise over the existing agreement. ***

## ARTICLE 15 – GRIEVANCE PROCEDURE

15.2 Group grievance. Any common grievance involving a significant number of nurses which has the same factual basis, may be submitted by the Association at the Step 1 level provided the grievance is submitted within twenty-one (21) calendar days of its occurrence

15.3 Time Limits. Time limits set forth in the grievance may be extended by mutual agreement of the Association and the Medical Center and shall be confirmed in writing by the party granting any such extension.

If the grievant does not comply with the time limitation, the grievance will be time barred. ***

III. THE FACTS.

Background.

The Employer is a full service hospital and medical center located in Spokane, Washington.[1] Virtually all Center departments utilize Registered Nurses ("RNs"). Since the early 1980s, the parties have been signatory to a continuous succession of collective bargaining agreements, culminating in the current Agreement. The bargaining unit covered by the Agreement currently consists of approximately 1,200 RNs.

The Personnel Handbook.

The Center's Personnel Handbook, in existence at the time the grievance was filed,

---

[1] Additional information concerning the Employer is available from its website www.shmc.org

SacredHeart/WSNA, Levak Award – 5/28/06                                      Page 3 of 15

provides:

> Rest Periods and Meal Time...
>
> At Sacred Heart Medical Center, all employees are allowed a rest period of 15 minutes to be taken once in each four (4) hours of work.
>
> All employees are normally required to take one-half hour lunch periods for which they do not receive pay.
>
> Omission of rest periods or lunch periods is not to be used as basis for leaving work early. The one-half hour lunch period or 15 minute rest period is construed to mean from the time you leave your place of work until you return.

Up to the time of the filing of the grievance, no Center handbook, manual, policy or other document provided for other than full 15-minute "block" breaks. That is, no such document mentioned so-called short, alternative "intermittent" breaks of one or more minutes that together would total 15 minutes.

### Bargaining History Evidence.

There are no conflicts in evidence concerning relevant bargaining history evidence. The language currently found in Agreement Section 8.5 was negotiated into the parties' collective bargaining agreement sometime in the early 1980s and has remained unchanged to date. There was no evidence presented concerning the intent of the original negotiators of that language. Section 8.5 apparently has never been discussed during the bargaining for any of the parties' collective bargaining agreements, including the current Agreement.

### Custom & Practice Evidence.

Unlike the bargaining history evidence, the parties strenuously disagreed on the custom & practice (a.k.a., "past practice") evidence.

In the opinion of the Arbitrator, the persuasive evidence established that since the time of the execution of the parties' first collective bargaining agreement, and up to and until August or September of 2004, the Center ordinarily attempted to provide a block 15-minute rest period during each four hour work period. Often, however, staffing levels, patient acuity and other factors—less frequently, the unwillingness of RNs to leave their patients or other duties to take breaks—resulted in significant numbers of RNs not receiving one or more 15-minute block breaks during a shift. The persuasive evidence further established, however, that in most cases RNs were not responsible for missed breaks, the Center simply failed to provide sufficient RN staff or other support staff to provide block break relief.

At staff meetings RNs were advised that they would not be paid for missed breaks, and they never were so compensated, either with money or with compensatory time off.

### Pre-Empath Practice

Prior to August or September, 2004, when a Center-wide process established by a consultant known as Empath was implemented at the Center, no standardized system for assigning or taking breaks existed throughout the Center, each Charge Nurse or unit manager—both will be sometimes referred to as "managers"—would determine how breaks were to be taken. Some managers would assign break times at the beginning of a shift, others would leave it up to the RNs to determine when they would take breaks. Most managers had no "sign-out/sign-in" procedure in place, some would expect that their RNs would notify them when they took breaks. There was no evidence that any RN who chose not to take a break was ever directed to do so; in fact, the inference from the evidence is to the contrary—the manager simply allowed the RN to made the decision.

Also, prior to Empath, an RN who found that he or she would not have support for taking a break, and who wanted to take a full break, could contact his or her manager. Most Charge Nurses did not have patient loads, so were available to personally give break relief. Charge Nurses would also contact other units to obtain relief personnel. Also, sometimes Float RNs were specifically assigned to give break relief. In addition, Licensed Practical Nurses ("LPNs") and Nursing Assistants ("NACs") were regularly employed and were able to relieve RNs. Also, RNs sometimes relieved each other under an unstructured and informal "buddy system."

