IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| AMERICAN NURSES ASSOCIATION, <u>et al.</u>, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civ. Action No. 1:06cv1087 (HHK) |
| | ) | |
| MICHAEL O. LEAVITT, <u>et al.</u>, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS
AND OPPOSITION TO PLAINTIFFS' MOTION FOR ORDER OF JURISDICTION
OR, IN THE ALTERNATIVE, TO PERMIT JURISDICTIONAL DISCOVERY**

OF COUNSEL:
JAMES C. STANSEL
Acting General Counsel

JANICE L. HOFFMAN
Associate General Counsel

MARK D. POLSTON
Deputy Associate
General Counsel for Litigation

DAVID HOSKINS
LAWRENCE J. HARDER
Attorneys
Department of Health
and Human Services

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

SHEILA M. LIEBER
PETER ROBBINS
Department of Justice
20 Massachusetts Avenue, NW, Room 7142
Washington, D.C.  20530
Tel: (202) 514-3953

Attorneys for Defendants

## TABLE OF CONTENTS

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I.  THE PLAINTIFF ASSOCIATIONS DO NOT HAVE STANDING TO SUE
IN THEIR OWN RIGHT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A.  Plaintiffs Do Not Allege that Any Policy of the Secretary Has Impaired
Their Ability to Function as Advocates of Their Members' Interests. . . . . . . . . . 4

    B.  Plaintiffs Have Not Shown that the Alleged Understaffing at
Accredited Hospitals Is Caused by the Use of Sample-Based and
Allegation-Driven Surveys.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    C.  Plaintiffs' Alleged Injuries Would Not Be Redressed by the Requested Relief.. . 13

    D.  The Ability of the Plaintiff Associations to Function as Advocacy
Organizations Is Not Within the Zone of Interests Protected or
Regulated by the Medicare Conditions of Participation. . . . . . . . . . . . . . . . . . . 18

II.  PLAINTIFFS LACK STANDING TO SUE ON BEHALF OF THEIR MEMBERS. . . . 19

III.  THIS COURT DOES NOT HAVE SUBJECT-MATTER JURISDICTION
UNDER THE ADMINISTRATIVE PROCEDURE ACT. . . . . . . . . . . . . . . . . . . . . . . 22

IV.  PLAINTIFFS FAIL TO STATE A COGNIZABLE CLAIM FOR RELIEF. . . . . . . . . . 24

    A.  The Statutory Language in 42 U.S.C. § 1395x(e)(5) Provides All the
Authority the Secretary Needed to Promulgate the "Bedside Availability"
Regulation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

    B.  The Joint Commission's Standards Are Not Facially Incompatible with the
Secretary's Construction of "Bedside Availability". . . . . . . . . . . . . . . . . . . . . . . 29

    C.  The Secretary Has Delegated No Enforcement Authority to the
Joint Commission. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

V.  PLAINTIFFS' MOTIONS FOR A DECLARATION OF SUBJECT-MATTER
JURISDICTION OR, IN THE ALTERNATIVE, FOR DISCOVERY
SHOULD BE DENIED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

## INTRODUCTION

This action seeks to increase the number of registered nurses employed by nationally accredited hospitals.  The three plaintiff nurse associations attempt to produce this result not by forcing the hospitals themselves to hire more nurses, but by compelling the Secretary of Health and Human Services to change the enforcement track under which he surveys accredited hospitals for compliance with one Medicare "condition of participation."  Plaintiffs do not allege, however, that the compliance surveys currently used at accredited hospitals – which are based on selected samples and allegations of specific deficiencies – produce levels of registered-nurse staffing that are any different than the levels that would be produced if alternative, periodic surveys were used.  Nor have they demonstrated that it is impermissible, as a matter of law, for the Secretary to use sample-based and allegation-driven surveys, rather than periodic surveys, to enforce the particular nurse-staffing regulation at issue.  The complaint should therefore be dismissed for lack of subject-matter jurisdiction and failure to state a claim.

As defendants explained in their opening memorandum, the regulation on which the case focuses requires hospitals that participate in Medicare to have sufficient "supervisory and staff personnel for each department or nursing unit to ensure, when needed, the immediate availability of a registered nurse for bedside care of any patient."  42 C.F.R. § 482.23(b).  At hospitals accredited by the Joint Commission (formerly the Joint Commission on Accreditation of Healthcare Organizations), the Secretary enforces the "bedside availability" regulation by means of the sample-based and allegation-driven surveys authorized by 42 U.S.C. §§ 1395aa(c) and 1395bb(d).  At unaccredited hospitals, the regulation is enforced by means of the periodic surveys authorized by 42 U.S.C. § 1395aa(a).  The reason for this distinction is that the "bedside availability" regulation was promulgated under 42 U.S.C. § 1395x(e)(5), which authorizes the Secretary to ensure that each hospital participating in Medicare "provides 24-hour nursing service

rendered or supervised by a registered professional nurse."  By law, hospitals that are accredited

by the Joint Commission must initially be "deemed" to meet all of the regulations promulgated

under subsection (e)(5), 42 U.S.C. § 1395bb(a), subject to verification of compliance through

sample-based and allegation-driven surveys.  The Secretary has no discretion in selecting this

enforcement track.

Plaintiffs contend that use of the sample-based and allegation-driven enforcement track is

impermissible here because the "bedside availability" regulation should be re-interpreted as

having been promulgated under the catch-all authority to establish "such other requirements as

the Secretary finds necessary in the interest of the health and safety of individuals who are

furnished services in the institution."  42 U.S.C. § 1395x(e)(9).  At accredited hospitals,

enforcement of regulations promulgated under subsection (e)(9) is not automatically placed on

the sample-based and allegation-driven survey track.  Rather, if the standard used in the

regulation is "higher" than the standard used for accreditation by the Joint Commission,

enforcement cannot be placed on the sample-based and allegation-driven tracks unless "the

Secretary determines" that the Joint Commission's standard "is at least equivalent to the standard

promulgated by the Secretary."  42 U.S.C. § 1395bb(a).

To prevail on the merits, plaintiffs must first convince this Court that the "bedside

availability" regulation at 42 C.F.R. § 482.23(b) must be read as having been promulgated under

subsection (e)(9) as a catch-all, health-and-safety regulation, rather than under subsection (e)(5)

as a nurse-staffing regulation, despite the Secretary's express statement to the contrary in the

regulatory preamble.  Second, they must convince the Court that the regulatory standard

requiring that a registered nurse be available to supervise or provide bedside care, when needed,

is higher than the standard used for accreditation purposes by the Joint Commission, which

requires that every hospital have at least one registered nurse available to provide or supervise

care. Even if they prevailed on both these points, however, the most that plaintiffs could then ask

for by way of relief would be a judicial order requiring the Secretary to enforce the "bedside

availability" regulation at accredited hospitals on the periodic track applicable to unaccredited

hospitals, until such time, if any, that he makes a determination that the Joint Commission's

standards are at least equivalent to the regulation. To have standing to seek this relief in the first

place, however, plaintiffs must show that the current use of sample-based and allegation-driven

enforcement tracks is causing a remediable injury, either to the plaintiff associations themselves

or to their members. They must also show that the claims of the plaintiff associations or their

members are within the zone of interests of the Medicare statutes, and that their complaint is

otherwise within the subject-matter jurisdiction of this Court. They have made no convincing

argument that they meet any of these tests.

## ARGUMENT

### I. THE PLAINTIFF ASSOCIATIONS DO NOT HAVE STANDING TO SUE IN THEIR OWN RIGHT.

For an organization to assert standing "on its own behalf," it must meet "the general

standing requirements applied to individuals," Nat'l Taxpayers Union, Inc. v. United States, 68

F.3d 1428, 1433 (D.C. Cir. 1995) (citation omitted), including the "the now familiar elements of

injury in fact, causation, and redressability." Lance v. Coffman, 127 S. Ct. 1194, 1196 (2007). In

addition, it must show that its "complaint fall[s] within the zone of interests protected by the law

invoked." Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1, 12 (2004). In their opposition to

defendants' original motion to dismiss, plaintiffs did not even attempt to defend their standing to

sue in their own right, rather than as representatives of their members.[1]  Their attempt to revive

that theory now is unavailing.