Further, it was the pre-Empath practice that an RN who was unable or unwilling to take a full 15-minute break was allowed to take one to a very few minutes to quickly go to the restroom, get some coffee or obtain a snack, and return to work. However, it was clear from the evidence that ordinarily the RN was not given the opportunity to relax or rest for several minutes when the RN did so. And it is equally clear that the term "intermittent break" was never utilized either formally or informally by the Center or its employees to describe those short ventures away from work.[2] Certainly, there was no persuasive evidence that such ventures were regularly in the neighborhood of even four or five minutes; indeed, the persuasive evidence was to the contrary. Moreover, conditions sometimes prevented RNs from taking even those short ventures, even to go to the restroom. When conditions

---

[2] The Employer utilizes the term "intermittent break" to describe those short ventures. The Arbitrator has chosen to use the term "short venture" both because the former term was not utilized in practice and because that term has a specific meaning under Washington regulations, namely, an interval in which the employee is allowed to relax and rest or a brief inactivity from work or exertion. Short ventures do not actually allow for relaxation, rest or inactivity from work, and therefore do not fall within the Washington Administrative Code ("WAC") term

prevented RNs from taking 15-minute breaks, those same conditions ordinarily prevented them from taking true short duration rest breaks. Even the Employer does not seriously contend that the ventures it allowed were in the main more than the RN quickly going to the bathroom, obtaining a cup of coffee or a snack, and then immediately returning to work.

The absence of any Center-wide uniform policy resulted in the situation that while some RNs were able to take both of their 15-minute breaks, many were able to take only one, some were able to take neither, and many were regularly unable to take true intermittent breaks of any meaningful duration. Moreover, even short ventures were only made, in the language of the Employer, "when workload permitted."

### The 2004 Group Grievance.

On February 2, 2004, RN Jim Brennan filed a group grievance that arose from a missed break during his December 4, 2003 shift, seeking financial remuneration at the overtime rate. The Center denied the grievance at Steps I and II, stating (1) that it was the Center's intent to provide breaks, (2) that the Center was working on a task force to address the problem Center-wide—that plan was the Empath plan discussed below—and (3) that under the WAC "intermittent" rest periods could be provided in lieu of the statutory ten minutes. The grievance file is incomplete, but it appears to the Arbitrator from the Step III correspondence that the Association notified the Center on May 7, 2004 that it was willing to withdraw the grievance, subject to the reserved right to again grieve the issue, based on the Center's assurance that it was working on the Center-wide plan. Interestingly, however, on May 11 the Center notified the Association that because the matter had not been further timely appealed, it considered the grievance to be closed.

The Arbitrator finds that there was no meeting of the minds at Step III. The Association based a good faith decision not to proceed further with the grievance based upon perceived assurances from the Employer that the new Empath process would satisfactorily address Association concerns. On the other side of the coin, it appears that the Employer, in good faith, believed that the Association's failure to process the matter further resolved the question. Clearly, the issue now before the Arbitrator was never resolved and was left open for further resolution.

At the time the grievance was progressing, the parties were in negotiations for the current Agreement. During those negotiations, neither party made any proposals concerning rest breaks.

### Empath.

Shortly prior to 2004, the Center hired a consultant, Empath, to put in place a new assignment and scheduling process, a process that was basically concerned with better

movement of RNs to and from the Emergency Department and various Center units. As James Strain, the Assistant Vice President for Nursing testified, the Center was greatly concerned about the number of times that the Employer was "on divert," i.e., closed. While Empath initially involved only the Emergency Department, it was soon applied to all units.

The written Empath process expressly provided for a distinct 30-minute meal period and "two distinct 15 minute breaks." There was nothing in the Empath process providing for intermittent breaks, full block breaks were contemplated. The consultant began educating staff in Empath in January, 2004, and the Empath procedures were implemented in August or September, 2004.

Empath required the Charge Nurse or manager to establish, at the start of each shift, fixed meal and break periods, and the manager was made responsible for providing those periods. Empath further allowed the manager to combine one break with the meal period, for a total of 45 minutes. In addition, an RN who believed that conditions would not allow him or her to take a scheduled break, was supposed to notify the manager of that fact 30 minutes in advance of a scheduled break.

Empath provided for a back-up procedure: a formalized "buddy" system and for other back-up relief obtainable from other units through the Nursing Supervisor. Under Empath, Charge Nurses no longer personally provided relief for breaks.