> **A.  Plaintiffs Do Not Allege that Any Policy of the Secretary Has Impaired Their Ability to Function as Advocates of Their Members' Interests.**

"In those cases where an organization is suing on its own behalf, it must establish

concrete and demonstrable injury to the organization's activities – with a consequent drain on the

organization's resources – constituting more than simply a setback to the organization's abstract

social interests."  Common Cause v. FEC, 108 F.3d 413, 417 (D.C. Cir. 1997) (quoting Nat'l

Taxpayers, 68 F.3d at 1433) (internal quotation marks, brackets and ellipses omitted).  "The

injury in fact component of the standing inquiry is often difficult for organizational plaintiffs . . .

to satisfy," Citizens for Responsibility & Ethics in Washington v. FEC, 401 F. Supp. 2d 115, 120

(D.D.C. 2005), aff'd, 473 F.3d 337 (D.C. Cir. 2007), because the plaintiff must do more than

merely allege that its ability to secure its "objectives" have been "frustrated" in some manner,

Nat'l Taxpayers Union, 68 F.3d at 1433, or that there has been "damage to an interest in 'seeing'

the law obeyed or a social goal furthered."  Id. (quoting Am. Legal Found. v. FCC, 808 F.2d 84,

92 (D.C. Cir. 1987)).  "The law is clear that actions contrary to an organization's mission do not

create an injury if the organization's activities" – that is, the expressive activities by which it

seeks to achieve its goals – "are not somehow impeded."  Citizens for Responsibility & Ethics,

401 F. Supp. 2d at 120 (emphasis added).  "Were an association able to gain standing merely by

choosing to fight a policy" that it perceives to be "contrary to its mission," the "courthouse door

---

[1] Compare Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendants' Motion to Dismiss at 5-16 (Doc. 12) with Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint ("Pl. Mem.") at 6-11 (Doc. 25).

would be open to all associations," Long Term Care Pharmacy Alliance v. UnitedHealth Group, 498 F. Supp. 2d 187, 192 (D.D.C. 2007), in a manner "that would effectively abolish the [standing] requirement altogether." Id. (quoting Fair Employment Council of Greater Washington, Inc. v. BMC Marketing, 28 F.3d 1268, 1277 (D.C. Cir. 1994)). "The pivotal inquiry is therefore not whether the organization has diverted resources from one priority to another," but whether its programmatic "activities have been directly impeded by defendant's activities." Id. (emphasis added); see also Action Alliance of Senior Citizens v. Leavitt, 456 F. Supp. 2d 11, 16 n.4 (D.D.C. 2006), rev'd on other grounds, 483 F.3d 852 (D.C. Cir. 2007) (quoting Nat'l Taxpayers Union, 68 F.3d at 1433) ("Frustration of an organization's objectives alone 'is the type of abstract concern that does not impart standing.'").

What plaintiffs conceive to be "[s]afe staffing levels" are obviously not one of the "programmatic" activities impairment of which might give rise to standing. Pl. Mem. at 7. They are merely one of the goals that the associations seek to promote by means of their programmatic activities (such as collective bargaining, lobbying and issue-advocacy). Because plaintiffs do not allege any interference with any genuine programmatic activities, it is irrelevant whether any plaintiff organization "has expended and continues to expend financial resources of the association to monitor registered nurse staffing levels in hospitals that have been accredited by the Joint Commission and to respond to problems of its registered nurse members arising from insufficient registered nurse staffing." Pl. Mem. at 7 (citation omitted). In the absence of any allegation that defendants' conduct has directly interfered with the programmatic ability of plaintiffs to monitor nurse-staffing levels or to respond to what they perceive to be problems of their members, such expenditure of resources is precisely the kind of "self-inflicted harm," Long Term Care, 498 F. Supp. 2d at 192, that does not suffice to give the plaintiff associations

-5-

standing to sue in their own right.  See also Action Alliance, 456 F. Supp. 2d at 16. n.4 ("having

to juggle limited resources is a challenge faced by all organizations").  Plaintiffs have therefore

failed to allege the kind of programmatic injury necessary to establish standing to sue in their

capacities as organizations.

> **B.    Plaintiffs Have Not Shown that the Alleged Understaffing at Accredited Hospitals Is Caused by the Use of Sample-Based and Allegation-Driven Surveys.**

Even if the alleged frustration of plaintiffs' goals sufficed to constitute an injury in fact,

plaintiffs have made no serious effort to show either causation or redressability.  Neither

plaintiffs nor their members have demonstrated any connection between the number of registered

nurses hired at accredited hospitals and the complained-of government conduct, that is, the

Secretary's treatment of the bedside-availability regulation as a subsection (e)(5) provision and

his consequent enforcement of the regulation at accredited hospitals on the sample-based and

allegation-driven survey tracks.

As defendants explained in their opening memorandum, Defendants' Memorandum in

Support of Their Motion to Dismiss Plaintiffs' Second Amended Complaint ("Def. Mem.") at 19

(Doc. 24), causation requires "a causal connection between the injury and the conduct

complained-of," Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992), such that the injury

can be said to be "fairly . . . trace[able] to the challenged action of the defendant," and not merely

the result of "the independent action of some third party not before the court."  Id. (quoting

Simon v. Eastern Kentucky Welfare Rights. Org., 426 U.S. 26, 41-42 (1976)).  "These standing

requirements apply with no less force to suits brought by organizational plaintiffs." Common Cause, 108 F.3d at 417.[2]

Where, as here, the "existence of one or more of the essential elements of standing 'depends on the unfettered choices made by independent actors not before the courts,'" it becomes "the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury." Lujan, 504 U.S. at 562 (citations omitted). And the existence of standing is "particularly problematic" where, as here, "the only challenged action is the failure of the Executive Branch to impose penalties upon a third party." Talenti v. Clinton, 102 F.3d 573, 577 (D.C. Cir. 1996) (citing Linda R.S. v. Richard D., 410 U.S. 614, 618 (1973), and Branton v. FCC, 993 F.2d 906, 910-11 (D.C. Cir. 1993)).

To draw the necessary causal connection between alleged injury and the complained-of government conduct, plaintiffs would have to articulate why it would be "reasonably likely," Renal Physicians Ass'n v. HHS, 489 F.3d 1267, 1273-74 (D.C. Cir. 2007), that an accredited hospital would be more apt to risk violation of the bedside-availability standard (and thereby jeopardize millions of dollars in Medicare payments) if it knew that the regulation was being enforced by means of sample-based and allegation-driven surveys rather than periodic surveys. To withstand a motion to dismiss, moreover, "it is not enough simply to plead this causative link." Id. Rather, plaintiffs must "allege facts" showing that at least some accredited hospitals would hire more nurses if the hospitals knew they would be subject to enforcement of the nurse-

---

[2] Plaintiffs' unsupported contention that "[c]ausation is not an element of standing," Pl. Mem. at 6 n.2, is obviously incorrect, as is their unsupported contention that traceablity is a "lower standard" than causation. Id.

staffing standard under the periodic survey track, rather than the sample-based and allegation-driven survey track.  Id.