Empath also provided for a "break tracking form," which was utilized only for about three months. While the form included a space for RNs to sign in and out for breaks, there was no provision on the form for missed breaks. After the Center discontinued use of the form it provided an erasable board on which RNs could sign in and out. Because it was erased each day, however, it provided no record of missed breaks.[3]

In practice then, for a number of reasons, 15-minute block breaks did not occur under Empath. Among those: unfilled RN vacancies left the Center short-staffed, Empath introduced new RN duties and responsibilities, Empath eventually eliminated floats, and buddies were often unable to cover for their own patients as well as their buddies' patients.

Navigant.

Not long after Empath was implemented, the Employer hired another consultant to address the Center's very significant financial problems. While Navigant maintained the prior RN to patient ratios, it reduced the number of support staff. The reductions in staffing levels made it very difficult, if not impossible, to provide the 15-minute rest blocks

---

[3] The Staffing Analysis Form provided for in Article 9 also provided an opportunity for RNs to advise the Center of missed breaks.

contemplated by Empath. As Strain testified, Empath was based upon a staffing level that allowed for backups to be available, and when those backups were unavailable, block breaks too were often unobtainable.

### The Survey

A jointly prepared survey distributed to Center RNs to most departments except the Emergency Department in early 2005 revealed that RNs in those departments did not receive their breaks most of the time.

### Summary: the Custom & Practice Since Empath and Navigant

While the parties' briefs are couched in terms of a disagreement over the custom and practice that existed since the implementation of Empath and Navigant, the Arbitrator can find no disagreement regarding that custom and practice on relevant facts. Those facts are as follows. First, a significant number of RNs, indeed a majority, continued not to receive at least one uninterrupted break per shift. Second, in most of those cases, affected RNs did not take true intermittent breaks, i.e., multi-minute intervals in which the RNs actually were able to relax and rest away from work duties. Ordinarily, affected RNs were only able to take short ventures to "run" to the restroom, to a drinking fountain, or to obtain a cup of coffee or a snack, before returning directly to work. Third, RNs who missed breaks and did not take true, meaningful intermittent breaks were never compensated for the missed breaks.

During Conference Committee discussions concerning missed breaks, the Employer rejected Association proposals to modify the time clock system to provide for the clocking out to and in from breaks.

### The Instant Grievance

The Employer's failure under Empath to effectively address the question of missed breaks led to the filing of the grievance.

### Post-Grievance Events

Subsequent to the initiation of the grievance, the Employer promulgated an August, 2005 Human Resources Handbook and Policy Manual (the "Policy Manual"), which provides:

MEAL AND REST PERIODS

In accordance with the State of Washington Administrative Policy (RCW 49.12, WAC 296-126-092) all employees will receive meal and rest periods

At SHMC employees receive one 15-minute rest period for each four hours of working time. Ideally, the rest period will occur near the midpoint of each four-hour work period. In some departments, the supervisor or department head may schedule rest periods. Rest periods may not be used to leave early.

Employees need not be given a scheduled rest period when the nature of work allows intermittent rest periods equal to 15 minutes during each four hours of work. "Intermittent" is defined as intervals of short duration in which employees are allowed to relax and rest, or a brief inactivity from work or exertion.

If employees work more than five hours in a day, they are required to take a meal break two to five hours into their shift. The normal meal break is a 30-minute unpaid period. If an employee is unable to receive a meal break during their shift, the employee will indicate "no lunch" on the time clock and will be paid for the missed lunch break at the appropriate rate of pay. If employees work three or more hours beyond their scheduled shift, they will have an additional meal period before or during that period. The rest periods are not cumulative and the omission of a rest period shall not be used as a basis for leaving work early

Because the Policy Manual post-dates the grievance, it is irrelevant to the Arbitrator's determination of the stipulated issue.