Plaintiffs simply have not met their standing burden here.  The injuries of which they complain all stem from the allegation that some accredited hospitals at which their members work are not employing what plaintiffs consider to be enough registered nurses.  Second Amended Complaint ("Am. Compl.") at ¶¶ 42-50.  The Secretary does not hire nurses, however; hospitals do.  The government conduct of which plaintiffs complain, of course, cannot possibly be that the Secretary is not enforcing Medicare nurse-staffing requirements at all; plaintiffs admit that he does enforce the requirements through sample-based and allegation-driven surveys.  Pl. Mem. at 43.  Enforcement of the nurse-staffing requirement is therefore obviously on the Secretary's "radar screen."  Id. at 10.  The real gravamen of plaintiffs' complaint is that the Secretary has allegedly misread the authority under which one regulation – the "bedside availability" standard in 42 C.F.R. § 482.23(b) – was promulgated and, as a result, he has been enforcing the standard only through the sample-based and allegation-driven surveys authorized by 42 U.S.C. §§ 1395aa(c), 1395bb(d), rather than the periodic survey track authorized by 42 U.S.C. § 1395aa(a).  To establish causation, then, plaintiffs would have to allege that there is some reason to think that sample-based and allegation-driven enforcement of the bedside-availability regulation results in a lower rate of registered-nurse hiring than results from periodic surveys.  By gainsaying that such a causal connection between the complained-of government conduct and the allegedly injurious staffing conditions must be shown at all, Pl. Mem. at 3-4, plaintiffs effectively concede that this connection does not exist.[3]

_____

[3] It would not, of course, be necessary to show that hospitals subject to periodic surveys "have better registered nurse staffing than the hospitals that are accredited by the Joint

In their opening memorandum, defendants showed why an inverse relationship between staffing levels and the use of sample-based and allegation-driven surveys would be counter-intuitive.  Def. Mem. at 23-24.  There is simply no reason to suppose that the use of sample-based or allegation-driven surveys reduces the number of registered nurses employed by accredited hospitals.  Plaintiffs do not allege that sample selection is any less fearsome an enforcement mechanism than periodic surveys.  And, if anything, hospitals that compete for patients on the basis of their public reputations would presumably have <u>more</u> to fear from an allegation-driven compliance survey, which focuses on a particular problem area, 42 C.F.R. § 488.7(a)(2), and is conducted only after "substantial allegations of noncompliance" have been made.  42 C.F.R. § 488.7(a).  Plaintiffs' own evidence nicely confirms the point.

> Anyone in healthcare, from chief executive officers to front-line staff, dreads hearing, "We're here to do an unannounced site visit to your facility."  On any day of the week, unexpected surveyors who say these words can cause anxiety, stress and anguish in even the best-run organizations.

Cheryl A. Niespodziani, <u>HCPro's CMS-Joint Commission Crosswalk</u> " ("<u>HCPro's Crosswalk</u>") 5 (2006) (Pl. Ex. H).

Moreover, plaintiffs' amended complaint dramatizes just how much accredited hospitals potentially have to fear from allegation-driven surveys.  The paragraphs added to plaintiffs' complaint since the case was first filed nicely demonstrate that their members have both an incentive and a willingness to keep meticulous daily records of any circumstances in which they believe (at least by their own lights) that the hospitals at which they work have allowed staffing of registered nurses to fall, even for short periods of time, to levels that they consider

---

Commission," Pl. Mem. at 4, to make an argument that periodic surveys are required as a matter of law.  But it would be necessary to allege the superiority of periodic surveys to show that use of a different enforcement track is causing injury.

unacceptably low.  Am. Compl. at ¶¶ 42-50.  The evidence submitted by plaintiffs in support of

their opposition memorandum further demonstrates that the nurse associations are not shy about

raising such allegations with state authorities.  See New York State Nurses Association, The

Nursing Shortage in New York City Public Hospitals:  How Is It Affecting Patients? 3-4 (Oct.

18, 2005) (Pl. Ex. F).  With self-interested watchdogs like that on the premises 24-hours a day,

seven days a week, an accredited hospital would be foolish to let its guard down.[4]

Nor have plaintiffs alleged facts showing that the Joint Commission accreditation process

misses such a high rate of non-compliance with the bedside-availability requirement as to

warrant the conclusion that a switch to periodic surveys would make any appreciable difference

in the staffing decisions made by accredited hospitals.  Once again, the evidence on which

plaintiffs themselves rely proves exactly the opposite.  The Government Accountability Office

report cited by plaintiffs, see Pl. Mem. at 44, collected the results of compliance surveys

conducted by state surveyors (pursuant to 42 U.S.C. § 1395aa(c) and 42 C.F.R. § 488.7) at 500

Joint Commission-accredited hospitals during the fiscal years 2000 through 2002.  Medicare:

CMS Needs Additional Authority to Adequately Oversee Patient Safety in Hospitals ("GAO

Report") 4, 10 (GAO-04-850 July 2004), http://www.gao.gov/new.items/d04850.pdf.  As was

---

[4] The only portion of plaintiffs' amended complaint that even attempts to allege causation
merely claims that "short staffing" by accredited hospitals is "attributable," in some unspecified
way, to a generalized "failure" on the part of defendants "to enforce their own regulations" and
that this purported failure stems from their policy of "permitting [Joint Commission]
accreditation to qualify hospitals for participation in the Medicare program without the necessary
levels of registered nurses and other support staff to ensure the immediate availability of [a
registered nurse] to render bedside care when needed."  Am. Compl. at ¶ 52.  As was discussed in
defendants' opening memorandum, however, accredited hospitals are not excused from the
obligation to comply with the bedside-availability requirement, Def. Mem. at 11-16, and
plaintiffs themselves admit that the Secretary does, in fact, enforce the regulation by means of
sample-based and allegation-driven surveys.  Pl. Mem. at 43.

discussed in defendants' opening memorandum, sample-based surveys and periodic surveys are conducted by exactly the same state contractors, using exactly the same procedures and standards. The surveys differ only in timing. Thus, the report would provide a useful indication of how much more non-compliance, if any, would be likely to be uncovered if the Secretary routinely used periodic surveys, rather than sample-based and allegation-driven surveys, to enforce the bedside-availability regulation.

Out of the 500 surveys studied, the report found that there were only 10 instances where the state surveyors found what they considered to be a serious deficiency in the category labeled "[n]ursing services" and the Joint Commission surveyors had not previously found the same problem. Id. at 14. A 98-percent consistency rate is, standing alone, astonishingly high. See id. at 41, 46. The actual consistency rate between state and Joint Commission surveys for the bedside-availability requirement, however, can fairly be presumed to be considerably higher than that. There are a total of sixteen sections and subsections in the nursing services regulations at 42 C.F.R. § 482.23, and bedside availability is only the second sentence in one of them. 42 C.F.R. § 482.23(b). The GAO report, in turn, did not attempt to break down the ten deficiencies in "[n]ursing services" into sub-categories, but there is no reason to think that the staffing of registered nurses generally – let alone staffing for bedside availability in particular – accounted for more than a small fraction of them, if any.[5]

_____

[5] In relying on the GAO report, plaintiffs also neglect to point out that the majority of the differences between state survey findings and Joint Commission findings did not have to do with the quality of medical care at all, but rather involved requirements related to the "hospital's physical environment, which includes life safety code standards on fire prevention and safety." GAO Report at 12. And even in this context, the report emphasized that any disparities between the results of state surveys and Joint Commission surveys "may be related to the difference in how state agencies generally survey separately a hospital's compliance with the life safety code portion of the physical environment" condition of participation, while Joint Commission

Actual state survey experience at hospitals identified in plaintiffs' second amended complaint also appears consistent with results of the Joint Commission accreditation surveys. Since 2002, sample-based surveys have been conducted at eleven of the hospitals about which plaintiffs complain in their second amended complaint, and allegation-driven surveys were conducted at five. Declaration of Shonte Carter at ¶ 2 (Def. Ex. C) (attached to this reply). No finding of a deficiency with respect to the bedside-availability requirement in 42 C.F.R. § 482.23(b) apparently resulted from any of these surveys. Id. at ¶ 3. Presumably, either the "short-staffing" perceived by plaintiffs at these hospitals was of a sporadic and short-lived duration or plaintiffs have a different concept than the state surveyors do of what constitutes an acceptable level of registered-nurse staffing under 42 C.F.R. § 482.23(b). Either way, it is hard to see how forcing the Secretary to switch these hospitals from the sample-based and allegation-driven track to the periodic track would have any impact on what plaintiffs perceive to be injuries caused by hospital staffing decisions. Plaintiffs have therefore failed to show the causation necessary for standing.[6]

---

"surveys assess compliance with the life safety code using a combination of the hospital's self-assessment, a hospital building tour, and observations made by all surveyors during the survey process." Id. at 13. In addition, all of the GAO findings were made subject to the further caveat that the survey years studied ended before the Joint Commission adopted its current policy of conducting unannounced inspections and before the Joint Commission adopted the "tracer methodology" that today represents the centerpiece of its survey. See Def. Mem. at 8-11. The GAO report acknowledged that these innovations "have the potential to improve the detection of serious deficiencies," but stated that "it is too soon after its January 2004 implementation for a meaningful evaluation." GAO Report at 16. The GAO report, of course, could not possibly have taken into account the 2007 revisions in the Joint Commission standards specifically related to registered nurses.