## IV. ASSOCIATION CONTENTIONS.

First, the Agreement clearly and unambiguously requires 15-minute rest breaks and must be enforced as written, regardless of any contrary past practice. *See, State of Alaska,* State Case No. 03-1-018 (Levak 2002); Elkouri & Elkouri, *How Arbitration Works*, BNA, 6th Ed., and other authorities. The word "shall" in Article 8.5 is mandatory, the length of the break is specified and the purpose of the break—rest—is stated

Second, assuming *arguendo* that the Arbitrator would look beyond the plain language of Article 8.5, recent arbitration decisions which consider rest break clauses that expressly incorporate state law allowing for intermittent breaks support the conclusion that where, as here, no such incorporation exists, the term "15-minute rest break" should be given its plain meaning. In *Good Samaritan Hospital/WSNA*, Eric Lindauer, 2/7/05, the rest break language expressly provided that the breaks would be administered in accordance with the WAC, which provides for intermittent breaks Lindauer determined that given that language, the contract was ambiguous so he looked to past practice, including the employer's written

handbook and policy/procedure statements which expressly permitted intermittent breaks. *See also, Yakima Regional Hospital*, FMCS 05-53457, Eduardo Escamilla, 3/13/06, which contained a similar contract provision, and in which Escamilla adopted Lindauer's reasoning. In the instant case, a mirror opposite of those cases, the statute is not incorporated in the Agreement; and to graft it on would be to add a new provision, one that the Employer could have bargained in negotiations but did not.

Third, and still assuming *arguendo* that the Arbitrator would look beyond the plain language of Article 8.5, the Employer's own written Personnel Handbook and the Empath document provide for a block break and make no mention of alternative intermittent breaks. And no other relevant Employer documents provided for intermittent breaks. Indeed, Employer witnesses testified that the Center always tried to provide for block breaks

Fourth, the Employer's contention that the Association should have demanded to change the Agreement during negotiations should be rejected because at Step III of the earlier grievance management informed the Union that it would move to a solution, and the Empath procedures, procedures which provided for full 15-minute breaks, were not adopted until after negotiations concluded.

Fifth, the Employer's right to manage the Center does not negate its obligation to maintain working conditions which will allow for full breaks. *See, Landmark Hotels*, 89-2 ARB, p. 8488 (Drazin 1989); *Wilson & Co.*, 1 LA 342 (Lohman 1946); *Pope & Talbot*, 87 LA 57 (Hales 1986)

Sixth, the record contains overwhelming and largely undisputed evidence that RNs did not receive 15-minute breaks

Seventh, the Employer has, in any event, wholly failed to prove that RNs received even intermittent breaks totaling the required 15 minutes. As Lindauer stated, rejecting the argument made in his case, in order for there to be a rest period there must be a clear and substantial interval where the RN can relax and take care of personal business if the RN so chooses; simply quickly using the restroom or taking a drink of water does not suffice.

Eighth, the Arbitrator should issue a remedy directing the Employer to provide rest periods and awarding back pay for missed breaks (Citing authorities). An RN who misses both breaks during an 8-hour day is taking a 7.5% cut in pay. The Employer offers no explanation of why RNs who manage to take their breaks should be compensated, but those who miss them should not. In *Yakima Hospital*, Escamilla, citing *Wingert v. Yellow Freight*, Wn. 2d 841, stated that such compensation is appropriate. Moreover, *Anderson v. Mt. Clemens Pottery Co*, 328 US 680 (1946) established that when a violation occurs such as in the instant case, the burden shifts to the Employer to prove that it paid employees for every missed break That view is also supported by arbitral precedent. (Citing authority)

Also, since the Employer failed in its burden, the Arbitrator has the authority to fashion a remedy, even though the result may only be approximate. (Citing authority). In the alternative, the Arbitrator should order compensation for missed breaks to all RNs on shifts identified in the Staffing Analysis Forms submitted to management.

## V. EMPLOYER CONTENTIONS.

First, the Agreement is unclear and ambiguous—it is silent as to whether the allotted 15-minute break periods must be uninterrupted or may be intermittent—therefore reference to past practice evidence is appropriate. This is particularly true because Washington law permits employers to provide employees with intermittent rest periods. (Citing authorities) In the instant case, not only does the established past practice support the Employer, the Association's failure to file a grievance until 2004 demonstrates the binding nature of the practice. (Citing authority). Further, its failure to seek supporting language during the negotiations for the Agreement indicates its tacit agreement with the practice (Citing authority). Finally, since 2004, the Employer has continued to provide RNs with rest periods consistent with established practice, namely: intermittent breaks when patient care demands prevent the RN from taking a 15-minute uninterrupted break.