[6] Contrary to plaintiffs' view, the Secretary's stated intention to "explore regulatory changes to implement the statutory requirement to deny deemed status where [regulatory] requirements are higher than requirements prescribed by the Joint Commission," CMS Financial Report Fiscal Year 2005 126 (2005), does not "recognize[]" any "lack[]" of enforcement of the

### C.  Plaintiffs' Alleged Injuries Would Not Be Redressed by the Requested Relief.

Even if plaintiffs could establish that the allegedly injurious nurse-staffing decisions of non-party hospitals could fairly be traced to the Secretary's complained-of choice of enforcement track, they fail to allege specific facts "sufficient to demonstrate a substantial likelihood," as opposed to mere speculation, that such injuries would be redressed by the relief requested in their complaint.  Renal Physicians, 489 F.3d at 1275.  As explained above, the only remedial action that this Court would have authority to take to correct an alleged misplacement of the bedside-availability regulation on the sample-based and allegation-driven enforcement track would be an injunctive order requiring the Secretary to place enforcement of the bedside-availability regulation on the periodic track until such time, if any, that he determines that the Joint Commission accreditation standards are at least equivalent to the regulatory standard.  Plaintiffs seek no such remedy here and, even if they did, there is no reason to think that a switch to periodic-track enforcement by the Secretary would alter the staffing decisions independently made by hospitals at which plaintiffs' members work.  Indeed, plaintiffs do not identify a single hospital that would "necessarily" change its nurse staffing as a result of such an order.  Renal Physicians, 489 F.3d at 1274; see also id. at 1274-75 (quoting Nat'l Wrestling Coaches Ass'n v. Dep't of Educ., 366 F.3d 930, 939 (D.C. Cir. 2004)) ("a quest for ill-defined 'better odds' is not close to what is required to satisfy the redressability prong of Article III").  Redressability is therefore lacking.

---

bedside-availability requirement.  Pl. Mem. at 31.  The passage merely suggests, in the broadest possible terms, the possibility of enhancing the Secretary's oversight authority consistent with his responsibilities to protect patient health and safety under 42 U.S.C. § 1395x(e)(9).

Furthermore, the remedy that plaintiffs do seek is beyond the power of the Court to grant. Plaintiffs' contention that "[a] favorable decision from the Court would redress Plaintiffs' injuries by requiring [the Secretary] to establish a system to ensure that Joint Commission standards are at least equivalent to those established by the Secretary," Pl. Mem. at 19-20, incorrectly assumes that the Secretary has any legal authority to establish a system which ensures that Joint Commission standards are at least equivalent to those established by regulation. The Secretary has "no authority to order," Citizens for Responsibility and Ethics in Washington v. FEC, 574 F.3d 337, 340 (D.C. Cir. 2007), the Joint Commission to do anything at all. As plaintiffs' own memorandum emphasizes, the "Joint Commission is a private, non-profit accrediting organization" whose accreditation standards are "controlled" exclusively by its own governing body. Pl. Mem. at 2; see also Def. Mem. at 7. Indeed, the GAO report on which plaintiffs themselves rely emphasizes that, because of the Joint Commission's "unique legal status," the Secretary "cannot take action to address performance problems with [the Joint Commission's] hospital accreditation program," GAO Report at 20, and the report concludes that Congress would have to amend the Medicare statutes in order for him to exercise any kind of superintending "authority" over the accreditation process. Id. at 28. Plaintiffs are, quite literally, asking this Court to legislate from the bench.

The terms in which plaintiffs otherwise describe their requested relief likewise miss the mark. Their request for a judicial order instructing the Secretary to "set aside" an "acknowledgement of hospitals' participation in the Medicare program if their accreditation from the Joint Commission forms the basis for such participation," Pl. Mem. at 19, incorrectly implies that Joint Commission accreditation in some way excuses a hospital from compliance with the conditions of participation that are necessary under the Medicare program. The basis for

participation in the Medicare program is the hospital's agreement to comply with the conditions

of participation, pursuant to 42 U.S.C. § 1395cc.  Accreditation by the Joint Commission

determines whether the Secretary may permissibly <u>enforce</u> a particular condition of participation

by means of the periodic surveys authorized by 42 U.S.C. § 1395aa(a), or whether he is limited to

enforcing the condition by means of the sample-based and allegation-driven surveys described in

42 U.S.C. §§ 1395aa(c) and 1395bb(d).  Accreditation has not excused any hospital's compliance

with any condition of participation since 1972, when Congress deliberately stripped it of that

significance.  <u>See</u> Def. Mem. at 11-16.  Plaintiffs' request for relief merely reflects a failure to

understand that those amendments reduced the importance of "deemed" status to determining

little more than the manner in which the Secretary is authorized to allocate enforcement

resources.[7]

It also is unclear what plaintiffs mean when they ask for a judicial order "requiring [the

Secretary] to ensure that hospitals comply with the registered nurse staffing regulation."  Pl.

Mem. at 19.  As defendants have repeatedly explained, the Secretary <u>already</u> endeavors to ensure

that hospitals comply with the regulation, using the enforcement mechanisms he has been

authorized to employ in 42 U.S.C. §§ 1395aa(a), 1395aa(c), and 1395bb(d).  At unaccredited

hospitals, all conditions of participation are enforced through periodic surveys conducted by state

contractors.  42 C.F.R. §§ 488.11, 488.20.  At accredited hospitals, conditions of participation

that meet the requirements of 42 U.S.C. § 1395bb(a) are enforced through sample-based and

---

[7] Plaintiffs' request for a remedial order requiring the Secretary to provide hospitals whose participation in Medicare is based on Joint Commission accreditation with "provisional approval for participation in Medicare to ensure continuing access to health care services," Pl. Mem. at 19, suffers the same analytical flaw.  Since ongoing hospital participation in Medicare is contingent on compliance with conditions of participation, not on accreditation, such an order would serve no purpose.

allegation-driven surveys.  42 C.F.R. §§ 488.7, 488.10(c).  The rest, if any, are enforced through periodic surveys.  To the extent that plaintiffs are asking this Court to compel the Secretary, through the use of these mechanisms, to achieve what they consider to be an acceptable degree of hospital compliance nationwide, they are seeking a form of judicial supervision over discretionary enforcement authority that is unarguably beyond the subject-matter jurisdiction of the Court.  See Def. Mem. at 32-33 (citing, inter alia, Heckler v. Chaney, 470 U.S. 821, 831 (1985)).  To the extent that plaintiffs are trying to say that sample-based and allegation-driven surveys are not really a genuine enforcement mechanism, their argument is nicely refuted later in their own memorandum.  See Pl. Mem. at 43 ("Plaintiffs understand that [the Secretary] has the authority to find hospitals out of compliance, notwithstanding their accredited status, when deficiencies are identified.").  If plaintiffs think that the use of sample-based and allegation-driven surveys fails to meet their ideal, their argument should be addressed to Congress.  This Court cannot simply invent a new enforcement scheme for them.