Second, even assuming *arguendo* that the Employer violated the Agreement, the Association failed to offer evidence of damages sufficient to enable the Arbitrator to calculate damages with certainty. (Citing authorities). The Staffing Analysis Forms did not provide a basis for formulaic relief and any global remedy. Furthermore, the 21-day limitations period in the Agreement is enforceable and significantly limits any damages. (Citing authorities) Finally, special circumstances do not exist to warrant an award of interest.

## VI. ARBITRATOR'S CONCLUSION.

The Arbitrator concludes that the Association proved by a preponderance of the evidence that the Employer violated the Agreement. Accordingly, the grievance will be sustained. The following is the Arbitrator's rationale.

The parties do not disagree on the basic principle of contract interpretation applicable to this grievance. That principle is that clear and unambiguous contract language must be enforced as written, and that reference to bargaining history or custom and practice is only appropriate where the contract is unclear and ambiguous. The Arbitrator's own early statement regarding that principle can be found in Elkouri & Elkouri, *How Arbitration*

*Works*, 6th Ed., Ruben Ed., BNA, 2003, at pages 628-29, where he is quoted (by another arbitrator) as follows:

> The Arbitrator will declare an agreement to be clear and unambiguous where he is able to determine its meaning without any other guide than a knowledge of the simple facts on which, from the nature of the language, in general, its meaning depends. Where, however, the simple facts allow both sides to advance plausible contentions for conflicting interpretations, the Arbitrator will declare the language to be unenforceable, and will make reference to pre-contract bargaining history, past practice and other applicable rules of construction in order to arrive at the true meaning of the disputed provision.[4]

In the instant case, the patently clear and unambiguous language of Article 8.5 supports the Association and requires a resolution of this grievance in its favor. Only the Association has advanced a plausible contention concerning the meaning of that provision.

Article 8.5 provides that 15-minute breaks *shall* be provided during each four-hour work period. The Arbitrator is at a loss to see how that language could be any clearer. The word *shall* is mandatory; it allows for no managerial discretion whatsoever. The Employer must provide for those rest breaks; it has no option to do otherwise.

The Arbitrator further agrees with the Association that the Lindauer and Escamilla decisions support a finding that the Agreement is clear and unambiguous. In both of those cases—mirror cases to the instant dispute, as the Association cogently argues—those arbitrators quite properly found that the contractual references to administration of the disputed provisions in accordance with the WAC creates an ambiguity that made reference to past practice and other appropriate evidence.[5] The complete absence of such reference to the WAC in the Agreement or in any other Employer policy, procedure or handbook strongly supports the Association position.

---

[4] *See, also*, St. Antoine, Ed., National Academy of Arbitrators, *The Common Law of the Workplace*, Carlton Snow, Ch. 2, "Contract Interpretation," Sections 2.1, "The Prime Directive Intent of the Parties" & 2.2, "Not Ordinary Contracts"; *How Arbitration Works*, Ch. 9, *Standards for Interpreting Contract Language*, pp. 471-72; Schoonhoven, Ed., *Fairweather's Practice and Procedure in Labor Arbitration*, BNA 3rd Ed, pp. 173-74.

[5] Lindauer also properly considered industry practice, specifically, credible testimony that other Northwest hospitals that had similar references to the WAC in the rest break provisions of their collective bargaining agreements had a similar practice of intermittent rest breaks in lieu of full breaks. The Arbitrator would further note that in the instant case, no industry practice evidence was offered by the Employer.

SacredHeart/WSNA, Levak Award, 5/28/06                                                                                  Page 12 of 15

Even assuming *arguendo* some ambiguity in Article 8.5—and the Arbitrator expressly finds that none exists—the result is the same. The most relevant evidence concerning intent is found in two Employer documents: the Personnel Handbook and the Empath document. The Personnel Handbook—the only policy document in existence at the time the grievance was filed relative to break periods—expressly provides that all employees are allowed a rest period of 15 minutes to be taken *once* in each four-hour shift. Again, the Arbitrator is at a loss to see how that language could have been made any clearer. It plainly guarantees a single 15-minute rest period during each 4-hour work period. The Empath document similarly, in equally unmistakable language, contemplates and guarantees 15-minute breaks. Neither document provides for even intermittent breaks in lieu of full 15-minute block breaks.