The other arguments made by plaintiffs with respect to redressability are merely confusing.  It is hard, for instance, to make any sense out of plaintiffs' observations that hospitals are "responsive to the Joint Commission survey standards," Pl. Mem. at 9, and that "a better-defined Joint Commission standard would go far toward improving compliance with the Conditions of Participation that accreditation of most of the nation's hospitals is supposed to reflect."  Id. at 10.  In the first place, neither the Secretary nor this Court has the power to re-define the Joint Commission's private accreditation standards.  Second, the Joint Commission's accreditation standards are supposed to reflect whatever the Joint Commission wants them to reflect.  The Joint Commission does not enforce Medicare conditions of participation.  Plaintiffs' contention that the Joint Commission might change its standards if this Court were to remand the

case to the Secretary for an equivalency determination, id., is wholly speculative. Suffice it to say that the Joint Commission has not revised its standards to plaintiffs' liking, even though the case was stayed, at a plaintiffs' request, for a period of more than four months, to give plaintiffs an opportunity to make their case for revision privately to the Joint Commission. Since accredited hospitals already have no more than "provisional status" vis-a-vis compliance with any condition of participation, id., plaintiffs' additional contention that judicial imposition of some kind of provisional compliance status would remedy their purported injuries is meaningless. Finally, a judicial order requiring the Secretary to commence "periodic surveys," id., would remedy plaintiffs' purported injuries only if plaintiffs alleged that periodic surveys would result in a change in nurse-staffing levels. However, as was previously discussed, they emphatically deny that it is necessary for them to establish the superiority of periodic surveys as a factual element necessary to standing. Id. at 19.

The vague language in which plaintiffs couch their request for relief merely underscores the three fundamental defects in their theory of redressability: this Court cannot give plaintiffs what they want, plaintiffs do not want the only form of relief the Court could even hypothetically grant, and the only remedy that the Court could hypothetically grant would not redress their perceived injuries. At the very least, plaintiffs have failed to allege facts "sufficient to demonstrate a substantial likelihood," Renal Physicians, 489 F.3d at 1275, that hospitals would change their nurse-staffing behavior in response to any order this Court is empowered to enter in such a way as to redress the injuries plaintiffs claim to suffer. Their second amended complaint should therefore be dismissed for lack of standing.

-17-

**D.  The Ability of the Plaintiff Associations to Function as Advocacy Organizations Is Not Within the Zone of Interests Protected or Regulated by the Medicare Conditions of Participation.**

Finally, plaintiffs make no serious argument that the interests of the plaintiff associations as advocacy groups is with the zone of interests protected or regulated by the statutes or regulations at issue.  As was discussed earlier, for purposes of determining whether plaintiffs have standing to sue in their own right, it is irrelevant whether they have suffered any perceived impairment of their "missions."  Pl. Mem. at 8.  It is therefore irrelevant whether those missions are within the zone of interests of the Medicare regulation that they claim is not being properly enforced.  What they must show is that their organizational activities – that is, their ability to collectively bargain or lobby – are within that zone of interests.  The plaintiffs make no such argument, nor could one conceivably be made.  The plaintiff associations therefore lack personal standing to sue in their own right on the alternative ground that their claims are not within the zone of interests protected or regulated by the Medicare statutes and regulations.[8]

---

[8] The zone-of-interests arguments in plaintiffs' opposition memorandum are, once again, merely confusing.  Their contention that they can maintain standing to sue in their own right as organizations even if their perceived injury is not with the zone of interests of the Medicare regulation they claim is not being properly enforced, Pl. Mem. at 8, is nonsense.  Their admission that "the zone of interest tests relates to personal standing," id., concedes that whatever injury to themselves as organizations on which they rely to establish standing as organizations must be within the zone of interests.  In addition, it is hard to make any sense of plaintiffs' contention that the zone of interests "is not an element of associational standing."  Id.  In the first place, the term "associational standing" refers to the ability of an association to sue on behalf of its members.  See, e.g., Arizonans for Official English v. Arizona, 520 U.S. 43, 45 (1997).  It has nothing to do with whether an organization can sue in its own right.  In any event, for an association to sue on behalf of its members, the injuries alleged to have been suffered by members of the association must be within the zone of interests of the legal provision alleged to have been violated, as the only decision on which plaintiffs rely on this point states.  See Am. Chiropractic Ass'n v. Leavitt, 431 F.3d 812, 815 (D.C. Cir. 2005).

-18-

## II.  PLAINTIFFS LACK STANDING TO SUE ON BEHALF OF THEIR MEMBERS.

Plaintiffs also lack standing to sue as representatives of their members.  To have

organizational (also referred to as associational or representational) standing to pursue the

interests of their member nurses, plaintiffs must show, at a minimum, that their "members would

have standing in their own right," Arizonans for Official English, 520 U.S. at 66, and that the

court would otherwise have subject-matter jurisdiction over the members' claims.  Shalala v.

Illinois Council on Long Term Care. Inc., 529 U.S. 1, 24 (2000).  Neither element has been

established here.

At the outset, plaintiffs have failed to show the elements of traceability and redressability

with respect to any injuries alleged to have been suffered by their members for the same reasons

that they have failed to establish those elements with regard to standing to sue in their own right.

As was discussed above, plaintiffs have alleged no facts that would give rise to even a plausible

inference that more registered nurses would be employed at accredited hospitals if the survey

track under which the bedside-availability regulation is enforced were changed.  This Court's

analysis of associational standing can therefore end here.

Plaintiffs have also failed to establish a legally cognizable injury in fact to their members,

however.  At the outset, plaintiffs' theory of standing is constricted by their disavowal of any

attempt to "borrow" injuries allegedly being suffered by Medicare patients who are not members

of the plaintiff associations.  Pl. Mem. at 15.  The remaining references in their opposition

memorandum to the ways in which "the public" is purportedly being "harmed" by the

enforcement policies of the Secretary, id. at 13, can therefore be dismissed as an effort to spruce

up the psychological surroundings of a crumbling argument.  But to the extent that the plaintiff

associations still are attempting to assert that injuries allegedly experienced by non-member

-19-

Medicare beneficiaries can provide any basis for their member nurses to have standing in this Court, the argument should be rejected for the unopposed reasons set forth in defendants' opening memorandum.  Def. Mem. at 19-21.

What is left of plaintiffs' injury theory are two different kinds of alleged harms.  First, plaintiffs contend that some of their member nurses are suffering injuries qua nurses because their workloads are too heavy to allow them (a) to provide services at the "high professional standards" which they demand of themselves, Pl. Mem. at 13 (citation omitted), and (b) to take "breaks" when they should, id. at 15, to avoid "fatigue and anxiety."  Id. at 13.  These complaints about job satisfaction are merely a variation on the "vocational nexus" theory that the Supreme Court found to be too nebulous to establish standing in Lujan.  504 U.S. at 565.  At the very least, however, it is hardly "likely, as opposed to merely speculative," id. at 560, that any particular member of the plaintiff associations would enjoy more happiness or break time, or less anxiety or fatigue, if the Secretary were required to enforce the bedside-availability regulation by means of periodic, rather than sample-based and allegation-driven, compliance surveys.

Even if plaintiffs' alleged injuries qua nurses survived this analysis, however, workload-related grievances of nurses cannot reasonably be said to be within the "zone of interests" protected or regulated by the Medicare program when Congress emphasized that the regulations that now appear at 42 C.F.R. §§ 498.1-498.103 were intended to be "exclusive" means of enforcing the conditions of participation.  S. Rep. No. 89-404 at 55 (1965), reprinted in 1965 U.S.C.C.A.N. 1943, 1995.  It is hard imagine how Congress could have made it clearer that it "meant to exclude" nurses and other health-care professionals from using the Medicare statutes

-20-

and regulations as a vehicle for airing workplace grievances against their hospital employers.  Pl.