Furthermore, it is crystal clear that the Center has failed to prove that it regularly, either historically or since the implementation of the Empath procedures, provided true intermittent break periods. The Employer's argument that short ventures to the bathroom or to get a drink, a cup of coffee or a snack, constitute intermittent rest breaks cannot be accepted. In *Good Samaritan Hospital*, Lindauer properly rejected that argument, stating that,

> In order for there to be a rest period there must be a clear and substantial interval where the nurse can relax and take care of personal business if she so chooses ***
>
> In order to provide quality care, the nurses need occasional rest breaks that allow them to attend to personal needs. Simply drinking a glass of water or quickly using the restroom does not suffice. *** [O]nly multiple-minute intervals of relief from duty of exertion can be considered intermittent rest periods.

The Arbitrator adopts Lindauer's statement. As noted above, here the record as a whole established that RNs do not consistently or regularly receive meaningful intermittent rest breaks totaling the mandated 15 minutes.

One other subject needs to be addressed: that of the so-called "refused" break. The Arbitrator agrees with the Employer that a number of RNs have seemingly "willingly" worked through some breaks, either not requesting relief or rejecting offers from their Charge Nurse or others to relieve them. Clearly though, those situations do not amount to a defense for two reasons. First, the overall record demonstrated that in the vast majority of the cases missed breaks directly related to patient and treatment responsibilities and staffing deficiencies, not a true need for continuous patient monitoring.[6] And even when the situation

---

[6] Perhaps the best factual example is that of Radiology RN Richard Pollilo, who sometimes rejects a break offer where he believes it will put the patient at risk, but who, because

exists where an RN simply cannot leave a patient to take a break without jeopardizing that patient's health, that fact begs the question of how the RN is to be compensated for the missed break. The argument that an employee who relinquishes a contractual right for the benefit of the employee's employer is entitled to no compensation for that relinquishment makes no sense at all. Second, it is management's and the RN's supervisor's responsibility to direct the RN to take those breaks. Perceived professional pride and responsibility by an employee can serve as an effective form of subtle coercion. Management cannot escape responsibility for contract compliance to employees by creating or allowing a continuing situation to exist under which employees allow a perceived duty to their employer, their trade or their patrons—whether customers, clients or patients—to deprive them of collectively bargained rights

Remedy.

This leaves only the question of remedy. The Arbitrator will order the Employer to comply with the Agreement and provide the required 15-minute breaks. The Arbitrator will further order the Employer to compensate each RN for lost breaks at the RN's straight time rate, with no interest.

The Employer strongly asserts that no financial remedy would be appropriate, arguing, among other things, that adequate evidence was not offered by the Association to establish the extent of missed breaks throughout the Center and that the injury to most RNs is speculative. The Arbitrator has read the cases cited by the Employer with interest, but finds that the record as a whole and the authorities cited by the Association support a global remedy  The primary method suggested by the Association for determining lost breaks through the use of claim forms will satisfy, with reasonable certainty, the question of lost breaks, particularly since the claims will be limited in time.  On that latter subject, the Arbitrator agrees with the Employer that in the face of Article 15 2, any financial remedy can only go back 21 days from the filing date of the grievance, August 3, 2004.

AWARD

The Employer violated the Agreement by failing to provide rest periods as required by Article 8 5. The grievance is sustained. The Employer shall forthwith comply with Article 8 5 by providing the required 15-minute block breaks. Further, all affected RNs, those in the employ of the Employer from August 3, 2004 to date, shall be compensated for missed 15-

---

of staffing deficiencies and an increase in treatment and patient care demands, has for some time taken no morning breaks at all and only about 30% of his afternoon breaks

SacredHeart/WSNA, Levak Award, 5/28/06.                                                       Page 14 of 15

minute breaks at each RN's straight-time rate, without interest. Within 14 calendar days of its receipt of this Opinion and Award, the Employer shall provide individual claim forms to all RNs in its employ during the period of August 3, 2004 to date. On those claim forms RNs shall, within 14 calendar days, declare, under penalty of perjury, the actual or estimated number of 15-minute rest breaks missed since August 3, 2004 to date. The Employer shall then, within 21 calendar days, audit those claim forms, shall arrive at the amount due each RN and shall compensate them. The Employer and the Association shall also meet and confer over any surviving disputes concerning the amount due any RN. The Arbitrator retains jurisdiction of this case for a period of 90 days of the date of this Opinion and Award to resolve any general dispute concerning remedy or any dispute concerning the specific compensation due any RN under the terms of this Award

Dated this 28th day of May, 2006,

Thomas F. Levak, Arbitrator,
Portland, Oregon.