Mem. at 8.[9]

The second kind of injury alleged by plaintiffs – that their members suffer harms <u>qua</u>

<u>hospital patients</u> – founders on the fact that plaintiffs raise no more than a "'conjectural'"

possibility that such harm is conceivable, and fail to show "'actual'" or "'imminent'" harm that is

"concrete and particularized," <u>Lujan</u>, 504 U.S. at 560 (citations omitted), with respect to any

specific member-patients in any specific accredited hospitals.  Although plaintiffs identify with

some specificity hospitals at which they believe staffing deficiencies have existed on particular

days in the past, Am. Compl. at ¶¶ 42-50, they do not allege that any of their members were

patients at these hospitals or, if they were, that they were placed on units with staffing

deficiencies, let alone with particularized deficiencies that caused the unavailability of a

registered nurse for bedside care, when needed.  As defendants explained in their opening

memorandum, mere "'some day'" possibilities, without any description of "concrete" threats, or

"indeed any specification of <u>when</u> the some day will be," do not suffice to establish "the 'actual or

---

[9] The only zone-of-interests decision on which plaintiffs rely for a contrary proposition, Pl. Mem. at 8-9, is inapposite.  The issue in <u>American Chiropractic Association</u> involved the Secretary's interpretation of a Medicare provision that delineated the range of reimbursable services that could be furnished by chiropractors, and a group of chiropractors brought suit seeking to prevent other health professionals from receiving reimbursement for what they considered their exclusive share of the Medicare market.  <u>Am. Chiropractic</u>, 431 F.3d at 814-15. The Court of Appeals for this Circuit merely held that chiropractors had standing to defend what they contended was their rightful market share, <u>id.</u> at 815, for the same reasons that financial institutions were found to have standing to do the same thing in <u>Clarke v. Securities Industry Association</u>, 479 U.S. 388, 399-400 (1987).  <u>American Chiropractic</u> would be analogous here only if the complained-of policy were to allow hospitals to receive payment for services performed by practical nurses that Medicare law said could only be provided by registered nurses.  Nothing in <u>American Chiropractic</u> suggests that chiropractors would have had standing to allege that they were unhappy with their job performance or that their employers were making them work through break time.

imminent' injury" that standing requires.  Lujan, 504 U.S. at 564 (emphasis in original); see, e.g.,

Dallas Gay Alliance, Inc. v. Dallas County Hosp. Dist., 719 F. Supp. 1380, 1390-91 (N.D. Tex.

1989) (bare allegation of understaffing insufficient to establish personal injury to patients).  In

any case, there is only the most remote and speculative possibility that the health care being

received by any hypothetical member-patients would be even marginally improved by the

Secretary's switching from sample-based and allegation-driven surveys to periodic surveys to

enforce the bedside-availability regulation at accredited hospitals.  For all of these reasons,

therefore, standing is lacking.

**III.   THIS COURT DOES NOT HAVE SUBJECT-MATTER JURISDICTION UNDER THE ADMINISTRATIVE PROCEDURE ACT.**

Even if plaintiffs' complaint could survive standing analysis, their claims could not be

maintained under the Administrative Procedure Act, 5 U.S.C. §§ 701-706.  First, plaintiffs' own

evidence establishes that their grievance about being effectively forced to miss breaks is subject

to resolution under a judicially-enforceable collective bargaining agreement, Pl. Mem. at 15 &

Pl. Ex. G, and the availability of this alternative "remedy in a court" precludes APA review.

5 U.S.C. § 704; see Nat'l Wrestling Coaches Ass'n, 366 F.3d at 945-48.  Second, to the extent

that plaintiffs are merely trying to allege that the Secretary has placed enforcement of the

bedside-availability regulation on the wrong enforcement track at accredited hospitals because he

has allegedly misconstrued the instructions in 42 U.S.C. § 1395bb(a), defendants have never

denied that there is law to apply within the meaning of 5 U.S.C. § 701(a)(2).  But to the extent

plaintiffs are trying to argue that the Secretary is not doing any enforcement at all, the allegation

is contradicted by their own admission that he has the authority to conduct sample-based and

allegation-driven surveys, Pl. Mem. at 43, their own evidence recognizing that he is conducting

sample-based surveys, GAO Report at 10, and their failure to allege that he has ever refused to conduct an allegation-driven survey where allegations of substantial deficiencies have been brought to the attention of appropriate authorities. Whether – or how vigorously – to enforce conditions of participation by means of a lawful survey process is left to the Secretary's unreviewable discretion. Def. Mem. at 32-33 (citing Chaney, 470 U.S. at 831).[10]

Finally, APA review is precluded under 5 U.S.C. § 701(a)(1) because the comprehensive statutory scheme, which invests the power to enforce hospital conditions of participation exclusively in the Secretary, 42 U.S.C. § 1395cc, forecloses suits by private attorneys general. Def. Mem. at 34-35. In making this argument, defendants obviously have no quarrel with the proposition that beneficiaries have a right to sue under 42 U.S.C. § 1395ff where they have been denied benefits to which they believe they are entitled under Medicare Parts A or B. See Pl. Mem. at 34. But neither beneficiaries nor nurses have been given any similar right to sue to enforce the hospital terms and conditions in 42 U.S.C. § 1395cc. The only entity to which Congress has given that enforcement power is the Secretary, id., and the legislative history states in no uncertain terms that this enforcement scheme was intended to be "exclusive." S. Rep. No. 89-404 at 55, reprinted in 1965 U.S.C.C.A.N. at 1995. From this, it can reasonably be inferred that Congress intended to preclude private actions to enforce conditions of participation, for the obvious reason that it did not want to give private champions of the public interest a chance to muddy the enforcement policies developed by the executive branch of government.[11]

---

[10] Indeed, technically speaking, the statutory scheme does not even mandate enforcement; it merely authorizes enforcement by means of periodic surveys, 42 U.S.C. § 1395aa(a), and sample-based and allegation-driven surveys. 42 U.S.C. § 1395aa(c).

[11] For purposes of this analysis, it is not necessary to address the circumstances when exhaustion of administrative remedies would be necessary for a hospital to challenge an adverse

## IV.  PLAINTIFFS FAIL TO STATE A COGNIZABLE CLAIM FOR RELIEF.

Even if plaintiffs' complaint could survive to this point, they have not stated a claim upon which relief can be granted because their substantive legal theory is without merit.  To survive a motion to dismiss for failure to state a claim, "a plaintiff must make sufficiently detailed factual allegations in his complaint 'to raise a right to relief above the speculative level.'"  Rae v. United States, 2008 WL 60412 at *1 (D.D.C. Jan. 4, 2008) (quoting Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1965 (2007)).  The motion "should be granted and claims should be dismissed under this rule if the plaintiff does not provide 'enough facts to state a claim for relief that is plausible on its face.'"  Hudert v. Alion Sci. & Tech. Corp., 2007 WL 4225418 at *2 (D.D.C. Nov. 30, 2007) (quoting Bell Atantic, 127 S. Ct. at 1974).  The standard on which plaintiffs rely – that a court "should not dismiss a complaint for failure to state a claim unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim," Pl. Mem. at 28 (citing, inter alia, Conley v. Gibson, 355 U.S. 41, 45-46 (1957)) – was repudiated by the Supreme Court as "an incomplete, negative gloss on an accepted pleading standard:  once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint."  Bell Atlantic, 127 S. Ct. at 1969.  Plaintiffs in this case cannot state a claim adequately because the statutory construction on which their theory of the case rests is incorrect as a matter of law.  The Secretary has reasonably construed the authority under which he

---

enforcement action.  Illinois Council, 529 U.S. at 10-24.  Similarly, the issue is not whether 42 U.S.C. § 1395ii expressly precludes federal question jurisdiction under the reasoning in American Chiropractor, 431 F.3d at 816-17, but whether the comprehensive enforcement scheme under 42 U.S.C. § 1395cc implicitly forecloses APA review under the reasoning in Block v. Community Nutrition Institute, 467 U.S. 340, 347-48 (1984).  Plaintiffs' reliance on the former line of authority, Pl. Mem. at 25-28, is misplaced.

promulgated the bedside-availability regulation, and he has not delegated any authority to the Joint Commission.

> **A.    The Statutory Language in 42 U.S.C. § 1395x(e)(5) Provides All the Authority the Secretary Needed to Promulgate the "Bedside Availability" Regulation.**

Plaintiffs' contention that the bedside availability regulation "can only have been adopted" under the Secretary's catch-all authority in 42 U.S.C. § 1395x(e)(9) "to impose additional requirements to protect the health and safety of the consumer," Pl. Mem. at 33, incorrectly assumes that the Secretary's authority to interpret the meaning of 42 U.S.C. § 1395x(e)(5) by regulation is limited to repeating the statutory language verbatim.  The Secretary is authorized to promulgate "such regulations as may be necessary to carry out the administration of the insurance programs under" the Medicare statutes, 42 U.S.C. § 1395hh(a)(1), and the language of 42 U.S.C. § 1395x(e)(5) is not self-executing.  It obviously requires some interstitial interpretation to clarify what it <u>means</u> to say that a hospital is <u>genuinely</u> furnishing "24-hour nursing service" to its patients and what it <u>means</u> to say that the nursing service is <u>genuinely</u> being "rendered or supervised by a registered professional nurse."  <u>Id</u>.  So long as the Secretary's view with respect to when nursing care can legitimately be said to be performed under the bona fide supervision of a registered nurse is "within the bounds of reasonable interpretation," <u>Your Home Visiting Nurse Servs., Inc. v. Shalala</u>, 525 U.S. 449, 453 (1999), the Secretary needed no other statutory authority to promulgate the bedside-availability standard in 42 C.F.R. § 482.23(b).

Plaintiffs' apparent view – that only the narrowest possible reading of subsection (e)(5) is "within the zone of reasonable interpretation," <u>Verizon Commc'ns., Inc. v. FCC</u>, 535 U.S. 467, 501 (2002) – has no basis in law or logic.  Under the Secretary's construction of the statute, it is not necessary for a registered nurse to <u>always</u> be available at the bedside of <u>every</u> patient in order

for it to be said that a registered nurse is providing meaningful supervision over the services being furnished by the rest of the nursing staff. But it is necessary for the hospital to do something more than merely employ a registered nurse and give him or her a supervisory title. The hospital must at least take the minimal step of employing sufficient "supervisory and staff personnel" to "ensure, when needed, the immediate availability of a registered nurse for bedside care of any patient." 42 C.F.R. § 482.23(b) (emphasis added). A hospital that does not meet that requirement is out of compliance with the conditions of participation because it is not doing what it takes to provide "24-hour nursing service rendered or supervised by a registered professional nurse," 42 U.S.C. § 1395x(e)(5), not because it is out of compliance with an additional requirement imposed under 42 U.S.C. § 1395x(e)(9). The regulation does not go "over and above" what the statute requires. Pl. Mem. at 33. It defines with greater precision what the statute requires.

Because the four corners of subsection (e)(5) are entirely sufficient, standing alone, to authorize the regulation, it was not necessary for the Secretary to reach to the general health-and-safety provision in 42 U.S.C. § 1395x(e)(9) to locate his statutory authority. It follows, in turn, that it is perfectly permissible for him to monitor compliance at accredited hospitals by means of sample-based and allegation-driven surveys, 42 U.S.C. §§ 1395aa(c), 1395bb(d), and to do so without first making any determination as to whether accreditation standards are equivalent to regulatory standards. 42 U.S.C. § 1395bb(a). Indeed, that is the only way that Congress permits him to enforce a regulation promulgated under subsection (e)(5) at accredited hospitals.

Plaintiffs' contention that the Secretary himself really thinks that the bedside-availability regulation was promulgated under 42 U.S.C. § 1395x(e)(9), rather than 42 U.S.C. § 1395x(e)(5), Pl. Mem. at 33-34, strains credulity. The portion of the preamble to the current regulations that

-26-

explains the Secretary's statutory authority for the nursing staffing regulation states, in its

entirety, as follows:  "Section 1861(e)(5) of the Social Security Act requires that a hospital

provide 24-hour nursing services."  51 Fed. Reg. 22,010, 22,018 (June 17, 1986).  Section

1861(e)(5) is codified at 42 U.S.C. § 1395x(e)(5).  The preamble goes on to explain that the

regulations which "implement this statutory requirement," id. (emphasis added), consist of two

parts:  a "condition statement with the statutory language that requires 24-hour nursing care be

furnished or supervised by a registered nurse" and "requirements on organization, staffing,

administration of drugs, and delivery of care."  Id.  The general condition statement appears in

the first paragraph.  42 C.F.R. § 482.23.  The more specific requirements follow immediately

thereafter.  42 C.F.R. §§ 482.23(a)-(c).  The latter requirements do not go beyond the statutory

language.  They merely elaborate in greater detail on what the statutory language means.  That is

the function of interstitial rulemaking.  See, e.g., Smiley v. Citibank (South Dakota), N.A., 517

U.S. 735, 740-41 (1996) ("Congress, when it left ambiguity in a statute meant for implementation

by an agency, understood that the ambiguity would be resolved, first and foremost, by the

agency").  If the Secretary thought it was necessary to reach beyond his authority under

subsection (e)(5) and invoke the authority under subsection (e)(9), the preamble would have said

so expressly.  And surely it would have said so expressly if, as plaintiffs contend, every

paragraph of the regulations other than the first two sentences was promulgated under subsection

(e)(9) and not subsection (e)(5).

    Plaintiffs' suggestion that this Court look to the original bedside-availability regulation

promulgated in 1966 to find the Secretary's "longstanding" interpretation of his statutory

authority, Pl. Mem. at 34, reminds one of the Chinese proverb about being careful what one

wishes for.  The proposed rule cited § 1861(e) as its authority for the entire regulation without

-27-

reference to subsections, 31 Fed. Reg. 2,748, 2,748 (Feb. 15, 1966), but the language of the regulation itself supports the conclusion that the original bedside-availability regulation was merely intended to explain what 42 U.S.C. § 1395x(e)(5) means. Using language similar to that in the current regulations, the original rules provided that a "licensed registered professional nurse" must be "on duty at all times," 42 C.F.R. § 405.1024 (1967), and must be "available for all patients on a 24-hour basis." 42 C.F.R. § 405.1024(b) (1967). Those requirements obviously interpret the meaning of 42 U.S.C. § 1395x(e)(5), and could be promulgated without reference to 42 U.S.C. § 1395x(e)(9). The regulation then went on to list "[t]he factors explaining the standard," id. (emphasis in original), including specific requirements that "[t]he staffing pattern insures the availability of registered professional nursing care for all patients on a 24-hour basis every day," 42 C.F.R. § 405.1024(b)(1) (1967), and that care provided by a licensed practical nurse must be supplemented by the presence of "a registered professional nurse supervisor who makes frequent rounds and is immediately available to give skilled nursing care when needed." 42 C.F.R. § 1024(b)(2) (1967). Those provisions are the predecessors to the regulation that exists today in 42 C.F.R. § 482.23(b). The current regulation therefore explains the statutory standard in subsection (e)(5) in exactly the same way that the predecessor regulations have explained the statutory standard since the beginning of the Medicare program, and the "history of the regulation," Pl. Mem. at 30, refutes plaintiffs' view that the bedside-availability regulation was ever promulgated under subsection (e)(9) or its predecessor statute.

Defendants, of course, have no quarrel with the proposition that there are many regulations in 42 C.F.R. Part 482 that were promulgated only under the authority of subsection (e)(9). See Pl. Mem. at 34. But the regulatory history for such regulations is replete with express

references to subsection (e)(9).[12]  The mere fact that some regulations were promulgated under subsection (e)(9), of course, does not remotely support plaintiffs' assumption that the bedside-availability regulation is necessarily one of them.  The fact that the preamble to the nurse-staffing regulations in 42 C.F.R. § 482.23 expressly relies on subsection (e)(5) for authority and makes no mention of subsection (e)(9) unarguably supports the conclusion that the Secretary intended for the nurse-staffing regulation to implement the language in subsection (e)(5) and did not require any reliance on (e)(9).  At the very least, however, it pulverizes any argument that the Secretary has any longstanding view that the regulation could permissibly have been issued only under subsection (e)(9).

### B.   The Joint Commission's Standards Are Not Facially Incompatible with the Secretary's Construction of "Bedside Availabilty."

Because the bedside-availability regulation at issue here may reasonably be viewed as having been promulgated under 42 U.S.C. § 1395x(e)(5) and not § 1395x(e)(9), it was not necessary for the Secretary to make any determination under 42 U.S.C. §1395bb(a) as to whether

---

[12] See, e.g., 70 Fed. Reg. 6,140, 6,158-59 (Feb. 4, 2005) (organ procurement); 68 Fed. Reg. 1374, 1374 (Jan. 10, 2003) (fire safety); 66 Fed. Reg. 54,179, 54,179-80 (Oct. 26, 2001) (fire safety); 62 Fed. Reg. 66,726, 66,727-31 (Dec. 19, 1997) (patient rights); id. at 66,748 (organ procurement); 55 Fed. Reg. 31,196, 31,198 (Aug. 1, 1990) (fire safety); 52 Fed. Reg. 2430, 2430 (Jan. 22, 1987) (fire safety); 51 Fed. Reg. 22,010, 22,026 (June 17, 1986) (physical environment); 48 Fed. Reg. 299, 303 (Jan. 4, 1983) (physical environment); see also 71 Fed. Reg. 60,532, 60,532 (Oct. 13, 2006) (patient information collection); 59 Fed. Reg. 64,141, 64,144 (Dec. 13, 1994) (extension of discharge planning requirements to non-Medicare patients); 59 Fed. Reg. 32,086, 32,106 (June 22, 1994) (requirements for reporting "anti-dumping" violations).  One regulation, published at 42 C.F.R. § 482.22, even contains paragraphs promulgated under different subsections of 42 U.S.C. 1395x(e).  The medical-staff bylaws requirement in 42 C.F.R. § 482.22(c) implements the requirement in subsection (e)(3) of the statute, while the qualifications for the medical staff and medical director, 42 C.F.R. § 482.22(a), are promulgated under subsection (e)(9).  Once again, however, the Secretary's reliance on subsection (e)(9) as authority for the latter regulations is expressly stated in the regulatory history.  59 Fed. Reg. at 64,151.

the Joint Commission standards are equivalent in order to place accredited hospitals on the

sample-based and allegation-driven survey track.  If this Court were to disagree, however, the

only remedy would be to remand to the Secretary with instructions to stop using the sample-

based and allegation-driven track until such time as he found the Joint Commission standards to

be equivalent.  It is not proper for plaintiffs to ask <u>this Court</u> to make that legal determination

before the Secretary himself has spoken.

Even if this Court were to address the question on plaintiffs' terms, however, there is no

merit in their contention that the relevant portion of the Joint Commission accreditation manual

has "nothing specific about registered nurses."  Pl. Mem. at 38.  The Joint Commission manual

contains an "Element of Performance" that states as follows:  "The nurse executive assures the

provision of nursing services 24 hours a day, 7 days a week with at least one on-premise

registered nurse (RN) furnishing or supervising the service 24 hours a day, 7 days a week."

<u>Comprehensive Accreditation Manual for Hospitals: The Official Accreditation Standards</u> at NR-

4 (Joint Commission 2007) ("Joint Commission Manual") (Def. Ex. B attached to motion to

dismiss second amended complaint).  So long as the Joint Commission interprets the word

"supervising" as connoting the availability of a registered nurse to supervise (or take over)

bedside care, when needed, it would be "at least equivalent," 42 U.S.C. § 1395bb(a), to the

regulatory requirement at 42 C.F.R. § 482.23(b).[13]  There is nothing "magical[]" about this

analysis.  Pl. Mem. at 37.

### C. The Secretary Has Delegated No Enforcement Authority to the Joint Commission.

Finally, there is no merit in plaintiffs' improper-delegation theory.  Pl. Mem. at 41-43.

The short answer to their argument is that the Secretary has not delegated any of his authority to

the Joint Commission, either to establish regulatory standards or to enforce them.  He has merely

placed accredited hospitals on the survey-based and allegation-driven enforcement track in

circumstances where he believes accredited status requires that result under 42 U.S.C.

§§ 1395aa(c), 1395bb(a) and 1395bb(d).  That is what the statutes instruct.  Any role that the

Joint Commission could be said to play is derived from those statutes exclusively, and not from

any delegation (or subdelegation) of administrative authority by the Secretary.  Since plaintiffs do

---

[13] In determining the meaning of the Joint Commission manual, the pamphlet which plaintiffs themselves recognize as authoritative cautions against reading the portion labeled "Nursing Standards" in isolation from the rest of the manual because, at least prior to the November 2006 editorial change, the manual did not "have standards in the Nursing (NR) Chapter that addresses those areas and instead includes them in the Management of Human Resources (HR) chapter."  HCPro's Crosswalk at 43.  As defendants discussed at length in their opening memorandum, the Joint Commission manual, when read as a whole, employs a combination of "tracer" investigation, staff and patient interviews, evaluation of patient records, and analysis of nursing-sensitive outcome indicators that is very similar to the approach used by state surveys when enforcing nurse-staffing regulations on behalf of the Secretary.  Def. Mem. at 3-11.  The only basic difference is that the state-survey manual includes an instruction to make sure that the same registered nurse is not assigned to more than one floor or unit at the same time, id. at 7, and the Joint Commission manual leaves that kind of judgment up to the common sense of the surveyor.  It would be up to the Secretary, in the first instance, to determine whether accreditation standards were "equivalent" to the regulations within the meaning of 42 U.S.C. § 1395bb(a), if this Court deemed that such a determination were necessary.  But, at the very least, a reasonable person could view any differences between the two survey regimes to be minor.  There would be no basis, therefore, on which this Court could second-guess an agency judgment on the question.

not contend that those statutes are unconstitutional, there is simply nothing left to discuss of their non-delegation theory.

### V.    PLAINTIFFS' MOTIONS FOR A DECLARATION OF SUBJECT-MATTER JURISDICTION OR, IN THE ALTERNATIVE, FOR DISCOVERY SHOULD BE DENIED.

In addition to their opposition to defendants' motion to dismiss, plaintiffs have filed a document they style as a "Motion for Order of Jurisdiction or, in the Alternative, to Permit Jurisdictional Discovery" ("Pl. Juris. Mot.") (Doc. 26). Response to this motion is complicated by the fact that there is no such thing, under the Federal Rules of Civil Procedure, as a "motion for an order of jurisdiction." To the extent that plaintiffs may be deemed to be seeking partial summary judgment, the motion lacks merit for the reasons stated earlier. In addition, the motion lacks a statement of material facts as to which there is no genuine issue, LCvR 7(h), 56.1, and is not supported in the manner necessary for summary judgment. Furthermore, because it does not purport to be a dispositive motion, plaintiffs have violated Local Rule 7(m), which requires prior consultation with opposing counsel. Plaintiffs' alternative motion for discovery should be denied on the ground that it does not identify any discovery necessary to resolve any jurisdictional issue. Indeed, the first portion of plaintiffs' motion urges this Court to decide jurisdiction on the basis of the facts in the record.[14] Pl. Juris. Mot. at 3-4. Both motions therefore should be denied.

---

[14] Although plaintiffs disagree with certain <u>legal</u> conclusions in defendants' motion to dismiss (such as plaintiffs' failure to allege causation and redressability), Pl. Mem. at 5-6, they have identified no specific <u>facts</u> that are in dispute. They simply characterize all legal disagreements as factual ones.

## CONCLUSION

For the reasons stated, defendants' motion to dismiss should be granted, and plaintiffs' cross-motion for an "order of jurisdiction" or, in the alternative, for "jurisdictional discovery," should be denied.

OF COUNSEL:

JAMES C. STANSEL                          JEFFREY S. BUCHOLTZ
Acting General Counsel                     Acting Assistant Attorney General

JANICE L. HOFFMAN                        JEFFREY A. TAYLOR
Associate General Counsel                  United States Attorney

MARK D. POLSTON                          /s/ Peter Robbins
Deputy Associate                          SHEILA M. LIEBER
General Counsel for Litigation             PETER ROBBINS
                                          United States Department of Justice
DAVID HOSKINS                            20 Massachusetts Avenue, N.W., Room 7142
LAWRENCE J. HARDER                       Washington, D.C.  20530
Attorneys                                 Tel:  (202) 514-3953
United States Department of
Health and Human Services                 Attorneys for Defendants